No. 22-4242

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### ZACKARY ELLIS SANDERS,

*Defendant-Appellant*,

v.

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia (No. 1:20-cr-00143-TSE)

## JOINT APPENDIX VOLUME 2 OF 8 (JA458–JA891)

William G. Clayman
Aidan Taft Grano-Mickelsen
UNITED STATES ATTORNEY'S OFFICE
FOR THE EASTERN DISTRICT OF VIRGINIA
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3744
william.clayman@usdoj.gov

*Counsel for Appellee*

Lawrence S. Robbins
Brandon L. Arnold
Leslie C. Esbrook
KRAMER LEVIN ROBBINS RUSSELL
2000 K Street NW, 4th Floor
Washington, D.C. 20006
Telephone: (202) 775-4500
lrobbins@kramerlevin.com

*Counsel for Appellant*

# TABLE OF CONTENTS

## VOLUME 1

E.D. Va. Docket Sheet (No. 1:20-cr-00143-TSE) ..................................................JA1

Affidavit in Support of a Criminal Complaint and an Arrest Warrant
(March 19, 2020) (Dkt. 4)...........................................................................JA61

Government's Response in Opposition to Defendant's Motion for
Revocation of Detention Order (April 1, 2020) (Dkt. 15)...........................JA74

Indictment (June 24, 2020) (Dkt. 29) .................................................................JA86

Order (August 21, 2020) (Dkt. 74) ....................................................................JA92

Exhibit 1 to [Dkt. 97] Government's Omnibus Response in Opposition
to Defendant's Motions to Suppress: Cox Communications' response
(Dkt. 97-1).................................................................................................JA93

Exhibit 2: Transcript of motion hearing, *United States v. Bosyk*, 1:17-
cr-302 (E.D. Va. Feb. 2, 2018) (Dkt. 97-2) ....................................JA97

Order (October 26, 2020) (Dkt. 114) ...............................................................JA104

Unopposed Motion to Continue Trial and Waiver of Speedy Trial Rights
(October 28, 2020) (Dkt. 116) ..................................................................JA105

Renewed Unopposed Motion to Continue Trial and Waiver of Speedy
Trial Rights (October 30, 2020) (Dkt. 124)..............................................JA109

Government's Notice of Intent to Present Evidence Under Federal Rule
of Evidence 414 (November 2, 2020) (Dkt. 127).......................................JA115

Government's Amended Notice of Intent to Present Evidence Under
Federal Rule of Evidence 414 (November 17, 2020) (Dkt. 133) ...............JA121

Memorandum in Support of Motion to Suppress Statements (December
17, 2020) (Dkt. 150) .................................................................................JA127

Exhibit 1: February 14, 2020 FD-302 Report (Dkt. 150-1) ........................JA148

Exhibit 2: Declaration of Dr. Risa Sanders (Dkt. 150-2) ...........................JA152

Exhibit 3: Excerpts of Transcript of Zackary Sanders's February 12,
2020 Recorded Statement (Dkt. 150-3).....................................JA162

Order (December 18, 2020) (Dkt. 152) ............................................................JA205

Memorandum in Support of Motion in Limine in Opposition to
  Government's Amended Notice of Intent to Present Evidence Under
  Federal Rule of Evidence 414 (December 18, 2020) (Dkt. 154)..............JA207

Government's Motion *in Limine* to Exclude and Limit Certain
  Arguments, Lines of Questioning, and Evidence at Trial
  (December 18, 2020) (Dkt. 163)...................................................JA215

Government's Motion *in Limine* to Introduce Certain Evidence Pursuant
  to Federal Rules of Evidence 404(b) and 414 (December 18, 2020)
  (Dkt. 165)...........................................................................JA231

Government's Response in Opposition to Defendant's Motion to
  Compel (December 18, 2020) (Dkt. 167)......................................JA248

Defendant's Response to Show Cause Order (December 23, 2020)
  (Dkt. 177)...........................................................................JA269

Government's Position on the Court's Order to Show Cause (December
  29, 2020) (Dkt. 179) ............................................................JA278

Order (January 7, 2021) (Dkt. 196) ...............................................JA288

United States' Response to Defendant's Motion *in Limine* in Opposition
  to Notice Pursuant to Federal Rule of Evidence 414 (January 8, 2021)
  (Dkt. 201)...........................................................................JA295

Opposition to Government's Motion in Limine to Introduce Evidence
  Pursuant to Federal Rules of Evidence 404(b) and 414 (January 8,
  2021) (Dkt. 207)...................................................................JA304

Defendant's Renewed Motion for Leave for this Court to Consider His
  Motion to Suppress Statements as Timely Filed (January 13, 2021)
  (Dkt. 213)...........................................................................JA313

Order (January 14, 2021) (Dkt. 214) .............................................JA319

Reply to Government's Response to Mr. Sanders's Opposition to 414
  Notice (January 14, 2021) (Dkt. 216).........................................JA320

Reply to Defendant's Response to Motion *in Limine* to Admit Certain
  Evidence Pursuant to Federal Rules of Evidence 404(b) and 414
  (January 15, 2021) (Dkt. 223)..................................................JA327

Reply to Defendant's Response to Motion *in Limine* to Exclude and
  Limit Certain Arguments, Lines of Questioning, and Evidence at
  Trial (January 15, 2021) (Dkt. 224)...........................................JA332

Mr. Zackary Ellis Sanders's Notice of Supplemental Authority in
    Support of His Opposition to Government's Motion *in Limine* to
    Exclude and Limit Certain Arguments, Lines of Questioning, and
    Evidence at Trial (January 18, 2021) (Dkt. 225)..........................................JA338

Notice of Correction (January 21, 2021) (Dkt. 232) .......................................JA342

Government's Response to Defendant's Motion for Leave to File
    Untimely Fifth Motion to Suppress (January 22, 2021) (Dkt. 235) ............JA345

Defendant's Reply to Government's Opposition to His Renewed Motion
    for this Court to Consider His Motion to Suppress Statements as
    Timely Filed (January 29, 2021) (Dkt. 243)................................................JA354

Order (February 4, 2021) (Dkt. 245) ........................................................JA361

Defendant's Notice of Objection to Rule 404 and 414 Ruling
    (May 10, 2021) (Dkt. 337)..........................................................................JA364

Government's Response in Opposition to the Defendant's Fourth
    Motion to Compel (May 14, 2021) (Dkt. 350)............................................JA368

Order (May 26, 2021) (Dkt. 369)................................................................JA374

Zackary Ellis Sanders's Renewed Motion to Suppress Statements Taken
    in Violation of *Miranda v. Arizona* (August 19, 2021) (Dkt. 429) .............JA382

Memorandum in Support of Renewed Motion to Suppress Statements
    Taken in Violation of *Miranda v. Arizona* (August 19, 2021) (Dkt.
    430) ...........................................................................................................JA385

Government's Response in Opposition to Defendant's Second Renewed
    Motion to Reconsider His Motion to Compel (August 19, 2021)
    (Dkt. 432)...................................................................................................JA390

Order (August 25, 2021) (Dkt. 442) ..............................................................JA399

Government's Response in Opposition to Defendant's Second Renewed
    Motion to Reconsider the Court's Denial of Defendant's Fifth
    Motion to Suppress as Untimely (August 30, 2021) (Dkt. 446) .................JA401

Order (September 8, 2021) (Dkt. 457)..............................................................JA409

*Curriculum vitae* of Dr. Fred S. Berlin (October 4, 2021) (Dkt. 480-1) ..........JA411

Government's Response in Opposition to Defendant's Motion to
    Reconsider His Motion to Suppress (October 8, 2021) (Dkt. 490).............JA448

# VOLUME 2

Reply to the Government's Opposition to Mr. Sanders's Renewed
   Motion to Suppress Based on the Warrantless Use of a Network
   Investigative Technique and False Material Information in Affidavit
   Paragraph 25 (October 12, 2021) (Dkt. 491)................................................JA458

Defendant Zackary Ellis Sanders's Supplemental Proposed Jury
   Instructions (October 14, 2021) (Dkt. 500) ..................................................JA464

Order (October 13, 2021) (Dkt. 501)................................................................JA512

Order (October 21, 2021) (Dkt. 522)................................................................JA515

Defendant's Objection to Court's Jury Instruction Regarding "Consent
   Is Not a Defense" and the Exclusion of Evidence Demonstrating
   Assent (October 25, 2021) (Dkt. 529) ..........................................................JA518

Order (October 25, 2021) (Dkt. 530)................................................................JA525

Defendant's Notice of Filing of Objection to Jury Instruction Regarding
   His Purpose (October 25, 2021) (Dkt. 534)..................................................JA529

Government's Revised Trial Exhibit List (October 27, 2021)
   (Dkt. 539-2).....................................................................................................JA534

Motion for Enlargement of Time in Which to File Motion for a New
   Trial Under Federal Rule of Criminal Procedure 33 and/or Motion for
   Judgment of Acquittal Under Rule 29 and Memorandum in Support
   (November 4, 2021) (Dkt. 543) .....................................................................JA547

Transcript of Trial Day 7 (October 27, 2021)[1] (Dkt. 551) ..............................JA550

Transcript of Trial Day 1 (October 19, 2021) (Dkt. 552)................................JA616

Transcript of Pretrial Conference (October 15, 2021) (Dkt. 555)....................JA774

Public Exhibits to [Dkt. 586] Memorandum in Support of Motion for
   New Trial

   Exhibit 6: Motion to Suppress Evidence, *United States v. Bateman*,
   No. 1:20-cr-10012-IT (D. Mass. Dec. 27, 2021) (Dkt. 586-6)...................JA839

---

[1] The captions of the trial transcripts incorrectly show the trial dates as having occurred in November 2021.

iv

# VOLUME 3

Exhibit 9: Application for a Search Warrant, *In the Matter of the Search of Property of* ███████████, *Pleasant Garden, NC 27313*, No. 1:20-mj-243-LPA (M.D.N.C. Aug. 18, 2020) (Dkt. 586-9) .................................................................................... JA892

Exhibit 10: Application for a Search Warrant, *In the Matter of the Search of* ███████████, *Burlington, VT*, No. 2:20-mj-00143-KJD (D. Vt. Dec. 4, 2020) (Dkt. 586-10) ......................... JA976

Exhibit 11: Application for a Search Warrant, *In the Matter of Search of Premises Located at* ███████████, *Barnhart Missouri, 63012*, No. 4:20-MJ-3301-NCC (E.D. Mo. Nov. 12, 2020) (Dkt. 586-11) ................................................................................. JA1021

Exhibit 12: Affidavit in Support of Search Warrant, *In the Matter of the Search of* ███████████, *Chipley, Florida 32428*, No. 5:20-mj-44-MJF (N.D. Fla. May 6, 2020) (Dkt. 586-12) ......................... JA1058

Exhibit 13: Application for a Search Warrant, *In the Matter of the Search of Entire property located at* ███████████., *Gardiner, Maine 04345*, No. 1:20-mj-00255-JCN (D. Me. Sept. 8, 2020) (Dkt. 586-13) ................................................................ JA1122

Exhibit 14: Application for a Search Warrant, *In the Matter of the Search of the premises known as* ███████████, *Rochester, NH*, No. 1:21-mj-00146-AJ (D.N.H. June 4, 2021) (Dkt. 586-14) .................. JA1163

Exhibit 15: Affidavit in Support of Search Warrant, *In the Matter of Search at* ███████████, *Lansing, Michigan 48912*, No. 1:20-mj-00481-SJB (W.D. Mich. Nov. 19, 2020) (Dkt. 586-15) ....... JA1196

Exhibit 17: 01/13/2017 FD-302 (Dkt. 586-17) ......................................... JA1230

Exhibit 39: Operation H Statistics (Dkt. 586-39) .................................... JA1232

Exhibit 41: 03/02/2022 Press Release (Dkt. 586-41) ............................... JA1236

Exhibit 42: 03/01/2022 Press Release (Dkt. 586-42) ............................... JA1241

Exhibit 43: 03/02/2022 Press Release (Dkt. 586-43) ............................... JA1247

Government's Response in Opposition to Defendant's Motion for New Trial and to Reconsider Motions to Compel and Suppress (March 18, 2022) (Dkt. 593) .......................................................................... JA1251

Exhibit 1: Order on Motion for Discovery, *United States v. Kiejzo*, No. 20-40036 (D. Mass. Oct. 4, 2021) (Dkt. 593-1) ................................JA1266

Notice of Filing of Supplemental Exhibits (March 22, 2022) (Dkt. 599) ......JA1278

Exhibit 1: Affidavit in Support of Application for Issuance of a Criminal Complaint, *United States v. Holmstedt*, No. 2:21-cr-00004 (E.D. Va. Dec. 8, 2020) (Dkt. 599-1) ........................................................JA1283

Exhibit 2: Statement of Facts, *United States v. Holmstedt*, No. 2:21-cr-00004 (E.D. Va. Feb. 4, 2021) (Dkt. 599-2) ........................................JA1289

Judgment (April 1, 2022) (Dkt. 621) ............................................................JA1295

United States' Notice of Filing of Redacted Memorandum Opinion and Proposed Restitution Order (April 8, 2022) (Dkt. 627)............................JA1302

Notice of Appeal (April 13, 2022) (Dkt. 636) ..............................................JA1306

Government Trial Exhibits 102A, 103A, 104A, 105A, and 106A: Redacted Transcript of Interview of Zackary Ellis Sanders (February 12, 2020) ....................................................................................JA1309

Government Trial Exhibits 201 to 235: Photographs ....................................JA1337

## VOLUME 4

### FILED UNDER SEAL

Motion to Compel Discovery (July 13, 2020) (Dkt. 38) ............................SJA1372

Exhibit 1: Declaration of Dr. Matthew Miller (July 12, 2020) ..............SJA1393

Exhibit 2: FLA Intelligence Report ........................................................SJA1405

Exhibit 3: FLA Letter ............................................................................SJA1407

Government's Response in Opposition to Defendant's Motion to Compel Discovery (July 27, 2020) (Dkt. 43) ..........................................SJA1409

Exhibit 1: Search Warrant Affidavit (Dkt. 43-1)....................................SJA1431

Reply to Government's Opposition to Motion to Compel Discovery (Dkt. 48) (July 30, 2020) ........................................................................SJA1473

Exhibit 1: 1/17/2020 FD-1057 Form (Dkt. 48-1)...................................SJA1499

Exhibit 2: Second Declaration of Dr. Miller (Dkt. 48-2) .......................SJA1504

Exhibit 3: Screenshot Taken by FBI of Posting on Page of Target Website (Dkt. 48-3) ................................................................................SJA1508

Exhibit 4: Declaration of Matthew Ryder, QC (Dkt. 48-4)....................SJA1510

Government's Supplemental Brief in Opposition to Defendant's Motion
  to Compel Discovery (August 10, 2020) (Dkt. 57) ................................SJA1523

Supplemental Brief on Defendant's Motion to Compel Discovery
  (August 10, 2020) (Dkt. 58) ....................................................................SJA1531

Exhibit 1 to [Dkt. 57] Government's Supplemental Brief in Opposition:
  FLA – Intelligence Report (Dkt. 59) .....................................................SJA1543

Exhibit 2: Declaration of Special Agent Christopher A. Ford
  (Dkt. 59-1)....................................................................................................SJA1545

Response to Government's Supplemental Brief on Defendant's Motion
  to Compel Discovery (Dkt. 65) (August 12, 2020) ................................SJA1551

Exhibit 1: Third Declaration of Dr. Matthew Miller (Dkt. 65-1)............SJA1560

Reply to Defendant's Response to Government's Supplemental Brief in
  Opposition to Defendant's Motion to Compel Discovery (Dkt. 70)
  (August 19, 2020) .......................................................................................SJA1563

Memorandum Opinion (August 21, 2020) (Dkt. 73)....................................SJA1568

Government's Response in Opposition to Defendant's Motion for
  Reconsideration of His Motion to Compel (September 9, 2020)
  (Dkt. 100).....................................................................................................SJA1582

Government's Omnibus Response in Opposition to Defendant's Motions
  to Suppress (September 9, 2020) (Dkt. 101) ..........................................SJA1590

Mr. Zackary Ellis Sanders's Reply to the Government's Opposition to
  His Renewed Motion to Compel (September 10, 2020) (Dkt. 105)........SJA1621

Mr. Zackary Ellis Sanders's Reply to the Government's Omnibus
  Opposition to Mr. Sanders's Motions to Suppress (September 10,
  2020) (Dkt. 106).........................................................................................SJA1628

Order (September 10, 2020) (Dkt. 107).........................................................SJA1650

Memorandum Opinion (October 26, 2020) (Dkt. 113) ...............................SJA1660

Memorandum in Support of United States' Motion to Seal, Keep
  Memorandum Opinion Under Seal, and File Redacted Memorandum
  Opinion (October 29, 2020) (Dkt. 121)...................................................SJA1678

Mr. Zackary Ellis Sanders's Motion to Compel the Government to
  Produce Material, or, in the Alternative, to Submit Material for *In
  Camera* Inspection (November 27, 2020) (Dkt. 137) .............................SJA1685

Exhibit 1: Transcript of September 11, 2020 Hearing (Dkt. 137-1) .......SJA1709

Supplement to Motion to Compel (December 5, 2020) (Dkt. 140).............SJA1745

Defendant's Reply to the Government's Opposition to Motion to
    Compel the Government to Produce Material, or, in the Alternative,
    to Submit Material for *in Camera* Inspection (December 23, 2020)
    (Dkt. 176)...................................................................................SJA1753

Exhibit 1: Target Website Homepage (Dkt. 176-1) ................................SJA1776

Exhibit 2: Fifth Declaration of Dr. Matthew Miller (Dkt. 176-2)...........SJA1778

Exhibit 3: Third Declaration of Matthew Ryder QC (Dkt. 176-3)..........SJA1781

Exhibit 4: Target Website Page (Dkt. 176-4).........................................SJA1787

Exhibit 5: May 8, 2020 Letter (Dkt. 176-5) ...........................................SJA1789

Exhibit 6: June 8, 2020 Letter (Dkt. 176-6) ...........................................SJA1793

Exhibit 7: June 22, 2020 Letter (Dkt. 176-7) .........................................SJA1809

Exhibit 8: July 7, 2020 Letter (Dkt. 176-8) ...........................................SJA1818

Exhibit 9: July 27, 2020 Email (Dkt. 176-9) ..........................................SJA1824

Defendant's Reply to Government's Position on Order to Show Cause
    (January 4, 2021) (Dkt. 185)........................................................SJA1827

Order (January 26, 2021) (Dkt. 236) ............................................................SJA1833

Supplement to Defendant's Motion to Compel the Government to
    Produce Material, or, in the Alternative, to Submit Material for *in
    Camera* Inspection (January 26, 2021) (Dkt. 241).................................SJA1841

Exhibit 1: Target Website Page (Dkt. 241-1).........................................SJA1851

Exhibit 2: Target Website Page (Dkt. 241-2).........................................SJA1853

Exhibit 3: January 22, 2021 Discovery Letter (Dkt. 241-3)....................SJA1855

Exhibit 4: January 25, 2021 Email (Dkt. 241-4) ....................................SJA1878

Memorandum in Support of Mr. Zackary Ellis Sanders's Motion to
    Suppress Due to Lack of Probable Cause (Motion to Suppress No. 1)
    (September 2, 2020) (Dkt. 252)...........................................................SJA1880

# VOLUME 5

### FILED UNDER SEAL

Exhibit 1: Affidavit in Support of Application for Search Warrant
(Dkt. 252-1)..............................................................................SJA1898

Exhibit 2: List of FBI Agents Executing Warrant (Dkt. 252-2)..............SJA1940

Exhibit 3: Description of 427 Photos Taken of Sanders Home
(Dkt. 252-3)..............................................................................SJA1944

Memorandum in Support of Mr. Zackary Ellis Sanders's Motion to
Suppress Based on False and Misleading Material Information in
Affidavit Paragraph 23 (Motion to Suppress No. 2) (September 2,
2020) (Dkt. 253)........................................................................SJA1959

Exhibit 1: FLA Intelligence Report (Dkt. 253-1)....................................SJA1993

Exhibit 2: September 16, 2019 FLA Letter (Dkt. 253-2).......................SJA1995

Exhibit 3: FLA Intelligence Report (Dkt. 253-3)....................................SJA1997

Exhibit 7: Fourth Declaration of Dr. Matthew Miller (Dkt. 253-6)........SJA1999

Exhibit 8: Declaration of Seth Schoen (Dkt. 253-7) ..............................SJA2009

Exhibit 9: Screenshot of Post Described in Paragraph 16 Taken by
FBI in January 2019 (Dkt. 253-8)............................................SJA2034

Exhibit 10: Additional Screenshots Taken by FBI in January 2019
(Dkt. 253-9)..............................................................................SJA2036

Exhibit 11: Search Warrant (Dkt. 253-10) .............................................SJA2040

Exhibit 13: July 31, 2020 Hearing Transcript (Dkt. 253-12) .................SJA2048

Memorandum in Support of Mr. Zackary Ellis Sanders's Motion to
Suppress Based on False and Misleading Material Information in
Affidavit Paragraph 25 (Motion to Suppress No. 4) (September 2,
2020) (Dkt. 254)........................................................................SJA2084

Exhibit 3: Affidavit in Support of Application for Search Warrant
(Dkt. 254-3)..............................................................................SJA2108

Exhibit 8: Second Declaration of Matthew Ryder QC (Dkt. 254-8).......SJA2150

Exhibit 9: Declaration of Dr. Richard Clayton (Dkt. 254-9)..................SJA2155

Exhibit 10: Affidavit in Support of Application for Search Warrant, *In the Matter of the Search of Computers that Access upf45jv3bziuctml.onion*, No. 1:15-SW-89 (E.D. Va. Feb. 20, 2015) (Dkt. 254-10)........................................................................SJA2173

Exhibit 11: Comparison Report of *Matish* Affidavit and *Sanders* Affidavit (Dkt. 254-11 to Dkt. 254-12) ....................................SJA2208

Exhibit 12: Declaration of Special Agent Christopher A. Ford (Dkt. 254-13)............................................................................SJA2262

Memorandum in Support of Mr. Zackary Ellis Sanders's Renewed Motion to Compel Discovery or in the Alternative for Reconsideration of the Court's Order Denying His Motion to Compel (September 2, 2020) (Dkt. 255) ...............................................SJA2268

Mr. Zackary Ellis Sanders's Memorandum in Support of Motion to Suppress Based on Materially Misleading Statements and Omissions Regarding Tor, the Target Website, and the Subject Premises (Motion to Suppress No. 3) (September 2, 2020) (Dkt. 256)..................SJA2279

Exhibit 5: Second Declaration of Dr. Matthew Miller (Dkt. 256-5).......SJA2309

Exhibit 9: Screenshot of Target Website (Dkt. 256-9)............................SJA2313

Exhibit 10: Additional Screenshots Taken by FBI in January 2019 (Dkt. 256-10)............................................................................SJA2315

Corrected Memorandum in Support of Defendant's Motion to Continue Trial, and Waiver of Speedy Trial Rights (March 24, 2021) (Dkt. 270)........................................................................................SJA2319

Defendant's Second Supplement to Corrected Motion to Continue Trial, and Waiver of Speedy Trial Rights (April 1, 2021) (Dkt. 282) ..............SJA2333

Memorandum in Support of Defendant's Motion for Leave to File Rule 12.2(b) Notice of Expert Evidence of a Mental Condition Bearing on Lack of Guilt (April 26, 2021) (Dkt. 305)...............................................SJA2337

Government's Response to the Defendant's Motion for Leave to File Rule 12.2(b) Notice (May 5, 2021) (Dkt. 314)........................................SJA2342

Exhibit 1: March 30, 2021 Email (Dkt. 314-1) ......................................SJA2349

Defendant's Memorandum in Support of Motion to Compel, or, in the Alternative, to Submit Material for *In Camera* Inspection (May 6, 2021) (Dkt. 335)..........................................................................................SJA2352

Defendant's Reply to Government Opposition (May 19, 2021)
(Dkt. 354)..............................................................................SJA2360

    Exhibit 1: Later Produced Screenshots of Target Website
(Dkt. 354-1).........................................................................SJA2368

Transcript of Proceedings held on May 7, 2021 (May 20, 2021)
(Dkt. 355) (Pages 1-60) ........................................................SJA2373

## VOLUME 6

### FILED UNDER SEAL

*Continued from previous volume:*
    Transcript of Proceedings held on May 7, 2021 (May 20, 2021)
(Dkt. 355) (Pages 61-85) ......................................................SJA2433

Order (May 20, 2021) (Dkt. 363).............................................SJA2459

Order (May 20, 2021) (Dkt. 364).............................................SJA2466

Order (June 14, 2021) (Dkt. 402).............................................SJA2475

Defendant's Memorandum on Admissibility of Rule 12.2(b) Evidence
(June 21, 2021) (Dkt. 413)....................................................SJA2483

Order (June 23, 2021) (Dkt. 418).............................................SJA2503

Defendant's Memorandum in Support of Motion to Supplement the
Record and Renew His Motion to Compel Exculpatory Material or,
in the Alternative, to Submit Exculpatory Material for *in Camera*
Review (August 6, 2021) (Dkt. 427) .....................................SJA2507

    Exhibit 1: 03/15/21 Discovery Letter (Dkt. 427-1) ...............SJA2527

    Exhibit 2: 03/15/21 Email (Dkt. 427-2)..................................SJA2535

    Exhibit 3: 04/21/21 Discovery Letter (Dkt. 427-3) ...............SJA2537

    Exhibit 4: 04/21/21 Email (Dkt. 427-4)..................................SJA2540

    Exhibit 5: Second Declaration of Anthony J. Ferrante (Dkt. 427-5).......SJA2542

Reply to the Government's Opposition to Mr. Sanders's Motion to
Supplement the Record and Renew His Motion to Compel
Exculpatory Material or, in the Alternative, to Submit Exculpatory
Material for *In Camera* Review (August 23, 2021) (Dkt. 443)...............SJA2559

United States' Response in Opposition to Defendant's Memorandum on Admissibility of Evidence Regarding a Mental Condition (September 3, 2021) (Dkt. 459) ..................................................................SJA2576

Memorandum in Support of Mr. Zackary Ellis Sanders's Renewed Motion to Suppress Based on Lack of Probable Cause and False and Misleading Statements and for a *Franks* Hearing (September 17, 2021) (Dkt. 467)....................................................................SJA2607

    Exhibit 2: Declaration of Professor Steven Murdoch (Dkt. 467-1).........SJA2639

Order (September 21, 2021) (Dkt. 468).........................................SJA2664

Memorandum in Support of Renewed Motion to Suppress Based on Warrantless Use of a Network Investigative Technique and False Material Information in Affidavit Paragraph 25 (September 24, 2021) (Dkt. 476)..............................................................................SJA2667

Zackary Sanders's Rule 16(b)(1)(C) Notice Regarding Dr. Fred S. Berlin (October 4, 2021) (Dkt. 481) ....................................................SJA2699

Memorandum Opinion (October 12, 2021) (Dkt. 492) ...............................SJA2705

United States' Motion *in Limine* to Exclude the Testimony of Dr. Frederick S. Berlin (October 13, 2021) (Dkt. 498) ................................SJA2730

Defendant's Opposition to the Government's Motion *in Limine* to Exclude the Testimony of Dr. Frederick S. Berlin (October 14, 2021) (Dkt. 511)..............................................................................SJA2730

Order (October 15, 2021) (Dkt. 512).........................................SJA2745

Order (October 22, 2021) (Dkt. 525).........................................SJA2749

Order (October 25, 2021) (Dkt. 533).........................................SJA2757

Transcript of Trial Day 2 (October 20, 2021) [2] (Dkt. 556)..........................SJA2762

## VOLUME 7

### FILED UNDER SEAL

Transcript of Trial Day 3 (October 21, 2021) (Dkt. 557)..............................SJA2967

---

[2] The captions of the trial transcripts incorrectly show the trial dates as having occurred in November 2021.

Transcript of Trial Day 4 (October 22, 2021) (Dkt. 558)............................SJA3203

Transcript of Trial Day 5 (October 25, 2021) (Dkt. 559) (Pages 1-94) .......SJA3408

# VOLUME 8

### FILED UNDER SEAL

*Continued from previous volume:*
   Transcript of Trial Day 5 (October 25, 2021) (Dkt. 559)
   (Pages 95-210) ........................................................................................SJA3502

Transcript of Trial Day 6 (October 26, 2021) (Dkt. 560)............................SJA3618

Memorandum in Support of Motion for New Trial and to Reconsider
   Motions to Compel and Motions to Suppress (March 14, 2022)
   (Dkt. 588)................................................................................................SJA3845

   Exhibit 1: Transcript of Motion Hearing, *United States v. Kiejzo*, No.
   20-cr-40036-TSH (D. Mass. Sept. 17, 2021) (Dkt. 588-1) ....................SJA3875

   Exhibit 5: Complaint, *United States v. Zachary M. Stauffer*, No. 4:20-
   mj-04005-RJD (S.D. Ill. Jan. 28, 2020) (Dkt. 588-2)............................SJA3925

   Exhibit 8: 03/04/2022 Government Email (Dkt. 588-3) ........................SJA3935

   Exhibit 20: Case Comparison Chart (Dkt. 588-4) .................................SJA3940

   Exhibit 44: FBI Operational Plan for Execution of Search Warrant
   (Dkt. 588-5)..............................................................................................SJA3949

Notice of Filing of Two Supplemental Exhibits (March 17, 2022)
   (Dkt. 592)................................................................................................SJA3964

   Exhibit 1: 3/23/2018 Report to Crown Counsel, *Regina v. Tyler
   David Walker* (Dkt. 592-1) ....................................................................SJA3970

Reply to the Government's Response to Motion for New Trial and to
   Reconsider Motions to Compel and Motions to Suppress (Dkt. 600).....SJA4004

Memorandum Opinion (March 31, 2022) (Dkt. 615)..................................SJA4026

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

                    Plaintiff,

    v.

ZACKARY ELLIS SANDERS,

                    Defendant.

Case No. 1:20-cr-00143
The Honorable Judge Ellis

Trial: October 19, 2021

HEARING REQUESTED

REPLY TO THE GOVERNMENT'S OPPOSITION TO MR. SANDERS'S RENEWED
MOTION TO SUPPRESS BASED ON THE WARRANTLESS USE OF A NETWORK
INVESTIGATIVE TECHNIQUE AND FALSE MATERIAL
INFORMATION IN AFFIDAVIT PARAGRAPH 25

Zackary Ellis Sanders, by and through counsel, respectfully submits this Reply to the

Government's Opposition to his Renewed Motion to Suppress Based on Warrantless Use of a

Network Investigative Technique and False Material Information in Affidavit Paragraph 25 (Dkt.

490).

In its Opposition, the government once again avoids addressing the substance of Mr.

Sanders's Fourth Amendment claims, instead focusing on its well-worn procedural objections.

The government does not deny, anywhere in its opposition, that the United States and the foreign

law enforcement agency ("FLA") were jointly investigating the target website in tandem, since at

least 2017. Nor does the government deny that the FBI asked the FLA to draft the September 16,

2019 letter in order to help justify the FBI's prior subpoenaing of information related to hundreds

(if not thousands) of IP addresses in the United States (which the FBI did on September 10,

2019). Most importantly, the government does not deny that the United States and the FLA

**JA458**

participated in a joint venture that involved the warrantless search of Americans' computers, in violation of the Fourth Amendment.

Instead, the government complains once again about the timing of Mr. Sanders's motion, marching through the docket with observations about page limits, the number of defense counsel, and motions the defense has filed that are wholly unrelated to the issue *sub judice*. This is an obvious effort to distract the Court from the substance of Mr. Sanders's renewed motion, the timing of which is of the government's own making. Due to the government's steadfast refusal to produce required discovery that it obviously possesses, the defense was unable to assemble the evidentiary record now before the Court in time for the August 2020 pretrial motions deadline. As a result of the government's failure to honor its discovery obligations, Mr. Sanders has been forced to rely on his own investigation. Mr. Sanders has now conducted his own investigation and has filed his motion. That is entirely proper and what any diligent defense counsel would do under the circumstances. The authority the government cites for the proposition that Mr. Sanders's motion is waived in fact supports Mr. Sanders's position. *See, e.g., United States v. Samuels*, 1:14-cr-351 (E.D. Va.), 2015 WL 1442884, at *3 (E.D. Va. March 26, 2015) (noting that courts should consider both "the reason for the late filing" as well as whether information after the original filing alerted the defendant to facts on which a motion to suppress might be based); Gov't Opp'n at 5. The Court should have the opportunity to consider the additional evidence supporting Mr. Sanders's claims on this more complete record.

At the time of the pretrial motions deadline, the defense was not in a position to present a joint venture argument because it did not have access to the information that the government has been withholding. Notably, this is precisely what the government also did in Operation Pacifier (the Playpen investigation), a similar law enforcement operation. *See, e.g.,* Internal FBI Email

(Dkt. 138-9) at 9 (noting that the "scope of the international aspect of the investigation" had not "been disclosed in any filings" and that the FBI wanted "to continue to protect [that information] to the best of [its] ability").  The government's position that it should profit from its own misconduct is incorrect and would only encourage the government to continue to flout its discovery obligations in future cases.

Nor are the government's evasive tactics new to this case.  When Mr. Sanders requested screenshots of the target website's homepage, asserting that it did not display (or even suggest) any illegal content, the government dismissed his request as a "fishing expedition."  Months later, however, when the government finally disclosed the screenshot after multiple attempts by Mr. Sanders to compel it, the screenshot contradicted how the government, and in turn this Court, had characterized the target website and what an Internet user who visited this site only once would have seen.  *See* Supplement to Motion to Compel (Dkt. 176) (explaining how the government deliberately suppressed, until well after the resolution of Mr. Sanders's motion to suppress, two screenshots of the target website's homepage and announcements page that directly contradicted its, and Agent Ford's, representations and that supported Mr. Sanders's arguments for suppression); *see also* Supplement to Motion to Compel (Dkt. 241) (providing an additional example of how the government suppressed until January 25, 2021, two additional exculpatory screenshots of the target website's registration and login pages).  That the government's same disingenuous tactics continue could not be more apparent than from footnote six of its opposition, where—in a familiar move—the government describes Mr. Sanders's claims about *United States v. Kidder* case as "wishful," Gov't Opp'n at 6, but outright refuses to state *whether Mr. Sanders is correct or not*.

The government further states, without support, that Mr. Sanders "has presented no evidence beyond his own wishful speculation to establish that the FBI did or should have doubted the reliability of the FLA's tip or that the FLA participated in the FLA's investigation beyond what is described in the discovery in this case." Dkt. 490 at 4. Contrary to the government's argument, Mr. Sanders has submitted expert declarations from Seth Schoen (former technologist at the Electronic Frontier Foundation), Dr. Richard Clayton (Director of the Cambridge Cybercrime Centre and Principal Research Associate in the Computer Laboratory of the University of Cambridge), Dr. Steven Murdoch (Professor of Security Engineering at University College London) (Dkt. 464-2), Dr. Matthew Miller (former Associate Professor of Computer Science and Information Technology at the University of Nebraska at Kearney) (Dkt. 254-4, 256-5, 254-5, 254-6), and Anthony Ferrante (former Director for Cyber Incident Response at the U.S. National Security Council at the White House and Chief of Staff for the FBI's Cyber Division) (Dkt. 427-4); news articles regarding US law enforcement's investigation of the target website since sometime prior to 2017 (Dkt. 476-3, 476-4, 476-5); statements from FLA government reports that describes this operation as having been one conducted with partners (Dkt. 138-1, 253-3, 253-12); and statements from the United States government itself (including in this case and in other cases) (Dkt. 4, 140-4, 254-3, 476-2, 476-8).

When the government finally addresses the substance of Mr. Sanders's claims—a discussion confined to a half page of an eight-page pleading—it simply cites to a single unpublished decision, in which a District Court from another jurisdiction resolved a defendant's motion to compel on the NIT issue in favor of the government. *See United States v. Bateman*, 1:20-cr-10012-IT, 2021 WL 3055014, at *3 (D. Mass. July 20, 2021). The government does not address the more persuasive contrary authority, *see, e.g., United States v. Mitrovich*, 458 F.

4

**JA461**

Supp. 3d 961 (N.D. Ill. 2020) (ordering the government to disclose information about its ability

to identify IP addresses and communications between the FBI and foreign law enforcement

agencies), or the ample evidentiary record that Mr. Sanders has now compiled through his own

independent efforts.

     For the reasons stated above and in Mr. Sanders's Renewed Motion to Suppress, all

evidence derived from the illegal search of the Sanders's family home should be suppressed.

     Respectfully submitted,


_____*/s/*_____
Jonathan Jeffress (#42884)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com


_____*/s/*_____
Nina J. Ginsberg (#19472)
Zachary Deubler (#90669)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA  22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email: nginsberg@dimuro.com
Email: zdeubler@dimuro.com


_____*/s/*_____
Mark J. Mahoney (admitted *pro hac vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Telephone: 716-853-3700
Facsimile: 716-853-3710
Email: mjm@harringtonmahoney.com

**JA462**

_____/s/_____
H. Louis Sirkin (*pro hac vice* pending)
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450
Facsimile: (513) 721-0109
Email: hls@santenhughes.com

*Counsel for Defendant Zackary Ellis Sanders*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October 2021, the foregoing was served electronically on the counsel of record through the US District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress

6

**JA463**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

                 Plaintiff,

    v.

ZACKARY ELLIS SANDERS,

                 Defendant.

Crim. No. 1:20-cr-00143
Honorable T.S. Ellis, III
Trial: Oct. 19, 2021

## DEFENDANT ZACKARY ELLIS SANDERS'S SUPPLEMENTAL PROPOSED JURY INSTRUCTIONS

Mr. Zackary Ellis Sanders, by and through undersigned counsel, submits the attached proposed jury instructions for inclusion by the Court in its charge to the jury. Mr. Sanders reserves the right to modify, withdraw, supplement, or substitute instructions as may be suggested by the evidence in the case before the charge conference. Mr. Sanders also reserves the right to supplement these instructions with an appropriate "Theory of the Defense" instruction prior to the charge conference.

| No. | Instruction | Authority |
|---|---|---|
| 18. | Statement or Conduct of a Single Defendant on Trial [Revised] | 1A Fed. Jury Prac. & Instr. § 14:03 (6th ed.) |
| 19. | Weak or Less Satisfactory Evidence [Revised] | 1A Fed. Jury Prac. & Instr. § 14:14 (6th ed.) |
| 22. | Offense Specific Definition – "Purpose of Producing" [Revised] | *United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020) |
| 23. | Offense Specific Definitions – "Sexually Explicit Conduct" and "Lascivious Exhibition" [Revised] | *United States v. Hillie*, No. 19-3027, 2021 WL 4228187, at *10 (D.C. Cir. Sept. 17, 2021) ("we decline to adopt the *Dost* factors, and thus we find unpersuasive those decisions of our sister circuits that follow the *Dost* factors, or that use *Dost* as the foundation for construing "lascivious exhibition of the |

JA464

anus, genitals, or pubic area," rather than *Miller* and its progeny, including *Ferber, X-Citement Video,* and *Williams. See United States v. Rivera*, 546 F.3d 245, 252–53 (2d Cir. 2008); *Salmoran v. Att'y Gen.*, 909 F.3d 73, 80 n.11 (3d Cir. 2018); *United States v. McCall*, 833 F.3d 560, 563 (5th Cir. 2016); *United States v. Hodge*, 805 F.3d 675, 680 (6th Cir. 2015); *United States v. Petroske*, 928 F.3d 767, 773 (8th Cir. 2019); *United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017); *United States v. Isabella*, 918 F.3d 816, 831 (10th Cir. 2019).")

*United States v. Hillie*, No. 19-3027, 2021 WL 4228187, at **4-5, 7, 9 (D.C. Cir. Sept. 17, 2021) (the terms "sexual intercourse," "bestiality," "masturbation," and "sadistic or masochistic abuse" are "graphic, sexual terms referring to sexually explicit conduct or behavior and a 'lascivious exhibition' must be equally graphic with regard to the conduct or child's behavior depicted); See also *United States v. X-Citement Video*, 513 U.S. 64, 78-79 (1994) (the term "lascivious exhibition of the genitals" as currently used in § 2256(2)(A)(v), has the same meaning as "lewd exhibition of the genitals," as that phrase was construed in *Miller* and *Ferber*); *United States v. Williams*, 553 U.S. 285, 296 (2008) ("§ 2256(2)(A)'s definition of 'sexually explicit conduct' means essentially the same thing as the definition of 'sexual conduct' at issue in *Ferber*, except that the conduct defined by § 2256(2)(A) must be, if anything, more 'hard-core' than the conduct defined by the New York law at issue in *Ferber*, given that the federal statute prohibits "sexually explicit conduct" rather than merely "sexual conduct," as in the state law); *New York v. Ferber*,

458 U.S. 747, 764-65, 773 (1982) (the phrase "lewd exhibition of the genitals referred to "the hard core of child pornography").

*United States v. Hillie* , 2021 WL 4228187, at **8-10 (rejecting argument that "lascivious exhibition of the genitals," as defined in § 2256(2)(A), should be construed in accordance with the so-called *Dost* factors); *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019) (*Dost* factors have been subject to criticism over the years); See also *United States v. Price*, 775 F.3d 828, 839--40 (7th Cir. 2014) (holding that district court did not plainly err by instructing jury on *Dost* factors, but declining to endorse the factors and "discourag[ing] their routine use); *United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring) ("The sixth factor, which asks whether the visual depiction was intended to elicit a sexual response in the viewer, is especially troubling. Congress did not make production of child pornography turn on whether the maker or viewer of an image was sexually aroused, and this *Dost* factor encourages both judges and juries to improperly consider a non-statutory element." (footnote omitted)); *United States v. Russell*, 662 F.3d 831, 840 (7th Cir. 2011) (permitting considerations of all the evidence concerning the defendant's conduct in deciding whether the government has proven that the defendant acted for the purpose of producing a visual depiction of sexually explicit conduct); *United States v. Johnson*, 639 F.3d 433, 441 (8th Cir. 2011) (permitting the use of extrinsic evidence in making subjective inquiries); *United States v. Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) ("[T]he *Dost* factors have fostered myriad disputes that have led courts far afield from the statutory

3

**JA466**

| | | |
|---|---|---|
| | | language.... [T]here is a risk that the *Dost* factors will be used to inappropriately limit the scope of the statutory definition.") (cited with approval in *United States v. Courtade*); *United States v. Goodale*, 831 F. Supp. 2d 804, 813 (D. Vt. 2011) (noting that the circuits are split regarding the application of the sixth *Dost* factor, and whether this inquiry should be limited to the "four corners of the image," or whether the fact-finder may consider extrinsic evidence).<br><br>*Ashcroft v. Frye Speech Coalition*, 122 S.Ct. 1389 (2002); *United States v. Stevens*, 130 S.Ct. 1577 (2010); *New York v. Ferber*, 102 S.Ct. 3348 (1982); First Amendment to the U.S. Constitution; Fifth Amendment to the U.S. Constitution; *Lawrence v. Texas*, 539 U.S. 558 (2003); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008). |
| 26. | Second Element – Employment, Use, Persuasion, Inducement, Enticement, or Coercion of a Minor in Sexually Explicit Conduct | Adapted from 3 Hon. Leonard B. Sand, et al., Modern Federal Jury Instructions – Criminal, §§ 62-5 and 62-6 (2018); *United States v. McCauley*, 983 F.3d 690, 695-97 (4th Cir. 2020) |
| 27. | "Knowingly" – Defined" | Adapted from 3 L. Sand, et al., Modern Federal Jury Instructions – Criminal, § 62-24 (modified to change the term "underage performer" to "underage minor" in the second sentence of the third paragraph); *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994); *Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019); *United States v. Matthews*, 209 F.3d 338, 351 (4th Cir. 2000); *United States v. Miltier*, 882 F.3d 81, 86 (4th Cir. 2018); *United States v. Dean*, 635 F.3d 1200, 1209 (11th Cir. 2011); *Stirone v. United States*, 361 U.S. 212 (1960); *United States v. Randall*, 171 F.3d 195 (4th Cir. 1999); *United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994). |

4

| 28. | Proof of Knowledge or Intent | 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 17.07 (6th ed.); *see also United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012); *United States v. Engle*, 676 F.3d 405, 418 (4th Cir. 2012). |
|---|---|---|
| 29. | Proof of knowledge or intent—Rule 404(b) Evidence | 1A Fed. Jury Prac. & Instr. § 17:08 (6th ed.) |
| 30. | Motive Distinguished from Intent | 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 17.06 (6th ed.). |
| 31. | Visual Depiction of Sexually Explicit Conduct – "Use of a Minor" | Adapted from 3 L. Sands, et al., Modern Federal Jury Instructions – Criminal, § 62-22 |
| 32. | Definition of "Used" | *United States v. Howard*, 968 F.3d 717, 722 (7th Cir. 2020) (The word "use" is undoubtedly broad in the abstract, but under the venerable doctrine of noscitur a sociis, a word "is known by the company it keeps," and we must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.") *Yates v. United States*, 574 U.S. 528, 543, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)); *United States v. Williams*, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (explaining that the meaning of broad statutory language is "narrowed by the commonsense canon of noscitur a sociis—which counsels that a word is given more precise content by the neighboring words with which it is associated"); *see also Lagos v. United States*, —— U.S. ——, 138 S. Ct. 1684, 1688–89, 201 L.Ed.2d 1 (2018); *McDonnell v. United States*, —— U.S. ——, 136 S. Ct. 2355, 2368–69, 195 L.Ed.2d 639 (2016). |
| 33. | Note-Taking | Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina § Preliminary Instruction F (2020 Online Edition); *see* |

5

**JA468**

| | | *also United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986) |
|---|---|---|
| 34. | Opinion evidence —The expert witness | 1A Fed. Jury Prac. & Instr. § 14:01 (6th cd.) |
| 35. | Dual Role Cautionary Instruction – Fact and Opinion Testimony | *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019) |
| 36. | Number of Witnesses Is Not Controlling | 1A Fed. Jury Prac. & Instr. § 14:16 (6th cd.) |
| 37. | Court's Questions to Witnesses | 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 11.05 (6th ed.) |
| 38. | Court's Comments on Certain Evidence | 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 11.06 (6th cd.) |
| 39. | Bias and Hostility | 1 L. Sand, et al., Modern Federal Jury Instructions §7.01, Instruction 7-2 (2015) |
| 40. | Mandatory Minimum Sentence | *United States v. Polouizzi*, 564 F.3d 142, 161 (2d Cir. 2009); *United States v. Polouizzi*, 687 F. Supp. 2d 133, 167-209 (E.D.N.Y.), *as amended* (Feb. 11, 2010), *vacated on other grds.*, 393 F. App'x 784 (2d Cir. 2010); *United States v. McDonald*, No. 1:10CR29 JCC, 2010 WL 3835107, at *3 (E.D. Va. Sept. 27, 2010), *aff'd*, 444 F. App'x 710 (4th Cir. 2011) |

Dated: October 14, 2021

Respectfully submitted,

_____ */s/* _____
Jonathan Jeffress (#42884)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

_____ */s/* _____
Nina J. Ginsberg (#19472)
Zachary Deubler (#90669)

6

**JA469**

DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email: nginsberg@dimuro.com
Email: zdeubler@dimuro.com

_____/s/_____
Mark J. Mahoney (admitted *pro hac vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Telephone: 716-853-3700
Facsimile: 716-853-3710
Email: mjm@harringtonmahoney.com

_____/s/_____
H. Louis Sirkin (*pro hac vice* pending)
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450
Facsimile: (513) 721-0109
Email: hls@santenhughes.com

*Counsel for Defendant Zackary Ellis Sanders*

### CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October 2021, the foregoing was served electronically on the counsel of record through the US District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress

**JA470**

**WITH CITATION OF AUTHORITY**

**JA471**

**REVISED JURY INSTRUCTION NO. 18**

STATEMENT OR CONDUCT OF A SINGLE DEFENDANT ON TRIAL

Evidence relating to any alleged statement, confession, [or] admission [or act or omission] alleged to have been made [or done] by a defendant outside of court and after a crime has been committed should always be considered by the jury with caution and weighed with great care. All such alleged statements, confessions, or admissions should be disregarded entirely unless the other evidence in the case convinces the jury beyond a reasonable doubt that the statement, confession, admission, or act or omission was made or done knowingly and voluntarily.

In determining whether any alleged statement, confession, [or] admission [or act or omission] alleged to have been made by a defendant outside of court and after a crime has been committed was knowingly and voluntarily made [or done] the jury should consider the age, training, education, occupation, and physical and mental condition of the defendant, and [his] [her] treatment while in custody or under interrogation as shown by all of the evidence in the case. Also consider all other circumstances in evidence surrounding the making of the alleged statement, confession, or admission.

If after considering the evidence you determine that a statement, confession [or] admission [or act or omission] was made [or done] knowingly and voluntarily, you may give it such weight as you feel it deserves under the circumstances.

AUTHORITY: 1A Fed. Jury Prac. & Instr. § 14:03 (6th ed.)

**JA472**

**REVISED JURY INSTRUCTION NO. 19**

WEAKER OR LESS SATISFACTORY EVIDENCE

If a party offers weaker or less satisfactory evidence when stronger and more satisfactory evidence could have been produced at trial, you may, but are not required to, consider this fact in your deliberations.

You must remember, however, that a defendant is not obliged to produce any evidence or to call any witnesses.

AUTHORITY: 1A Fed. Jury Prac. & Instr. § 14:14 (6th ed.)

**JA473**

**REVISED JURY INSTRUCTION NO. 22**

OFFENSE SPECIFIC DEFINITION – "PURPOSE OF PRODUCING"

"Purpose of producing" means that Defendant must engage in activity with the specific intent to produce a visual depiction of that conduct. The facts must support the conclusion that the defendant engaged in conduct in order to produce a visual depiction. Producing a visual depiction of sexually explicit conduct must be, at the very least, a significant purpose in the sexual conduct itself, not merely incidental. It is sufficient for the Government to prove that Defendant had a dominant motivating purpose of producing a visual depiction of sexually explicit conduct when engaging in activity.[1] Dominant in this context means that criminal motivations predominate over other, less powerful motivations for conduct.[2]

When deciding whether the Government has proven that Defendant acted with the requisite culpable purpose, you may consider all the evidence concerning Defendant's conduct.

AUTHORITY: *United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020)

---

[1] *United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996).
[2] *United States v. Miller*, 148 F.3d 207, 212–13 (2d Cir. 1998).

**JA474**

**REVISED JURY INSTRUCTION NO. 23**

OFFENSE SPECIFIC DEFINITIONS – "SEXUALLY EXPLICIT CONDUCT" AND "LASCIVIOUS EXHIBITION"

The term "sexually explicit conduct" means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

"Lascivious" means exciting sexual desires or salacious. And "lascivious exhibition" means visual depictions of the anus, genitals, or pubic area of any person who also engages in patently offensive, sexual conduct in a manner that connotes the commission of sexual intercourse, deviant sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse.

 Not every exposure of the genitals or pubic area is a lascivious exhibition, and the fact that a minor is depicted nude, on its own, is not enough for that visual depiction to qualify as a lascivious exhibition. "Lascivious exhibition of the genitals" means depictions showing a minor engaged in "hard core" sexual conduct.

You must determine whether the visual depiction is lascivious based on its overall content and all the evidence in the case.

In order to find Defendant guilty of the offenses charged in counts 1 through 5, you must find that the United States has presented evidence beyond a reasonable doubt that the visual depictions induced by the Defendant were visual depictions of sexually explicit conduct and that the conduct engaged in by each of the alleged minor victims constituted a crime.

AUTHORITY:

*United States v. Hillie*, No. 19-3027, 2021 WL 4228187, at *10 (D.C. Cir. Sept. 17, 2021) ("we decline to adopt the *Dost* factors, and thus we find unpersuasive those decisions of our sister circuits that follow the *Dost* factors, or that use *Dost* as the foundation for construing "lascivious exhibition of the anus, genitals, or pubic area," rather than *Miller* and its progeny, including *Ferber*, *X-Citement Video*, and *Williams. See United States v. Rivera*, 546 F.3d 245, 252–53 (2d Cir. 2008); *Salmoran v. Att'y Gen.*, 909 F.3d 73, 80 n.11 (3d Cir. 2018); *United States v. McCall*, 833 F.3d 560, 563 (5th Cir. 2016); *United States v. Hodge*, 805 F.3d 675, 680 (6th Cir. 2015); *United States v. Petroske*, 928 F.3d 767, 773 (8th Cir. 2019); *United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017); *United States v. Isabella*, 918 F.3d 816, 831 (10th Cir. 2019).")

*United States v. Hillie*, No. 19-3027, 2021 WL 4228187, at **4-5, 7, 9 (D.C. Cir. Sept. 17, 2021) (the terms "sexual intercourse," "bestiality," "masturbation," and "sadistic or masochistic abuse" are "graphic, sexual terms referring to sexually explicit conduct or behavior and a 'lascivious exhibition' must be equally graphic with regard to the conduct or child's behavior depicted); See also *United States v. X-Citement Video*, 513 U.S. 64, 78-79 (1994) (the term "lascivious

12

**JA475**

exhibition of the genitals" as currently used in § 2256(2)(A)(v), has the same meaning as "lewd exhibition of the genitals," as that phrase was construed in *Miller* and *Ferber*); *United States v. Williams*, 553 U.S. 285, 296 (2008) ("§ 2256(2)(A)'s definition of 'sexually explicit conduct' means essentially the same thing as the definition of 'sexual conduct' at issue in *Ferber*, except that the conduct defined by § 2256(2)(A) must be, if anything, more 'hard-core' than the conduct defined by the New York law at issue in *Ferber*, given that the federal statute prohibits "sexually explicit conduct" rather than merely "sexual conduct," as in the state law); *New York v. Ferber*, 458 U.S. 747, 764-65, 773 (1982) (the phrase "lewd exhibition of the genitals referred to "the hard core of child pornography").

*United States v. Hillie* , 2021 WL 4228187, at **8-10 (rejecting argument that "lascivious exhibition of the genitals," as defined in § 2256(2)(A), should be construed in accordance with the so-called *Dost* factors); *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019) (*Dost* factors have been subject to criticism over the years); See also *United States v. Price*, 775 F.3d 828, 839–40 (7th Cir. 2014) (holding that district court did not plainly err by instructing jury on *Dost* factors, but declining to endorse the factors and "discourag[ing] their routine use); *United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring) ("The sixth factor, which asks whether the visual depiction was intended to elicit a sexual response in the viewer, is especially troubling. Congress did not make production of child pornography turn on whether the maker or viewer of an image was sexually aroused, and this *Dost* factor encourages both judges and juries to improperly consider a non-statutory element." (footnote omitted)); *United States v. Russell*, 662 F.3d 831, 840 (7th Cir. 2011) (permitting considerations of all the evidence concerning the defendant's conduct in deciding whether the government has proven that the defendant acted for the purpose of producing a visual depiction of sexually explicit conduct); *United States v. Johnson*, 639 F.3d 433, 441 (8th Cir. 2011) (permitting the use of extrinsic evidence in making subjective inquiries); *United States v, Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) ("[T]he *Dost* factors have fostered myriad disputes that have led courts far afield from the statutory language.... [T]here is a risk that the *Dost* factors will be used to inappropriately limit the scope of the statutory definition.") (cited with approval in *United States v. Courtade*); *United States v. Goodale*, 831 F. Supp. 2d 804, 813 (D. Vt. 2011) (noting that the circuits are split regarding the application of the sixth *Dost* factor, and whether this inquiry should be limited to the "four corners of the image," or whether the fact-finder may consider extrinsic evidence).

*Ashcroft v. Frye Speech Coalition*, 122 S.Ct. 1389 (2002); *United States v. Stevens*, 130 S.Ct. 1577 (2010); *New York v. Ferber*, 102 S.Ct. 3348 (1982); First Amendment to the U.S. Constitution; Fifth Amendment to the U.S. Constitution; *Lawrence v. Texas*, 539 U.S. 558 (2003); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008).

13

**JA476**

**JURY INSTRUCTION NO. 26**

SECOND ELEMENT – EMPLOYMENT, USE, PERSUASION, INDUCEMENT, ENTICEMENT, OR COERCION OF A MINOR IN SEXUALLY EXPLICIT CONDUCT

The second element that the government must prove beyond a reasonable doubt is that the defendant employed or used or persuaded or induced or enticed or coerced ALLEGED MINOR VICTIMS 1, 2, 3, 4, and 5 to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct.

A "visual depiction" includes any photograph, film, video, or picture, including undeveloped film and videotape, and data stored on computer disk or by electronic means that is capable of conversion into a visual image, whether or not stored in a permanent format.

The term "producing" means producing, directing, manufacturing, issuing, publishing, or advertising.

To convict the defendant of employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct "for the purpose" of producing a visual depiction of that conduct, the government must prove that that producing a visual depiction was a dominant purpose of engaging in the sexually explicit conduct, and was not merely an incidental reason for engaging in that conduct. While the image itself can be probative of the defendant's intent, it cannot be the only evidence.

In deciding whether the government has proven that the defendant acted for the purpose of producing a visual depiction of the sexually explicit conduct, you may consider all of the evidence concerning the defendant's conduct.

AUTHORITY: Adapted from 3 Hon. Leonard B. Sand, et al., Modern Federal Jury Instructions – Criminal, §§ 62-5 and 62-6 (2018); *United States v. McCauley*, 983 F.3d 690, 695-97 (4th Cir. 2020).

14

**JA477**

**JURY INSTRUCTION NO. 27**

"KNOWINGLY" – DEFINED

An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.

In this case, the term "knowingly" refers to an awareness of the sexually explicit nature of the material and the involvement of minors in the visual depictions' production.

First, the government must prove beyond a reasonable doubt that the defendant knew both that the production of the visual depiction[s] charged in the indictment, involved the use of a minor engaging in sexually explicit conduct, and that it portrayed a minor engaged in that conduct.

Second, the government must prove beyond a reasonable doubt that the defendant had knowledge of the general nature and character of the material. The defendant need not have specific knowledge as to the identity or actual age of the underage minor, but the government must show that the defendant knew the individual depicted in the charged image[s] or video[s] was a minor. Such knowledge may be shown by direct or circumstantial evidence, or both. Eyewitness testimony of the defendant's viewing of the material is not necessary to prove his awareness of its contents; the circumstances may warrant an inference that he was aware of what the material depicts.

You may consider all of the evidence in determining whether the defendant had knowledge that the material contained a visual depiction of a minor engaging in sexually explicit conduct.

AUTHORITY: Adapted from 3 L. Sand, et al., Modern Federal Jury Instructions – Criminal, § 62-24 (modified to change the term "underage performer" to "underage minor" in the second sentence of the third paragraph); *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994); *Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019); *United States v. Matthews*, 209 F.3d 338, 351 (4th Cir. 2000); *United States v. Miltier*, 882 F.3d 81, 86 (4th Cir. 2018); *United States v. Dean*, 635 F.3d 1200, 1209 (11th Cir. 2011); *Stirone v. United States*, 361 U.S. 212 (1960); *United States v. Randall*, 171 F.3d 195 (4th Cir. 1999); *United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994).

15

**JA478**

**JURY INSTRUCTION NO. 28**

PROOF OF KNOWLEDGE OR INTENT

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind.  In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts *done* by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

AUTHORITY:  1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 17.07 (6th ed.); *see also United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012) ("[I]ntent can be implied—and it is the jury's role to make such factual inferences."); *United States v. Engle*, 676 F.3d 405, 418 (4th Cir. 2012) ("[W]e recognize that the jury may infer intent from circumstantial evidence ….").

16

**JA479**

**JURY INSTRUCTION NO. 29**

PROOF OF KNOWLEDGE OR INTENT—RULE 404(B) EVIDENCE

Evidence that an act was done or that an offense was committed by Defendant at some other time is not, of course, any evidence or proof whatever that, at another time, the defendant performed a similar act or committed a similar offense, including the offense charged in *[Count of]* this indictment.

Evidence of a similar act or offense may not be considered by the jury in determining whether Defendant actually performed the physical acts charged in this indictment. Nor may such evidence be considered for any other purpose whatever, unless the jury first finds beyond a reasonable doubt from other evidence in the case, standing alone, that Defendant physically did the act charged in *[Count of]* this indictment.

If the jury should find beyond a reasonable doubt from other evidence in the case that Defendant did the act or acts alleged in the particular count under consideration, the jury may then consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which Defendant actually did the act or acts charged in the particular count.

The defendant is not on trial for any acts or crimes not alleged in the indictment. Nor may a defendant be convicted of the crime[s] charged even if you were to find that *[he]* committed other crimes—even crimes similar to the one charged in this indictment.

AUTHORITY: 1A Fed. Jury Prac. & Instr. § 17:08 (6th ed.)

17

**JA480**

**JURY INSTRUCTION NO. 30**

MOTIVE DISTINGUISHED FROM INTENT

Intent and motive are different concepts and should never be confused.

Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Personal advancement and financial gain, for example, are two well-recognized motives for much of human conduct. These praiseworthy motives, however, may prompt one person to voluntary acts of good while prompting another person to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime. The motive of the defendant is, therefore, immaterial except insofar as evidence of motive may aid in the determination of state of mind or the intent of the defendant.

AUTHORITY: 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 17.06 (6th ed.).

18

**JA481**

**JURY INSTRUCTION NO. 31**

VISUAL DEPICTION OF SEXUALLY EXPLICIT CONDUCT  – "USE OF A MINOR"

The government must prove beyond a reasonable doubt that the production of the visual depiction[s] charged in the indictment involved the use of a minor engaging in sexually explicit conduct, as I will explain that term to you, and portrays that minor engaged in that conduct.

The visual depiction must be of a real person under the age of eighteen (18) engaging in sexually explicit conduct.  The government does not have to prove the identity of the minor or the exact age of the minor.  You may consider all of the evidence, including your viewing of the depiction, in determining whether the depiction portrayed an actual person under the age of eighteen (18) engaging in sexually explicit conduct.

AUTHORITY: Adapted from 3 L. Sands, et al., Modern Federal Jury Instructions – Criminal, § 62-22

19

**JA482**

**JURY INSTRUCTION NO. 32**

THE DEFINITION OF "USED"

The second element that the government must prove beyond a reasonable doubt is that the defendant employed or used or persuaded or induced or enticed or coerced ALLEGED MINOR VICTIMS 1, 2, 3, 4, and 5 to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct.

As used in this statute, the meaning of the word "used" is meant to be consistent with the words "employed" "persuaded" "induced" "enticed" and "coerced."

AUTHORITY: *United States v. Howard*, 968 F.3d 717, 722 (7th Cir. 2020) (The word "use" is undoubtedly broad in the abstract, but under the venerable doctrine of noscitur a sociis, a word "is known by the company it keeps," and we must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.") *Yates v. United States*, 574 U.S. 528, 543, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)); *United States v. Williams*, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (explaining that the meaning of broad statutory language is "narrowed by the commonsense canon of noscitur a sociis—which counsels that a word is given more precise content by the neighboring words with which it is associated"); see also *Lagos v. United States*, —— U.S. ——, 138 S. Ct. 1684, 1688–89, 201 L.Ed.2d 1 (2018); *McDonnell v. United States*, —— U.S. ——, 136 S. Ct. 2355, 2368–69, 195 L.Ed.2d 639 (2016).

**JURY INSTRUCTION NO. 33**

NOTE-TAKING

You are permitted to take notes during the trial. You, of course, are not obliged to take any notes, and some feel that the taking of notes is not helpful because it may distract you so that you do not hear and evaluate all of the evidence. If you do take notes, do not allow note taking to distract you from the ongoing proceedings.

Your notes should be used only as memory aids. You should not give your notes precedence over your independent recollection of the evidence. If you do not take notes, you should rely on your own independent recollection of the proceedings and you should not be influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror as to what the testimony may have been.

Notes are not official transcripts and may not cover points that are significant to another juror. The contents of notes must not be disclosed except to other jurors.

AUTHORITY: Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina § Preliminary Instruction F (2020 Online Edition); *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986)

21

**JA484**

**JURY INSTRUCTION NO. 34**

OPINION EVIDENCE—THE EXPERT WITNESS

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial. An exception to this rule exists as to those persons who are described as "expert witnesses". An "expert witness" is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an "expert witness" in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight, if any, as you may think it deserves. You should consider the testimony of expert witnesses just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence *[including that of other "expert witnesses"]*, you may disregard the opinion in part or in its entirety.

As I have told you several times, you—the jury—are the sole judges of the facts of this case.

AUTHORITY: 1A Fed. Jury Prac. & Instr. § 14:01 (6th ed.)

**JA485**

**JURY INSTRUCTION NO. 35**

DUAL ROLE CAUTIONARY INSTRUCTION – FACT AND OPINION TESTIMONY

Members of the Jury, you [will hear] [you have just heard] testimony from [NAME] [POSITION]. [NAME] [is being called] [was called] by the [government] [defendant] as an expert witness regarding his specialized knowledge in the field of forensic examination of digital devices. Within that area of expertise, [NAME] [is] [was] permitted to offer you his expert opinions. You are permitted to give [NAME] expert opinions on the nature of the examinations conducted involving devices belonging to the defendant, the methods, equipment and software used to accomplish the examinations, and his interpretations and observations resulting from the examinations such weight as you may think they deserve. If during his testimony, you thought you heard [NAME] offer an expert opinion on a subject outside the scope of his expertise, then I instruct you to disregard that testimony.

[NAME] [is also expected to provide] [also provided] ordinary fact testimony regarding his personal observations and actions taken during the rudimentary data review process and about the evidence he reviewed related to [INSERT]. The fact that he also possesses factual information regarding this case should not be taken into account by you as you determine what, if any, weight to decide to give [NAME] expert opinions. It's for you to decide how much weight to give all of the evidence, including [NAME] fact and opinion testimony. [NAME] testimony as a fact or expert witness is entitled to no greater or lesser weight simply because he is an expert.

AUTHORITY: *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019).

**JA486**

**JURY INSTRUCTION NO. 36**

NUMBER OF WITNESSES IS NOT CONTROLLING

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party.  You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe.  You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

AUTHORITY: 1A Fed. Jury Prac. & Instr. § 14:16 (6th ed.)

24

**JA487**

**JURY INSTRUCTION NO. 37**

COURT'S QUESTIONS TO WITNESSES

During the course of a trial, I may occasionally ask questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may relate. The court may ask a question simply to clarify a matter—not to help one side of the case or hurt the other side.

Remember at all times that you, as jurors, are the sole judges of the facts of this case.

AUTHORITY: 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 11.05 (6th ed.)

**JA488**

**JURY INSTRUCTION NO. 38**

COURT'S COMMENTS ON CERTAIN EVIDENCE

The law of the United States permits a federal judge to comment to the jury on the evidence in a case. Such comments are, however, only expressions of my opinion as to the facts and the jury may disregard them entirely. You, as jurors, are the sole judges of the facts in this case. It is your recollection and evaluation of the evidence that is important to the verdict in this case.

Although you must follow the Court's instructions concerning the law applicable to this case, you are totally free to accept or reject my observations concerning the evidence received in the case.

AUTHORITY: 1A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 11.06 (6th ed.)

**JA489**

**JURY INSTRUCTION NO. 39**

BIAS AND HOSTILITY

In connection with your evaluation of the credibility of the witness, you should specifically consider evidence of resentment or anger which some government witnesses may have towards the Defendant.

Evidence that a witness is biased, prejudiced or hostile towards the defendant requires you to view that witness' testimony with caution, to weigh it with care, and subject it to close and searching scrutiny.

AUTHORITY: 1 L. Sand, et al., Modern Federal Jury Instructions §7.01, Instruction 7-2 (2015)

**JA490**

**JURY INSTRUCTION NO. 40**

MANDATORY MINIMUM SENTENCE

You are instructed that if you find the defendant guilty of one or more counts of production of child pornography, as charged in Counts 1, 2, 3, 4, or 5, he will be subject to a 15-year mandatory minimum sentence.

You are further instructed that if you find the defendant guilty of one or more counts of receipt of child pornography, as charged in Counts 6, 7, 8, 9, 10, or 11 he will be subject to a 5-year mandatory minimum sentence.

AUTHORITY:

*United States v. Polouizzi*, 564 F.3d 142, 161 (2d Cir. 2009) (district court has discretion to instruct the jury on applicable mandatory minimum sentence in some circumstances); See *Shannon v. United States*, 512 U.S. 573, 587 (1994) (instruction concerning the consequences of an NGI verdict in some form may be necessary under certain limited circumstances); *United States v. Polouizzi*, 687 F. Supp. 2d 133, 167-209 (E.D.N.Y.), *as amended* (Feb. 11, 2010), *vacated on other grds.*, 393 F. App'x 784 (2d Cir. 2010) (On new trial, jury would properly be informed of the five-year mandatory minimum sentence of imprisonment required with a finding of guilt on any count of receipt of child pornography. Defendant had a Sixth Amendment right to be tried by a jury that knew the sentencing impact of its decisions, in light of special circumstances including defendant's need for psychiatric help in view of sexual childhood abuse).

*United States v. McDonald*, No. 1:10CR29 JCC, 2010 WL 3835107, at *3 (E.D. Va. Sept. 27, 2010), *aff'd*, 444 F. App'x 710 (4th Cir. 2011) (Supreme Court notes that in certain circumstances of misstatement or error, such as where a witness or prosecutor states in front of the jury that a defendant would "go free" if found NGRI, the instruction that an insanity finding would still result in confinement may be called for) (*Shannon v. United States*, 512 U.S. 573, 587 (1994)).

**JA491**

WITHOUT CITATION OF AUTHORITY

29

JA492

**REVISED JURY INSTRUCTION NO. 18**

STATEMENT OR CONDUCT OF A SINGLE DEFENDANT ON TRIAL

Evidence relating to any alleged statement, confession, [or] admission [or act or omission] alleged to have been made [or done] by a defendant outside of court and after a crime has been committed should always be considered by the jury with caution and weighed with great care. All such alleged statements, confessions, or admissions should be disregarded entirely unless the other evidence in the case convinces the jury beyond a reasonable doubt that the statement, confession, admission, or act or omission was made or done knowingly and voluntarily.

In determining whether any alleged statement, confession, [or] admission [or act or omission] alleged to have been made by a defendant outside of court and after a crime has been committed was knowingly and voluntarily made [or done] the jury should consider the age, training, education, occupation, and physical and mental condition of the defendant, and [his] [her] treatment while in custody or under interrogation as shown by all of the evidence in the case. Also consider all other circumstances in evidence surrounding the making of the alleged statement, confession, or admission.

If after considering the evidence you determine that a statement, confession [or] admission [or act or omission] was made [or done] knowingly and voluntarily, you may give it such weight as you feel it deserves under the circumstances.

**JA493**

**REVISED JURY INSTRUCTION NO. 19**

WEAKER OR LESS SATISFACTORY EVIDENCE

If a party offers weaker or less satisfactory evidence when stronger and more satisfactory evidence could have been produced at trial, you may, but are not required to, consider this fact in your deliberations.

You must remember, however, that a defendant is not obliged to produce any evidence or to call any witnesses.

**JA494**

**REVISED JURY INSTRUCTION NO. 22**

OFFENSE SPECIFIC DEFINITION – "PURPOSE OF PRODUCING"

"Purpose of producing" means that Defendant must engage in activity with the specific intent to produce a visual depiction of that conduct. The facts must support the conclusion that the defendant engaged in conduct in order to produce a visual depiction. Producing a visual depiction of sexually explicit conduct must be, at the very least, a significant purpose in the sexual conduct itself, not merely incidental. It is sufficient for the Government to prove that Defendant had a dominant motivating purpose of producing a visual depiction of sexually explicit conduct when engaging in activity. Dominant in this context means that criminal motivations predominate over other, less powerful motivations for conduct.

When deciding whether the Government has proven that Defendant acted with the requisite culpable purpose, you may consider all the evidence concerning Defendant's conduct.

**REVISED JURY INSTRUCTION NO. 23**

OFFENSE SPECIFIC DEFINITIONS – "SEXUALLY EXPLICIT CONDUCT" AND
"LASCIVIOUS EXHIBITION"

The term "sexually explicit conduct" means actual or simulated sexual intercourse, including
genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or
opposite sex; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals
or pubic area of any person.

"Lascivious" means exciting sexual desires or salacious. And "lascivious exhibition"
means visual depictions of the anus, genitals, or pubic area of any person who also engages in
patently offensive, sexual conduct in a manner that connotes the commission of sexual
intercourse, deviant sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse.

Not every exposure of the genitals or pubic area is a lascivious exhibition, and the fact that a
minor is depicted nude, on its own, is not enough for that visual depiction to qualify as a
lascivious exhibition. "Lascivious exhibition of the genitals" means depictions showing a minor
engaged in "hard core" sexual conduct.

You must determine whether the visual depiction is lascivious based on its overall content and
all the evidence in the case.

In order to find Defendant guilty of the offenses charged in counts 1 through 5, you must find
that the United States has presented evidence beyond a reasonable doubt that the visual
depictions induced by the Defendant were visual depictions of sexually explicit conduct and that
the conduct engaged in by each of the alleged minor victims constituted a crime.

33

**JA496**

**JURY INSTRUCTION NO. 26**

SECOND ELEMENT – EMPLOYMENT, USE, PERSUASION, INDUCEMENT,
ENTICEMENT, OR COERCION OF A MINOR IN SEXUALLY EXPLICIT CONDUCT

The second element that the government must prove beyond a reasonable doubt is that the
defendant employed or used or persuaded or induced or enticed or coerced ALLEGED MINOR
VICTIMS 1, 2, 3, 4, and 5 to take part in sexually explicit conduct for the purpose of producing a
visual depiction of that conduct.

A "visual depiction" includes any photograph, film, video, or picture, including undeveloped
film and videotape, and data stored on computer disk or by electronic means that is capable of
conversion into a visual image, whether or not stored in a permanent format.

The term "producing" means producing, directing, manufacturing, issuing, publishing, or
advertising.

To convict the defendant of employing, using, persuading, inducing, enticing, or coercing a
minor to engage in sexually explicit conduct "for the purpose" of producing a visual depiction of
that conduct, the government must prove that that producing a visual depiction was a dominant
purpose of engaging in the sexually explicit conduct, and was not merely an incidental reason for
engaging in that conduct. While the image itself can be probative of the defendant's intent, it
cannot be the only evidence.

In deciding whether the government has proven that the defendant acted for the purpose of
producing a visual depiction of the sexually explicit conduct, you may consider all of the
evidence concerning the defendant's conduct.

**JA497**

**JURY INSTRUCTION NO. 27**

"KNOWINGLY" – DEFINED

An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.

In this case, the term "knowingly" refers to an awareness of the sexually explicit nature of the material and the involvement of minors in the visual depictions' production.

First, the government must prove beyond a reasonable doubt that the defendant knew both that the production of the visual depiction[s] charged in the indictment, involved the use of a minor engaging in sexually explicit conduct, and that it portrayed a minor engaged in that conduct.

Second, the government must prove beyond a reasonable doubt that the defendant had knowledge of the general nature and character of the material. The defendant need not have specific knowledge as to the identity or actual age of the underage minor, but the government must show that the defendant knew the individual depicted in the charged image[s] or video[s] was a minor. Such knowledge may be shown by direct or circumstantial evidence, or both. Eyewitness testimony of the defendant's viewing of the material is not necessary to prove his awareness of its contents; the circumstances may warrant an inference that he was aware of what the material depicts.

You may consider all of the evidence in determining whether the defendant had knowledge that the material contained a visual depiction of a minor engaging in sexually explicit conduct.

**JURY INSTRUCTION NO. 28**

PROOF OF KNOWLEDGE OR INTENT

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts *done* by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

**JA499**

**JURY INSTRUCTION NO. 29**

PROOF OF KNOWLEDGE OR INTENT—RULE 404(B) EVIDENCE

Evidence that an act was done or that an offense was committed by Defendant at some other time is not, of course, any evidence or proof whatever that, at another time, the defendant performed a similar act or committed a similar offense, including the offense charged in *[Count of]* this indictment.

Evidence of a similar act or offense may not be considered by the jury in determining whether Defendant actually performed the physical acts charged in this indictment. Nor may such evidence be considered for any other purpose whatever, unless the jury first finds beyond a reasonable doubt from other evidence in the case, standing alone, that Defendant physically did the act charged in *[Count of]* this indictment.

If the jury should find beyond a reasonable doubt from other evidence in the case that Defendant did the act or acts alleged in the particular count under consideration, the jury may then consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which Defendant actually did the act or acts charged in the particular count.

The defendant is not on trial for any acts or crimes not alleged in the indictment. Nor may a defendant be convicted of the crime[s] charged even if you were to find that *[he]* committed other crimes—even crimes similar to the one charged in this indictment.

37

**JA500**

**JURY INSTRUCTION NO. 30**

MOTIVE DISTINGUISHED FROM INTENT

Intent and motive are different concepts and should never be confused.

Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Personal advancement and financial gain, for example, are two well-recognized motives for much of human conduct. These praiseworthy motives, however, may prompt one person to voluntary acts of good while prompting another person to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime. The motive of the defendant is, therefore, immaterial except insofar as evidence of motive may aid in the determination of state of mind or the intent of the defendant.

38

**JA501**

**JURY INSTRUCTION NO. 31**

VISUAL DEPICTION OF SEXUALLY EXPLICIT CONDUCT – "USE OF A MINOR"

The government must prove beyond a reasonable doubt that the production of the visual depiction[s] charged in the indictment involved the use of a minor engaging in sexually explicit conduct, as I will explain that term to you, and portrays that minor engaged in that conduct.

The visual depiction must be of a real person under the age of eighteen (18) engaging in sexually explicit conduct. The government does not have to prove the identity of the minor or the exact age of the minor. You may consider all of the evidence, including your viewing of the depiction, in determining whether the depiction portrayed an actual person under the age of eighteen (18) engaging in sexually explicit conduct.

**JA502**

**JURY INSTRUCTION NO. 32**

THE DEFINITION OF "USED"

The second element that the government must prove beyond a reasonable doubt is that the defendant employed or used or persuaded or induced or enticed or coerced ALLEGED MINOR VICTIMS 1, 2, 3, 4, and 5 to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct.

As used in this statute, the meaning of the word "used" is meant to be consistent with the words "employed" "persuaded" "induced" "enticed" and "coerced."

**JA503**

**JURY INSTRUCTION NO. 33**

NOTE-TAKING

You are permitted to take notes during the trial. You, of course, are not obliged to take any notes, and some feel that the taking of notes is not helpful because it may distract you so that you do not hear and evaluate all of the evidence. If you do take notes, do not allow note taking to distract you from the ongoing proceedings.

Your notes should be used only as memory aids. You should not give your notes precedence over your independent recollection of the evidence. If you do not take notes, you should rely on your own independent recollection of the proceedings and you should not be influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror as to what the testimony may have been.

Notes are not official transcripts and may not cover points that are significant to another juror. The contents of notes must not be disclosed except to other jurors.

41

**JA504**

**JURY INSTRUCTION NO. 34**

OPINION EVIDENCE—THE EXPERT WITNESS

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial. An exception to this rule exists as to those persons who are described as "expert witnesses". An "expert witness" is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an "expert witness" in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight, if any, as you may think it deserves. You should consider the testimony of expert witnesses just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence *[including that of other "expert witnesses"]*, you may disregard the opinion in part or in its entirety.

As I have told you several times, you—the jury—are the sole judges of the facts of this case.

42

**JA505**

**JURY INSTRUCTION NO. 35**

DUAL ROLE CAUTIONARY INSTRUCTION – FACT AND OPINION TESTIMONY

Members of the Jury, you [will hear] [you have just heard] testimony from [NAME] [POSITION]. [NAME] [is being called] [was called] by the [government] [defendant] as an expert witness regarding his specialized knowledge in the field of forensic examination of digital devices. Within that area of expertise, [NAME] [is] [was] permitted to offer you his expert opinions. You are permitted to give [NAME] expert opinions on the nature of the examinations conducted involving devices belonging to the defendant, the methods, equipment and software used to accomplish the examinations, and his interpretations and observations resulting from the examinations such weight as you may think they deserve. If during his testimony, you thought you heard [NAME] offer an expert opinion on a subject outside the scope of his expertise, then I instruct you to disregard that testimony.

[NAME] [is also expected to provide] [also provided] ordinary fact testimony regarding his personal observations and actions taken during the rudimentary data review process and about the evidence he reviewed related to [INSERT]. The fact that he also possesses factual information regarding this case should not be taken into account by you as you determine what, if any, weight to decide to give [NAME] expert opinions. It's for you to decide how much weight to give all of the evidence, including [NAME] fact and opinion testimony. [NAME] testimony as a fact or expert witness is entitled to no greater or lesser weight simply because he is an expert.

**JURY INSTRUCTION NO. 36**

NUMBER OF WITNESSES IS NOT CONTROLLING

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

**JURY INSTRUCTION NO. 37**

COURT'S QUESTIONS TO WITNESSES

During the course of a trial, I may occasionally ask questions of a witness.  Do not assume that I hold any opinion on the matters to which my questions may relate.  The court may ask a question simply to clarify a matter—not to help one side of the case or hurt the other side.

Remember at all times that you, as jurors, are the sole judges of the facts of this case.

45

**JA508**

**JURY INSTRUCTION NO. 38**

COURT'S COMMENTS ON CERTAIN EVIDENCE

The law of the United States permits a federal judge to comment to the jury on the evidence in a case. Such comments are, however, only expressions of my opinion as to the facts and the jury may disregard them entirely. You, as jurors, are the sole judges of the facts in this case. It is your recollection and evaluation of the evidence that is important to the verdict in this case.

Although you must follow the Court's instructions concerning the law applicable to this case, you are totally free to accept or reject my observations concerning the evidence received in the case.

**JA509**

**JURY INSTRUCTION NO. 39**

BIAS AND HOSTILITY

In connection with your evaluation of the credibility of the witness, you should specifically consider evidence of resentment or anger which some government witnesses may have towards the Defendant.

Evidence that a witness is biased, prejudiced or hostile towards the defendant requires you to view that witness' testimony with caution, to weigh it with care, and subject it to close and searching scrutiny.

**JA510**

**JURY INSTRUCTION NO. 40**

MANDATORY MINIMUM SENTENCE

You are instructed that if you find the defendant guilty of one or more counts of production of child pornography, as charged in Counts 1, 2, 3, 4, or 5, he will be subject to a 15-year mandatory minimum sentence.

You are further instructed that if you find the defendant guilty of one or more counts of receipt of child pornography, as charged in Counts 6, 7, 8, 9, 10, or 11 he will be subject to a 5-year mandatory minimum sentence.

**JA511**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:20-cr-143 |
| | ) | |
| ZACKARY ELLIS SANDERS, | ) | |
| Defendant. | ) | |

## SEALED ORDER

This matter is before the court on Defendant's Renewed Motion to Suppress Based on
Warrantless Use of a Network Investigative Technique and False Material Information in
Affidavit Paragraph 25. *See* Dkts. 471, 472. This motion has been fully briefed and the relevant
facts and legal contentions are clear from the record. Accordingly, oral argument is unnecessary
and would not aid the decisional process. The matter is therefore ripe for disposition.

The defendant has challenged the validity of the search warrant in a series of motions
over the last year. Indeed, defendant previously filed a Motion to Suppress Due to Lack of
Probable Cause, Dkt. 81, a Motion to Suppress Based on False and Misleading Material
Information in Affidavit Paragraph 23, Dkt. 85, a Motion to Suppress Based on Materially
Misleading Statements and Omissions Regarding Tor, Dkt. 83, a Renewed Motion to Suppress
Based on Lack of Probable Cause, Dkt. 463, and various Motions to Compel related to the
affidavit and search warrant in this case. *See, e.g.*, Dkts. 109, 112, 140, 176, 241, 335. All of the
prior motions to suppress have been denied. The relevant facts in this case have been reiterated
many times in previous memorandum opinions and orders and need not be repeated here. *See,
e.g.*, Dkt. 236 (Sealed Order); Dkt. 113 (Sealed Memorandum Opinion).

Given that defendant's prior motions to suppress have all been denied, the instant
renewed motion to suppress is properly construed as a motion for reconsideration. As has been

**JA512**

made clear in past Orders, a motion for reconsideration can be successful in only three situations: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence; or (3) to correct a clear error of law or prevent manifest injustice. *Zinkland v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007). None of these situations is present in the instant motion. Accordingly, the motion must be denied.

Defendant argues that newly discovered evidence in his case warrants reconsideration of prior Orders denying defendant's various motions to suppress. But the present motion cites no evidence that was previously unavailable to defendant, and instead this motion relies on documents that the government previously provided to defendant and publicly available articles about the child pornography website at issue in this case. *See* Dkts. 471-3, 471-4.

Instead of providing new evidence that might merit reconsideration, defendant provides an entirely new argument for suppression that is both meritless and untimely. Defendant argues in the present motion, for the first time, that the operation which led to the search of defendant's residence was a "joint venture" between the FBI and a Foreign Law Agency ("FLA") and that any search conducted by the FLA should be subject to the restrictions of the Fourth Amendment. Dkt. 472 at 1. Defendant attempts to excuse his failure to make this argument in earlier briefs by claiming that defendant "did not have access to the information that the government has been withholding." Dkt. 491 at 2. But this argument is belied by the information cited in the instant motion, which relies solely on publicly available articles, published caselaw, and documents that have been in the docket in this case for many months. *See* Dkt. 471. The instant motion also requests a *Franks* hearing as to the validity of the affidavit supporting the search warrant, but previous Orders have explained that defendant has failed to make a sufficient preliminary showing that he is entitled to a *Franks* hearing. *United States v. Sanders*, Case No. 1:20-cr-142

2

**JA513**

(E.D. Va., October 26, 2020) (Dkt. 113) (Sealed Memorandum Opinion). Nothing in this most recent round of briefing suggests that a *Franks* hearing is appropriate or resolves the serious issues of timeliness that have plagued all of defendant's motions on this topic.

In sum, defendant's renewed motion presents no new evidence suggesting that the search warrant in this case was not supported by probable cause. The defendant's new argument that the operation which led to the search warrant was a joint venture is untimely and without factual support. Thus, reconsideration of prior Orders is inappropriate, and the instant motion must be denied.

Accordingly,

It is hereby **ORDERED** that defendant's Renewed Motion to Suppress Based on Warrantless Use of a Network Investigative Technique and False Material Information in Affidavit Paragraph 25 (Dkt. 471) is **DENIED**.

The Clerk is directed to provide a copy of this Order to all counsel of record.

Alexandria, Virginia
October 13, 2021

T. S. Ellis, III
United States District Judge

3

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:20-cr-143 |
| | ) | |
| ZACKARY ELLIS SANDERS, | ) | |
| Defendant. | ) | |

## ORDER

This criminal prosecution for production, receipt, and possession of child pornography is presently before the Court on a jury trial. At trial on October 20, 2021, defendant sought to introduce sexually explicit chats and images of one of the defendant's alleged minor victims that were not admitted in the course of the government's case in chief. Defense counsel argued at trial that these chats and images should be admissible because these chats and images tend to show that the defendant's alleged minor victim might have created the explicit images *prior* to communication with the defendant and that this evidence is therefore relevant as to the five counts of production of child pornography production charged in the indictment. The government objected to admissions of these chats and the objection was sustained in part, as explained below.

This is not the first time that admissibility of the alleged minor victim's sexually explicit behavior has been considered. An Order issued May 20, 2021 granted the government's motion to exclude evidence related to the minor victim's alleged sexual behavior or sexual predisposition, explaining that such evidence was inadmissible under Federal Rule of Evidence 412. *See* Dkt. 364 (Sealed Order). As the May 20, 2021 Order explained, however, defendant may be able to introduce such evidence if such evidence established that the images introduced by the government to sustain the production of child pornography counts had, in fact, been

1

**JA515**

produced prior to the defendant's conversations with the minor victims. *See* Dkt. 364 at 5-6, n.8. Federal Rule of Evidence 412 requires that "evidence offered to prove that a victim engaged in other sexual behavior," as well as "evidence offered to prove a victim's sexual predisposition," cannot be admitted in a "criminal proceeding involving alleged sexual misconduct." Fed. R. Evid. 412(a).

At trial, defendant discussed three possible categories of evidence that defendant may seek to introduce to counter the government's evidence. The first category of images defendant discussed includes images that the government contends were produced as a result of defendant's actions, but which preexisted defendant's contact with the alleged minor victim. If defendant has evidence that these images were, in fact, produced prior to defendant's chats with his minor victim, *i.e.* that these images pre-date the chats at issue, then defendant is free to introduce that evidence or to elicit it from the minor victim. This evidence will not run afoul of Rule 412, because such evidence goes to whether the images that are the subject of the indictment were created at defendant's direction and thus are relevant to whether there was production of child pornography. Accordingly, such evidence, if such evidence exists, is admissible. The government may still, however, argue that defendant's conduct constitutes an attempt to produce child pornography, but that contention need not be resolved here.

Defendant may not, however, introduce into evidence other sexually explicit images that the minor victim sent the defendant or posted online. These include sexually explicit images of the minor victim that pre-date the chats that are the subject of the indictment and that the government has sought to introduce. These also include sexually explicit images of the alleged minor victim sent *after* the chats at issue occurred. These images are inadmissible under Rule 412, as the defendant seeks to introduce the evidence for the precise purpose prohibited by Rule

2

**JA516**

412. That is, defendant seeks to introduce the evidence "to prove that a victim engaged in other sexual behavior" or "to prove a victim's sexual predisposition." Fed. R. Evid. 412; *see also United States v. Ogden*, 685 F.3d 600, 604-05 (6th Cir. 2012) (excluding evidence of the victim's chats with other men pursuant to Rule 412). Accordingly, defendant will not be permitted to introduce other sexual chats or images of the alleged minor victim and the government's objection in this regard will be sustained.

Accordingly,

It is hereby **ORDERED** that the government's objection is **SUSTAINED IN PART and OVERRULED IN PART**. The government's objection is sustained with respect to evidence of other sexual images or chats involving the alleged minor victim, that are not the subject of the indictment. The government's objection is overruled with respect to any evidence that the defendant may have that shows that the images of the minor victim that are the subject of the indictment existed prior to defendant's chats with the alleged minor victim.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
October 21, 2021

/s/

T. S. Ellis, III
United States District Judge

3

**JA517**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

UNITED STATES OF AMERICA,

      v.

ZACKARY ELLIS SANDERS,

                Defendant.

Case No. 1:20-cr-00143
Honorable T.S. Ellis, III
Trial: Oct. 19, 2021

## DEFENDANT'S OBJECTION TO COURT'S JURY INSTRUCTION REGARDING "CONSENT IS NOT A DEFENSE" AND THE EXCLUSION OF EVIDENCE DEMONSTRATING ASSENT

Defendant, Zackary Ellis Sanders, by counsel, respectfully objects to the Court's repeated

instruction to the jury that under, 18 U.S.C. § 2251(a), "consent is not a defense." The defense objects to the

court's instruction on the basis that it is legally incorrect, prejudicial to the accused, and irremediably

confusing to the jury. For the same reasons, and given the statute's verbs, Mr. Sanders objects to the

continued exclusion of all evidence bearing on assent. The defense requests a curative instruction on this

issue as set forth in the Conclusion.

## DISCUSSION

I.     **Section 2251(a) in using the verbs "persuades, induces, entices, or coerces" assumes that minors can "assent" to engage in "any sexually explicit conduct."**

The catchphrase, "a child cannot consent to sex" does not reflect a true principle of

common law, federal law or state law. It is a vernacular expression derived from the fact that

legislators, and common law, have in various ways and contexts, sought to protect children by

limiting the defense of "consent" to sexual crimes to cases where the victim is over a certain age.

The concept of "age of consent" or any declarations about the consent of a victim are not

relevant, however, to offenses defined by the defendant's intent, or where lack of consent is not an element of the offense.

In the particular case of statutes defining child exploitation offenses, such as 18 U.S.C. § 2422 and 18 U.S.C. § 2251, a statute charged in this case, the use of this catchphrase undermines the legislative intent and plain language of the offenses.  This prejudices the accused by encouraging the jury to disregard the actual elements of the offense.  The prejudice is clear in cases of § 2251(a) and § 2422 with their overlapping proscriptions of enticing minors into engaging in sexual activity.

The Fourth Circuit and other Circuits have deliberately avoided confounding the question of whether the accused has enticed a minor to engage in sexual activity, on which the prosecutors have the burden of proof, with any reference to "consent."  Instead,  this and other Circuits have recognized that the terms of enticement in § 2251(a) that are common with § 2422 ("persuades, induces, entices, or coerces") are aimed at "*causing assent* on the part of the minor" to engaging in sexual activity.  *United States v. Harris*, 991 F.3d 552, 559-60 (4th Cir. 2021); *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012); *United States v. Berk*, 652 F.3d 132, 140 (1st Cir. 2011); *United States v. Murrell*, 368 F.3d 1283, 95 F. App'x 1283 (11th Cir. 2004); *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000); *United States v. Pierson*, 544 F.3d 933, 939 (8th Cir. 2008); *United States v. Thomas*, 410 F.3d 1235, 1244 (10th Cir. 2005); *United States v. Lee*, 603 F.3d 904, 914 (11th Cir. 2010); *United States v. Yost*, 479 F.3d 815, 819 n.3 (11th Cir. 2007).  The statute "criminalizes an intentional attempt to achieve a mental state—a minor's assent."  *Engle*, 676 F.3d 405; *see also* 419 *Dwinells*, 508 F.3d at 71; *Lee*, 603 F.3d at 914.[1]

---

[1] *Accord United States v. Seitu Sulayman Kokayi*, No. 1:18-cr-410 (LMB), 2019 U.S. Dist. LEXIS 78725 (E.D. Va. May 8, 2019, Brinkema, J.); *Coogle v. United States*, No. 2:18-cv-01291, 2020 U.S. Dist. LEXIS 250038, *24-25 (S.D. W. Va. Feb. 11, 2020); *Jeffries v. United States*, No. 4:15-CR-00083, 2018 U.S. Dist. LEXIS 174081, 2018 WL 4903267, at *11 (E.D. Va. Oct. 9, 2018), appeal dismissed, 763 F. App'x 326 (4th Cir. 2019).

Under the enticement provisions of § 2251(a), it is in fact relevant if the minor has already "assented" to the sexual activity without any persuasion.

> The "primary evil Congress meant to avert by enacting § 2422(b) was the psychological sexualization of children . . . ." *Fugit*, 703 F.3d at 255; *see also United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012) (recognizing that § 2422(b) "was designed to protect children from the act of solicitation' (internal quotation marks omitted)). Accordingly, what § 2422(b) criminalizes is "an intentional attempt to achieve a mental state - a minor's assent" - in its young victims. *Fugit*, 703 F.3d at 255 (internal quotation marks omitted). And the conduct § 2422(b) "seeks to regulate," *WesternGeco*, 138 S. Ct. at 2137 (internal quotation marks omitted) - or rather, prevent - is coerced sexual activity by children, *see* 18 U.S.C. § 2422(b) [*560] (criminalizing coercion [**17] of a minor "to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense").

*United States v. Harris*, 991 F.3d 552, 559-60 (4th Cir. 2021). Rather, these statutes are designed to protect children from the act of solicitation to engage in sexuality.

Thus, in interpreting the defendant's language, and his intent, it is relevant whether the accused believes that the minor assents to engaging in sexually explicit activity without enticement. This may be indicated by the minor having responded to the defendant's advertisement, only seeking individuals interested in engaging in sexually explicit behavior—all by themselves. True, *the actual assent or not is not dispositive*. However, in interpreting the aim of the accused in engaging with the minor, what the accused understands about the assent of the minor is certainly relevant to his intent. It is also relevant to whether obtaining a visual depiction of sexually explicit conduct was "at the very least a significant purpose" of the defendant's in saying what he said. *United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020). A jury cannot assess this purpose without viewing the full content of the defendant's communications with the alleged minor.

3

**JA520**

Especially in a §2251(a) case where the minor did engage in the sexual activity, telling the jury that a "child cannot consent" or that "consent is not a defense" is fatally prejudicial to a legitimate defense that the accused did not attempt to entice a child.  If the Court were to correctly instruct the jury as to the meaning of § 2251 when it comes to "enticement," the statute by its terms contemplates a situation where a minor does not engage in sexually explicit conduct on his or own accord.  In other words, the "consent is no defense" thinking would impose criminal liability without regard to actions by the accused designed to obtain "assent" or "consent" because such a thing is not possible.

If Congress had intended for the statute—with its 15-year mandatory minimum—to be applied in this manner, the statue would have read as follows:

> (a) Any person who intends that any minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e) . . .

Instead, as acknowledged by the language of § 2251 and § 2242, and the many courts having addressed the meaning of these enticement terms, Congress clearly understood that minors on their own do in fact "assent" to engaging in sexual behavior and that such assent can be relative to culpability.  Though Congress *did not have in mind* the now-pervasive use of cell phones and "web cams" by adolescents to willingly and of their own volition, *self*-produce*"* images that *literally* fall into the definition of "child pornography, in this environment such a phenomenon demonstrates in an unpredicted way that minors in fact do assent to engaging in such behaviors.

Telling jurors that minors cannot "consent," which they cannot distinguish from being told that a minor cannot "assent," carries with it the idea that anything that the accused did toward the victim must have been coercive because a minor "by law" could not have done it

4

**JA521**

willingly. The better language for the Court to use is that of assent, or the concept familiar on the question of voluntariness: whether the accused has sought to overcome the will of the minor.

**II.  Section 2252(a) concept of "employ, uses" is not pertinent in cases of self-produced images by a minor**

Section 2251 contains statutory terms that do not overlap with the federal enticement statute, § 2242, *i.e.*, "employs" and "uses." The term "used" in the second element of the instruction means "to put into action or service," "to avail oneself of," or "[to] employ." *United States v. Laursen*, 847 F.3d 1026, 1032 (9th Cir. 2017). Solicitation can obviously be done remotely by phone or in online communications, or through third persons. *See, e.g. United States v. Murrell*, 368 F.3d 1283, 95 F. App'x 1283 (11th Cir. 2004). In contrast, the term "uses" has generally been applied to cases where the accused with the victim and creation of a photographic or video image, "directly involved in the actual sexual abuse or exploitation of minors." *See United States v. Kemmish*, 120 F.3d 937, 941-42 (9th Cir. 1997).

<u>CONCLUSION</u>

"Consent" is irrelevant to the §2251(a) charge. The concepts related to "consent" on which the Court has instructed the jury, and the confusion that arises from giving pronouncements on "consent" in a case where one element of § 2251(a) is the purpose to attain the "assent" of the minor, are gravely prejudicial to the defense. The rulings where the concepts related to "consent" not being a defense which have been invoked to elicit evidence from government witnesses, have prejudiced defendant and compromised his right to present a defense.

5

**JA522**

Accordingly, the defense respectfully objects to these instructions, declarations and rulings and respectfully requests that the Court give a curative instruction to the jury to disregard them. We request the jury be instructed that it was not improper for the defense counsel to attempt to elicit facts that may have appeared in the case that might inform a decision as to what the defendant's purpose might have been in his various statements to the minors.

The defense also respectfully requests that there be no mention of the "consent" or expressions about a minor not being able to consent or that "consent is not a defense" in instructing the jury, as the defense has not and will not attempt to prove that any minor in fact "consented" to the engaging in sexually explicit conduct.

Respectfully submitted,

_____/s/_____
Jonathan Jeffress (#42884)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C. 20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

_____/s/_____
Nina J. Ginsberg (#19472)
Zachary Deubler (#90669)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email: nginsberg@dimuro.com
Email: zdeubler@dimuro.com

_____/s/_____

6

**JA523**

Mark J. Mahoney (admitted *pro hac vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Telephone: 716-853-3700
Facsimile: 716-853-3710
Email: mjm@harringtonmahoney.com

                    /s/
H. Louis Sirkin (admitted *pro hac vice*)
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450
Facsimile: (513) 721-0109
Email: hls@santenhughes.com

*Counsel for Defendant Zackary Ellis Sanders*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October 2021, the foregoing was served electronically on the counsel of record through the US District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

                    */s/ Jonathan Jeffress*
                    Jonathan Jeffress

7

**JA524**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Criminal Action No. 1:20-cr-143** |
| | ) | |
| ZACKARY ELLIS SANDERS, | ) | |
| Defendant. | ) | |

## ORDER

This matter comes before the Court on defendant's objection, Dkt. 529, to the Court's

instruction to the jury that "consent is not a defense" to an allegation of production of child

pornography under 18 USC § 2251(a). Defendant further objects to the exclusion of evidence

bearing on the alleged "assent" of defendant's minor victims. Dkt. 529 at 1.[1] Defendant has

argued repeatedly during trial that minors can, in fact, consent to sexual activity. This argument

has no bearing, however, on whether minors may consent to the production of child

pornography, which is the crime for which defendant is charged. The Court has already issued a

curative instruction, at defendant's request, that minors may consent to engage in sexually

explicit conduct (for example, a minor may masturbate in the privacy of his or her home), but

defendant's latest request asks for a further instruction that defendant's belief about a minor's

assent to the production of child pornography somehow bears on defendant's criminal liability.

Defendant's argument in the middle of trial is particularly untimely, given that a May 20,

2021 Order, *see* Dkt. 364, explained that "evidence of the alleged minor victims' consent is

irrelevant and inadmissible pursuant to Rule 402." Dkt. 364 at 3. The May 20, 2021 Order cited

---

[1] Although this evidence is irrelevant and inadmissible under Rule 402, as explained in this
Order, it is also inadmissible under Rule 412, which prohibits in sex-offense cases the use of
evidence offered either "to prove that a victim engaged in other sexual behavior" or "to prove a
victim's sexual predisposition." Fed. R. Evid. 412(a).

1

**JA525**

a number of cases explaining that consent of minor victims is irrelevant to a charge that

defendant used those minor victims for the purpose of production of child pornography. *See, e.g.*

*United States v. Sibley*, 681 F. App'x 457, 461 (1st Cir. 2017) (holding that "consent is irrelevant

to whether [the defendant] used [the minor victim] for the purposes of 18 U.S.C. § 2251(a).");

*United States v. Wells*, 843 F.3d 1251, 1255 (10th Cir. 2016) ("[O]f course, a minor cannot

consent to production of child pornography."); *Ortiz-Graulau v. United States*, 756 F.3d 12, 19

(1st Cir. 2014) ("[A]ny facts about the consensual and allegedly non-exploitative nature of the

relationship between [the defendant] and [the minor victim] or about the circumstances in which

the photographs were taken could not have supported a legally permissible defense."); *United

States v. Street*, 531 F.3d 703, 708 (8th Cir. 2008) ("Here, the district court properly concluded

consent was not a defense and, because [the minor victim's] willingness to engage in the acts

was irrelevant, Rule 412's consent exception was inapplicable."). This Order was issued nearly

five months before trial began, and defendant made no motion for reconsideration and did not re-

raise the issue until after trial had begun.

Defendant relies on caselaw interpreting 18 U.S.C. § 2422(b), which criminalizes

coercion of a minor to engage in sexual activity. But § 2422(b) is not at issue in this case, which

involves a prosecution for violation of 18 U.S.C. § 2251(a). Defendant seems to suggest that

caselaw interpreting § 2422(b) is somehow relevant to determining whether consent is a defense

to production of child pornography, but no such connection is apparent. The two statutes

criminalize different conduct: § 2251(a) criminalizes the use of minors for production of child

pornography and § 2422(b) criminalizes the enticement of minors to engage in sexually explicit

conduct. And the two statutes use different verbs, as § 2422(b) criminalizes someone who

"persuades, induces, entices, or coerces" a minor to engage in sexually explicit activity, 18

2

**JA526**

U.S.C. § 2422(b), while § 2251(a) criminalizes anyone who "*employs, uses,* persuades, induces, entices, or coerces" a minor to engage in sexually explicit conduct with the purpose of producing pornography. 18 U.S.C. § 2251(a) (emphasis added).  Thus, § 2251(a) criminalizes a broader range of actions (e.g. employing or using a minor) than does § 2422(b).

Defendant's brief in support of the instant objection relies heavily on caselaw interpreting § 2422(b) as criminalizing "an intentional attempt to achieve a mental state – a minor's assent – in its young victims." *United States v. Harris*, 991 F.3d 552, 559 (4th Cir. 2021), *cert. denied*, No. 21-5604, 2021 WL 4733596 (U.S. Oct. 12, 2021) (internal citations omitted). But it is unclear from defendant's brief why caselaw interpreting § 2422(b), which uses different words to criminalize different behavior than the statute charged in this case, § 2251(a), should bear on the issue of whether a minor victim can consent to a violation of § 2251(a). More importantly, defendant does not appear to cite a single case suggesting that consent is a defense to either § 2422(b) or § 2251(a). Thus, defendant's reliance on caselaw interpreting § 2422(b) is misplaced and does little to advance his argument here.

In sum, defendant has not demonstrated that the assent of his minor victims is a defense to the charges of production of child pornography.

Accordingly,

It is hereby **ORDERED** that defendant's objection to the Court's jury instruction given in the course of the trial that "consent is not a defense to the production of child pornography" is **OVERRULED** because that instruction is correct.

It is further **ORDERED** that defendant's objection to the exclusion of evidence suggesting that defendant's minor victims consented to engage in sexually explicit acts is also **OVERRULED**. That consent is irrelevant. Defendant will have an opportunity to re-argue this

3

**JA527**

issue at the final jury instructions conference, but the ultimate instruction is unlikely to differ

from the conclusion contained here.

The Clerk is directed to send a copy of this Order all counsel of record.

Alexandria, Virginia
October 25, 2021

/s/

T. S. Ellis, III
United States District Judge

4

**JA528**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

v.

ZACKARY ELLIS SANDERS,

Defendant.

Case No. 1:20-cr-00143
Honorable T.S. Ellis, III
Trial: Oct. 19, 2021

**DEFENDANT'S NOTICE OF FILING OF OBJECTION TO JURY INSTRUCTION
REGARDING HIS PURPOSE**

Defendant, Zackary Ellis Sanders, by counsel, submits the attached notice of filing of his

objection to this Court instructing the jury merely that the government has to prove that "a

motivating purpose" in his employing, using, persuading, inducing, enticing, or coercing any

minor to engage in sexually explicit conduct was to create a visual depiction of that conduct.

Merely instructing the jury that producing a visual depiction be "a motivating purpose,"

without more, would misstate the law on a point so important that it would seriously impair Mr.

Sanders's defense. *See United States v. Raza*, 876 F.3d 604, 614 (4th Cir. 2017) (explaining

when a jury instruction constitutes reversible error).

Here, the plain statutory language criminalizes a defendant knowingly "employ[ing],

us[ing], persuad[ing], induc[ing], entic[ing], or coerc[ing] any minor to engage in . . . any

sexually explicit conduct for *the purpose* of producing any visual depiction of such conduct." 18

U.S.C. § 2251(a) (emphasis added). The statute is clear that it must be "the purpose," and not "a

purpose."

**JA529**

The Fourth Circuit has interpreted the meaning of "the purpose" and concluded that it means something more than "a purpose" or "a motivating purpose." In *United States v. Thompson*, the court instructed the jury, *inter alia*, that

> the Government must prove that producing a visual depiction of the sexually explicit conduct was one of the Defendant's purposes for using, employing, persuading, inducing, enticing, or coercing the victim to engage in sexually explicit conduct, and *that it was a significant or motivating purpose and was not merely incidental to the sexually explicit conduct.* In deciding whether the Government has proven that the Defendant acted for *the purpose* of producing a visual depiction of the sexually explicit conduct, you may consider all of the evidence concerning the Defendant's conduct. While the Government must prove that Defendant acted with *the purpose* of producing a visual depiction of a child engaging in sexually explicit conduct, it is not required that the Government prove that the visual depiction of that conduct was actually produced.

*United States v. Thompson*, Case No. 8:17-cr-00195-TDC (Sept. 14, 2018) (Dkt. 99) (emphases added). The Fourth Circuit concluded that "this instruction adequately informed the jury of the controlling legal principles." *United States v. Thompson*, 807 F. App'x 251, 252 (4th Cir.), *cert. denied*, 141 S. Ct. 905 (2020). The *Thompson* instruction did not merely state that the defendant's purpose was a "motivating purpose," but made clear that it was a "significant or motivating purpose," and "was not merely incidental to the sexually explicit conduct." *Id.* at 252; *see also United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020) (finding that the difference between "the purpose" and "a purpose" "is whether the accused's alleged purpose *carries some predominant weight*, as required by the plain statutory language, or whether [producing a visual depiction] was one among many, potentially much more significant purposes. Indeed, 'a purpose' could be merely one in ten . . . without considering any relative weight amongst these varying purposes.") (emphasis added).

Thus, the Fourth Circuit has made clear that "the language 'the purpose' requires that [producing a visual depiction] *be at the very least a significant purpose* in the sexual conduct

2

**JA530**

itself, not merely incidental." *Id.* at 695 (emphasis added). In *McCauley*, *id.* at 695, the Fourth

Circuit cited favorably to *United States v. Torres*, 894 F.3d 305 (D.C. Cir. 2018), where the D.C.

Circuit "assume[d]," and which the government conceded in that case, "that the government must

show that *the purpose* of producing a visual image was a defendant's *dominant motive* for using,

inducing, or coercing a minor's sexual conduct," *id.* at 312. The *McCauley* court also noted that

"[t]wo of our sister circuits have recognized this, defining 'the purpose' as *'one of the dominant'*

*motives or purposes* under § 2251(a). *Id.* at 696 (emphasis added) (citing *United States v. Sirois*,

87 F.3d 34, 39 (2d Cir. 1996); *United States v. Raplinger*, 555 F.3d 687, 693 (8th Cir. 2009)).

Here, based on the evidence presented at trial, the jury could rationally conclude, for

example and for the sake of argument, that (1) the alleged minor victims engaged in sexually

explicit conduct and (2) that they recorded videos of that conduct at Mr. Sanders's request, but

that Mr. Sanders is not guilty because his significant, dominant, or motivating purpose/purposes

was/were not to produce a visual depiction,[1] but was something else, including for the alleged

minor victims to complete tasks necessary to their dominant-submissive relationship with him, to

prove that they had completed tasks as part of their training in BDSM protocols, and to allow

them to experience feelings of submission that he believed that they desired (and that producing

a visual depiction was only incidental to those other purposes that predominated). To do so, the

jury must understand that "[i]t is simply not enough to say 'the photo speaks for itself *and* for the

defendant and that is the end of the matter." *United States v. Palomino-Coronado*, 805 F.3d 127,

130 (4th Cir. 2015) (emphasis in original) (citation and quotation omitted).

---

[1] *United States v. Williams*, 553 U.S. 285, 294 (2008) (noting that "the commonsense canon of
*noscitur a sociis* . . . counsels that a is given more precise content by the neighboring words with
which it is associated").

**JA531**

If this Court merely instructs the jury that it must find that producing a visual depiction was one of Mr. Sanders's "motivating purposes," because motivating can simply mean "able to influence someone," the jury is likely to believe that "a motivating purpose" is analogous to merely stating that it need only be "a purpose" of Mr. Sanders's. This would effectively and impermissibly eliminate the specific intent element of § 2251(a) and convert it into a strict liability offense. As a result, this Court should instruct the jury that producing a visual depiction of sexually explicit conduct must be, "at the very least, a significant purpose in the sexual conduct itself, not merely incidental," *McCauley*, 983 F.3d at 695, and that it "carr[y] some predominant weight," *id. See also* Defense Revised Proposed Jury Instruction No. 22 (Dkt. 500 at 11).

Respectfully submitted,

_____/s/_____
Jonathan Jeffress (#42884)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C. 20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

_____/s/_____
Nina J. Ginsberg (#19472)
Zachary Deubler (#90669)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email: nginsberg@dimuro.com
Email: zdeubler@dimuro.com

4

**JA532**

/s/

_____
Mark J. Mahoney (admitted *pro hac vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Telephone: 716-853-3700
Facsimile: 716-853-3710
Email: mjm@harringtonmahoney.com

/s/

_____
H. Louis Sirkin (admitted *pro hac vice*)
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450
Facsimile: (513) 721-0109
Email: hls@santenhughes.com

*Counsel for Defendant Zackary Ellis Sanders*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October 2021, the foregoing was served electronically on the counsel of record through the US District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress

5

**JA533**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:20-CR-143 |
| v. | ) | |
| | ) | Honorable T.S. Ellis, III . |
| ZACKARY ELLIS SANDERS, | ) | |
| | ) | Trial: October 19, 2021 |
| *Defendant.* | ) | |
| | ) | |

## GOVERNMENT'S REVISED TRIAL EXHIBIT LIST

| GX | Description | Offered | Admitted |
|---|---|---|---|
| **100 Series** | | | |
| 101 | Interview of the defendant (**BULK**) | ✓ | ✓ |
| 102 | Clip 1 | ✓ | ✓ |
| 102A | Transcript of Clip 1 | ✓ | ✓ |
| 103 | Clip 2 | ✓ | ✓ |
| 103A | Transcript of Clip 2 | ✓ | ✓ |
| 104 | Clip 3 | ✓ | ✓ |
| 104A | Transcript of Clip 3    E. Bailey 10|25|21 | ✓ | ✓ |
| 105 | Clip 4 | ✓ | ✓ |
| 105A | Transcript of Clip 4 | ✓ | ✓ |
| 106 | Clip 5 | ✓ | ✓ |
| 106A | Transcript of Clip 5 | ✓ | ✓ |
| **200 Series** | | | |

| 201 | Search warrant photo | | ✓ | ✓ |
|-----|---------------------|---|---|---|
| 202 | Search warrant photo | | ✓ | ✓ |
| 203 | Search warrant photo | | ✓ | ✓ |
| 204 | Search warrant photo | | ✓ | ✓ |
| 205 | Search warrant photo | | ✓ | ✓ |
| 206 | Search warrant photo | | ✓ | ✓ |
| 207 | Search warrant photo | | ✓ | ✓ |
| 208 | Search warrant photo | | ✓ | ✓ |
| 209 | Search warrant photo | | ✓ | ✓ |
| 210 | Search warrant photo | | ✓ | ✓ |
| 211 | Search warrant photo | L. Carillo 10/20/21 | ✓ | ✓ |
| 212 | Search warrant photo | | ✓ | ✓ |
| 213 | Search warrant photo | | ✓ | ✓ |
| 214 | Search warrant photo | | ✓ | ✓ |
| 215 | Search warrant photo | | ✓ | ✓ |
| 216 | Search warrant photo | | ✓ | ✓ |
| 217 | Search warrant photo | | ✓ | ✓ |
| 218 | Search warrant photo | | ✓ | ✓ |
| 219 | Search warrant photo | | ✓ | ✓ |
| 220 | Search warrant photo | | ✓ | ✓ |
| 221 | Search warrant photo | | ✓ | ✓ |
| 222 | Search warrant photo | | ✓ | ✓ |
| 223 | Search warrant photo | | ✓ | ✓ |
| 224 | Search warrant photo | | ✓ | ✓ |

2

**JA535**

| 225 | Search warrant photo | | ✔ | ✔ |
|---|---|---|---|---|
| 226 | Search warrant photo | | ✔ | ✔ |
| 227 | Search warrant photo | | ✔ | ✔ |
| 228 | Search warrant photo | | ✔ | ✔ |
| 229 | Search warrant photo | | ✔ | ✔ |
| 230 | Search warrant photo | | ✔ | ✔ |
| 231 | Search warrant photo | | ✔ | ✔ |
| 232 | Search warrant photo | —L. Calvillo, 10/20/21 | ✔ | ✔ |
| 233 | Search warrant photo | | ✔ | ✔ |
| 234 | Search warrant photo | | ✔ | ✔ |
| 235 | Search warrant photo | | ✔ | ✔ |
| 236 | Search warrant photo | | | |
| 237 | Search warrant photo | | | |
| 238 | Search warrant photo | | | |
| 239 | Search warrant photo | | | |
| 240 | Search warrant photo | | | |
| 241 | Search warrant photo | | | |
| 242 | Search warrant photo | | | |
| 243 | Search warrant photo | | | |
| 244 | Search warrant photo | | | |
| 245 | Search warrant photo | | | |
| **300 Series** | | | | |
| 301 | Birth Certificate of MINOR VICTIM 1 C.M. 10/20/21 C. Ford 10/21/21 | | ✔ | ✔ |
| 302 | Birth Certificate of MINOR VICTIM 3 | | | |

301 A    Birth Certificate of Minor Victim 1. Original    ✔    ✔ C. Ford 10/21/21
302 A    Original Birth Certificate    ✔    ✔ C. Ford 10/21/21
                                                            E. Bailey 10/25/21

3

**JA536**

303A Birth Certificate of MINOR VICTIM 4 (Original) ✓ ✓ C. Ford 10/21/21

| 303 | Birth Certificate of MINOR VICTIM 4 J.Ross, 10/20/21 C. Ford, 10/21/21 | ✓ | ✓ |
| 304 | Birth Certificate of MINOR VICTIM 5 | | |

304A Original Birth Certificate ✓ ✓ C. Ford 10/21/21

**400 Series**

| 401 | Defendant's Apple iPad (S/N: DMPBGGCPHDDV) (1B19) **(BULK)** L. Calvillo 10/20/21 C. Ford, 10/21/21 | ✓ | ✓ |
| 402 | Defendant's Apple iPad (S/N: DMPHM3K7DVGF) (1B22) **(BULK)** L. Calvillo, 10/20/21 ; C. Ford 10/21/21 | ✓ | ✓ |
| 403 | Defendant's Apple iPhone (S/N: C39VJ0XDJCL6) (1B27) **(BULK)** D. Iannotti, 10/20/21 ; C. Ford 10/21/21 | ✓ | ✓ |

**500 Series**

| 501 | iMessage chat from iPhone with MINOR VICTIM 5 | | |
| 501A | Excerpt of chat with MINOR VICTIM 5 C. Ford 10/21/21 | ✓ | ✓ |
| 501B | Images of MINOR VICTIM 5 C. Ford, 10/21/21 | ✓ | ✓ |
| 501C | Images of the defendant C. Ford, 10/21/21 | ✓ | ✓ |
| 501D | Excerpt of chat with MINOR VICTIM 5 C. Ford, 10/21/21 | ✓ | ✓ |
| 501E | Excerpt of chat with MINOR VICTIM 5 C. Ford 10/21/21 | ✓ | ✓ |
| 501F | Excerpt of chat with MINOR VICTIM 5 C. Ford 10/21/21 | ✓ | ✓ |
| 501G | 52714754045__73AB732B-BAA0-45C8-A787-C77261CDE4EF.JPG.jpeg **(OBSCENE)** C. Ford 10/21/21 | ✓ | ✓ |
| 501H | 52714781881__75E5A438-B179-407B-91BD-315FD9746ADE.JPG.jpeg C. Ford 10/21/21 | ✓ | ✓ |
| 501I | 52714789384__3E3E42BF-01ED-4C0C-84BB-9945CC0C2A36.JPG.jpeg **(OBSCENE)** C. Ford 10/21/21 | ✓ | ✓ |
| 501J | Images from chat with MINOR VICTIM 5 | | |
| 501K | Images from chat with MINOR VICTIM 5 | | |
| 501L | 52714938940__FB053126-E4FA-41B6-9D7C-E6024B261AD4.JPG.jpeg | | |

501 at 99 — 5/9/17 1:11Pm - 1:28Pm ✓ ✓ C. Ford 10/22/21
501 at 32 - 4/29/17 3:50 Pm - 3:53 Pm ✓ ✓ C. Ford 10/22/21
501 at 35 - 4/29/17 11:55 Pm to 4/30/17 12:07 Am ✓ ✓

**JA537**

| | | | |
|---|---|---|---|
| 501M | 52714958292__B17F08D4-CF52-4467-A54D-797686587F68.JPG.jpeg | | |
| 501N | IMG_7808.PNG | | |
| 501O | IMG_7809.PNG | | |
| 501P | Excerpt of chat with MINOR VICTIM 5  *C. Ford 10/21/21* | ✓ | ✓ |
| 501Q | 52851573385__4F3586FD-30F3-42AA-8F5C-5499D519680D.JPG.jpeg (OBSCENE)  *C. Ford 10/21/21* | ✓ | ✓ |
| 501R | 52851593447__5083B650-4D97-4C3D-92A9-D9770E9DD635.MOV.mov (OBSCENE)  *C. Ford 10/21/21* | ✓ | ✓ |
| 501S | Storyboard of 52851593447__5083B650-4D97-4C3D-92A9-D9770E9DD635.MOV.mov (OBSCENE) | ✓ | ✓ |
| 501T | Excerpt of chat with MINOR VICTIM 5  *C. Ford 10/21/21* | ✓ | ✓ |
| 501U | 53014104853__513FE191-4D59-4030-BFBF-EE68718E718F.jpeg (OBSCENE)  *C. Ford 10/21/21* | ✓ | ✓ |
| 501V | IMG_5592.mov (OBSCENE) | ✓ | ✓ |
| 501W | Storyboard of IMG_5592.mov (OBSCENE)  *C. Ford 10/21/21* | ✓ | ✓ |
| 501X | IMG_5593.mov (OBSCENE) | ✓ | ✓ |
| 501Y | Storyboard of IMG_5593.mov (OBSCENE) | ✓ | ✓ |
| 502 | Image and metadata from Apple iPhone  *C. Ford 10/21/21* | ✓ | ✓ |
| 502A | Print screen  *C. Ford 10/21/21* | ✓ | ✓ |
| 503 | iMessage chat from iPhone with MINOR VICTIM 3 | | |
| 503A | Excerpt of chat with MINOR VICTIM 3  *C. Ford 10/21/21* | ✓ | ✓ |
| 503B | Images from chat with MINOR VICTIM 3  *C. Ford 10/21/21* | ✓ | ✓ |
| 503C | 52744582335__CB13D965-986D-40A1-904D-28CB090A7B09.jpg  *C. Ford 10/21/21* | ✓ | ✓ |
| 503D | 52745533752__6385C049-5B1D-49D3-905D-099A4F1C066D.jpg (OBSCENE)  *C. Ford 10/21/21  E. Bailey 10/25/21* | ✓ | ✓ |

*503 - Pg. 65 Only — iMessage chat*    ✓    ✓ *C. Ford*

5

**JA538**

| | | | |
|---|---|---|---|
| 503E | 52745652768__B36E1911-41C1-45E6-9ACE-C322142BD83B.mov **(OBSCENE)** | ✓ C. Ford 10/21/21 | ✓ |
| 503F | Storyboard of 52745652768__B36E1911-41C1-45E6-9ACE-C322142BD83B.mov **(OBSCENE)** | ✓ | ✓ |
| 503G | 52747940016__5D3B67CA-148A-4A62-9056-EDE761A93D6B.mov **(OBSCENE)** | ✓ | ✓ |
| 503H | Storyboard of 52747940016__5D3B67CA-148A-4A62-9056-EDE761A93D6B.mov **(OBSCENE)** | C. Ford 10/21/21 ✓ | ✓ |
| 503I | Excerpt of chat with MINOR VICTIM 3  C. Ford 10/21/21 | ✓ | ✓ |
| 503J | 52763388824__3D70D1A9-EE94-46BD-958F-1610D9D966A5.mov **(OBSCENE)** | ✓ | ✓ |
| 503K | Storyboard of 52763388824__3D70D1A9-EE94-46BD-958F-1610D9D966A5.mov **(OBSCENE)** | C. Ford 10/21/21 E. Bailey 10/25/21 ✓ | |
| 503L | Excerpt of chat with MINOR VICTIM 3 | | |
| 503M | Excerpt of chat with MINOR VICTIM 3  C. Ford 10/21/21 | ✓ | ✓ |
| 503N | IMG_7481.jpg  C. Ford 10/21/21 | ✓ | ✓ |
| 503O | IMG_7483.jpg  C. Ford 10/21/21 | ✓ | ✓ |
| 503P | IMG_7484.mov **(OBSCENE)** | ✓ | ✓ |
| 503Q | Storyboard of IMG_7484.mov **(OBSCENE)**  C. Ford 10/21/21 | ✓ | ✓ |
| 503R | 54026732320__AF64280C-0AC4-4295-8B28-94EED87B6B17.jpg  C. Ford 10/21/21 ; E. Bailey 10/25/21 | ✓ | ✓ |
| 503S | Excerpt of chat with MINOR VICTIM 3 | | |
| 503T | Images from chat with MINOR VICTIM 3 | | |
| 504 | Images and metadata from Apple iPhone  C. Ford 10/21/21 | ✓ | ✓ |
| 504A | Print screen  C. Ford, 10/21/21 | ✓ | ✓ |
| 505 | Telegram chat from iPhone with MINOR VICTIM 1  C. M. 10/20/21, C. Ford 10/21/21 | | ✓ |
| 505A | Excerpt of chat with MINOR VICTIM 1 | ✓ | ✓ |

6

**JA539**

| 505B | IMG_9514.MOV (OBSCENE)    C.Ford 10/21/21 | ✓ | ✓ |
|------|----------------------------------------------------------------|------|------|
| 505C | Storyboard of IMG_9514.MOV (OBSCENE) | ✓ | ✓ |
| 505D | telegram-cloud-photo-size-1-5039871056881494294-m.jpg (OBSCENE) | | |
| 506 | Image and metadata from Apple iPhone  C.Ford 10/21/21 | ✓ | ✓ |
| 506A | Print screen  C.Ford 10/21/21 | ✓ | ✓ |
| 507 | Telegram chat from iPhone with MINOR VICTIM 6 | | |
| 507A | Excerpt of chat with MINOR VICTIM 6  C.Ford 10/21/21 | ✓ | ✓ |
| 507B | Excerpt of chat with MINOR VICTIM 6  C.Ford 10/21/21 | ✓ | ✓ |
| 507C | Excerpt of chat with MINOR VICTIM 6  C.Ford 10/21/21 | ✓ | ✓ |
| 507D | Excerpt of chat with MINOR VICTIM 6  C.Ford 10/21/21 | ✓ | ✓ |
| 507E | Excerpt of chat with MINOR VICTIM 6  C.Ford 10/21/21 | ✓ | ✓ |
| 507F | telegram-cloud-photo-size-1-4974457012746299609-m.jpg | | |
| 507G | telegram-cloud-photo-size-1-4974457012746299610-m.jpg  C.Ford   10/21/21 | ✓ | ✓ |
| 507H | IMG_7104.mov (OBSCENE) | ✓ | ✓ |
| 507I | Storyboard of IMG_7104.mov (OBSCENE)    C.Ford 10/21/21 | ✓ | ✓ |
| 507J | IMG_9316.mov (OBSCENE) | ✓ | ✓ |
| 507K | Storyboard of IMG_9316.mov (OBSCENE) | ✓ | ✓ |
| 507L | Excerpt of chat with MINOR VICTIM 6 | | |
| 507M | telegram-cloud-photo-size-1-4996812197262895185-m.jpg | | |
| 507N | telegram-cloud-photo-size-1-5039821875210987612-m.jpg | | |
| 507O | Images from chat with MINOR VICTIM 6 | | |

7

| 508 | Image and metadata from iPhone *C. Ford 10/21/21* | ✓ | ✓ |
|---|---|---|---|
| 508A | Print screen *C. Ford 10/21/21* | ✓ | ✓ |
| 509 | Kik chat from iPad with MINOR VICTIM 4 *C. Ford 10/21/21* | ✓ | ✓ |
| 509A | 55630bdd-9ec8-4701-81cd-5ba2f448b741.jpg *C. Ford 10/21/21* | ✓ | ✓ |
| 509B | f6261d32-41cb-43ff-9eda-545348a3399a.jpg *C. Ford 10/21/21* **(OBSCENE)** | ✓ | ✓ |
| 509C | 4c533786-6454-45cb-9ecd-8e5da6b3a891.mp4 | ✓ | ✓ |
| 509D | a72ecdfc-adb6-42ce-93f0-2a2ebe63a75d.mp4 | ✓ | ✓ |
| 509E | 2bab8085-b3af-415e-9f16-68ef0595d18c.mp4  *C. Ford 10/21/21* | ✓ | ✓ |
| 509F | 7b848199-f59c-440d-bb67-378dc7986306.mp4 | ✓ | ✓ |
| 509G | bc0e8cf8-0f0c-4e9f-bd54-8af38e84e323.mp4 **(OBSCENE)** | ✓ | ✓ |
| 509H | Storyboard of bc0e8cf8-0f0c-4e9f-bd54-8af38e84e323.mp4 **(OBSCENE)**  *C. Ford 10/21/21* | ✓ | ✓ |
| 509I | 632ef5fb-1575-48bb-8fcb-78c2b725144fb.mp4 | | |
| 509J | 283d61a4-ce04-49ae-a311-db3fbb504d6a.mp4 | | |
| 510 | Image and metadata from iPhone *C. Ford 10/21/21* | ✓ | ✓ |
| 510A | Print screen *C. Ford 10/21/21* | ✓ | ✓ |
| 511 | Kik chat from iPad with MINOR VICTIM 2 *C. Ford 10/21/21* | ✓ | ✓ |
| 511A | c7fa2221-abdc-4d0e-a240-d2cc0aaac416.jpg *C. Ford 10/21/21* **(OBSCENE)** | ✓ | ✓ |
| 511B | ddbca105-8150-4492-95d3-6465bbea0fed.mp4 **(OBSCENE)**  *C. Ford 10/21/21* | ✓ | ✓ |
| 511C | Storyboard of ddbca105-8150-4492-95d3-6465bbea0fed.mp4 **(OBSCENE)** | ✓ | ✓ |
| 511D | 6036a16b-dda8-4497-ae22-e3c95a32cb7a.mp4 *C. Ford 10/21/21* **(OBSCENE)** | ✓ | ✓ |

8

| 511E | Storyboard of 6036a16b-dda8-4497-ae22-e3e95a32cb7a.mp4 **(OBSCENE)** C. Ford 10/21/21 | ✓ | ✓ |
|---|---|---|---|
| 511F | 0cbc8e8a-c05c-4d1c-9039-9e88b8db844d.jpg C. Ford 10/21/21 **(OBSCENE)** | ✓ | ✓ |
| 511G | 90f54aaf-9d00-4328-a99b-6082e03fe2a3.jpg **(OBSCENE)** | | |
| 511H | ae621228-6528-4a78-8df4-5c58f6956ffe.jpg **(OBSCENE)** | | |
| 511I | 789f8ebe-1da4-4b3e-a7f5-c92f1caaece3.jpg C. Ford, 10/21/21 **(OBSCENE)** | ✓ | ✓ |
| 511J | 3361ac45-8c3a-4976-8e13-ab8209b94523.mp4 C. Ford 10/21/21 **(OBSCENE)** | ✓ | ✓ |
| 511K | Storyboard of 3361ac45-8c3a-4976-8e13-ab8209b94523.mp4 **(OBSCENE)** C. Ford 10/21/21 | ✓ | ✓ |
| 512 | Print screens of Sexting Forum | | |
| 513 | Personal images from iPad C. Ford, 10/21/21 | ✓ | ✓ |
| 514 | Image and metadata from iPhone C. Ford, 10/21/21 | ✓ | ✓ |
| 514A | Print screen C. Ford 10/21/21 | ✓ | ✓ |
| **600 Series** | | | |
| 601 | Sandisk Cruzer Edge thumb drive **(BULK)** L. Calvillo, 10/20/21 C. Ford, 10/21/21 | ✓ | ✓ |
| 601A | Photos of Sandisk Cruzer Edge thumb drive | | |
| 602 | 10yr_12yr_boys.wmv **(OBSCENE)** | ✓ | ✓ |
| 602A | Clip of 10yr_12yr_boys.wmv **(OBSCENE)** C. Ford 10/21/21 | ✓ | ✓ |
| 602B | Storyboard of 10yr_12yr_boys.wmv **(OBSCENE)** | ✓ | ✓ |
| 603 | 01.avi **(OBSCENE)** | ✓ | ✓ |
| 603A | Clip of 01.avi **(OBSCENE)** C. Ford 10/21/21 | ✓ | ✓ |
| 603B | Storyboard of 01.avi **(OBSCENE)** | ✓ | ✓ |

6

| 604 | File information   C. Ford, 10/21/21 | ✓ | ✓ |
|---|---|---|---|
| **700 Series** | | | |
| 701 | HP Elite Book 755 laptop **(BULK)**   L. Calville, 10/20/21   C. Ford, 10/21/21 | ✓ | ✓ |
| 701A | Photos of HP Elite Book 755 laptop | | |
| 702 | Little_Boy_Bondage_11Yo_And_Men.wmv **(OBSCENE)** | ✓ | ✓ |
| 702A | Clip of Little_Boy_Bondage_11Yo_And_Men.wmv **(OBSCENE)** | ✓ | ✓ |
| 702B | Storyboard of Little_Boy_Bondage_11Yo_And_Men.wmv **(OBSCENE)** | ✓ | ✓ |
| 703 | RF Katalog (Blue Orchid)(SF).avi **(OBSCENE)** | ✓ | ✓ |
| 703A | Clip of RF Katalog (Blue Orchid)(SF).avi **(OBSCENE)** | ✓ | ✓ C. Ford 10/21/21 |
| 703B | Storyboard of RF Katalog (Blue Orchid)(SF).avi **(OBSCENE)** | ✓ | ✓ |
| 704 | mikael and his first bicycle.mpg **(OBSCENE)** | ✓ | ✓ |
| 704A | Clip of mikael and his first bicycle.mpg **(OBSCENE)** | ✓ | ✓ |
| 704B | Storyboard of mikael and his first bicycle.mpg **(OBSCENE)** | ✓ | ✓ |
| 705 | File information   C. Ford, 10/21/21 | ✓ | ✓ |
| **800 Series** | | | |
| 801 | Lexar thumb drive **(BULK)**   L. Calville, 10/20/21   C. Ford, 10/21/21 | ✓ | ✓ |
| 801A | Photos of Lexar thumb drive | | |
| 802 | Night27 with 2 men.mp4 **(OBSCENE)** | ✓ | ✓ |
| 802A | Clip of Night27 with 2 men.mp4 **(OBSCENE)** | ✓ | ✓ |
| 802B | Storyboard of Night27 with 2 men.mp4 **(OBSCENE)** | C. Ford 10/21/21 ✓ | ✓ |
| 803 | Baby Boy Fucked By 17yo Brother.mpg **(OBSCENE)** | ✓ | ✓ |

10

**JA543**

| | | | |
|---|---|---|---|
| 803A | Clip of Baby Boy Fucked By 17yo Brother.mpg **(OBSCENE)** | ✓ | ✓ |
| 803B | Storyboard of Baby Boy Fucked By 17yo Brother.mpg **(OBSCENE)** | ✓ | ✓ |
| 804 | young boy forced to suck.wmv **(OBSCENE)** | ✓ | ✓ |
| 804A | Clip of young boy forced to suck.wmv **(OBSCENE)** | ✓ | ✓ |
| 804B | Storyboard of young boy forced to suck.wmv **(OBSCENE)** | ✓ C.Ford, 10/21/21 | ✓ |
| 805 | US+Boy+Delights+Daddy.m4v **(OBSCENE)** | ✓ | ✓ |
| 805A | Clip of US+Boy+Delights+Daddy.m4v **(OBSCENE)** | ✓ | ✓ |
| 805B | Storyboard of US+Boy+Delights+Daddy.m4v **(OBSCENE)** | ✓ | ✓ |
| 806 | File information  C. Ford. 10/21/21 | ✓ | ✓ |
| **900 Series** | | | |
| 901 | HP laptop (S/N: 5CH1262Y5Y) **(BULK)** L. Calvillo, 10/20/21  C. Ford. 10/21/21 | ✓ | ✓ |
| 901A | Photos of HP laptop | | |
| 902 | [boy+man] young 9yo boy sucks dads cock he cums in his mouth.flv **(OBSCENE)** | ✓ | ✓ |
| 902A | Clip of [boy+man] young 9yo boy sucks dads cock he cums in his mouth.flv **(OBSCENE)** | ✓ C Ford 10/21/21 | ✓ |
| 902B | Storyboard of [boy+man] young 9yo boy sucks dads cock he cums in his mouth.flv **(OBSCENE)** | ✓ | ✓ |
| 903 | ZackSanders_Resume.docx  C. Ford. 10/21/21 | ✓ | ✓ |
| 904 | File information  c. Ford 10/21/21 | ✓ | ✓ |
| **1000 Series** | | | |
| 1001 | Hard drive **(BULK)** | | |

11

**JA544**

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:        /s/
           William G. Clayman
           Special Assistant United States Attorney (LT)
           Jay V. Prabhu
           Seth M. Schlessinger
           Assistant United States Attorneys
           U.S. Attorney's Office
           2100 Jamieson Avenue
           Alexandria, Virginia 22314
           Tel: 703-299-3700
           Fax: 703-299-3981
           Email: william.g.clayman@usdoj.gov
           Email: jay.prabhu@usdoj.gov
           Email: seth.schlessinger@usdoj.gov

12

## CERTIFICATE OF SERVICE

I hereby certify that on this day, October 12, 2021, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of that electronic

filling (NEF) to counsel of record for the Defendants.

Jessica D. Aber
United States Attorney

By:        /s/

William G. Clayman
Special Assistant United States Attorney (LT)
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3700
Fax: 703-299-3981
Email: william.g.clayman@usdoj.gov

13

**JA546**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>ZACKARY ELLIS SANDERS,<br><br>                Defendant. | Case No. 1:20-cr-00143<br>Honorable T.S. Ellis, III<br>Sentencing: March 4, 2022 |

## MOTION FOR ENLARGEMENT OF TIME IN WHICH TO FILE MOTION FOR A NEW TRIAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 33 AND/OR MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29 AND MEMORANDUM IN SUPPORT

Zackary Ellis Sanders, by and through counsel, respectfully submits this Motion for

Enlargement of Time in Which to File Motion for a New Trial Under Federal Rule of Criminal

Procedure 33 and/or a Motion for a Judgment of Acquittal Under Rule 29 and Memorandum in

Support.  In support of this motion, counsel respectfully submits as follows:

1.  On October 26, 2021, Mr. Sanders was convicted after trial on twelve counts involving

the production, receipt and possession of child pornography.  Sentencing is scheduled for

March 4, 2022.

2.  Mr. Sanders has ordered trial transcripts, which he anticipates receiving towards the end

of November or the beginning of December, 2021.

3.  Under the fourteen days allotted under Rules 29 and 33, Mr. Sanders's motion(s) would

be due on or about November 9, 2021.

4.  By this motion, Mr. Sanders seeks 60 additional days to file any motion.  The new due

date would be January 9, 2022.  This extension will allow Mr. Sanders and his counsel to

**JA547**

review the transcripts and fully investigate any issues that might necessitate a new trial or

result in a judgment of acquittal.  This is Mr. Sanders's first motion to continue the

deadline for the filing of motions under Rule 33 or Rule 29.

**WHEREFORE**, the defendant respectfully submits that, for good cause shown, the

Court should grant the instant motion and continue the deadline for any new trial motion

and/or motion for a judgment of acquittal until January 9, 2022.

Respectfully submitted,


_____/s/_____
Jonathan Jeffress (#42884)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com


_____/s/_____
Nina J. Ginsberg (#19472)
Zachary Deubler (#90669)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA  22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email: nginsberg@dimuro.com
Email: zdeubler@dimuro.com


_____/s/_____
Mark J. Mahoney (admitted *pro hac vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Telephone: 716-853-3700
Facsimile: 716-853-3710

**JA548**

Email: mjm@harringtonmahoney.com

_____ /s/ _____
H. Louis Sirkin (*pro hac vice* pending)
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450
Facsimile: (513) 721-0109
Email: hls@santenhughes.com

*Counsel for Defendant Zackary Ellis Sanders*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November 2021, the foregoing was served electronically on the counsel of record through the US District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress

3

**JA549**

1

```
 1                      UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF VIRGINIA
 2                           Alexandria Division

 3    UNITED STATES OF AMERICA,         :
                                        :      Criminal Case
 4                    Plaintiff         :      No. 20-CR-00143-TSE
                                        :
 5           v.                         :      November 27, 2021
                                        :      9:35 a.m.
 6    ZACKARY ELLIS SANDERS,            :
                                        :      JURY INSTRUCTIONS
 7                    Defendant         :      VERDICT
      ............................      :      ......................

 8                    TRANSCRIPT OF TRIAL PROCEEDINGS
 9                              DAY 7
                    BEFORE THE HONORABLE T.S. ELLIS, III
10                     UNITED STATES DISTRICT JUDGE
                               and a jury
11

12     APPEARANCES:

13     FOR THE PLAINTIFF:          SETH SCHLESSINGER
                                   JAY V. PRABHU
14                                 WILLIAM CLAYMAN
                                   U.S. ATTORNEY'S OFFICE
15                                 2100 Jamieson Avenue
                                   Alexandria, VA  22314
16                                 (703) 299-3700

17     FOR THE DEFENDANT:          NINA J. GINSBERG, ESQ.
                                   DiMURO GINSBERG, P.D.
18                                 1101 King Street
                                   Suite 610
19                                 Alexandria, VA  22314
                                   (703) 684-4333
20
                                   JONATHAN STUART JEFFRESS, ESQ.
21                                 JADE CHONG-SMITH, ESQ.
                                   KAISER DLLON, PLLC
22                                 1099 14th Street, NW
                                   8th Floor West
23                                 Washington, DC  20005
                                   (202) 640-2850
24
                                   (APPEARANCES CONTINUED ON NEXT
25                                 PAGE.)
```

2

```
 1
 2      FOR THE DEFENDANT:          HENRY LOUIS SIRKIN
                                    SANTEN & HUGHES, LPA
 3                                  600 Vine Street
                                    Suite 2700
 4                                  Cincinnati, OH  45202
                                    513-721-4450
 5
        OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
 6                                  U.S. District Court, 9th Floor
                                    401 Courthouse Square
 7                                  Alexandria, Virginia  22314
                                    (240) 426-7767
 8
 9                      ( Pages 1 - 66)
10
11          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  The record will reflect that

3     the defendant, counsel for the defendant and counsel for the

4     Government are present and prepared to proceed.  We're going to

5     bring the jury in, do the usual calling of the roll, ask the

6     question, and I'll proceed to instruct the jury.  Bring the jury

7     in, please.

8              (Jury in at 9:37 a.m.)

9              THE COURT:  Good morning, ladies and gentlemen.  We'll

10    begin, as always, with the calling of the roll.

11             COURTROOM CLERK:  Juror number 19, Joseph Hilton.

12             JUROR:  Present.

13             COURTROOM CLERK:  Juror number 2, Bruce Arthur.

14             JUROR:  Present.

15             COURTROOM CLERK:  Juror number 31, Joshua Mecham.

16             JUROR:  Present.

17             COURTROOM CLERK:  Juror number 2, Candice Alidoosti.

18             JUROR:  Present.

19             COURTROOM CLERK:  Juror number 26, Richard Loveland the

20    second.

21             JUROR:  Present.

22             COURTROOM CLERK:  Juror number 33, Lucinda McLaughlin.

23             JUROR:  Present.

24             COURTROOM CLERK:  Juror number 27, Patrick Kerns.

25             PROSPECTIVE JUROR:  Present.

4

```
 1            COURTROOM CLERK:  Juror number 6, Jason Brost.

 2            JUROR:  Present.

 3            COURTROOM CLERK:  Juror number 38, Christy Rice.

 4            JUROR:  Present.

 5            COURTROOM CLERK:  Juror number 31, Michael Mason.

 6            JUROR:  Present.

 7            COURTROOM CLERK:  Juror number 16, Kamel Elhassani.

 8            JUROR:  Present.

 9            COURTROOM CLERK:  Juror number 7, Razzakul Chowdhury.

10            JUROR:  Present.

11            COURTROOM CLERK:  Juror number 42, Elizabeth Sheriff.

12            JUROR:  Present.

13            COURTROOM CLERK:  And juror number 6, Patrick Campo.

14            JUROR:  Present.

15            THE COURT:  Again, good morning, ladies and gentlemen.

16    Let me ask, were any of you unable to follow the Court's and

17    adhere to the Court's instructions to refrain from discussing

18    the matter among yourselves or with anyone, or undertaking any

19    investigation on your own?

20            The record will reflect that no hands are raised.  And

21    I see some shaking of heads, so am I correct in assuming that

22    you were all able to adhere to the Court's instructions?

23            All right.  The record will reflect that there seems to

24    be a unanimous nodding of the heads.

25            Members of the jury, now that you've heard the evidence
```

5

1   and arguments of counsel, it becomes my duty to give you

2   instructions as to the law applicable to this case.  All of the

3   instructions of law given to you by the Court, those given to

4   you at the beginning of the trial, those given to you during the

5   trial, and these final instructions must guide and govern your

6   deliberations.  It is your duty as jurors to follow the law as

7   stated by the Court and to apply the rules of law to the facts

8   as you find them from the evidence in the case.

9        Counsel have quite properly referred to some of the

10  governing rules of law in their arguments.  If, however, any

11  difference appears to you between the law as stated by counsel

12  and that stated by the Court in these instructions, you are, of

13  course, to be governed by the Court's instructions.  Nothing I

14  say in these instructions is to be taken as an indication that I

15  have any opinion about the facts of the case, or what that

16  opinion is.  It is not my function to determine the facts, but

17  yours.

18       You are not to single out one instruction alone as

19  stating the law but must consider the instructions as a whole.

20  Neither are you to be concerned with the wisdom of any rule of

21  law stated by the Court.  Regardless of any opinion you may have

22  as to what you think the law ought to be, it would be a

23  violation of your sworn duty as jurors if you ignore the law as

24  I give it to you and apply some other law.  It would also be a

25  violation of your sworn duty as jurors of the facts to base a

6

1    verdict upon anything but evidence in the case.

2            You've been chosen as jurors for this trial in order to

3    evaluate all the evidence received and to decide each of the

4    factual questions presented by the allegations brought by the

5    Government in the indictment and the pleas of not guilty by the

6    defendant.

7            In deciding the issues presented to you for decision in

8    this trial, you must not be persuaded by bias, prejudice, or

9    sympathy for or against any of the parties in this case, or by

10   any public opinion.  You should not be influenced by any

11   person's race, color, religion, national ancestry or sex.

12   Justice through trial by jury must always depend upon the

13   willingness of each individual juror to seek the truth as to the

14   facts from the same evidence presented to all jurors, and to

15   arrive at a verdict by applying the same rules of law given by

16   the Court.

17           Now, the law presumes -- as I told you at the outset,

18   the law presumes a defendant to be innocent of a crime.  Thus, a

19   defendant, although accused, begins the trial with a clean

20   slate, with no evidence against him.  And the law permits

21   nothing but legal evidence presented before the jury to be

22   considered in support of any charge against the accused.  So the

23   presumption of innocence alone is sufficient to acquit a

24   defendant unless the jurors are satisfied beyond a reasonable

25   doubt of the defendant's guilt after careful and impartial

7

1    consideration of all the evidence in the case.  It is not

2    required that the Government prove guilt beyond all possible

3    doubt.  The test is one of reasonable doubt.

4         The jury will remember that a defendant is never to be

5    convicted on mere suspicion or conjecture.  The burden is always

6    on the prosecution to prove guilt beyond a reasonable doubt.

7    The burden never shifts to a defendant, for the law never

8    imposes upon a defendant in a criminal case the burden or duty

9    of calling any witnesses or producing any evidence.  So if the

10   jury, after careful and impartial consideration of all the

11   evidence in the case, has a reasonable doubt that the defendant

12   is guilty of the charge, it must acquit.

13        There is nothing particularly different in the way that

14   a juror should consider the evidence in a trial from that in

15   which any reasonable and careful person would treat any very

16   important question that must be resolved by examining facts,

17   opinions, and evidence.  You're expected to use your good sense

18   in considering and evaluating the evidence in the case, for only

19   those purposes for which it has been received, and to give such

20   evidence a reasonable and fair construction in the light of your

21   common knowledge of the natural tendencies and inclinations of

22   human beings.  If a defendant be proved guilty beyond a

23   reasonable doubt, say so.  If not proved guilty beyond a

24   reasonable doubt, say so.

25        Keep constantly in mind that it would be a violation of

8

1    your sworn duty to base a verdict upon anything other than the

2    evidence received in the case and the instructions of the Court.

3    Remember as well that the law never imposes upon a defendant in

4    a criminal case the burden or duty of calling any witnesses or

5    producing any evidence because the burden of proving guilt

6    beyond a reasonable doubt is always with the Government.

7            Now, the evidence in this case, as I've told you at the

8    outset, consists of the sworn testimony of the witnesses,

9    regardless of who may have called them, all exhibits received in

10   evidence, regardless of who may have produced them, and you'll

11   have all of these in the jury room.  And to the extent that any

12   of them are CDs or something that need to be played, there will

13   also be a device this the jury room that will permit that.

14           Am I correct, Tanya?

15           COURTROOM CLERK:  Yes, Judge.

16           THE COURT:  All right.  So as I said, the evidence in

17   the case consists of the sworn testimony of the witnesses,

18   regardless of who may have called them, all exhibits received in

19   evidence, regardless of who may have produced them, and all

20   facts which may have been agreed or stipulated to, and all facts

21   and events which may have been judicially noticed.  Any proposed

22   testimony or proposed exhibit as to which an objection was

23   sustained by the Court, any testimony or exhibit ordered

24   stricken by the Court must be entirely disregarded.  And

25   anything you may have seen or read or heard outside the

1    courtroom is not proper evidence and must be entirely

2    disregarded.

3            Questions, objections, statements and arguments of

4    counsel are not evidence in the case.  You are to base your

5    verdict only on the evidence received in the case.  And in your

6    consideration of the evidence received, however, you are not

7    limited to the bald statements of the witnesses or to the bald

8    assertions in the exhibits.  In other words, you're not limited

9    solely to what you see and hear as the witnesses testify or as

10   the exhibits are admitted.  You're permitted to draw from the

11   facts that you find have been proved such reasonable inferences

12   as you feel are justified in the light of your experience and

13   common sense.

14           Now, the questions asked by a lawyer for either party

15   to this case are not evidence.  The questions received by a

16   lawyer for either party -- the questions asked by a lawyer for

17   either party are not evidence.  If a lawyer asks a question of a

18   witness which contains an assertion of fact, you may not

19   consider the assertion by the lawyer as any evidence of that

20   fact.  Only the answers are evidence.

21           As I told you at the outset, there are two types of

22   evidence which are generally presented during a trial, direct

23   evidence and circumstantial evidence.  Direct evidence is the

24   testimony of a person who asserts or claims to have actual

25   knowledge of a fact, such as an eyewitness.  Circumstantial

10

1    evidence is proof of a chain of facts and circumstances

2    indicating the existence of a fact.

3         The law makes no distinction between the weight or

4    value to be given to either direct or circumstantial evidence,

5    nor is a greater degree of certainty required of circumstantial

6    evidence than of direct evidence.  You should weigh all the

7    evidence in the case, and after weighing all the evidence, if

8    you are not convinced of the guilt of the defendant beyond a

9    reasonable doubt, you must find the defendant not guilty.

10        Now, inferences are simply deductions or conclusions

11   which reason and common sense lead the jury to draw from the

12   evidence in the case.  Testimony and exhibits can be admitted

13   into evidence during a trial only if certain criteria or

14   standards are met.  It's the sworn duty of the attorney on each

15   side of a case to object when the other side offers testimony or

16   an exhibit which that attorney believes is not properly

17   admissible under the rules of law.  Only by raising an objection

18   can a lawyer request and obtain a ruling from the Court on the

19   admissibility of the evidence being offered by the other side.

20        You should not be influenced against an attorney or his

21   or her client because the attorney has made objections.  Do not

22   attempt, moreover, to interpret any rulings, my rulings on

23   objections as somehow indicating how I think you should decide

24   the case.  I'm simply making a ruling on a legal question.

25        By allowing the testimony or other evidence to be

1   introduced over the objections of an attorney, the Court does

2   not, unless expressly stated, indicate any opinion as to the

3   weight or effect of the evidence.  As stated before, you and you

4   alone, as jurors, are the sole judges of the credibility of all

5   the witnesses and the weight and effect of all the evidence.

6          On the other hand, where the Court has sustained an

7   objection to a question addressed to a witness, jurors must

8   disregard the statement entirely.  You may draw no inference in

9   the wording of the question, or speculate as to what the witness

10  would have said had he or she been permitted to answer the

11  question.

12         It's the duty of the Court to admonish an attorney who,

13  out of zeal for his or her cause, does something which I feel is

14  not in keeping with the rules of evidence or procedure.  You are

15  to draw absolutely no inference against the side to whom an

16  admonition of the Court may have been addressed during the trial

17  of this case.

18         The law of the United States permits a federal judge to

19  comment to the jury on the evidence in the case.  Such comments

20  are, however, only expressions of my opinion as to the facts,

21  and the jury may disregard them entirely.  You as jurors are the

22  sole judges of the facts in this case, and it's your

23  recollection and evaluation of the evidence that is important to

24  the verdict in this case.  Although you must follow the Court's

25  instructions concerning the law applicable to this case, you are

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

12

1    totally free to accept or reject any observation concerning the

2    evidence received in the case.

3            During the course of the trial, I may have occasionally

4    asked questions of a witness.  Do not assume that I hold any

5    opinion on the matters to which my questions related.  The Court

6    may have asked questions simply to clarify a matter, not to help

7    one side of the case or hurt another.  Remember, as I've said

8    several times, at all times you as jurors are the sole judges of

9    the facts of this case.

10           Your opinion on the facts of this case should not be

11   determined on the number of witnesses testifying for or against

12   a party.  You should consider all the facts and circumstances in

13   evidence to determine which of the witnesses you choose to

14   believe or not believe.  You may find that the testimony of a

15   smaller number of witnesses on one side is more credible than

16   the testimony of a greater number of witnesses on the other

17   side.

18           Charts or summaries have been prepared by the

19   Government and have been admitted into evidence, and have been

20   shown to you during the trial for the purpose of explaining

21   facts that are allegedly contained in records or other documents

22   which have been admitted in the case -- into evidence in the

23   case.  You may consider the charts and summaries as you would

24   any other evidence admitted during the trial, and give them such

25   weight or importance, if any, as you may -- as you feel they

13

1    deserve.

2         Now, the rules of evidence ordinarily do not permit

3    witnesses to testify as to their own opinions or their own

4    conclusions about issues in the case.  An exception to this rule

5    exists as to those witnesses who are described as expert

6    witnesses.  An expert witness is someone who, by education or by

7    experience, may have become knowledgeable in some technical,

8    scientific, or very specialized area.

9         If such knowledge or experience may be of assistance to

10   you in understanding some of the evidence or in determining a

11   fact, an expert witness in that area may state an opinion as to

12   relevant and material matter in which he or she claims to be an

13   expert.

14        You should consider the expert opinion received in this

15   case and give it such weight as you may think it deserves.  You

16   should consider the testimony of expert witnesses just as you

17   consider other evidence in the case.  If you should decide that

18   the opinion of an expert is not based on sufficient education or

19   experience or if you should conclude that the reasons given in

20   support of the opinion are not sound or if you should conclude

21   that the opinion is outweighed by other evidence in the case,

22   you may disregard the opinion in part or in its entirety.  And

23   as I've told you several times, you, the jury, are the sole

24   judges of the facts of this case.

25        If any reference by the Court or by counsel to matters

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA562**

14

1    of testimony or exhibits does not coincide with your own

2    recollection of that evidence, it is your recollection which

3    should control during your deliberations, and not the statement

4    of the Court or of counsel.  You're the sole judges of the

5    evidence received in the case.

6            Now, as I've told you before, you as jurors are the

7    sole and exclusive judges of the credibility of each of the

8    witnesses called to testify in this case, and only you determine

9    the importance or the weight that their testimony deserves.

10   After making your assessment concerning the credibility of a

11   witness, you may decide to believe all of that witness'

12   testimony or only a portion of it, or none of it.  In making

13   your assessment, you should carefully scrutinize all of the

14   testimony given, the circumstances under which each witness has

15   testified, and all of the other evidence which tends to show

16   whether a witness is worthy of belief.

17           Consider each witness' intelligence, motive to falsify,

18   state of mind, and appearance and manner while on the stand.

19   Consider each of the witness' ability to observe the matters as

20   to which he or she has testified, and consider whether he or she

21   impresses you as having an accurate recollection -- an accurate

22   memory or recollection of these matters.

23           Consider also any relation a witness may bear to either

24   side of the case, the manner in which each witness might be

25   affected by your verdict, and the extent to which, if at all,

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA563**

—15

1    the witness is either supported or contradicted by other

2    evidence in the case.

3           Now, inconsistencies or discrepancies in the testimony

4    of a witness or between the testimony of different witnesses may

5    or may not cause you to disbelieve or discredit such testimony.

6    Two or more persons witnessing an incident or a transaction may

7    simply see or hear it differently.  Innocent misrecollection,

8    like failure of recollection, is not an uncommon experience.  In

9    weighing the effect of a discrepancy, however, always consider

10   whether it pertains to a matter of importance or an

11   insignificant detail, and consider whether the discrepancy

12   results from innocent error or intentional falsehood.

13          In connection with your evaluation of the credibility

14   of witnesses, you should specifically consider evidence of

15   resentment or anger, which some witness may have.  Evidence that

16   a witness is biased, prejudiced, or hostile toward one side or

17   another may require you to view that witness' testimony with

18   caution or to weigh it with care, and subject it to close and

19   searching scrutiny.

20          After making your own judgment or assessment concerning

21   the believability of a witness, you can then attach such

22   importance or weight to that testimony, if any, that you feel it

23   deserves.  You will then be in a position to decide whether the

24   Government has proven the charges beyond a reasonable doubt.

25          Now, evidence relating to any alleged statement or

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA564**

16

1    confession or admission or act or omission alleged to have been

2    made or done by a defendant outside of court and after a crime

3    has been committed should always be considered by the jury with

4    caution, and weighed with greater care.  All such alleged

5    statements, confessions, or admissions should be disregarded

6    entirely unless other evidence in the case convinces the jury

7    beyond a reasonable doubt that the statement, confession,

8    admission, or act or omission was made or done knowingly and

9    voluntarily.

10          In determining whether any statement, confession,

11   admission, or act or omission alleged to have been made by a

12   defendant outside of court after a crime has been committed was

13   knowingly and voluntarily made, the jury should consider the

14   age, training, education, occupation, and physical and mental

15   condition of the defendant, and his treatment while in custody

16   or under interrogation as shown by the evidence in the case.

17   Also consider all other circumstances in evidence surrounding

18   the making of the statement, confession, or admission.

19          If after considering all -- after considering the

20   evidence, you determine that a statement, confession, admission,

21   or act or omission was made or done knowingly and voluntarily,

22   you may give it such weight as you feel it deserves under the

23   circumstances.

24          Statements knowingly made -- statements knowingly and

25   voluntarily made by a defendant upon being informed that a crime

17

1   has been committed or upon being accused of a criminal charge

2   may be considered by the jury.  When a defendant voluntarily

3   offers an explanation or voluntarily makes some statement

4   tending to show his or her innocence, and it is later shown that

5   the defendant knew that the statement or explanation was false,

6   the jury may consider this as showing a consciousness of guilt

7   on the part of the defendant since it is reasonable to infer

8   that an innocent person does not usually find it necessary to

9   invent or fabricate an explanation or statement tending to

10  establish his innocence.

11      Whether or not evidence as to a defendant's explanation

12  or statement points to a consciousness of guilt on his or her

13  own part, and the significance, if any, to be attached to any

14  such evidence are matters exclusively within the province of the

15  jury as the sole judges of the facts of this case.  And in your

16  evaluation of an exculpatory statement shown to be false, you

17  may consider that there may be reasons fully consistent with

18  innocence that could cause a person to give a false statement

19  showing their innocence.  Fear of law enforcement, reluctance to

20  become involved, and simple mistake may cause a person who has

21  committed no crime to give such statement or explanation.

22      Now, an indictment, as I told you at the outset, is but

23  a formal method used by the Government to accuse a defendant of

24  a crime.  It is not evidence of any kind against the defendant.

25  The defendant is presumed to be innocent of the crime or crimes

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA566**

18

1    charged.  Even though this indictment has been returned against

2    the defendant, the defendant begins the trial with absolutely no

3    evidence against him.

4         The defendant has pled not guilty to the indictment,

5    and therefore denies that he is guilty of the charges.

6         Now, the defendant is not on trial for any act or

7    conduct not specifically charged in the indictment, and a

8    separate crime is charged in each count of the indictment.  Each

9    charge and the evidence pertaining to it should be considered

10   separately by the jury.  The fact that you may find the

11   defendant guilty or not guilty as to one of the charges --

12   offenses charged should not control your verdict as to the other

13   offenses charged.

14        The indictment charges the offenses alleged -- or were

15   committed on or about a certain date.  Although it is necessary

16   for the Government to prove beyond a reasonable doubt that the

17   offenses were committed on a date reasonably near the dates

18   alleged in the indictment, it is not necessary for the

19   Government to prove that the offenses were committed precisely

20   on the dates charged.

21        The Court instructs the jury that although the

22   indictment may charge the defendant with committing an offense

23   in several ways, using conjunctive language -- that is, "and" --

24   it is sufficient if the Government proves the offense in the

25   disjunctive -- that is, "or."  That is to say, a jury may

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA567**

19

1    convict on a unanimous finding of any of the alternative acts

2    charged in the indictment.

3         For example, in -- Count 1 of the indictment charges

4    that defendant attempted to and did employ, use, persuade,

5    induce, entice, and coerce a minor.  And there are other

6    examples of charging in the conjunctive or disjunctive in the

7    indictment.  In order to prove that the defendant -- to prove

8    the defendant guilty of a particular offense, the Government

9    does not need to prove that the defendant did all of the

10   alternative acts, but only that he did one of the alternative

11   acts in the example above.

12        The Government would need to prove beyond a reasonable

13   doubt that the defendant attempted to or did employ or use or

14   persuade or induce or entice or coerce.

15        The intent of a person, or the knowledge that a person

16   possesses at any given time, may not ordinarily be proved

17   directly because there's no way of directly scrutinizing the

18   workings of the human mind.  In determining the issue of what a

19   person knew or what a person intended at a particular time, you

20   may consider any statements made or acts done or omitted by that

21   person, and all other facts and circumstances received in

22   evidence which may aid in your determination of that person's

23   knowledge or intent.  You may infer, but you are certainly not

24   required to infer, that a person intends the natural and

25   probable consequences of acts knowingly done or knowingly

20

 1   omitted.

 2            It's entirely up to you, however, to decide what facts

 3   to find from the evidence received during this trial.

 4            Now, Count 1 through 5 of the indictment charges that

 5   on various dates listed below -- and I'll tell you what they

 6   are -- within the Eastern District of Virginia, Zackary Ellis

 7   Sanders attempted to and did knowingly employ, use, persuade,

 8   induce, entice, and coerce five minors, Minor Victim 1 through

 9   5, to engage in sexually explicit conduct for the purpose of

10   producing a visual depiction of such conduct, and he knew and

11   had reason to know that the visual depiction would be

12   transported or transmitted using any means and facility of

13   interstate and foreign commerce, and in and affecting commerce

14   and foreign interstate and foreign commerce, or mailed, and that

15   visual depiction was produced and transmitted using materials

16   that had been mailed, shipped, and transported in and affecting

17   interstate and foreign commerce by any means, and that visual

18   depiction had been transported and transmitted using any means

19   or facility of interstate commerce, and affecting interstate and

20   foreign commerce by any means, including by computer; to wit, a

21   digital visual depiction of different minors engaged in sexually

22   explicit conduct on the following dates:

23            For Count 1, between on or about November 20, 2019, and

24   on or about November 25, 2019.  That's Minor Victim 1.

25            For Count 2, between on or about November 10, 2019, and

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA569**

1    on or about November 14th -- from the 10th to the 14th -- 2019.

2    That's Minor Victim 2.

3         Count 3, between on or about September 17, 2017, and on

4    or about April 4, 2018.  That's Minor Victim 3.

5         Count 4, between on or about November 29, 2017, and on

6    or about December 11, 2017.  That's Minor Victim 4.

7         And between on or about May 8th, 2017, and on or about

8    October 21st, 2017.  That's Minor Victim 5.

9         Now, Section 2251(a) of Title 18, which is the statute

10   that is alleged to have been violated in Count 1, the U.S. Code

11   at that point provides in relevant part that any person who

12   employs, uses, persuades, induces, entices, or coerces, or

13   attempts to employ -- let me begin again.

14        Any person who employs, uses, persuades, induces,

15   entices, or coerces, or attempts to employ, use, persuade,

16   induce, entice, or coerce any minor to engage in any sexually

17   explicit conduct for the purpose of producing any visual

18   depiction of such conduct shall be guilty of a federal crime if

19   such person transported or transmitted, using any means or

20   facility of interstate or foreign commerce, or in or affecting

21   interstate or foreign commerce or mail, if that visual depiction

22   was produced or transmitted using material that had been --

23   materials that had been mailed, shipped, or transported in or

24   affecting interstate or foreign commerce by any means, including

25   by computer, or such visual depiction has actually been

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA570**

22

1    transported or transmitted using any means or facility of

2    interstate or foreign commerce, or in or affecting interstate or

3    foreign commerce or mail.

4            Now, in order to prove the defendant guilty of

5    producing child pornography, as charged in Count 1, the

6    Government must prove the following elements beyond a reasonable

7    doubt:

8            First, that at the time of the alleged incident,

9    Minor Victims 1, 2, 3, 4, and 5, the alleged victims named in

10   Count 1 through 5 of the indictment, were under the age of 18.

11           Two -- second element.  Two, that the defendant

12   attempted to and did knowingly employ, use, or persuade, or

13   induce or entice or coerce Minor Victims 1, 2, 3, 4, and 5 to

14   engage in sexually explicit conduct for the purpose of producing

15   a visual depiction of that conduct.

16           And three, the visual depiction was produced using

17   materials that had been mailed, shipped, or transported in or

18   affecting interstate or foreign commerce by any means, or such

19   visual depiction had actually been transported or transmitted

20   using any means or facility of interstate or foreign commerce,

21   or in or affecting interstate or foreign commerce or mail.

22           So with respect to the first element that the

23   Government must prove beyond a reasonable doubt, is that

24   Minor Victims 1, 2, 3, and 4 and 5 were each less than 18 years

25   old at the time of the acts alleged in the indictment.

23

```
 1              The Government does not have to prove that the
 2     defendant knew that the Minor Victims 1, 2, 3, 4, and 5 were
 3     less than 18 years old.  Moreover, defendant's belief,
 4     reasonable or not, that Minor Victims 1, 2, 3, 4, and 5 were
 5     18 years or older is irrelevant and not a defense to the crime
 6     charged.
 7              I therefore instruct you that if you find that
 8     Minor Victims 1, 2, 3, 4, and 5 were, in fact, less than
 9     18 years old at the time of the acts alleged in the indictment,
10     then that is sufficient to satisfy the first element of the
11     offense.
12              The second element of the offense that the Government
13     must prove beyond a reasonable doubt is that the defendant
14     employed or used or persuaded or induced or enticed or coerced
15     Minor Victims 1, 2, 3, 4, and 5 to take part in sexually
16     explicit conduct for the purpose of producing a visual depiction
17     of that conduct.  A visual depiction includes any photograph,
18     film, video, or picture, including undeveloped film and
19     videotape and data stored on a computer disk, or by electronic
20     means that is capable of conversion into a visual image whether
21     or not stored in a permanent format.
22              The term "producing" means producing, directing,
23     manufacturing, issuing, publishing, or advertising.  The phrase
24     "purpose of producing" means that the defendant had the specific
25     intent to cause the production of a video depiction.  The facts
```

24

1     must support the conclusion that the defendant engaged in

2     conduct in order to produce a visual depiction of sexually

3     explicit conduct.

4            While the image itself can be probative of the

5     defendant's intent, it cannot be the only evidence.

6            In deciding whether the Government has proven that the

7     defendant acted for the purpose of producing a visual depiction

8     of sexually explicit conduct, you may consider all of the

9     evidence concerning the defendant's conduct.  The production of

10    a visual depiction of sexually explicit conduct must have been a

11    significant or motivating purpose of the defendant, and not

12    merely incidental to engaging in the sexually explicit conduct.

13           It is not necessary, however, for the Government to

14    prove that the defendant was single-minded in his purpose or

15    that the production of a visual depiction of sexually explicit

16    conduct was the defendant's sole or primary purpose.  Rather, it

17    is sufficient for the Government to prove that the defendant had

18    a significant or motivating purpose of producing a visual

19    depiction of sexually explicit conduct when he employed or used

20    or persuaded or induced or enticed or coerced Minor Victims 1

21    through 5 to engage in sexually explicit conduct.

22           The third element that the Government must prove beyond

23    a reasonable doubt is that the visual depiction was produced

24    using materials that had been mailed or transported in

25    interstate or foreign commerce and that the defendant knew or

1    had reason to know that the visual depiction had been

2    transported or transmitted using any means and facility of

3    interstate or foreign commerce or that the visual depiction was

4    actually transported or transmitted using any means or facility

5    of interstate or foreign commerce.

6          Simply stated, the phrase "transported in interstate or

7    foreign commerce" means that the materials used to produce the

8    visual depiction had previously moved from one state to another

9    or between the United States and another country.  If you find,

10   for example, that a cellular telephone or computer was used to

11   produce the visual depiction in question and that the cellular

12   telephone was manufactured or assembled outside the Commonwealth

13   of Virginia, then that is sufficient to satisfy this element.

14         The Government does not have to prove that the

15   defendant personally transported the cellular telephone or

16   computer across a state line or into the United States or that

17   the defendant knew that the cellular telephone or computer had

18   previously crossed state line or previously had been imported

19   into the United States.

20         Furthermore, because of the interstate nature of the

21   internet, if you find beyond a reasonable doubt that the

22   defendant used the internet in receiving or possessing the

23   produced visual depiction of a minor engaged in sexually

24   explicit conduct, then that visual depiction traveled in

25   interstate commerce.  It does not matter whether the computer --

26

1    it does not matter whether the computer that -- Counsel, pick up

2    your earphones.  I think I missed a verb here.

3            (BENCH CONFERENCE ON THE RECORD.)

4            THE COURT:  Mr. Schlessinger, you were the one who did

5    instructions?

6            MR. SCHLESSINGER:  Yes, Your Honor.

7            THE COURT:  All right.  And Ms. Chong-Smith, you were

8    the one who did instructions, I believe.

9            MS. GINSBERG:  She is not here, Your Honor.

10            THE COURT:  All right.  Ms. Ginsberg, you will stand in

11    for her.

12            MS. GINSBERG:  Yes.

13            THE COURT:  You can see that at the bottom of page 32

14    there seems to be a word missing.  Mr. Schlessinger, what do you

15    think it should be?  It says:  It does not matter whether the

16    visual depiction the defendant was -- I see.  "It does not

17    matter whether the computer" -- and then it goes on.  What

18    should that be?

19            MR. SCHLESSINGER:  Your Honor, I believe it should be,

20    "It does not matter whether the computer that the visual

21    depiction was transported to was in Virginia."

22            THE COURT:  "It does not matter whether the" -- go

23    ahead.  What did you say?

24            MR. SCHLESSINGER:  "Whether the computer that the

25    visual depiction was transported to was in Virginia."

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA575**

27

1            That's what does not matter.

2            THE COURT:  So the only thing that's added is the word

3      "that"?

4            MR. SCHLESSINGER:  The word "the" in between "that" and

5      "visual."

6            THE COURT:  So read me again how you think it should

7      be, Mr. Schlessinger.

8            MR. SCHLESSINGER:  "It does not matter whether the

9      computer that the visual depiction was transported to was in

10     Virginia."

11           THE COURT:  All right.  Ms. Ginsberg?

12           MS. GINSBERG:  We don't object.

13           THE COURT:  All right.  Thank you.

14           (END BENCH CONFERENCE.)

15           THE COURT:  All right.  Let me begin with the sentence

16     before that.  Furthermore, because of the interstate nature of

17     the internet, if you find beyond a reasonable doubt that the

18     defendant used the internet in receiving or possessing the

19     produced visual depiction of a minor engaged in sexually

20     explicit conduct, then that visual depiction traveled in

21     interstate commerce.

22           It does not matter whether the computer that the visual

23     depiction was transported to was in Virginia and it does not

24     matter whether the visual depiction the defendant received or

25     possessed was transmitted from within Virginia.  If the internet

28

1   was used in moving the visual depiction, then it traveled in

2   interstate commerce.

3          Now, for purposes of the charges contained here, a

4   minor is defined as any person under the age of 18.  And I

5   instruct you that, under federal law, which is the sole law

6   governing in this case, that a minor cannot consent to the

7   production of child pornography.  Accordingly, any argument

8   regarding a minor's consent to the production of child

9   pornography is irrelevant in reaching your verdict.

10          The Government has -- the Government only has to prove

11   venue -- that is, the place where the underlying events

12   occurred -- by a preponderance of the evidence.  This means

13   that, with respect to venue, the Government only has to convince

14   you that it is more likely so than not so that part, if not all,

15   of the offense took place or occurred in the Eastern District of

16   Virginia.

17          And the Eastern District of Virginia includes the

18   eastern half of the state, including Northern Virginia,

19   extending down to and including Richmond, Fredericksburg,

20   Tidewater, Norfolk, and Newport News, and extending to the west,

21   but not as far as Charlottesville.  Charlottesville is not in

22   the Eastern District of Virginia.

23          Now, Counts 6 through 11 of the indictment charge --

24   they charge that in separate instances on or about the dates set

25   forth -- and I'll tell you the dates -- within the Eastern

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA577**

29

```
 1    District of Virginia, the defendant, Zackary Ellis Sanders,
 2    attempted to and did receive visual depiction using any means
 3    and facility of interstate and foreign commerce that had been
 4    mailed and had been shipped or transported in and affecting
 5    interstate and foreign commerce, and which had -- and which
 6    contained materials which had been mailed or so shipped and
 7    transported by any means, including by computer, and the
 8    production of such visual depiction involved the use of a minor
 9    engaging in sexually explicit conduct, and the visual depiction
10    was of such conduct; to wit, digital visual depictions of
11    different minors engaged in sexually explicit conduct on the
12    following dates:
13         For Count 6, on or about January 16, 2020,
14    Minor Victim 6; Count 7, between on or about November 20, 2019
15    and on or about November 25th, 2019, Minor Victim 1; Count 8,
16    between on or about November 10, 2019, and on or about
17    November 14, 2019 -- that's Minor Victim 2; Count 9, between on
18    or about September 17, 2017, and on or about April 14, 2018 --
19    that's Minor Victim 3; Count 10, between on or about
20    November 29, 2017, and on or about December 11, 2017 -- that's
21    Minor Victim 4; and Count 11, between on or about September 15,
22    2017, and on or about October 21, 2017 -- that's
23    Minor Victim 5 -- all in violation of Section 2252(a)(2) of
24    Title 18, which provides in relevant part as follows:
25         Any person who knowingly receives or attempts to
```

30

1    receive any visual depiction using any means or facility of

2    interstate or foreign commerce or that has been mailed or has

3    been shipped or transported in or affecting interstate or

4    foreign commerce, or which contains materials which have been

5    mailed or so shipped or transported by any means, including by

6    computer, or knowingly reproduces any visual depiction for

7    distribution using any means or facility of interstate or

8    foreign commerce or in and affecting interstate or foreign

9    commerce or through the mails, if, A, the producing of such

10   visual depiction involves the use of a minor engaging in

11   sexually explicit conduct, and, B, such visual depiction is of

12   such conduct, shall be guilty of a federal crime.

13           So in order to prove the defendant guilty of receiving

14   child pornography, as charged in Counts 6 through 11 of the

15   indictment, the Government must prove the following elements

16   beyond a reasonable doubt:

17           First, that the defendant knowingly received or

18   attempted to receive any visual depiction.

19           Two, that defendant received or attempted to receive

20   the visual depiction using any means or facility of interstate

21   or foreign commerce, or that the visual depiction had been

22   shipped or transported in or affecting interstate or foreign

23   commerce, or the visual depiction contained materials that had

24   been made or shipped or transported in or affecting interstate

25   or foreign commerce.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA579**

```
 1              Third, that the producing of the visual depiction

 2   involved using a minor engaged in sexually explicit conduct.

 3              Four, that the visual depiction is of a minor engaged

 4   in sexually explicit conduct.

 5              And five, that the defendant knew that the visual

 6   depiction involved the use of a minor engaging in sexually

 7   explicit conduct.

 8              The Government has alleged that the defendant either

 9   produced or attempted to produce child pornography as charged in

10   Counts 1 through 5 of the indictment.  In addition, the

11   Government has alleged that the defendant either received or

12   attempted to receive child pornography as charged in Counts 6

13   through 11 of the indictment.  So in order to sustain its burden

14   of proof for the crime of attempt, as charged in these counts of

15   the indictment, the Government must show the following two

16   essential elements beyond a reasonable doubt:

17              First, that the defendant knowingly took a substantial

18   step toward committing the offense.

19              And two, that defendant had the intent to commit the

20   offense.

21              The difference between conduct which violates the law

22   and conduct which does not violate the law in this regard -- and

23   I'm talking about attempts -- is what is referred to as a

24   substantial step towards the commission of a crime.

25              The substantial step must be an act that strongly
```

32

1    corroborates that the defendant intended to carry out the

2    offense.  A defendant may be found guilty of attempting to

3    commit a federal crime even though no one actually did all of

4    the acts necessary in order to commit that crime.  A defendant

5    may not be found guilty of attempting to commit any crime,

6    however, merely by thinking about it or even by making some plan

7    or other preparation for the commission of a crime.

8         In order to find the defendant guilty of committing the

9    crime or attempted -- crime of attempted production of child

10   pornography and attempted receipt of child pornography, the

11   Government must prove beyond a reasonable doubt that the mental

12   processes of the defendant passed from the stage of thinking

13   about the crime to actually intending to commit that crime, and

14   that the physical process of the defendant went beyond and

15   passed from the stage of mere preparation to some form -- some

16   firm, clear, and undeniable action to accomplish that intent.

17        Count 12 of the indictment charges that in or about

18   February 2020, within the Eastern District of Virginia, the

19   defendant, Zackary Ellis Sanders, knowingly possessed at least

20   one matter which contained a visual depiction that had been

21   mailed or had been shipped or transported using any means or

22   facility of interstate or foreign commerce, or in or affecting

23   interstate or foreign commerce, or which was produced using

24   materials that had -- which had been mailed or so shipped or

25   transported by any means, including by computer, and that the

33

1    production of such visual depiction involved the use of a minor

2    engaging in sexually explicit conduct, and such visual depiction

3    was of such conduct; to wit, digital visual depictions of

4    minors, including prepubescent minors, and minors who had not

5    attained the age of 12 years of age engaged in sexually explicit

6    conduct stored on a SanDisk Cruzer Edge thumb drive, an HP

7    Elitebook 755 laptop, a Lexar thumb drive, an HP laptop serial

8    number 5CH11262Y5Y, and an HP laptop, serial number CMF8255WHS.

9         Section 2255(a)(4) of Title 18 of the U.S. Code

10   provides, in relevant part, that any person who knowingly

11   possesses one or more books, magazines, periodicals, films,

12   videotapes, or other matter which contain any visual depiction

13   that has been mailed or has been shipped or transported using

14   any means or facility of interstate or foreign commerce, or in

15   or affecting interstate or foreign commerce, or which was

16   produced using materials which have been made [sic] or so

17   shipped or transported by any means, including by computer, if,

18   one, the producing of such visual depiction involves the use of

19   a minor engaging in sexually explicit conduct; and two, such

20   visual depiction is of such conduct, shall be guilty of a

21   federal crime.

22        Now, in order for the Government to prove the defendant

23   guilty of possessing child pornography, as charged in Count 12

24   of the indictment, the Government must prove the following

25   elements beyond a reasonable doubt:

34

1              First, that the defendant knowingly possessed a matter

2      which contained any visual depiction.

3              Two, that the producing of such visual depiction

4      involved the use of a minor engaging in sexually explicit

5      conduct, and the visual depiction is of such sexually explicit

6      conduct.

7              And third, that the matter which contained the visual

8      depiction involving the use of a minor engaging in sexually

9      explicit conduct had been transported using any means or

10     facility of interstate or foreign commerce, or in or affecting

11     interstate or foreign commerce by any means, including by

12     computer, or the matter which contained a visual depiction

13     involving the use of a minor engaging in sexually explicit

14     conduct was produced using materials which had been mailed or so

15     shipped or transported by any means, including by computer.

16             And four, the fourth, that the defendant knew that the

17     visual depiction involved the use of a minor engaging in

18     sexually explicit conduct.

19             Now I'm going to define a number of terms for you.  I

20     will define the terms "visual depiction," "computer," "minor,"

21     "sexually explicit conduct," and "lascivious exhibition," which

22     apply to your deliberations and to the indictment.

23             The term "visual depiction" includes images, pictures,

24     videos, undeveloped film, and video data stored on a computer

25     disk or by electronic means which is capable of conversion into

35

1    a visual image, and data which is capable of conversion into a

2    visual image that has been transmitted by any means, whether or

3    not stored in permanent format.

4         Computer -- the term "computer" means any electronic,

5    magnetic, optical, electrochemical, or other high-speed data

6    processing device performing logical, arithmetic or storage

7    functions and includes any data storage facility or

8    communications facility directly related to or operating in

9    conjunction with such a device.

10        "Minor," as I've told you, I think, before, means any

11   person under the age of 18 years.

12        The term "sexually explicit conduct" means actual or

13   simulated, one, sexual intercourse involving genital-genital,

14   oral-genital, and [sic] genital, or oral-anal, whether between

15   persons of the same or opposite sex.

16        Two, bestiality.

17        Three, masturbation.

18        Four, sadistic or masochistic abuse.

19        And five, the lascivious exhibition of the genitals or

20   pubic area of any person.

21        For the visual depiction of an exhibition of the

22   genitals or pubic area of a minor to be considered sexually

23   explicit conduct, the exhibition must be lascivious.  Whether a

24   picture or image of the genitals or pubic area constitutes such

25   lascivious exhibition requires a consideration of the overall

1    context of the material.  In determining whether an exhibition

2    of the genitals or pubic area of a minor is lascivious, you may

3    consider the following factors:

4         Whether the focal point of the visual depiction is on

5    the minor's genitals or pubic area; two, whether the setting or

6    visual depiction is sexually suggestive -- that is, a place or

7    pose generally associated with sexual activity; whether the

8    minor is depicted in an unnatural pose or in inappropriate

9    attire considering the age of the minor; whether the minor is

10   fully or partially clothed or nude; whether the visual depiction

11   suggests coitus or a willingness to engage in sexual activity;

12   and whether the visual depiction is intended or designed to

13   elicit a sexual response in the viewer.

14        Whether -- a picture or image need not involve all of

15   these factors to be lascivious exhibition of the genitals or

16   pubic area.  It is for you to decide the weight or lack of

17   weight to be given to any of these factors.  Ultimately, you

18   must determine whether the visual depiction is lascivious based

19   on its overall content.

20        The Government must prove beyond a reasonable doubt

21   that the visual depiction was distributed or attempted -- or an

22   attempt was made to distribute it in one of three ways:

23        First, the visual depiction was distributed by any

24   means or facility of interstate or foreign commerce.

25        Second, that the visual depiction had been shipped or

1    transported in or affecting interstate or foreign commerce.

2         Or third, that the visual depiction contained materials

3    which had been mailed or shipped or transported in and affecting

4    interstate commerce by any means, including by computer.

5         The term "means or facility of interstate commerce"

6    includes any electronic devices, program, including social media

7    applications connected to the internet and capable of sending

8    information over the internet.

9         The phrase "affecting interstate or foreign commerce"

10   means having at least a minimal effect upon interstate or

11   foreign commerce.

12        The Government is not required to prove that the

13   defendant knew that any means or facility of interstate commerce

14   had been or would be used when he received or distributed the

15   visual depiction.

16        The Government must prove beyond a reasonable doubt

17   that the production of the visual depiction involved the use of

18   a minor engaging in sexually explicit conduct and portrays that

19   minor engaged in that conduct.  The visual depiction must be of

20   a real person under the age of 18 engaging in sexually explicit

21   conduct.

22        The Government does not have to prove the identity of

23   the minor or the exact age of the minor.  You may consider all

24   of the evidence admitted, including your viewing of the person

25   depicted in the video or image, in determining whether the image

1    portrayed an actual person under the age of 18 engaging in

2    sexually explicit conduct.

3           The Government must prove beyond a reasonable doubt

4    that the defendant knew both that the production of the visual

5    depiction involved the use of a minor engaging in sexually

6    explicit conduct and that it portrayed minors engaged in that

7    conduct.  An act is done knowingly when it is done voluntarily

8    and intentionally, and not because of accident, mistake, or some

9    other innocent reason.

10          In this case, "knowingly" refers to an awareness of the

11   sexually explicit nature of the material and to the knowledge

12   that the visual depictions were, in fact, actual minors engaging

13   in that sexually explicit conduct.

14          The Government must show that the defendant had

15   knowledge of the general nature of the contents of the material.

16   The defendant need not have specific knowledge as to the

17   identity of -- the identity or actual age of the underage

18   performer, but the defendant must have knowledge or an awareness

19   that the material contained a visual depiction of a minor

20   engaging in sexually explicit conduct.

21          Such knowledge may be shown by direct or circumstantial

22   evidence or both.

23          Eyewitness testimony of the defendant's viewing of the

24   material is not necessary to prove the awareness of its

25   contents.  The circumstances may warrant an inference that he

39

1    was aware of what the material depicts.  Furthermore,

2    defendant's belief as to the legality or illegality of the

3    material is irrelevant.

4        Now, intent and motive are different concepts and

5    should never be confused.  Motive is what prompts a person to

6    act or to fail to act; that is, what prompts a person to act or

7    fail to act.  Intent refers to the state of mind with which the

8    act is done or omitted.  Personal advancement and financial gain

9    are -- for example, are two well-recognized motives of human

10   conduct.  These praiseworthy motives -- they may be

11   praiseworthy -- however, may prompt one person to voluntary acts

12   of good while prompting another person to voluntary acts of

13   crime.

14       Good motive alone is never a defense where the act done

15   or omitted is a crime.  The motive of the person is, therefore,

16   immaterial except insofar as evidence of motive may aid in

17   determining the state of mind or intent of the defendant.

18       Now, in the course of the trial you were permitted to

19   take notes.  You are permitted to use your notes as you

20   deliberate, but your notes should be used only as memory aids.

21   You should not give your notes precedence over your independent

22   recollection of the evidence.  Notes are not entitled to any

23   greater weight than the recollection or impression of each juror

24   as to what the testimony may have been.

25       Now, you may not base your verdict in any way upon

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA588**

1    sympathy, bias, guesswork, or speculation.  Your verdict must be

2    based solely on the evidence and the Court's instructions.

3         Your verdict must represent the considered judgment of

4    each juror.  In other words, in order to return a verdict, it is

5    necessary that each juror agree thereto.  Your verdict must be

6    unanimous.

7         Now, it's your duty as jurors to consult with one

8    another and to deliberate with a view to reaching an agreement

9    if you can do so without violence to your individual judgment.

10   You must each decide the case for yourself, but only after an

11   impartial consideration of the evidence in the case with your

12   fellow jurors.

13        In the course of your deliberations, do not hesitate to

14   reexamine your own views and to change your opinion if convinced

15   it is erroneous.  But do not surrender your honest conviction as

16   to weight or effect of evidence solely because of the opinion of

17   your fellow jurors or for the mere purpose of returning a

18   verdict.  Remember at all times you are not partisans; you are

19   judges, judges of the facts.  Your sole interest is to seek the

20   truth from the evidence in the case.

21        The punishment provided by law for the offenses charged

22   in the indictment is a matter exclusively within the province of

23   the Court and should never be considered by the jury in any way

24   in arriving at an impartial verdict as to the offenses charged.

25        Now, during your deliberations you must not communicate

41

1    with or provide any information to anyone by any means,

2    electronic or otherwise, about this case.  You may not use any

3    electronic device or media, such as a telephone, cell phone,

4    smart phone, iPhone, BlackBerry, or computer, the internet or

5    any internet service or any text or instant messaging service or

6    any internet chat room, blog, or website such as Facebook,

7    Myspace, LinkedIn, YouTube, or Twitter, to communicate with

8    anyone any information about this case, or to conduct any

9    research about this case until I accept your verdict.

10           Now, when you retire to the jury room, you'll elect --

11   or select one of your number to act as your foreperson.  The

12   foreperson will preside over your deliberations and will be your

13   spokesperson here in court.  Forms of the verdict have been

14   prepared for your convenience.

15           May I have that, please.  Thank you.

16           And I'm going to explain the verdict form to you now.

17   I've had a hard time seeing all of you.

18           The verdict form is a three-page form, and in that form

19   is the following:  First, there is the style of the case at the

20   top.  The title is verdict form.  And then it says, Count 1:

21   With respect to Count 1, production of child pornography, we,

22   the jury, find the defendant, Zackary Ellis Sanders, either not

23   guilty or guilty.  So you are to reach a verdict and put down

24   whether you find him not guilty or guilty.

25           And then it goes to Count 2:  With respect to Count 2,

42

1    production of child pornography, we, the jury, find the

2    defendant, Zackary Ellis Sanders, not guilty or guilty.  You'll

3    remember that each of the counts is a different alleged minor

4    victim.

5         And then there's Count 3, and exactly the same question

6    is asked as to Count 3 and as to Count 4 and as to Count 5.

7         Now, Count 6, the question then is:  With respect to

8    Count 6, receipt of child pornography, we, the jury, find the

9    defendant either not guilty or guilty, as you may find.  And 7,

10   8, 9, and 10 are all the different counts of receipt of child

11   pornography.  And 11 as well.

12        In other words, 6, 7, 8, 9, 10, and 11 are the receipt

13   counts, and you are asked to mark here whether you find the

14   defendant not guilty or guilty.

15        And then, for Count 12, it says, with respect to

16   Count 12, possession of child pornography, we, the jury, find

17   the defendant, Zackary Ellis Sanders, either not guilty or

18   guilty as you may find.  There's an additional question asked

19   with respect to Count 12.  If your verdict is not guilty as to

20   Count 12, you don't have to answer that further question.  If

21   your finding is that the defendant is guilty as to Count 12,

22   then you have to answer the following question, and that's

23   explicit here on the form:  Did a visual depiction involved in

24   the offense charged in Count 12 involve a prepubescent minor or

25   a minor who had not attained the age of 12 years?

43

1          And there's a place for you to mark no or yes.  And

2     again, you don't have to answer that question if you find the

3     defendant not guilty of Count 12.  But if you find the defendant

4     guilty of Count 12, you must answer that question.

5          And after that, there's a statement that says:  So say

6     we all this -- whatever day you reach your verdict.  What is

7     today?  Today is the 27th -- 27th, but you may deliberate as

8     long as or as little as you like.  So whatever that date is, it

9     will be.

10         And then your foreperson signs it and then you'll

11    return with your verdict to the courtroom.  So it's a three-page

12    form, and I have reviewed it all with you.

13         Now, it's proper to add the caution that nothing said

14    in the instructions I've given you and nothing in my form of the

15    verdict prepared for your convenience is meant to suggest or to

16    convey in any way or manner any intimation as to what verdict I

17    think you should find.  What your verdict shall be is your sole

18    and exclusive duty and responsibility.

19         Now, if it becomes necessary during your deliberations

20    to communicate with the Court, you may send a note by the court

21    security officer who will be right outside.

22         They're going to deliberate on this floor, aren't they?

23         COURT SECURITY OFFICER:  Yes, sir.

24         THE COURT:  He will be right outside the door.  And the

25    note should be signed by your foreperson or by one or more

44

```
 1    members of the jury.  No member of the jury should ever attempt

 2    to communicate with the Court by any means other than a signed

 3    writing, and the Court will not communicate with any member of

 4    the jury on any subject touching the merits of the case

 5    otherwise than in writing or orally here in open court.

 6              I may communicate with you for other reasons such as

 7    how long you wish to continue to deliberate.  I've had other

 8    situations.  If it gets too hot in there, too cold in there,

 9    those sorts of things I will communicate with you other than by

10    a signed writing or orally here in open court.

11              Now, you'll note from the oath about to be taken by the

12    court security officer that he too, as well as all other

13    persons, are forbidden to communicate in any way or manner with

14    any member of the jury on any subject touching the merits of the

15    case.

16              And bear in mind that you are never to reveal to any

17    person, not even to the Court, not even to me, how the jury

18    stands, numerically or otherwise, on the questions before you

19    until after you have reached your unanimous verdict.

20              All right.  You may administer the oath to the court

21    security officer.

22              COURTROOM CLERK:  You shall keep this jury together,

23    not have any communication with them, nor permit any other to

24    communicate with them touching this trial, so help you God?

25              COURT SECURITY OFFICER:  I shall.
```

45

1          THE COURT:  All right.  Now, as I said, the exhibits

2     will be in there, but it's going to take us a few minutes to get

3     the exhibits in there.  Unless that's already happened.

4          COURTROOM CLERK:  Yes, Judge.

5          THE COURT:  Would that I could be as efficient as those

6     of my colleagues.

7          But in any event, once all of you are there and all the

8     exhibits are in there and the verdict form and the tape

9     recorder, because you will not have a written version of the

10    instructions I've given you, but you will have a tape recording

11    of it.  You're not required to listen to the tape again, but

12    it's there if you want to, if you think that's important.

13    That's up to you.  And that will be provided to you.  The -- I

14    don't have a written version, and I prefer to do it this way.

15    The tape recorder will be there.

16          Now, once all of that is in the room and the 12 of you

17    are in the room and the door closes, then you may begin your

18    deliberations.  Now, you may tell the court security officer at

19    any time if you want to take a recess, but remember this:  If

20    one of you -- if any one of you, or more, leave the room to go

21    use the head -- bathroom, or for some other reason are absent

22    temporarily, cease your deliberations.  You can only deliberate

23    if all of you are there and the door is closed because all of

24    you have to know what everyone else says.  So if one of you

25    leaves and there's a discussion, that person who left hasn't

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA594**

46

```
 1    heard all of that, and that person must hear everything.

 2              Now, put on your earphones, please.

 3              (BENCH CONFERENCE ON THE RECORD.)

 4              THE COURT:  Can you hear me?

 5              MR. SCHLESSINGER:  Yes, Your Honor.

 6              MS. GINSBERG:  Yes, Your Honor.

 7              THE COURT:  All right.  Has the jury been fully and

 8    fairly instructed in accordance with the instructions

 9    conference, Mr. Schlessinger?

10              MR. SCHLESSINGER:  Yes, Your Honor.

11              THE COURT:  Ms. Ginsberg?

12              MS. GINSBERG:  Yes, Your Honor.  But I do have an

13    objection to the verdict form.

14              THE COURT:  Too late.

15              MS. GINSBERG:  Is Your Honor going to send the

16    indictment into the jury room?

17              THE COURT:  I hadn't planned to.  Do you want it?

18              MS. GINSBERG:  No, I don't.

19              THE COURT:  All right.  I don't plan to send it to

20    them.

21              MS. GINSBERG:  The reason for my objection, Your Honor,

22    is I think the verdict form, without reference to the individual

23    images and the individual victims, is going to be totally

24    confusing to the jury.

25              THE COURT:  All right.  Your objection comes too late.
```

47

1    I don't think it's a sound objection in any event.  They'll have

2    to use their recollections to match images with what was done,

3    and the Government made clear which images it said were in

4    effect for -- or were operative for each count.

5            So -- and you don't want the indictment sent back, and

6    I will accommodate that request and I won't send the indictment

7    back.  But I'm not going to change the verdict form.

8            MS. GINSBERG:  I understand.  Your Honor, one other

9    request.  The phone, the cell phone, is an exhibit which the

10   Government moved into evidence.  I believe the appellate court

11   has ruled that the phone should be provided for the jurors the

12   same way a tape recorder is going to be provided for them to

13   listen to any portion of the recorded chats or recorded

14   testimony.  I've asked the Government if they have a power cord

15   and I don't think they have one present in the courtroom.

16           THE COURT:  Mr. Schlessinger, she wants to give the

17   jury the ability to plug in to the phone.  What's your view?

18           MR. SCHLESSINGER:  Your Honor, that's not appropriate.

19   It was not a part of any exhibit that's been admitted.

20   Moreover, unlike the computer that's going to be provided to the

21   jurors in order to play the CDs, which is incapable of altering

22   the CDs that were admitted as exhibits, the power cord

23   inherently will and does change the condition and the contents

24   of the phone that's been admitted as an exhibit.

25           So it's not appropriate to be admitted.  At an absolute

48

```
 1    minimum, I don't think --
 2              THE COURT:  Well, the phone itself is admitted.
 3              MR. SCHLESSINGER:  It is.
 4              THE COURT:  But not a device to hook in to the phone.
 5              MR. SCHLESSINGER:  That's correct, Your Honor.
 6              THE COURT:  All right.  Ms. Ginsberg?
 7              MS. GINSBERG:  Your Honor, it was for that reason that
 8    I asked yesterday that the entire transcript of the chats be
 9    admitted.  The Government objected to that.  They did
10    acknowledge, and the Court has acknowledged, that the phone has
11    been admitted as a Government exhibit at their request, and that
12    being the case, it is an exhibit, the jury is entitled to have
13    access to the contents.  And if the Government is concerned
14    about altering the data on the phone, they should have come up
15    with some other mechanism for the jury to be able to access the
16    contents of an exhibit which they have admitted.
17              THE COURT:  All right.  Go ahead, Ms. Ginsberg.
18              MS. GINSBERG:  That's my argument, Your Honor.
19              THE COURT:  All right.  Thank you.
20              Mr. Schlessinger, last chance.
21              MR. SCHLESSINGER:  Once again, Your Honor, we admitted
22    the phone itself, which the jury may fully examine.  We have not
23    admitted a power cord that goes along with the phone, and the
24    jury should not have access to that, which is going to alter the
25    evidence, and which also they have indicated no request for at
```

49

1      this time.

2                So at an absolute minimum, it would be entirely

3      premature to send it back and send the signal that the jury

4      should plug it in or examine it in that way.

5                THE COURT:  Now, I did, did I not, indicate to the

6      defendant, Ms. Ginsberg, that you were free to introduce any

7      other part of that -- those conversations?  Am I correct?

8                MS. GINSBERG:  Yes, Your Honor.  But the phone was

9      admitted.

10               THE COURT:  Yes, you've said that.  I understand your

11     argument.  I don't find it persuasive, so I'm going to decline

12     to do as you request.

13               And I didn't ask you, Mr. Schlessinger, because I was

14     in agreement with Ms. Ginsberg that the indictment should not be

15     admitted -- or should not be sent back to the jury.  Do you have

16     a different view?

17               MR. SCHLESSINGER:  I do, Your Honor.  We have asked

18     that it be sent back, but I understand the Court's ruling, and

19     we understand.

20               THE COURT:  And you don't want it sent back, do you,

21     Ms. Ginsberg?

22               MS. GINSBERG:  No, we don't.

23               THE COURT:  All right.  I'm not going to send it back.

24               All right.  We'll allow the jury to retire and begin

25     their deliberations.

50

```
 1              MR. SCHLESSINGER:  I'm sorry, Your Honor.  Is
 2   Your Honor going to excuse the alternates at this time?
 3              THE COURT:  Yes, I am.  They are Elizabeth Sheriff and
 4   Patrick Campo.  Any objection to that, Mr. Schlessinger?
 5              MR. SCHLESSINGER:  No.
 6              THE COURT:  Ms. Ginsberg?
 7              MS. GINSBERG:  No, Your Honor.  Just going back to the
 8   evidence just briefly, I do want to make sure that the recording
 9   of Mr. Sanders' statement is available to the jury, the
10   transcript --
11              THE COURT:  Did I admit it?
12              MS. GINSBERG:  The transcript, at least, has been
13   admitted.  That should go back to the jury.
14              THE COURT:  Whatever I have admitted, Ms. Ginsberg,
15   will go back to the jury.  If I have not admitted it because you
16   didn't specifically offer it, it will not.
17              All right?  This is not the time to offer any piece of
18   evidence that wasn't specifically offered at the time.
19              MS. GINSBERG:  One last thing, Your Honor.
20              THE COURT:  Yes, your client is sending you notes.  Go
21   ahead.
22              MS. GINSBERG:  Your Honor, for the record, the phone
23   was charged when it was seized, and so that is the format that
24   the phone should be given to the jury.
25              THE COURT:  All right.  Let me be clear.  I have
```

51

```
1      rejected your argument that the phone be sent back -- the phone

2      will go back, but not with a device that enables the jury to

3      access it.  That's what you wanted, and I have denied that.

4              MS. GINSBERG:  Yes, Your Honor.

5              THE COURT:  Anything further, Mr. Schlessinger?

6              MR. SCHLESSINGER:  No, Your Honor.

7              (END BENCH CONFERENCE.)

8              THE COURT:  All right, ladies and gentlemen.  I'm sure

9      you all know how many persons comprise a jury in a federal

10     criminal case.  Of course it is 12.  Two of you have been

11     alternates.  We could not have proceeded in this case without

12     your participation.  So we are grateful to you for that.  But

13     it's now my duty to excuse you, number 42, Ms. Sheriff, and

14     number 6, Mr. Campo.  Yes.

15             Now, I'm going to excuse you and you may take your

16     books.  But I'm going to ask you that you refrain from

17     discussing this matter with anyone.  In other words, remain as

18     if I were just having another recess.  The reason for that is

19     that it may be necessary to call you back and ask you to serve.

20     It would be a very rare circumstance where that might be

21     necessary.  So I wouldn't be too worried about it, but it could

22     happen.  In 34 years of my doing this, it has not happened.  But

23     it may.

24             So please remain so that you don't discuss the matter

25     with anyone because, if you're recalled, that will be the first
```

1    thing I'll ask you, whether you've discussed the matter with

2    anyone or undertaken any investigation, because you remain just

3    as you are.

4            But the Court thanks you, again, for your service.

5    Again, I tell you, we could not have proceeded without your

6    participation.

7            You may take your books now and depart.  Let me ask the

8    court security officer, do we have the means to communicate?

9            COURT SECURITY OFFICER:  I'm sorry?

10           THE COURT:  Do we have the means to communicate with

11   Ms. Sheriff and Mr. Campo?

12           COURT SECURITY OFFICER:  Do we have cell phones?

13           THE COURT:  All right.  I'll do it this way.  Give him

14   a cell number, please, and that means that, if we need to reach

15   you, we will.

16           Now, once there's a result, we will call you.  We will

17   tell you what the result is.

18           All right.  You may depart.

19           (Alternate jurors excused.)

20           THE COURT:  All right.  Now, ladies and gentlemen, I'm

21   going to have you retire.  Take your books with you.  You'll go

22   into the jury room or -- is it the jury room or are we going to

23   use the large conference room?

24           COURT SECURITY OFFICER:  The large conference room.

25           THE COURT:  Good.  That enables you to have social

1    distancing.  There is a method to our madness.  When we use jury

2    rooms in the non-pandemic times, you're much closer together and

3    you don't have a window to look out; it's an encouragement to do

4    the work that you've been asked to do.  But here you'll be in a

5    much larger conference room so you'll be able, if you wish, to

6    retain or to maintain your social distancing.  Some people want

7    it.  Some people don't.  Individual.  You decide what you want.

8    Accommodate each other.  That's what I do.  I wear the mask when

9    it makes other people feel better and when it's required, and I

10   may not otherwise.

11         Now, you may follow -- and this time you won't hear the

12   familiar litany of refraining from discussing the matter among

13   yourselves because the time has arrived when you must do that.

14   Once all 12 of you are in the room, everything is in the room,

15   the verdict form, the tape recorder with my instructions, and

16   the exhibits are all in the room, the door closes, and the court

17   security officer leaves, then you may begin your deliberations.

18   And you may deliberate as long or as little as you like.

19         When lunches come, you can decide to eat your lunch,

20   everybody continuing to deliberate, or you can take a break.

21   You may determine that you want to do that.  But if you take a

22   break and you don't deliberate, people leave the room --

23   remember, you may not deliberate unless all 12 of you are

24   present.

25         All right.  You may follow the court security officer

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA602**

54

 1    out.

 2              (Jury out at 11:06 a.m.)

 3              THE COURT:  As I recall, the interview of defendant was

 4    offered both in an audio form and a transcript form.  Do you

 5    agree, Mr. Schlessinger?

 6              MR. SCHLESSINGER:  Yes, that's correct, Your Honor.

 7              THE COURT:  All right.  Both should go back to the

 8    jury.  What were the exhibit numbers, Ms. Ginsberg?

 9              MS. GINSBERG:  DX-5.  The transcript is DX -- the

10    Defendant's Exhibit 5.

11              THE COURT:  Is that right, Mr. Schlessinger?

12              MR. SCHLESSINGER:  Yes, Your Honor.  The audio of the

13    entire thing is Government's Exhibit 101.  The transcript of

14    that is Defense Exhibit 5.

15              THE COURT:  All right.  Court stands in recess.  You

16    may, of course, leave the courthouse, but leave a number where

17    you can be reached in the event there's a question or a verdict.

18              MS. GINSBERG:  Judge, I think we'll probably be just

19    across the street.

20              THE COURT:  I'm sorry?

21              MS. GINSBERG:  I think we'll be just across the street

22    at the Westin, so we'll be very close to the courthouse.

23              THE COURT:  Suit yourself.  It's --

24              MS. GINSBERG:  Thank you.

25              THE COURT:  -- entirely up to you all.

55

```
 1              All right.  Court stands in recess until the jury

 2      reaches a verdict, because I don't plan to recess them or

 3      inquire of them how much they wish to continue to deliberate

 4      today until 5 o'clock or so.  And that's when I'll have the

 5      court security officer inquire of them of that.

 6              MS. GINSBERG:  Thank you, Your Honor.

 7              THE COURT:  Court stands in recess.

 8              (Recess taken at 11:08 a.m.)

 9              THE COURT:  We have a note from the jury.  I'll read

10      the note and then the court security officer can show it to

11      counsel and you can look at it together at the podium.

12              "Judge Ellis, the jury has reached a verdict.

13      10/27/21, 12:30 p.m.," I can't read the signature.

14              Tell me who signed it.  Brost.  Male or female?

15              COURTROOM CLERK:  Male.

16              THE COURT:  Hand it to the court security officer.  The

17      parties may look at it at the bench and then I will tell you how

18      the verdict will be received.

19              I'll have the note made a part of the record in this

20      case.  And the way in which the verdict will be received is,

21      after the jury is brought in, the deputy clerk -- and I'll tell

22      this to the jury as well.  The deputy clerk will be asked

23      whether the jury has reached a verdict, and upon receiving an

24      affirmative answer, presumably from the foreperson, the deputy

25      clerk will ask for the verdict form.
```

1          And then I will review the verdict form to ensure that
2     it's correct as to form.  If it isn't -- only as to form.  In
3     other words, if they checked "not guilty" and "guilty" to the
4     same count, I'll have you on the earphones and discuss how the
5     matter will be dealt with.
6          On the other hand, if there's no problem as to form, I
7     will have the deputy clerk publish the verdict, which will
8     require defendant to stand, face the jury, and then the deputy
9     clerk will publish the verdict.  And after the deputy clerk
10    publishes the verdict, then I will have some words of thanks for
11    the jury.
12         Any questions, Mr. Schlessinger?
13         MR. SCHLESSINGER:  No, Your Honor.
14         THE COURT:  Ms. Ginsberg?
15         MS. GINSBERG:  No, sir.
16         THE COURT:  All right.  Bring the jury in, please.
17         (Jury in at 1:08 p.m.)
18         THE COURT:  Ladies and gentlemen, I've received a note
19    signed by Mr. Brost.  I assume you're the foreperson?
20         JURY FOREPERSON:  That's correct, Your Honor.
21         THE COURT:  I've received a note indicating the jury
22    has reached a unanimous verdict.  Is that correct?
23         JURY FOREPERSON:  That's correct, Your Honor.
24         THE COURT:  Now, the way in which a verdict is received
25    in this case, let me describe that to you.  The deputy clerk

57

1    will ask the foreperson whether the jury has reached a unanimous

2    verdict, and when you respond affirmatively, she'll ask for the

3    verdict form.  She'll give me the verdict form.  I will then

4    review it to ensure that it is correct as to form; in other

5    words, that you didn't do something like put down "not guilty"

6    and "guilty" for the same count.

7         Once I review -- I'm not interested in the result, I'm

8    interested in whether the form is correct.  And then, if I

9    conclude that it is, I will have the deputy clerk publish the

10   jury verdict, which she will do by reading it with the defendant

11   standing and facing the jury.

12        And after that, I will have some words of thanks to you

13   and advice and instruction, and then permit you to retire.

14        All right.  The deputy clerk may proceed.

15        COURTROOM CLERK:  Mr. Foreman, has the jury agreed upon

16   the verdict?

17        JURY FOREPERSON:  Yes, we have.

18        COURTROOM CLERK:  Will you hand it to the court

19   security officer, please.

20        THE COURT:  You may publish the verdict.

21        COURTROOM CLERK:  Will the defendant please stand and

22   face the jury.  In the case United States of America versus

23   Zackary Ellis Sanders, Case Number 2020-CR-143, with respect to

24   Count 1, production of child pornography, we the jury find the

25   defendant, Zackary Ellis Sanders, guilty.

58

```
 1              With respect to Count 2, production of child
 2     pornography, we the jury find the defendant, Zackary Ellis
 3     Sanders, guilty.
 4              With respect to Count 3, production of child
 5     pornography, we the jury find the defendant, Zackary Ellis
 6     Sanders, guilty.
 7              With respect to Count 4, production of child
 8     pornography, we the jury find the defendant, Zackary Ellis
 9     Sanders, guilty.
10              With respect to Count 5, production of child
11     pornography, we the jury find the defendant, Zackary Ellis
12     Sanders, guilty.
13              With respect to Count 6, receipt of child pornography,
14     we the jury find the defendant, Zackary Ellis Sanders, guilty.
15              With respect to Count 7, receipt of child pornography,
16     we the jury find the defendant, Zackary Ellis Sanders, guilty.
17              With respect to Count 8, receipt of child pornography,
18     we the jury find the defendant, Zackary Ellis Sanders, guilty.
19              With respect to Count 9, receipt of child pornography,
20     we the jury find the defendant, Zackary Ellis Sanders, guilty.
21              With respect to Count 10, receipt of child pornography,
22     we the jury find the defendant, Zackary Ellis Sanders, guilty.
23              With respect to Count 11, receipt of child pornography,
24     we the jury find the defendant, Zackary Ellis Sanders, guilty.
25              With respect to Count 12, possession of child
```

```
 1    pornography, we the jury find the defendant, Zackary Ellis

 2    Sanders, guilty.  Did a visual depiction involved in the offense

 3    charged in Count 12 involve a prepubescent minor or a minor who

 4    had not attained 12 years of age?  Yes.

 5           So say we all, this 27th day of October, 2021,

 6    Foreperson.

 7           THE COURT:  You may be seated.  The deputy clerk will

 8    now poll the jury to ensure it is their individual verdict.

 9           COURTROOM CLERK:  Juror number 19, Joseph Hilton, is

10    this your verdict?

11           JUROR:  Yes.

12           COURTROOM CLERK:  Juror number 2, Bruce Arthur, is this

13    your verdict?

14           JUROR:  Yes.

15           COURTROOM CLERK:  Juror number 31, Joshua Mecham, is

16    this your verdict?

17           JUROR:  Yes.

18           COURTROOM CLERK:  Juror number 2, Candice Alidoosti, is

19    this your verdict?

20           JUROR:  Yes.

21           COURTROOM CLERK:  Juror number 26, Richard Loveland the

22    second, is this your verdict?

23           JUROR:  Yes.

24           COURTROOM CLERK:  Juror number 33, Lucinda McLaughlin,

25    is this your verdict?
```

60

1              JUROR:  Yes.

2              COURTROOM CLERK:  Juror number 27, Patrick Kerns, is

3    this your verdict?

4              JUROR:  Yes.

5              COURTROOM CLERK:  Juror number 6, Jason Brost, is this

6    your verdict?

7              JUROR:  Yes.

8              COURTROOM CLERK:  Juror number 38, Christy Rice, is

9    this your verdict ?

10             JUROR:  Yes.

11             COURTROOM CLERK:  Juror number 31, Michael Mason, is

12   this your verdict?

13             JUROR:  Yes.

14             COURTROOM CLERK:  Juror number 16, Kamel Elhassani, is

15   this your verdict?

16             JUROR:  Yes.

17             COURTROOM CLERK:  And juror number 7, Razzakul

18   Chowdhury, is this your verdict?

19             JUROR:  Yes.

20             THE COURT:  All right.  Ladies and gentlemen, I'm now

21   able to excuse you, but I first want to thank you for your

22   service as jurors in this case.  This lasted some considerable

23   period of time, and there was a good deal of evidence and

24   testimony that you listened to.  And it was apparent to the

25   Court that you paid careful and close attention to the evidence

61

1    as it was presented, and it's also apparent that you deliberated

2    conscientiously in order to reach a unanimous verdict.

3            Now, you are no longer under any constraints to speak

4    to anyone about this case.  However, I will say this.  The

5    lawyers may not contact you.  They're forbidden by local rule

6    from doing so.  If a lawyer contacts you, I want to know about

7    it immediately.

8            You, however, may speak to whoever you wish about the

9    case.  In that regard, let me add a caution.  It's not an order,

10   it's a caution.  I am always disturbed when I see in the media

11   jurors discussing on the media what went on in the course of

12   jury deliberations.  That seems to me to be inappropriate.  It

13   does an injury to the deliberative process if jurors knew in

14   advance that everything that they said and did in the course of

15   deliberations was going to be grist for the media mill.

16           So I suggest to you - and it is a suggestion, not an

17   order - that you have a duty of confidentiality to your fellow

18   jurors to maintain the confidentiality of what went on in the

19   course of your deliberations.  But that is a decision you must

20   make.

21           Now, I'm going to excuse you, again, with thanks.  I

22   invite you -- this is not my courthouse, and although this is

23   the courtroom where I do all my work and my chambers are

24   attached to it, it doesn't belong to me.  None of this belongs

25   to me.  It is the people's courthouse.  It's your courthouse as

62

1    well as mine, and these proceedings, all of the proceedings that

2    I am in, are proceedings that you and every American should have

3    an interest in.

4         So I invite you, if you have a comment or a criticism

5    or something you want to express to me, to come back and tell me

6    about it.  But don't do it for eight or 10 weeks, not until this

7    case is completely over.  What will happen now is that I will

8    order the preparation of a presentence investigation report.

9    This is a document which has a great deal of information about

10   the defendant in it that I can take into account in imposing an

11   appropriate sentence.

12        And then, about eight or 10 weeks from now, or perhaps

13   even longer, I will impose an appropriate sentence.  And after

14   that is concluded, then I'm happy to see any of you who wish to

15   come and talk to me about the case.  And you can always call the

16   clerk's office, particularly Ms. Randall, the deputy clerk, and

17   ask if the case is totally over.  And I will have the deputy

18   clerk call the alternate jurors and tell them about the verdict,

19   and relate to them as well that they cannot be contacted, but

20   they're free to speak to whomever they wish.

21        And you can add the caution that I added to the jurors

22   here.

23        All right.  You have your books.  Take your books with

24   you, thank you again for your service.  You're free now to

25   depart.

63

```
 1                    (Jury out at 1:20 p.m.)
 2              THE COURT:  Mr. Sanders, come to the podium, please,
 3    sir.  Mr. Sanders, you have been found guilty by the jury.  I'll
 4    enter judgment in that regard at the appropriate time.  But I'm
 5    going to order the preparation of a presentence investigation
 6    report.  This is a vitally important document because it's a
 7    document on which the Court will chiefly rely in imposing an
 8    appropriate sentence.
 9              And you have a role to play in the preparation of this
10    report.  You will be asked by a probation officer to provide
11    information so that the report can be prepared.  You'll be asked
12    to provide information about your family, your background, your
13    education, your work experience, your health and financial
14    conditions, any criminal history that you may have, and indeed
15    anything that may be material in any way to the Court's
16    sentencing decision.  And you may have your counsel with you
17    when you provide that information to the probation officer.
18              And when the report is completed, Mr. Sanders, you'll
19    receive a copy.  So will your counsel.  You'll have an
20    opportunity to review it, to review it with your counsel, and
21    then to call to the Court's attention any corrections you think
22    should be made to the report, or any objections you have to the
23    facts, conclusions, or calculations contained in the report.
24    And the Government will also have an opportunity to register its
25    corrections or objections.
```

64

1          Now, if the Government disputes those objections or

2     corrections that you offer, or you dispute those that are

3     offered by the Government, then the Court will hold a hearing

4     and then the Court will resolve the dispute at that time by

5     issuing findings.

6          Then the Court will proceed to sentencing.  At the time

7     of sentencing, Mr. Sanders, you'll have the right to address the

8     Court and to say anything at all you wish to the Court by way of

9     extenuation, mitigation, or indeed anything, Mr. Sanders, that

10    you think the Court should know before the Court decides what

11    sentence to impose in your case.  You won't be required to

12    address the Court, but you will have the opportunity to do it.

13    And, of course, your counsel - or one of them, rather - will

14    have an opportunity to address the Court on your behalf.

15         I will set sentencing for the 4th of March at 9 a.m.

16    Is that date available ?

17         MS. GINSBERG:  I expect so, Your Honor.  I don't have

18    my calendar, but unless the Elsheikh matter is in trial at that

19    date, I am available on that date.

20         THE COURT:  Well, it might be.  If it is, Ms. Ginsberg,

21    we'll accommodate that, since that's also mine.

22         MS. GINSBERG:  Yes, sir.

23         THE COURT:  And we'll see.  So I understand that you

24    you can't be in two places at one time, and you need some time

25    to prepare.  So we'll set it for the 4th of March, and I'll

65

1   change that date if it becomes necessary to do so.

2          Mr. Schlessinger, I assume that date is okay with you,

3   or whoever is going to do this?

4          MR. SCHLESSINGER:  Yes, it is, Your Honor.

5          THE COURT:  All right.  Anything else to be

6   accomplished in this matter today on behalf of the Government?

7          MR. SCHLESSINGER:  No, Your Honor.

8          THE COURT:  On behalf of the defendant?

9          MS. GINSBERG:  Just one thing.  If we could ask the

10  Court's assistance.  I'm not sure what the conditions at the

11  Alexandria jail are in terms of crowding or COVID, but we would

12  ask the Court to ask the marshal service to have Mr. Sanders

13  retained at the Alexandria Detention Center as opposed to being

14  sent to any other of the regional jails.  As Your Honor knows,

15  you facilitated his ability to get ongoing medical treatment.

16  He is receiving specialized treatment --

17         THE COURT:  Do you have any objection to that,

18  Mr. Schlessinger?

19         MR. SCHLESSINGER:  Your Honor, just that I think the

20  Bureau of Prisons and the marshals need to be allowed sufficient

21  latitude to take whatever steps necessary.

22         THE COURT:  Well, yes, but I can always trump that, and

23  that's what Ms. Ginsberg is asking me to do.  He's receiving

24  treatment for another condition, so unless the marshals tell me

25  it's a real problem, I want him kept here.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA614**

66

1          DEPUTY MARSHAL:  Understood.  I'll pass it up the

2    chain.

3          THE COURT:  Anything else today?

4          MS. GINSBERG:  No, sir.

5          THE COURT:  I want to thank counsel for your

6    cooperation.  I don't recall a case in this court that I've had

7    in which four law firms have been involved.  I've had three.  I

8    went back to check.  I've had three, but four was a new record.

9    And I appreciate the cooperation of counsel in getting this

10   matter tried.

11         Court stands in recess until tomorrow -- there may be

12   something else tomorrow.  All right.  Court stands in recess.

13         (Off the record at 1:26 p.m.)

14

15

16

17              **CERTIFICATE OF OFFICIAL COURT REPORTER**

18

19         **I, Rebecca Stonestreet, certify that the foregoing is a**

20   **correct transcript from the record of proceedings in the**

21   **above-entitled matter.**

22

23

24   **_____//Rebecca Stonestreet_____           __12/3/21___**

25   **SIGNATURE OF COURT REPORTER                 DATE**

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA615**

```
                                                                          1
 1                   UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3    UNITED STATES OF AMERICA,        :
                                       :      Criminal Case
 4               Plaintiff             :      No. 20-CR-00143-TSE
                                       :
 5          v.                         :      November 19, 2021
                                       :      9:10 a.m.
 6    ZACKARY ELLIS SANDERS,           :
                                       :      JURY SELECTION
 7               Defendant             :      OPENING STATEMENTS
      ..............................   :      ......................

 8                    TRANSCRIPT OF TRIAL PROCEEDINGS
 9                               DAY 1
                 BEFORE THE HONORABLE T.S. ELLIS, III
10                   UNITED STATES DISTRICT JUDGE
                             and a jury
11

12     APPEARANCES:

13     FOR THE PLAINTIFF:          SETH SCHLESSINGER
                                   JAY V. PRABHU
14                                 WILLIAM CLAYMAN
                                   U.S. ATTORNEY'S OFFICE
15                                 2100 Jamieson Avenue
                                   Alexandria, VA  22314
16                                 (703) 299-3700

17     FOR THE DEFENDANT:          NINA J. GINSBERG, ESQ.
                                   DiMURO GINSBERG, P.D.
18                                 1101 King Street
                                   Suite 610
19                                 Alexandria, VA  22314
                                   (703) 684-4333
20
                                   JONATHAN STUART JEFFRESS, ESQ.
21                                 JADE CHONG-SMITH, ESQ.
                                   KAISER DLLON, PLLC
22                                 1099 14th Street, NW
                                   8th Floor West
23                                 Washington, DC  20005
                                   (202) 640-2850
24
                                   (APPEARANCES CONTINUED ON NEXT
25                                 PAGE.)
```

2

1

2      FOR THE DEFENDANT:          HENRY LOUIS SIRKIN
                                   SANTEN & HUGHES, LPA
3                                  600 Vine Street
                                   Suite 2700
4                                  Cincinnati, OH  45202
                                   513-721-4450

5

6      OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                   U.S. District Court, 9th Floor
7                                  401 Courthouse Square
                                   Alexandria, Virginia  22314
                                   (240) 426-7767

8

9                      ( Pages 1 - 158)

10

11           COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

# P R O C E E D I N G S

1

2      THE COURT:  Good morning.  The record will reflect that

3  this is United States against Sanders, 20-CR-143, and it is

4  apparent to the Court that counsel and the defendant are present

5  and prepared to proceed.  I've been advised, however, that

6  Ms. Ginsberg, your client wishes to be heard on something.

7      MS. GINSBERG:  Yes, that's correct, Your Honor.

8      THE COURT:  Is that to be *ex parte* or under seal?

9      MS. GINSBERG:  Your Honor, we would prefer to do it

10  *ex parte*, if it's possible.

11      THE COURT:  Any objection, Mr. Schlessinger?

12      MR. SCHLESSINGER:  No objection to that, Your Honor.

13      THE COURT:  All right.  Then I would ask you all to

14  depart.

15      (Counsel and parties exit the courtroom.)

16      I don't acquiesce easily to *ex parte* statements, but

17  I'll hear Mr. Sanders briefly.  Mr. Sanders, come to the podium

18  briefly, sir.

19      All right.  Mr. Sanders, what do you have to say?

20      THE DEFENDANT:  This entire time, you know, there have

21  been significant problems between my counsel and myself.  I have

22  not been listened to, I have said things; nothing has been done

23  about it.  It comes months later that I've been pleading for my

24  counsel to do certain things, that they finally look into it,

25  realize it needs to be done.  By that point either it's too

4

```
1     late, a motion gets filed untimely.
2             During our, you know, video calls that we've had at the
3     court, I have been speaking to my attorneys; a certain
4     individual has been distracted.  One time they accidentally
5     turned their microphone on and they were watching a golf
6     tutorial video while I was trying to discuss my case with them.
7             For the first year at least of my case I was pleading
8     to get a new attorney.  My mother, Risa, who is paying them,
9     refused to do anything about it.  We were locked down in the
10    jail during COVID.  I had pretty much no access to the outside.
11    We weren't allowed to go to the law library, we weren't allowed
12    to speak with any really counselors.  There was no one who would
13    do anything.
14            Every time I was able to get to a phone, I'm begging
15    and pleading to do something about this.  And my mother, Risa,
16    said that if I don't use a certain attorney, that she's not
17    going to pay for an attorney, that the Court is not going to
18    appoint someone, and it's too close to trial.  I'm not going to
19    get a continuance, nothing that can be done about this.
20            As I'm sure Your Honor has seen, everything has been
21    late, everything has been untimely.  There's mistakes, there's
22    ridiculous things that have happened.  I've desperately pleaded
23    for over a year, and then it was only after it became so obvious
24    to anyone that I wasn't allowed to change attorneys, but another
25    person was selected for me and brought onto the team who kind of
```

5

1    viewed themselves, I believe, as more of a consultant role at

2    the beginning.

3         One of my counsel said to me after they were finally

4    added to the case, after things had not been done properly for

5    the first year, that they don't really have time for my case,

6    that they weren't expecting this, that I need to hire more

7    lawyers.  An exact quote was, "I don't have time for this.  You

8    need to hire five more lawyers.  This is too much.  You know,

9    I'm busy with my other cases, I don't have time to handle this."

10        You know, it has been so frustrating.  I have been

11   pleading, you know, for them to look into certain research,

12   certain discovery.  There's tons of discovery that has not been

13   looked at, not been addressed.  I mean, as you saw yourself the

14   other day, my attorneys don't even know what BDSM stands for.

15        This case is integral to BDSM and the gay leather

16   community and gay leather culture.  If there's no understanding

17   of the background, of any of these dynamics, there's no way to

18   argue whether this was for the purpose of producing a video or

19   not, or whether this was part of our normal relationship, that

20   these were activities that we were engaging in whether or not

21   there is a video; that the video had no reason or purpose at all

22   to any of the dynamics exchanged between us, and that any of the

23   conduct would happen regardless.

24        If there's no understanding of the culture and the

25   context and the dynamic, how can I have a proper legal defense?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA620**

6

```
1              THE COURT:  All right.  I understand, Mr. Sanders, that

2    you're expressing, in a very articulate and interesting fashion,

3    your dissatisfaction with your attorneys.  That's unfortunate.

4    However, you or your family selected these attorneys, and you're

5    paying them.  You are not an indigent defendant whose counsel

6    are appointed by the Court.

7              Now, you do have a number of lawyers, and some of them

8    I'm personally familiar with their activities.  Ms. Ginsberg has

9    a long record of very effective participation in federal

10   criminal trials here going back many years.

11             THE DEFENDANT:  Uh-huh.

12             THE COURT:  And it is unfortunate.  I know that you are

13   dissatisfied.  You've made that quite clear.  And, of course,

14   you may discharge as many of your attorneys - or all of them -

15   as you wish.

16             But one thing isn't going to happen.  I'm not going to

17   approve, Ms. Ginsberg, your withdrawal from the case.  You're

18   currently the earliest person.  I think there was one other

19   person before you.  But I'm not going to approve her withdrawal

20   because this case is scheduled for trial today.  Nearly 100

21   people have been summoned to appear for a jury selection this

22   morning, so we're going ahead.

23             Now, I understand that you are dissatisfied with some

24   of the Court's rulings, too.  I understand that.  I've been

25   doing this a long time, and every time I make a ruling, one side
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

7

1    is happy, the other side is unhappy.

2          THE DEFENDANT:  Of course.

3          THE COURT:  It's the dynamic.  But you should know that

4    every decision I've made, virtually every one that I've made, is

5    reviewable by an appellate court in the event there's an adverse

6    verdict against you.  And you should also know that I've made a

7    number of rulings -- you've mentioned how central BDSM is for

8    your case.  I've made a number of rulings about that expert, but

9    I have deferred that, for that expert, until the end.

10          Now, of course, you say it's central to your case.  I

11    don't know.  I don't have a view on that at this point in time.

12    And the rulings I've made apply to the experts that I have been

13    presented with.  They do not apply to the defendant.  Of course,

14    you have an absolute right to remain silent, and if you do

15    remain silent, I will tell the jury that they cannot even

16    discuss the fact that you have remained silent when they

17    consider their verdict, because your right to remain silent is

18    absolute under the Constitution.  You also have an absolute

19    right to testify before a jury, should you choose to do so.  And

20    I will consider any objections at that time anew with respect to

21    BDSM and the like.

22          Now, having said all that, you may discharge as many of

23    your attorneys as you wish.  I am not going to release

24    Ms. Ginsberg.  You may do as you wish otherwise, but we're going

25    to proceed with jury selection this morning.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

8

1          So to the extent that you're requesting a continuance,

2    I'm going to deny that.  But what I will do, Mr. Sanders, is to

3    give you 15 minutes to discuss with your attorneys anything

4    further you want them to say or that you wish to say.  Is that

5    clear?

6          THE DEFENDANT:  Yes, it is.  And if I may just add one

7    last thing, just for the record.

8          THE COURT:  Yes, you may.

9          THE DEFENDANT:  You know, we were supposed to have

10   attorney visits that were scheduled at the jail over the past

11   several days leading up to trial, yesterday, the day before,

12   Friday, I believe Thursday as well.  They canceled every single

13   one of those visits except for one.  I only saw them briefly for

14   one of those visits.  I was not able to meet with them, discuss

15   the case, or anything of the like.

16         So I just kind of have to get that on the record, I

17   feel.

18         THE COURT:  All right.  You may be seated.

19   Ms. Ginsberg, you may respond briefly.

20         MS. GINSBERG:  Thank you, Your Honor.  Mr. Sanders is

21   inaccurate at least with respect to two of the four scheduled

22   visits.  The first visit was on Thursday night.  It was

23   approximately three and a half hours.  The second -- or three

24   hours.  The second visit was approximately three and a half

25   hours.  We did not visit on Sunday evening or last evening

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA623**

9

1    because we were preparing for trial.

2            THE COURT:  All right.  Thank you, Ms. Ginsberg.

3            I'm going to recess, and, Ms. Ginsberg, I'm going to

4    give you and your co-counsel there an opportunity to have a

5    further discussion briefly with Mr. Sanders.  And then we will

6    proceed with the jury selection in accordance with the procedure

7    I have previously outlined to the parties.

8            Court stands in recess for 15 minutes.  If you

9    absolutely need longer Ms. Ginsberg, tell the court security

10   officer and I'll consider it.  But we have roughly 50 people

11   here and awaiting jury selection, and I don't want to keep them

12   waiting unnecessarily.

13           MS. GINSBERG:  Thank you, Your Honor.

14           THE COURT:  Court stands in recess.

15           (Recess taken at 9:21 a.m.)

16           THE COURT:  This is United States against Sanders and

17   it's 20-CR-143.  And I thought we were going to be prepared to

18   proceed, but we need to recess and bring the panel up here and

19   begin the jury selection process.

20           Now, I don't think there's anything further to be done

21   in the matter that you've raised, Ms. Ginsberg, am I correct?

22           MS. GINSBERG:  You are correct, Your Honor.  Thank you.

23           THE COURT:  All right.  Let's proceed.  Now, I'm going

24   to tell the panel when they get here that -- I'll give

25   Mr. Sanders' full name.  His middle is the same as my last name.

10

1      I'll tell him there's no relation.

2              I'm correct in that regard, am I not, Ms. Ginsberg?

3              MS. GINSBERG:  I'm sorry, Your Honor, I apologize.

4      Mr. Jeffress was...

5              THE COURT:  I said there's no relationship between me

6      and your client because we share a name, Ellis.

7              MS. GINSBERG:  No, there is not.

8              THE COURT:  All right.  Neither is there any relation

9      between me and two of the jurors whose name is Ellis.  Not a

10     bit.  Interestingly, though, I can't remember another time in

11     the past 34 years where I have had jurors with the last name of

12     Ellis.

13             All right.  Court stands in recess.  Let's bring the

14     jury in and have them seated here in the courtroom.  Court

15     stands in recess.  I will reconvene as soon as the deputy clerk

16     or the court security officer advises me that the jurors are

17     present in the courtroom.

18             (Recess taken at 9:38 a.m.)

19             THE COURT:  Good morning, ladies and gentlemen.  This

20     is the trial of United States against Sanders.  My name is

21     Tim Ellis, I will be the judge presiding over this case, and

22     I'll proceed to tell you a bit more in a minute.

23             But would counsel pick up your earphones, please.  This

24     is a means that I have of communicating with the defendant,

25     defendant's counsel, and plaintiff counsel about matters that

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA625**

11

1    need not be before the jury.

2              (BENCH CONFERENCE ON THE RECORD.)

3              THE COURT:  I'm going to ask Ms. Randall, the deputy

4    clerk, to tell counsel - I think Ms. Ginsberg asked - to tell

5    counsel what was the situation with the three jurors who had

6    been excused.  Other jurors are absent for reasons I don't know.

7              COURTROOM CLERK:  Juror number 1, Amy Agarwal, she's

8    taking her mother to a cardiac procedure this morning.  Juror

9    number 7, Kimberly Brown, has a daughter that has a doctor's

10   appointment this morning.  And juror number 45, Patrick Tessier,

11   is a full-time student out of town, Harrisburg, Virginia.

12             THE COURT:  He shouldn't having called in the first

13   place.

14             Now, there are some other jurors absent and we don't

15   know the reason for those.  In addition, jurors who answered

16   "yes" to questions 2 through 5 on the questionnaire are not

17   here.  How many of those were there, Ms. Randall?

18             COURTROOM CLERK:  Judge, there were 12.

19             THE COURT:  12.  All right.  And if you need the gender

20   and race of those, we will be glad to furnish that to you as

21   well.

22             All right.  We're going to proceed now with the jury

23   selection process.

24             MS. GINSBERG:  Judge, I'm going to object to the

25   excusal of numbers, I think, 1 and 7.  Those are individuals who

12

1    could have made other arrangements.

2          THE COURT:  All right.  You note that, I take it.  I

3    don't think so, Ms. Ginsberg.  You have no idea.  I'm happy with

4    the reason for the exclusion and your objection is noted.  Let's

5    proceed.

6          (END BENCH CONFERENCE.)

7          THE COURT:  All right.  Ladies and gentlemen, as I

8    indicated, my name is Tim Ellis.  I will be the judge presiding

9    over this trial today, which is United States against Sanders.

10   And I will tell you a bit about this case in a moment.

11         But at the outset, I want to take this opportunity to

12   thank each of you for your service as jurors.  Nothing you do as

13   an American citizen is any more important than your service as

14   jurors.  Together with voting, it is one of the two cardinal

15   duties each of us has as an American in any case.  So we thank

16   you for your service.

17         Now, we're going to proceed in the jury selection,

18   which is what we're doing this morning, and it is in two phases.

19   First, I will ask you a series of questions -- first, I'm going

20   to have the roll called, and after the roll is called, then

21   we'll proceed.  The roll is called to enable the counsel to

22   match a name with a face.  So when your name is called, please

23   stand, say "present" or "here" so the court reporter can record

24   your presence, and when the next name is called, you may be

25   seated again.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

13

1          After that, an oath will be administered to you to tell

2     the truth.  This is what's called the voir dire process.  You

3     may have heard that term.  I'm sure I'm mispronouncing it.  It's

4     a law French statement derived from the Latin which merely

5     means, literally, to speak the truth.

6          So you will be administered an oath to answer the

7     Court's questions truthfully, and I will ask you a series of

8     questions designed to enable the Court to determine whether any

9     of you may be disabled, by any rule of law, from serving as a

10    juror in this case.

11         Now we'll begin with the calling of the roll, and then

12    I will have the oath administered to you.  All right.  You may

13    proceed.

14         COURTROOM CLERK:  Ladies and gentlemen of the jury, as

15    I call your name, please stand, answer "present," and be seated

16    as the next name is called.

17         Juror number 2, Bruce Arthur.

18         PROSPECTIVE JUROR:  Present.

19         COURTROOM CLERK:  Juror number 3, James Bowman.

20         PROSPECTIVE JUROR:  Present.

21         COURTROOM CLERK:  Juror number 4, Wesley Braudaway.

22    Juror number 4, Wesley Braudaway.

23         THE COURT:  Show cause.

24         COURTROOM CLERK:  Juror number 5, Colette Brooks.

25         PROSPECTIVE JUROR:  Present.

14

```
 1              COURTROOM CLERK:  Juror number 6, Jason Brost.

 2              PROSPECTIVE JUROR:  Present.

 3              COURTROOM CLERK:  Juror number 8, Steven Cereghino.

 4              PROSPECTIVE JUROR:  Present.

 5              COURTROOM CLERK:  Jury number 9, Virginia

 6    Chavez-Mendoza.  Juror number 9, Virginia Chavez-Mendoza.

 7              THE COURT:  All right.  Show cause.

 8              COURTROOM CLERK:  Juror number 10, Jun Cho.

 9              PROSPECTIVE JUROR:  Present.

10              COURTROOM CLERK:  Juror number 11, Diane Corina.

11              PROSPECTIVE JUROR:  Present.

12              COURTROOM CLERK:  Juror number 12, Patricia Craig.

13              PROSPECTIVE JUROR:  Present.

14              COURTROOM CLERK:  Juror number 13, Marilyn Davis.

15              PROSPECTIVE JUROR:  Present.

16              COURTROOM CLERK:  Juror number 14, Jamal Dimashk.

17              PROSPECTIVE JUROR:  Present.

18              COURTROOM CLERK:  Juror number 15, Elizabeth Earls.

19              PROSPECTIVE JUROR:  Present.

20              COURTROOM CLERK:  Juror number 16, Kamel Elhassani.

21              PROSPECTIVE JUROR:  Present.

22              COURTROOM CLERK:  Juror number 17, Valerie Galbraith.

23              PROSPECTIVE JUROR:  Present.

24              COURTROOM CLERK:  Juror number 18, Bobby Ray Giles, Jr.

25              PROSPECTIVE JUROR:  Present.
```

15

```
 1                COURTROOM CLERK:  Juror number 19, Erwin Go.

 2            PROSPECTIVE JUROR:  Present.

 3            COURTROOM CLERK:  Juror number 20, Erin Harris.

 4            PROSPECTIVE JUROR:  Present.

 5            COURTROOM CLERK:  Juror number 21, Samantha Hart.

 6            PROSPECTIVE JUROR:  Present.

 7            COURTROOM CLERK:  Juror number 22, Douglas Hazelgrove.

 8            PROSPECTIVE JUROR:  Present.

 9            COURTROOM CLERK:  Juror number 23, Robert Heiden.

10            PROSPECTIVE JUROR:  Here, ma'am.

11            COURTROOM CLERK:  Juror number 24, Fang Hu.  Juror

12    number 24, Fang Hu.

13            THE COURT:  All right.  Show cause.

14            COURTROOM CLERK:  Juror number 25, Scott Hunter.

15            PROSPECTIVE JUROR:  Present.

16            COURTROOM CLERK:  Juror number 26, Leonora Jordan.

17            PROSPECTIVE JUROR:  Present.

18            COURTROOM CLERK:  Juror number 27, Patrick Kerns.

19            PROSPECTIVE JUROR:  Present.

20            COURTROOM CLERK:  Juror number 28, Nathaniel Lee.

21            PROSPECTIVE JUROR:  Present.

22            COURTROOM CLERK:  Juror number 29, Brian Lieberman.

23            PROSPECTIVE JUROR:  Present.

24            COURTROOM CLERK:  Juror number 30, Nebojsa Malic.

25            PROSPECTIVE JUROR:  Present.
```

16

```
 1              COURTROOM CLERK:  Juror number 31, Michael Mason.
 2              PROSPECTIVE JUROR:  Present.
 3              COURTROOM CLERK:  Juror number 32, Michael McAllister.
 4              PROSPECTIVE JUROR:  Present.
 5              COURTROOM CLERK:  Juror number 33, Lucinda McLaughlin.
 6              PROSPECTIVE JUROR:  Present.
 7              COURTROOM CLERK:  Juror number 34, Fonda Newcomb.
 8              PROSPECTIVE JUROR:  Present.
 9              COURTROOM CLERK:  Juror number 35, Alexander Nykorchuk.
10              PROSPECTIVE JUROR:  Present.
11              COURTROOM CLERK:  Juror number 36, Elizabeth Pennisi.
12              PROSPECTIVE JUROR:  Present.
13              COURTROOM CLERK:  Juror number 37, Michael Quinlan.
14              PROSPECTIVE JUROR:  Present.
15              COURTROOM CLERK:  Juror number 38, Kristin Richter.
16              PROSPECTIVE JUROR:  Present.
17              COURTROOM CLERK:  Juror number 39, Cynthia Riggs.
18              PROSPECTIVE JUROR:  Present.
19              COURTROOM CLERK:  Juror number 40, Gerald Roma, III.
20         Juror number 40, Gerald Roma, III.
21              THE COURT:  Show cause.
22              COURTROOM CLERK:  Juror number 41, Kelly Leigh Rupard.
23              PROSPECTIVE JUROR:  Present.
24              COURTROOM CLERK:  Juror number 42, Elizabeth Sheriff.
25              PROSPECTIVE JUROR:  Present.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA631**

17

1          COURTROOM CLERK:  Juror number 43, Daniel Stapor.

2          PROSPECTIVE JUROR:  Present.

3          COURTROOM CLERK:  Juror number 44, Weiwei Stiltner.

4          PROSPECTIVE JUROR:  Present.

5          COURTROOM CLERK:  Juror number 46, Selma Totimeh.

6          PROSPECTIVE JUROR:  Present.

7          COURTROOM CLERK:  Juror number 47, James Vollmers.

8    Juror number 47, James Vollmers.

9          THE COURT:  Show cause.

10          COURTROOM CLERK:  Juror number 48, Nazra Waheed.  Juror

11   number 48, Nazra Waheed.

12          THE COURT:  Show cause.

13          COURTROOM CLERK:  Is there any juror whose name I have

14   not called?

15          THE COURT:  The record will reflect there were none.

16   You may proceed to administer the oath to the panel.

17          COURTROOM CLERK:  Ladies and gentlemen of the jury,

18   will you please stand, raise your right hands, and respond after

19   the oath by stating "I shall."

20          Do you swear that you shall true and perfect answer

21   make to such questions as may be propounded to you by the Court

22   so help you god?

23          PROSPECTIVE JUROR PANEL:  (Collectively) I shall.

24          COURTROOM CLERK:  Thank you.  Please be seated.

25          THE COURT:  All right.  Ladies and gentlemen, I'm now

18

1   going to tell you what the charges are in this case, and I'm

2   going to read to you excerpts from the indictment.  But I hasten

3   to instruct you that the indictment itself is not proof or

4   evidence of guilt of any kind whatsoever.  It's merely the

5   Government's formal means of accusing a defendant of a crime.

6   And I also hasten to add that the defendant has pled not guilty

7   to the charges in the indictment, and therefore must be presumed

8   by you to be innocent of those charges unless and until the jury

9   find otherwise.

10          Let me inquire, Mr. Schlessinger, are there still --

11   there are 12.  Is that correct?

12          MR. SCHLESSINGER:  12 counts in the indictment,

13   Your Honor, yes.

14          THE COURT:  All right, ladies and gentlemen.  The first

15   Counts, 1 through 5, the first five charges are as follows:  In

16   separate instances, on or about the dates set forth below - and

17   there are five dates that are set forth - within the

18   Eastern District of Virginia, Defendant Zackary Ellis Sanders

19   attempted to and did employ, use, persuade, induce, entice, and

20   coerce a minor to engage in sexually explicit conduct for the

21   purpose of producing a visual depiction of such conduct, knowing

22   and having reason to know that such visual depiction would be

23   transported or transmitted using any means and facility of

24   interstate and foreign commerce, and in and affecting commerce

25   and foreign commerce and mail, and which visual depiction was

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA633**

19

1    actually transported and transmitted using any means and

2    facility of interstate and foreign commerce, and in and

3    affecting interstate and foreign commerce and mail, and which

4    visual depiction was produced using materials that had been

5    shipped, transported, and affecting interstate and foreign

6    commerce by any means, including by computer; to wit, digital

7    visual depictions of different minors engaged in sexually

8    explicit conduct, on those five dates.

9            All right.  The next group of charges, again five of

10   them -- six of them.  Six of them are as follows:  In separate

11   instances, on or about the dates set forth, within the

12   Eastern District of Virginia, the defendant, Zackary Ellis

13   Sanders, attempted to and did receive a visual depiction using

14   any means and facility of interstate and foreign commerce, and

15   that had been mailed and had been shipped and transported in and

16   affecting interstate and foreign commerce, and which materials,

17   which had been mailed and so shipped and transported by any

18   means, including by computer, and the production of such visual

19   depiction involved the use of a minor engaging in sexually

20   explicit conduct, and the visual depiction was of such conduct;

21   to wit, digital visual depictions of different minors engaged in

22   sexually explicit conduct on the various dates.  And there are

23   six different dates alleged in the indictment.

24           So that covers the first 11 counts or charges.

25           The 12th count, 12th and final count or charge, is:  In

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA634**

—20

```
 1    or about February 2020, within the Eastern District of Virginia,
 2    that the defendant, Zackary Ellis Sanders, knowingly possessed
 3    at least one matter which contained a visual depiction that had
 4    been mailed or had been shipped or transported using any means
 5    or facility of interstate or foreign commerce, or in or
 6    affecting interstate or foreign commerce, or which was produced
 7    using materials which had been mailed or so shipped or
 8    transported, by any means, including by computer, and the
 9    production of such depiction involved the use of a minor
10    engaging in sexually explicit conduct, and such visual depiction
11    was of such conduct; to wit, digital visual depictions of
12    minors, including prepubescent minors and minors who had not
13    attained the age of 12 years of age, engaged in sexually
14    explicit conduct stored on a Sandisk Cruzer Edge thumb drive, an
15    HP Elite Book 755 laptop, a Lexar thumb drive, an HP laptop, and
16    an IP [sic] laptop, all in violation of Section 2252(a)(4) and
17    (b)(2) of Title 18 of the U.S. Code.
18            So, ladies and gentlemen, those are the charges in the
19    indictment.  And, as I've told you, the indictment from which
20    I've read the charges is not itself proof or evidence of guilt
21    of any kind whatsoever.  It's merely the formal means the
22    government has of accusing a defendant of a crime.  And the
23    defendant has pled not guilty to all of those charges, and
24    therefore must be presumed to be innocent of all of those
25    charges unless and until the jury find otherwise.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA635**

21

 1          All right.  That tells you a bit about what this case

 2     is about.  Now, I'm going to ask you a series of questions and I

 3     will do so in two phases.  In the first phase, if you have an

 4     affirmative answer to any question that I ask, raise your hands

 5     after the question is asked and the court security officer will

 6     take a microphone to you and you will answer the question

 7     standing from where you are currently sitting.  That's in

 8     Phase One.

 9          Now, in Phase Two of the voir dire I will ask you

10     questions and they'll be in a series of three.  And if you have

11     an affirmative answer to any of the questions that I ask, then I

12     will have you come forward and sit in the witness box, but

13     you'll be behind plastic, as I am here.  The reason I'm not

14     wearing a mask is I'm 50 feet from everybody and I'm behind this

15     Plexiglass screen.  You'll be behind the Plexiglass screen, and

16     you will have the ability to use earphones and a microphone to

17     give your answers to the questions in the relative privacy of

18     bench and counsel.

19          In other words, what you say in response to the

20     questions that I will ask will be heard only by the lawyers and

21     the defendant and by me, but not by others in the courtroom.

22     And that's done to preserve your confidentiality in any answers

23     that you may be required to give, and also to prevent any

24     knowledge that you have concerning this case or anything else

25     from affecting or infecting other members of the panel.

22

```
1            Let me again hasten to tell you, if I didn't before,
2    the defendant, Mr. Sanders', middle name is the same as my last
3    name but we're not related in any way.  There will also be, I
4    believe, some members of the jury panel - maybe not in the
5    morning session but in the afternoon session - with the last
6    name of Ellis.  And so far as I'm aware, there is no relation
7    whatever between me and those persons merely because we may
8    share a last name.  I will point out that I've been doing this
9    for 34 years now, and this is the first time in 34 years that
10   any members of the panel have come up with a last name like
11   mine.  It isn't the first time that other persons in the
12   courtroom, like counsel and parties, have had the last name, but
13   it's the first time the jurors have.
14            So, now, I've said to you that we'll proceed in two
15   phases, and we're going to do that this morning.  I expect it to
16   take about three hours.  And then I will do the same thing in
17   the afternoon for a similarly large group of people who will
18   also be prospective jurors in this case.  But we can't do it all
19   at the same time as we could in pre-pandemic times because of
20   the need to maintain social distancing.
21            And let me take this opportunity to tell you that the
22   court is very sensitive to the need to safeguard the health and
23   safety of all prospective jurors.  That's why we have you
24   wearing masks and that's why we have the social distancing.  And
25   we will continue to observe that.
```

23

1          All right.  To begin with, Mr. Schlessinger, would you

2    stand, introduce yourself and your co-counsel to the panel, as

3    well as your case agent.

4          MR. SCHLESSINGER:  Yes, Your Honor.  Ladies and

5    gentlemen, good morning.  My name is Seth Schlessinger, and I

6    have with me here at counsel table my co-counsel, Bill Clayman

7    and Jay Prabhu.  We are prosecutors with the Department of

8    Justice.  We represent the United States in this matter.  And

9    we're also joined here by case agent FBI Special

10   Agent Christopher Ford, as well as Loraine McNeill, who is a

11   paralegal with our office.

12          Once again, good morning.

13          THE COURT:  All right.  Do you or any member of your

14   family, so far as you know, know any of these individuals, or

15   have you had any business or social dealings of any kind

16   whatsoever with any of them?  The record will reflect there are

17   no hands.

18          Now, Mr. Schlessinger and his co-counsel are members of

19   the United States Attorney's Office for the Eastern District of

20   Virginia.  So let me ask whether you or any member of your

21   family, so far as you know, know any of the employees or

22   attorneys in that office, or have you had any business or social

23   dealings of any kind whatsoever with any of them.  If so, raise

24   your hands.  There being no hands raised, I will continue.

25          Agent Ford is employed by the Federal Bureau of

24

1    Investigation.  I want to know whether you or any member of your

2    family, so far as you know, know any of the employees or agents

3    of the FBI, or whether you've had any business or social

4    dealings of any kind whatsoever with any of them.  Once again,

5    no hands are raised.

6              Did I see a hand?  Yes, I did.  All right.  May I have

7    your name, please?

8              PROSPECTIVE JUROR:  Jason Brost.

9              THE COURT:  You're an attorney?

10             PROSPECTIVE JUROR:  I'm an attorney.

11             THE COURT:  With what firm?

12             PROSPECTIVE JUROR:  Combs & Taylor.

13             THE COURT:  And what is the main focus of your law

14   practice?

15             PROSPECTIVE JUROR:  It's a general practice supporting

16   small businesses, commercial litigation, and some transaction

17   support.

18             THE COURT:  All right.  Apart from what you had in law

19   school and criminal law, have you had any special training in

20   criminal law?

21             PROSPECTIVE JUROR:  No, no special training.  No.

22             THE COURT:  Do you believe there's anything in your

23   legal practice or education that would prevent or hinder you in

24   any way from rendering a fair and impartial verdict in this

25   case?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA639**

25

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Now, who do you know in the FBI?

3            PROSPECTIVE JUROR:  Actually, the dad of another child

4    in my child's skating class is an FBI agent.  I actually don't

5    even remember his first name.  But I just saw him yesterday at

6    skating.  That's really the extent of it.

7            THE COURT:  I'm not sure I understood what you said.

8    You're the dad of another -- oh, I see, you're -- "the dad of

9    another child in my child's skating class is an FBI agent."  Is

10   that right?

11           PROSPECTIVE JUROR:  Yes.  So I see him every couple of

12   weeks.

13           THE COURT:  Do you socialize with him other than the

14   skating class?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Do you feel that knowing another FBI agent

17   in the context of your child's skating class would prevent or

18   hinder you in any way from rendering a fair and an impartial

19   verdict in this case based solely on the evidence and the

20   Court's instructions on the law?

21           PROSPECTIVE JUROR:  No, Your Honor.

22           THE COURT:  Thank you.  You may be seated.  Anyone

23   else?

24           PROSPECTIVE JUROR:  James Bowman.

25           THE COURT:  Yes, Mr. Bowman.  And who is it that you

26

1    know in the FBI?

2            PROSPECTIVE JUROR:  Our neighbor, Forrest Brannon (ph),

3    is in the FBI; and then an old high school buddy,

4    Bill Kirkonel (ph).  I believe he is since retired.  He lives in

5    Savannah.

6            THE COURT:  The first one you mentioned is a neighbor?

7            PROSPECTIVE JUROR:  Yes, sir.

8            THE COURT:  And do you know what he does for the FBI?

9            PROSPECTIVE JUROR:  As far as I know, he has done SWAT

10   stuff.  He works in investigations.  I don't know specifics

11   because he doesn't talk too much about it.  As a neighbor, we do

12   socialize with them fairly frequently.

13           THE COURT:  Do you feel that having a neighbor you

14   socialize with who is employed with the FBI as you've described

15   would prevent or hinder you in any way from rendering a fair and

16   an impartial verdict in this case based only on the evidence and

17   the Court's instructions on the law?

18           PROSPECTIVE JUROR:  No, Your Honor.

19           THE COURT:  Now, you also mentioned that you had, what

20   was it?

21           PROSPECTIVE JUROR:  A high school friend who is FBI.

22   He's since retired.  We haven't done anything socially literally

23   in decades, and I don't feel that would affect me in any way

24   either.

25           THE COURT:  All right.  Thank you, Mr. Bowman, you may

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA641**

27

1    be seated.

2          Anyone else?  Was there a hand over here?  No.  All

3    right.  The record will reflect there are no other hands.

4          Now, Ms. Ginsberg, would you stand and introduce your

5    client and your co-counsel to the panel, please?

6          MS. GINSBERG:  Good morning.  My name is Nina Ginsberg.

7    I'm a lawyer with the law firm DiMuro Ginsberg here in

8    Alexandria.  This is Mr. Sanders, Zack Sanders.

9          THE COURT:  And also your co-counsel, if you would,

10   please.

11         MS. GINSBERG:  To my right is Lou Sirkin of the law

12   firm of Santen & Hughes in Cincinnati, Ohio.  To my left is

13   John Jeffress and Jade Chong-Smith of the law firm of

14   KaiserDillon in the District of Columbia, and our paralegal,

15   Leanna Feinleib, also of KaiserDillon.

16         THE COURT:  Ladies and gentlemen, do any or any member

17   of your family, so far as you know, know any of these

18   individuals, or have you had any business or social dealings

19   with any of them?  The record will reflect no hands.

20         You also heard that the attorneys are members of firms

21   in Ohio and in the District of Columbia.  Do you or any member

22   of your family, so far as you know, know any of the employees or

23   the attorneys in those firms, or have you had any business or

24   social dealings of any kind whatsoever with any of them?  Once

25   again, the record will reflect there are no hands raised.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA642**

28

```
1              Now, I want to know, ladies and gentlemen, whether any
2     of you have served in the past on any grand juries or trial
3     juries in either state, federal, or local courts.  If you would
4     raise your hands, please.  There are a few hands raised.  All
5     right.  When a microphone is brought to you, let me have you
6     first give me your name, please.
7              PROSPECTIVE JUROR:  My name is Diane Corina.
8              THE COURT:  What juries have you served on in the past?
9              PROSPECTIVE JUROR:  It was Arlington County about
10    20 years ago.
11             THE COURT:  And what was the nature of the case on
12    which you served?
13             PROSPECTIVE JUROR:  It was capital rape and murder.
14             THE COURT:  And was the jury -- don't tell me the
15    result, but was the jury on which you served able to reach a
16    unanimous verdict?
17             PROSPECTIVE JUROR:  Yes.
18             THE COURT:  Any other jury service, Ms. Corina?
19             PROSPECTIVE JUROR:  No.
20             THE COURT:  Thank you, Ms. Corina, you may be seated.
21    Next.
22             PROSPECTIVE JUROR:  My name is Colette Brooks.  I
23    served with the Stafford County on a court case about three or
24    four years ago.  I was picked for the jury and we did reach a
25    unanimous decision.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA643**

29

1          THE COURT:  All right.  And what was the nature of the

2     case?

3          PROSPECTIVE JUROR:  It was a car accident case.

4          THE COURT:  All right.  Any other jury service,

5     Ms. Brooks?

6          PROSPECTIVE JUROR:  No, sir.

7          THE COURT:  Thank you.  You may be seated.  Next.

8          PROSPECTIVE JUROR:  My name is Jamal Dimashk, and I

9     served, I believe it was in Arlington County, as a juror many

10    years ago.  I can't recall.  The case was assaulting a

11    police officer, and we did come up with a verdict.

12         THE COURT:  All right.  Thank you, Mr. Dimashk.  Any

13    other jury service, sir?

14         PROSPECTIVE JUROR:  No, sir.

15         THE COURT:  Next.

16         PROSPECTIVE JUROR:  Your Honor, Nebojsa Malic.  I

17    served on an Arlington County jury briefly about 10 years ago.

18    I ended up getting stricken during voir dire after answering a

19    question about trustworthiness of police.

20         THE COURT:  Your name is Dimashk?

21         PROSPECTIVE JUROR:  Malic, M-A-L-I-C.

22         THE COURT:  So you didn't serve on that jury?

23         PROSPECTIVE JUROR:  I ended up being impanelled and

24    then stricken.

25         THE COURT:  All right.  Thank you, sir.  You may be

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA644**

30

```
1    seated.  I assume no other jury service?

2              PROSPECTIVE JUROR:  No, sir.

3              THE COURT:  Next?

4              PROSPECTIVE JUROR:  Nathaniel Lee.  I served a few

5    years ago, I don't remember when it was, state or whatever.  The

6    case was for embezzlement.

7              THE COURT:  All right.  Was the jury on which you

8    served able to reach a unanimous verdict?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Any other jury service?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Thank you.  You may be seated.  Next.

13             PROSPECTIVE JUROR:  My name is Doug Hazelgrove and I

14   served in Fairfax County probably six or seven years ago.  And

15   it was a car accident injury case, and we reached a unanimous

16   decision.

17             THE COURT:  Any other jury service, Mr. Hazelgrove?

18             PROSPECTIVE JUROR:  No, sir.

19             THE COURT:  Thank you, sir.  You may be seated.

20             PROSPECTIVE JUROR:  Good morning, sir.  My name is

21   Robert Heiden, and I'm not sure if this is exactly what you're

22   looking for, but I served on a court martial case.  I know you

23   said state, federal, or local.  I wanted to disclose that

24   anyway.

25             THE COURT:  Yes, that's perfectly appropriate.  I would
```

31

```
 1    have gotten it by other means.  But I take it you served on a
 2    special courts martial panel?
 3              PROSPECTIVE JUROR:  Yes, sir.
 4              THE COURT:  And were you a commissioned officer?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  What was your rank?
 7              PROSPECTIVE JUROR:  At the time, lieutenant.  First or
 8    second lieutenant, I can't remember.
 9              THE COURT:  All right.  Well, I remember going from
10    ensign to Lieutenant JG, and that was a big step for me back
11    then.
12              PROSPECTIVE JUROR:  Yeah, still is.  Good pay raise,
13    yeah.
14              THE COURT:  May I have your name again?
15              PROSPECTIVE JUROR:  Yes, sir.  It's Heiden, first name
16    Robert.
17              THE COURT:  What was the nature of the court martial on
18    which you served?
19              PROSPECTIVE JUROR:  It was a fraud case after
20    Hurricane Katrina.
21              THE COURT:  And was the court martial on which you sat
22    able to reach a unanimous conclusion?
23              PROSPECTIVE JUROR:  Yes, sir.
24              THE COURT:  Any other jury service, Mr. Heiden?
25              PROSPECTIVE JUROR:  No, sir.
```

32

```
 1              THE COURT:  Thank you, sir.  You may be seated.

 2              Next.  All right.  The record will reflect no other

 3    hands.

 4              Have all of you had an opportunity to tell me about any

 5    past jury service?  If any has not, please raise your hand.  No

 6    hands are raised, so we will continue.

 7              The next question I have for you is, I want you to tell

 8    me whether you are any member of your immediate family is

 9    employed by any law enforcement agency.  If your answer to that

10    is yes, please raise your hands.

11              All right.  I see a few hands.  Would you stand and

12    give me your name, please.

13              PROSPECTIVE JUROR:  Robert Heiden again.

14              THE COURT:  Yes, Mr. Heiden.

15              PROSPECTIVE JUROR:  My cousin is a sheriff in

16    Pennsylvania.

17              THE COURT:  How long has he served as a sheriff in

18    Pennsylvania?

19              PROSPECTIVE JUROR:  10 years.  Long time.

20              THE COURT:  Do you feel that having -- is it a cousin,

21    you say?

22              PROSPECTIVE JUROR:  Yes, sir.

23              THE COURT:  Having a cousin who served as a sheriff in

24    Pennsylvania, would that prevent or hinder you in any way from

25    rendering a fair and an impartial verdict in this case based
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA647**

33

```
 1    only on the evidence and the Court's instructions on the law?

 2              PROSPECTIVE JUROR:  No, sir.

 3              THE COURT:  Any other members of your family in law

 4    enforcement?

 5              PROSPECTIVE JUROR:  No, sir.

 6              THE COURT:  Thank you.  You may be seated.  Next.

 7              PROSPECTIVE JUROR:  Erin Harris.

 8              THE COURT:  Yes, Ms. Harris.

 9              PROSPECTIVE JUROR:  My aunt is employed by the

10    Virginia State Police.

11              THE COURT:  And what does your aunt do for the Virginia

12    State Police?

13              PROSPECTIVE JUROR:  She does licensing enforcement.

14              THE COURT:  Is she a law enforcement agent?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  She goes out and arrests people and the

17    like?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  What does she do?

20              PROSPECTIVE JUROR:  She manages her department.

21              THE COURT:  Is she a uniformed officer?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  Is she a clerical employee?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Do you feel that having an aunt so employed
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA648**

34

1    would prevent or hinder you in any way from rendering a fair and

2    an impartial verdict in this case based only on the evidence and

3    the Court's instructions on the law?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  Do you have any other relatives --

6            PROSPECTIVE JUROR:  My uncle is a state trooper.

7            THE COURT:  And how long has he been a state trooper?

8            PROSPECTIVE JUROR:  Over a decade.

9            THE COURT:  And is that a Virginia State Trooper?

10            PROSPECTIVE JUROR:  Virginia state.

11            THE COURT:  And where is he located?

12            PROSPECTIVE JUROR:  Manassas.

13            THE COURT:  Do you feel that having an uncle so

14    employed would prevent or hinder you in any way from rendering a

15    fair and an impartial verdict based only on the evidence and the

16    Court's instructions on the law?

17            PROSPECTIVE JUROR:  No.

18            THE COURT:  Thank you.  You may be seated.

19            Next.  There's somebody here in the front row, but

20    you'll get them on the way around.

21            Yes, sir.  Your name?

22            PROSPECTIVE JUROR:  Your Honor, Nebojsa Malic again.

23    My wife works for the U.S. Army Criminal Investigation Division

24    in the name verification team, processing records, seeing all

25    sorts of records.  And before that she served for about a decade

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA649**

35

```
 1    as a Transportation Security Administration agent.  So you said
 2    law enforcement...
 3               THE COURT:  But does your wife currently have any
 4    law enforcement responsibilities?
 5               PROSPECTIVE JUROR:  She does not wear a badge.  She
 6    does not have a gun and doesn't go around arresting people, no.
 7               THE COURT:  All right.  Do you feel that having a wife
 8    employed as you've so described would prevent or hinder you in
 9    any way from rendering a fair and an impartial verdict in this
10    case based only on the evidence and the Court's instructions on
11    the law?
12               PROSPECTIVE JUROR:  I don't think so.
13               THE COURT:  Well, do you have any doubt?
14               PROSPECTIVE JUROR:  A little bit.
15               THE COURT:  Why?
16               PROSPECTIVE JUROR:  Just the facts of cases that she's
17    discussed with me over the years, there's some troublesome stuff
18    and I'm not --
19               THE COURT:  Do you realize those cases have nothing
20    whatever to do with this case?
21               PROSPECTIVE JUROR:  I do realize, yes.
22               THE COURT:  Can you put whatever she has told you about
23    other cases to one side and judge this case fairly and
24    impartially based only on the evidence presented and the Court's
25    instructions on the law?
```

36

```
 1              PROSPECTIVE JUROR:  I think so.
 2              THE COURT:  You think so.  I need to be clearer.  Can
 3      you do so?
 4              PROSPECTIVE JUROR:  Yes.
 5              THE COURT:  What is the other person you described?
 6              PROSPECTIVE JUROR:  My wife has worked with the Army
 7      CID and TSA.  Thank you, Your Honor.
 8              THE COURT:  Thank you.  You may be seated.
 9              Yes, sir?
10              PROSPECTIVE JUROR:  My name is Michael McAllister.
11              THE COURT:  Yes, Mr. McAllister.
12              PROSPECTIVE JUROR:  My daughter is currently a
13      detective in Prince William County.
14              THE COURT:  Your daughter is a detective with
15      Prince William County?
16              PROSPECTIVE JUROR:  Yes, sir.
17              THE COURT:  And does she work in any specific area?
18              PROSPECTIVE JUROR:  I don't know.  I'm not 100 percent
19      sure if she's directly related to this case, but I did speak
20      with her this morning and she was on her way here, so I assume
21      that this is the case she's working.  She's also a member of the
22      FBI task force.
23              THE COURT:  Why do you assume it has anything to do
24      with this case?
25              PROSPECTIVE JUROR:  I'm not 100 percent sure that it
```

37

1    does have anything to do with this case.

2          THE COURT:  Why do you have any idea that it might have

3    something to do with this case?

4          PROSPECTIVE JUROR:  I'm just relating to you that she

5    is employed by Prince William County police department.

6          THE COURT:  All right.  And?

7          PROSPECTIVE JUROR:  And that's all, sir.

8          THE COURT:  Well, are you drawing an inference that

9    because she is employed by Prince William, that somehow has

10   something to do with this case?

11         PROSPECTIVE JUROR:  As I said, I'm not 100 percent sure

12   that she's directly related to the arrest of the gentleman.

13         THE COURT:  The arrest of whom?

14         PROSPECTIVE JUROR:  The defendant.

15         THE COURT:  I want to know why you think there's any

16   possibility for that.

17         PROSPECTIVE JUROR:  Well, she called me this morning

18   when I was on my way here and she said she was coming here.

19         THE COURT:  Did you ask her why?

20         PROSPECTIVE JUROR:  No, I did not.

21         THE COURT:  Did she tell you why?

22         PROSPECTIVE JUROR:  She just said that she was coming

23   to talk to the U.S. Attorney.

24         THE COURT:  And what is your -- it's your daughter.  Is

25   that right?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA652**

38

```
1              PROSPECTIVE JUROR:  Yes, sir.

2              THE COURT:  And what is her name?

3              PROSPECTIVE JUROR:  Michelle McAllister.

4              THE COURT:  Put on the earphones.

5              (BENCH CONFERENCE ON THE RECORD.)

6              THE COURT:  Mr. Schlessinger, can you hear me?

7              MR. SCHLESSINGER:  Yes, Your Honor, I can.

8              THE COURT:  Now, do you know who his daughter is and

9      why she said she was coming here?

10             MR. SCHLESSINGER:  No, I don't know who his daughter

11     is.  I don't think she's connected to this case.

12             THE COURT:  All right.  Do you know of any reason,

13     Ms. Ginsberg, why he might be -- or his daughter might be

14     connected to this case?

15             MS. GINSBERG:  I don't know specifically, but he said

16     that she was on an FBI task force and she was coming to this

17     courthouse.

18             THE COURT:  Well, there are other matters going on in

19     this courthouse.  All right.  I'll ask him about that.

20             (END BENCH CONFERENCE.)

21             THE COURT:  Did you say your daughter works on an FBI

22     task force?

23             PROSPECTIVE JUROR:  Yes, sir, I said that.

24             THE COURT:  What task force?

25             PROSPECTIVE JUROR:  Currently it's the gang force.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA653**

39

```
1            THE COURT:  It's gang?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  This case, as you know, has nothing to do

4    with gangs.

5            PROSPECTIVE JUROR:  Prior to that she was assigned to

6    crimes against children.

7            THE COURT:  All right.  Let me be very clear,

8    Mr. McAllister.  Did your daughter tell you she was coming for

9    this case?

10           PROSPECTIVE JUROR:  No, sir.

11           THE COURT:  Is there any reason, other than the fact

12   that she said she was coming to this court, that causes you to

13   think that she might have something to do with this case?

14           PROSPECTIVE JUROR:  No, sir.

15           THE COURT:  Do you feel that having a daughter so

16   employed, Mr. McAllister, would prevent or hinder you in any way

17   from rendering a fair and an impartial verdict in this case

18   based only on the evidence and the Court's instructions on the

19   law?

20           PROSPECTIVE JUROR:  No, sir.

21           THE COURT:  Mr. McAllister, what is your current

22   occupation?

23           PROSPECTIVE JUROR:  I'm retired law enforcement, sir.

24           THE COURT:  Retired from what, sir?

25           PROSPECTIVE JUROR:  United States Secret Service.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA654**

40

```
 1              THE COURT:  And were you a special agent?
 2              PROSPECTIVE JUROR:  No, uniform division.
 3              THE COURT:  And how long were you in the uniform
 4     division of the Secret Service?
 5              PROSPECTIVE JUROR:  27 years.
 6              THE COURT:  What did you do for the Secret Service?
 7              PROSPECTIVE JUROR:  Physical security, explosives
 8     detection.
 9              THE COURT:  All right.  Do you feel that your
10     employment would prevent -- your past employment would prevent
11     or hinder you in any way from rendering a fair and an impartial
12     verdict in this case based only on the evidence presented and
13     the Court's instructions on the law?
14              PROSPECTIVE JUROR:  No, sir.
15              THE COURT:  All right.  You may be seated,
16     Mr. McAllister.
17              Next.
18              PROSPECTIVE JUROR:  Hello, my name is Cynthia Riggs.
19              THE COURT:  All right.  Just a moment.  Yes, Ms. Riggs.
20              PROSPECTIVE JUROR:  My brother is in the sheriff's
21     department in Leesburg, Virginia.  He works in the courthouse.
22              THE COURT:  Your brother works in this courthouse?
23              PROSPECTIVE JUROR:  In the courthouse in
24     Leesburg, Virginia.
25              THE COURT:  Oh, but not in this courthouse?
```

41

1           PROSPECTIVE JUROR:  Right.

2           THE COURT:  Because he's a state employee.  Is that

3    correct?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  And what does your brother do for the

6    sheriff's department in Leesburg?

7           PROSPECTIVE JUROR:  I'm not exactly sure.  I know he's

8    a uniformed deputy within the courthouse, whatever is necessary.

9           THE COURT:  Do you feel that having a brother so

10   employed would prevent or hinder you in any way from rendering a

11   fair and an impartial verdict in this case based only on the

12   evidence presented and the Court's instructions on the law?

13          PROSPECTIVE JUROR:  No.  No, I don't.

14          THE COURT:  Thank you, Ms. Riggs.  You may be seated.

15          Next.

16          PROSPECTIVE JUROR:  My name is Doug Hazelgrove, and my

17   brother-in-law works as a detective for the City of Fairfax.

18          THE COURT:  Mr. Hazelgrove, what does your brother do

19   for the city?

20          PROSPECTIVE JUROR:  Brother-in-law.  He's a detective

21   for Fairfax City.

22          THE COURT:  And how long has he been employed as a

23   detective?

24          PROSPECTIVE JUROR:  Probably 20-plus years.

25          THE COURT:  And do you feel that having a brother so

42

1    employed would prevent or hinder you in any way from rendering a

2    fair and am impartial verdict in this case based only on the

3    evidence and the Court's instructions on the law?

4          PROSPECTIVE JUROR:  No, sir.

5          THE COURT:  Does your brother-in-law -- is it

6    brother-in-law?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  Does your brother-in-law focus on any

9    specific area of the law, criminal law?

10         PROSPECTIVE JUROR:  He does computer forensics.

11         THE COURT:  Computer forensics.  Is he an agent with

12   law enforcement arresting powers, or is he a computer IT person?

13         PROSPECTIVE JUROR:  He does go to crime scenes and

14   stuff, yes.

15         THE COURT:  Yes, I understand he may go to crime

16   scenes, but I want to know whether he is a law enforcement

17   person.  Does he arrest people and investigate, or he is an IT

18   person?

19         PROSPECTIVE JUROR:  Oh, no, he does arrest people and

20   investigate, yes.  Sorry.

21         THE COURT:  Do you feel that having a brother-in-law so

22   employed would prevent or hinder you in any way from rendering a

23   fair and an impartial verdict in this case based only on the

24   evidence and the Court's instructions on the law?

25         PROSPECTIVE JUROR:  No, sir.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA657**

43

1          THE COURT:  Thank you, Mr. Hazelgrove.  You may be

2     seated.

3          Next.

4          PROSPECTIVE JUROR:  My name is Lucinda McLaughlin.

5          THE COURT:  Yes.  What persons do you know in

6     law enforcement?

7          PROSPECTIVE JUROR:  Myself.  I work for Department of

8     Justice Interpol.

9          THE COURT:  Department of Justice Interpol is not an

10    American operation.  You don't work for Interpol, do you?

11         PROSPECTIVE JUROR:  Yes, I do.  In the United States,

12    there's one office for Interpol which is international, and it's

13    under the Department of Justice.

14         THE COURT:  What do you do in that office for Interpol?

15         PROSPECTIVE JUROR:  My main focus would be

16    Black Notices and identify dead bodies.  But I also work with

17    prison escapees, or investigations into prison escapees and

18    missing persons.

19         THE COURT:  Do you have law enforcement duties to go

20    out and arrest people?

21         PROSPECTIVE JUROR:  No, we are not an arresting agency.

22         THE COURT:  And I take it that's because you work

23    really for Interpol?

24         PROSPECTIVE JUROR:  I work for Interpol, yes.  I'm an

25    intelligence analyst.

44

```
1              THE COURT:  All right.  Do you feel that your work for
2    Interpol, and to the extent it has anything to do with the
3    Department of Justice, would prevent or hinder you in any way
4    from rendering a fair and an impartial verdict in this case
5    based only on the evidence and the Court's instructions on the
6    law?
7              PROSPECTIVE JUROR:  No, sir.  No, sir.
8              THE COURT:  Ms. McLaughlin, I didn't quite hear what
9    you did.  Did you say Black Notices?
10             PROSPECTIVE JUROR:  Black Notices, which would be
11   unidentified dead bodies or parts thereof.  I identify them
12   through DNA, fingerprints.
13             THE COURT:  I see.  So are you a medical or science
14   person?
15             PROSPECTIVE JUROR:  No, sir.  Just an investigative
16   analyst.
17             THE COURT:  All right.  Let me ask you again whether
18   you think that would -- your duties would prevent or hinder you
19   in any way from rendering a fair and an impartial verdict in
20   this case, or following the Court's instructions on the law and
21   issuing a fair and an impartial verdict?
22             PROSPECTIVE JUROR:  No, sir.
23             THE COURT:  All right.  Ms. McLaughlin, you may be
24   seated.
25             Next.  Has anyone told me everything they need to tell
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

45

 1    me in response to my question whether you or a member of your

 2    immediate family is in a law enforcement agency or works in law

 3    enforcement?  No hands are raised.

 4         All right.  I'm now going to read to you a list of

 5    names.  Pay careful attention to this list as I read it to you,

 6    because at the end I will ask you whether you know or have had

 7    any business or social dealings of any kind whatsoever with any

 8    of these persons.  FBI Special Agent Eric Bailey; FBI Special

 9    Agent Laura Calvillo; FBI Special Agent Ford, you've already

10    met; FBI forensic examiner Daniel Iannotti; FBI Special

11    Agent Kochy; and FBI Special Agent Jeremy Obie; and FBI Special

12    Agent Jeffrey Ross.

13         And do you or any member of your family, so far as you

14    know, know any of those individuals, or have you had any

15    business or social dealings of any kind whatsoever with any of

16    them?

17         Mr. Schlessinger, you have listed here a person with an

18    initial of GM and CM.  Can you give me -- you don't want to give

19    a last name because these are minors.  Is that correct?

20         MR. SCHLESSINGER:  There are minors -- both were minors

21    at the time.  One is now an adult.  But yes.

22         THE COURT:  Are they in this area?

23         MR. SCHLESSINGER:  They're within the Eastern District

24    of Virginia, both of them are, yes.

25         THE COURT:  I think I'm going to ask you for a last

46

1    name, just to be sure.  What is the last name for each?

2         MR. SCHLESSINGER:  For GM, the last name is ███████.

3    For CM, the last name is ██████.

4         THE COURT:  Ladies and gentlemen, do you or any member

5    of your family, so far as you know, know an individual whose

6    name is G. ████████ or an individual named C, what was the last

7    name?

8         MR. SCHLESSINGER:  ██████.

9         THE COURT:  If you would raise your hands and we'll

10   explore it further to see if they're the same people.  No hands

11   are raised.  Let's continue.

12        I have some more names for you, ladies and gentlemen.

13   Risa Sanders, Jay Sanders, Phillip DePue, Dr. Frederick Berlin,

14   and Donna Fessler.  Do you or any member of your family, so far

15   as you know, know any of those individuals, or have you had any

16   business or social dealings of any kind whatsoever with any of

17   them?

18        All right.  Finally, ladies and gentlemen, I want to

19   ask whether any of you have any information you need to change

20   with respect to questions 2 through 5, 2 through 5 of the COVID

21   questionnaire that you submitted previously.  If you have any

22   changes to that, please raise your hand.  And the record will

23   reflect no changes to questions 2 through 5.

24        Next, ladies and gentlemen, I'm going to ask you a

25   series of questions - several series - and I'll ask it in a

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA661**

47

1    series of three.  Because what I want you to do is, if you have

2    an affirmative answer to any of the three questions, I want you

3    to raise your hand and a court security officer will come,

4    shepherd you to the witness box here, where you will give your

5    answers in the relative privacy of myself, attorneys, and the

6    defendant, using an earphone and a microphone.  And I do that,

7    as I said, to preserve your privacy as to any information you

8    may have to provide, and also to prevent any information that

9    you may have from affecting or infecting any other prospective

10   juror.

11           The first question - and as I said, there will be three

12   questions - if your answer is no, you need not raise your hand

13   or come forward.  Have any of you seen or read or heard or know

14   anything about this case from any source whatever?  Now, it's

15   not likely or probable that you have, it's simply a matter of

16   caution that I ask you that.  Because if you know anything about

17   this case, it is important that you bring that promptly to the

18   Court's attention.

19           The second question is, have you or any member of your

20   family or close friend ever been the victim of child sexual

21   abuse.

22           And the third question is, have you or any member of

23   your family ever been a defendant in a criminal case, or ever

24   been accused of a crime by any federal, state, or local

25   prosecutor.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA662**

48

```
1            If your answer is yes to any of those questions, raise
2    your hand and the court security officer will come and escort
3    you to the witness box here so that we can hear your answers to
4    those questions.
5            (JUROR CONFERENCE ON THE RECORD.)
6            THE COURT:  Good morning.  Can you hear me?
7            PROSPECTIVE JUROR:  Yes, I can.
8            THE COURT:  You may remove your mask so that we can
9    understand you.  And you're behind the screen, so you're quite
10   well protected.  May I have your name, please?
11           PROSPECTIVE JUROR:  Valerie Galbraith.
12           THE COURT:  Yes, which question do you have an answer
13   to?
14           PROSPECTIVE JUROR:  My mother was in the foster care
15   system and was sexually abused as a child.
16           THE COURT:  Was anyone prosecuted as a result of that?
17           PROSPECTIVE JUROR:  No.
18           THE COURT:  And you understand that what happened to
19   your mother has nothing whatever to do with this case?
20           PROSPECTIVE JUROR:  Right.
21           THE COURT:  Do you feel you can put your feelings about
22   what happened to your mother to one side and judge this case
23   fairly and impartially based only on the evidence that's
24   presented here and the Court's instructions on the law?
25           PROSPECTIVE JUROR:  Yes.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA663**

49

```
 1              THE COURT:  Do you have any answers to any of the other
 2    questions I put to you, affirmative answers?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  Thank you, Ms. Galbraith.  You may return
 5    to your seat.
 6              Would you give me your name, please.
 7              PROSPECTIVE JUROR:  Erin Harris.
 8              THE COURT:  Yes, which question do you have an
 9    affirmative answer to?
10              PROSPECTIVE JUROR:  Can you repeat the questions,
11    please?
12              THE COURT:  Yes, I can.  I want to know whether you or
13    any member of your family, or anyone you know well, has been
14    involved in a crime involving -- oh, no, that's not the first
15    question.  I'm sorry.  Have you seen or read or heard or know
16    anything about this case from any source whatever.  And I ask
17    that question not because it's likely or probable that you have,
18    but merely out of an abundance of caution, to ensure that if you
19    know anything about this case, that it's brought promptly to the
20    Court's attention.
21              PROSPECTIVE JUROR:  No, I know nothing about this case.
22              THE COURT:  If your answer is no, you need not come
23    forward.  But you're here.  Let me ask you the second question.
24              Have you or any member of your family or any close
25    friend ever been the victim of child sexual abuse?
```

50

```
 1              PROSPECTIVE JUROR:  Yes.
 2              THE COURT:  And who would that be?
 3              PROSPECTIVE JUROR:  Myself.
 4              THE COURT:  All right.  May I have your name again,
 5    please?
 6              PROSPECTIVE JUROR:  Erin Harris.
 7              THE COURT:  Yes, Ms. Harris, was this when you were a
 8    much younger person?
 9              PROSPECTIVE JUROR:  Yes, I was a minor.
10              THE COURT:  And how old were you?
11              PROSPECTIVE JUROR:  Between the ages of five and 10.
12              THE COURT:  And was the abuser a member of your family?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  Was that person prosecuted?
15              PROSPECTIVE JUROR:  No.
16              THE COURT:  Now, Ms. Harris, do you have strong
17    feelings about that experience?
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  Do you feel you can put those feelings to
20    one side and judge this case fairly and impartially based only
21    on the evidence that's presented here and the Court's
22    instructions?
23              PROSPECTIVE JUROR:  If I'm being perfectly honest with
24    you, I feel that my personal experience would impact my ability
25    to judge things fairly.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA665**

51

```
 1              THE COURT:  All right.  Thank you.  You may remove your
 2    earphones now for a moment.
 3              Any objection to the striking of this person,
 4    Mr. Schlessinger?
 5              MR. SCHLESSINGER:  No objection from the Government.
 6              MR. CLAYMAN:  No objection, Your Honor.
 7              THE COURT:  Ms. Ginsberg, any objection?
 8              MS. GINSBERG:  None, Your Honor.
 9              THE COURT:  All right.  She is stricken for cause.
10              All right.  Ms. Harris, you may step down.  Thank you.
11    Turn off the noise for a moment.
12              (END JUROR CONFERENCE.)
13              THE COURT:  Ladies and gentlemen, some of you have
14    asked for a bathroom break, which I will take shortly.  But if
15    you're not coming up here because you have an affirmative
16    answer, then you may take a very short bathroom break.  But I'm
17    going to ask another series of questions, and everyone needs to
18    be in here when I do that.  So if you absolutely must go now,
19    you may do so.
20              Now, a number of persons are leaving.  I would assume
21    that none of those persons leaving have an affirmative answer to
22    the questions I've asked.
23              I want the court security officers to have the names of
24    everyone who leaves and have them back here in very short order.
25    Is that clear?
```

52

```
 1                    COURT SECURITY OFFICER:  Yes, Your Honor.
 2                    (JUROR CONFERENCE ON THE RECORD.)
 3                    THE COURT:  May I have your name, please?
 4                    PROSPECTIVE JUROR:  My name is Elizabeth Pennisi.
 5                    THE COURT:  I'm sorry, may I have it once again,
 6      please?
 7                    PROSPECTIVE JUROR:  Sure.  It's Elizabeth Pennisi.
 8                    THE COURT:  All right.  Which question do you have an
 9      affirmative answer to?
10                    PROSPECTIVE JUROR:  I have a close friend and colleague
11      who was molested as a child, and was later convicted of
12      basically having child pornography on his work computer.
13                    THE COURT:  All right.  Now, you understand that that
14      matter has nothing whatever to do with this case?
15                    PROSPECTIVE JUROR:  I do.
16                    THE COURT:  Now, this person was a close friend and
17      colleague.  Is that what you're saying?
18                    PROSPECTIVE JUROR:  Right.
19                    THE COURT:  And was the person who sexually abused her
20      a family member?
21                    PROSPECTIVE JUROR:  No.
22                    THE COURT:  And was the person who sexually abused her
23      caught and convicted?
24                    PROSPECTIVE JUROR:  No.
25                    THE COURT:  So you mentioned that somebody was
```

1      convicted of child pornography.  Who was that?

2           PROSPECTIVE JUROR:  Oh, so my friend was molested as a

3      child; then as an adult, he was arrested for having child

4      pornography on his work computer.

5           THE COURT:  And was he prosecuted for that?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  And was that in federal court?

8           PROSPECTIVE JUROR:  I don't remember.  It was in

9      Washington, D.C., and I honestly don't remember.

10          THE COURT:  How long ago?

11          PROSPECTIVE JUROR:  About 10 years ago.

12          THE COURT:  And was he sentenced to a period of

13     incarceration?

14          PROSPECTIVE JUROR:  No, he was not incarcerated.  He

15     was put on probation.

16          THE COURT:  All right.  And do you feel the legal

17     system operated fairly in his case?

18          PROSPECTIVE JUROR:  I do.

19          THE COURT:  Now, you understand that those matters have

20     nothing whatever to do with this case?

21          PROSPECTIVE JUROR:  Correct.

22          THE COURT:  Do you feel you can put your feelings about

23     that matter to one side and judge this case fairly and

24     impartially based only on the evidence and the Court's

25     instructions on the law?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA668**

54

1            PROSPECTIVE JUROR:  I do.

2            THE COURT:  Thank you.  Any other affirmative answers

3    to the questions I asked?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  Thank you.  You may return to your seat.

6            PROSPECTIVE JUROR:  Thank you.

7            THE COURT:  May I have your name, please?

8            PROSPECTIVE JUROR:  Fonda Newcomb.

9            THE COURT:  Which question do you have an affirmative

10   answer to?

11           PROSPECTIVE JUROR:  The third question.

12           THE COURT:  All right.  The third question, have you or

13   any member of your immediate family ever been a defendant in a

14   criminal case or ever been accused of a crime by any federal,

15   state, or local prosecutor.

16           PROSPECTIVE JUROR:  Yes.  My brother-in-law was

17   convicted of child molestation in the state of North Carolina.

18           THE COURT:  And was your brother sentenced to a period

19   of incarceration?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  How long?

22           PROSPECTIVE JUROR:  I want to say four years.

23           THE COURT:  And that was in the state system of

24   North Carolina?

25           PROSPECTIVE JUROR:  Correct.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA669**

55

1          THE COURT:  And do you feel that the legal system
2     operated fairly in that context?
3          PROSPECTIVE JUROR:  I was not involved in the trial, or
4     wasn't present, so I don't know if I can comment on that.
5          THE COURT:  All right.  You understand, however, that
6     that matter has nothing whatever to do with this case?
7          PROSPECTIVE JUROR:  Correct.  Yes, I understand.
8          THE COURT:  Can you put your feelings about that
9     matter, whatever they may be, to one side and judge this case
10    fairly and impartially based only on the evidence and the
11    Court's instructions on the law?
12         PROSPECTIVE JUROR:  Yes.
13         THE COURT:  Any other affirmative answers to the
14    questions presented to you?
15         PROSPECTIVE JUROR:  No, sir.
16         THE COURT:  Thank you.  You may return to your seat.
17         (END JUROR CONFERENCE.)
18         THE COURT:  Are all the persons who went to have a
19    bathroom break back in?
20         COURT SECURITY OFFICER:  Yes, Your Honor, they are.
21         THE COURT:  Now, I have a second series of questions to
22    ask you, ladies and gentlemen.  Have you or any member of your
23    family, or anyone you know well, ever been involved in a crime
24    or a prosecution involving child pornography or child sexual
25    abuse, whether as a victim, as a witness, as a complainant, or

56

1    in any other capacity?

2          The second question is, would you tend to believe or

3    would you tend to disbelieve the testimony of a law enforcement

4    officer merely because that person is a law enforcement officer?

5          And the third question is, you may be asked to view

6    evidence concerning alleged child pornography in this case, and

7    I want to know whether you would be able to do so and render a

8    fair and impartial verdict based on the evidence presented and

9    the instructions given to you by the Court.

10          If any of you have affirmative answers to those

11   questions, I ask that you come forward.

12          I have a device here that is designed to mask the

13   conversations that occur here at the bench.  When it was

14   installed, oh -- roughly 2005, I think, is when it was installed

15   for the second time; the first time when it was installed, it

16   was 1987.  And at that time I was told by the person installing

17   it that it would sound like waves breaking gently on some

18   distant tropical romantic beach, and that it would mask the

19   conversations here at the bench.  In a few minutes I'll ask

20   whether it succeeds in either of those efforts or goals.

21          All right.  Put the noise back on.

22          (JUROR CONFERENCE ON THE RECORD.)

23          THE COURT:  All right, sir, can you hear me?

24          PROSPECTIVE JUROR:  Yes, I hear you.

25          THE COURT:  You might want to remove your mask.  You're

57

1    behind the screen, and it would aid the court reporter and me in

2    understanding what you say.

3              May I have your name, please, sir?

4              PROSPECTIVE JUROR:  Yes, my name is Michael Mason.

5              THE COURT:  Mr. Mason, what is your occupation?

6              PROSPECTIVE JUROR:  I'm retired.  The focus of this

7    question, I'm a volunteer for Fairfax County.  I am a

8    facilitator in the child Speak Up and Be Safe Body safety

9    program.  We go into elementary schools and teach kids safety

10   rules about how to avoid abuse.  So I don't know anyone well,

11   but I've had a number of children make disclosures about child

12   sexual abuse.  So I thought I ought to clarify that.

13             THE COURT:  You were quite right to do, so but let me

14   go back to this for a moment.  I'm going to come to this

15   information because I'm glad you disclosed it.  What are you

16   retired from?

17             PROSPECTIVE JUROR:  I was a system consultant for

18   Deltek.  I'm an accountant by training, and I helped people to

19   configure and implement and install government contracting

20   systems.

21             THE COURT:  Now let's go back to your work for

22   Fairfax County.  As you said, you're a facilitator in the child

23   Speak Up and Be Safe Body safety program --

24             PROSPECTIVE JUROR:  Correct.

25             THE COURT:  -- in which you hear disclosures from

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA672**

58

1    children about child sexual abuse.  Do you understand that none

2    of those disclosures, none of what may have happened to those

3    children, have anything to do with this case?

4            PROSPECTIVE JUROR:  I do understand that, yes.

5            THE COURT:  Do you feel you can put your feelings to

6    one side about what may have been disclosed to you by these

7    children, and judge this case fairly and impartially based only

8    on the evidence presented and the Court's instructions on the

9    law?

10           PROSPECTIVE JUROR:  Yes, Your Honor.

11           THE COURT:  Do you have any answers to the other

12   questions I asked?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Thank you, sir.  You may step down and

15   return to your seat, sir.

16           Hold this person for a moment, please.  Have that

17   person come forward.

18           Good morning, sir.  Can you hear me?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  What is your name, sir?

21           PROSPECTIVE JUROR:  Robert Giles, Junior.

22           THE COURT:  I'm sorry, say that again, please.

23           PROSPECTIVE JUROR:  Robert Giles, Junior, G-I-L-E-S.

24           THE COURT:  All right, Mr. Giles.  I have a note

25   indicating -- I don't know whether you wrote it or not, but you

1    said that you had some sort of medical disorder and you couldn't

2    sit for long periods of time.  Is that correct, sir?

3           PROSPECTIVE JUROR:  Yeah.  I've been on sick leave

4    since April, and I had strep in my blood and cellulitis of my

5    skin, and it caused tremendous swelling.  And I can't sit for

6    long periods of time without the swelling.  And I put that in

7    the original -- when I originally got the summons, I wrote that

8    down.

9           THE COURT:  All right, sir.  As I understand it, you

10   had strep, streptococcus, in your blood, and cellulitis of your

11   skin that causes tremendous swelling, and you can't sit for

12   periods of time.  How long can you sit for?

13          PROSPECTIVE JUROR:  Well, right now it's starting to

14   swell now as I sit.  It comes like every hour or so, and then I

15   have to get up and walk around and stuff.  But also I'm on

16   medication.  I have medications, too.

17          THE COURT:  Do those medications affect or hinder you

18   in any way in paying attention to the evidence as it's

19   presented?

20          PROSPECTIVE JUROR:  No, I don't think it will.

21          THE COURT:  All right.  You may not be selected, sir,

22   but if you are, I will give you leave to raise your hand if you

23   feel you need to get up, and I'll call a recess.

24          PROSPECTIVE JUROR:  Okay.

25          THE COURT:  But generally we will sit and pay attention

60

1    to the evidence for about an hour and a half per session.  Do

2    you think you can handle that?

3              PROSPECTIVE JUROR:  I think so.

4              THE COURT:  All right.  Thank you for calling this to

5    my attention, and we'll do what we can to accommodate you, sir.

6              PROSPECTIVE JUROR:  Okay.  Thank you.

7              THE COURT:  You may return to your seat.

8              May I have your name, please, sir?

9              PROSPECTIVE JUROR:  James Bowman.

10             THE COURT:  Yes, which question do you have an

11   affirmative answer to?

12             PROSPECTIVE JUROR:  Two of them.  One was whether or

13   not I objectively hear law enforcement officers' opinions one

14   way or the other.  And I do tend to give the benefit of the

15   doubt to LEOs when I hear them.

16             THE COURT:  I'll come to the second one.  Let me deal

17   with this first one first.  You understand that law enforcement

18   officers, like everyone else, including judges, are human

19   beings, and sometimes they tell the truth and sometimes they

20   don't.  Do you understand that?

21             PROSPECTIVE JUROR:  Yes, sir.

22             THE COURT:  Do you feel you can put your feelings about

23   law enforcement officers telling the truth to one side and judge

24   this case fairly and impartially, and judge the testimony of a

25   law enforcement officer just as you would judge the testimony of

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA675**

61

1    any other witness?

2         PROSPECTIVE JUROR:  Yes, sir.

3         THE COURT:  What was the second answer you wanted to

4    give?

5         PROSPECTIVE JUROR:  It wasn't directly, but you were

6    saying we might have to see physical evidence of what happened.

7    I have two daughters, one is 16 and one is 21.  Any time

8    something comes up, I'm not sure I could stay objective about

9    something like that.

10        THE COURT:  All right.  You understand, though, that

11   this case has nothing whatever to do with your daughters?

12        PROSPECTIVE JUROR:  I understand that completely.

13        THE COURT:  Do you feel you can put your feelings about

14   your daughters and your desire to ensure that they're protected

15   and not assaulted to one side, and judge this case fairly and

16   impartially based only on the evidence presented here and the

17   Court's instructions on the law?

18        PROSPECTIVE JUROR:  I feel like I can, but I honestly

19   don't know.

20        THE COURT:  All right.  And what was your name again,

21   sir?

22        PROSPECTIVE JUROR:  James Bowman.

23        THE COURT:  Yes, Mr. Bowman.  Would you remove the

24   earphones for a moment, Mr. Bowman.  Oh, before you do so,

25   before you do so, what is your occupation?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA676**

62

1          PROSPECTIVE JUROR:  I'm in sales.  I'm currently out of

2     work.

3          THE COURT:  All right.  And what's the last job you

4     held?

5          PROSPECTIVE JUROR:  I worked for a company called

6     Locator Services in Old Town.  It was an association.  I did

7     digital sales, print sales, basically CRM sales, which is how

8     you manage your clients for an association, for a nonprofit.

9          THE COURT:  All right.  Thank you, sir.  If you would

10    remove your earphones for a moment.

11          All right.  Mr. Schlessinger, what's your view on

12    whether this juror should serve as a juror in this case, given

13    that he has very obvious firm concerns about his adult

14    daughters?

15          MR. SCHLESSINGER:  Your Honor, there's no objection to

16    removing this juror for cause.

17          THE COURT:  Ms. Ginsberg?

18          MS. GINSBERG:  Judge, we would request he be removed

19    for cause.

20          THE COURT:  All right.  I'll do so.  He is stricken for

21    cause.  Although I would point out to you, Ms. Ginsberg, it's

22    about as weak a motion to strike for cause as you could make.

23          MS. GINSBERG:  I understand.  I just think he's

24    expressed doubts about his ability to be impartial.

25          THE COURT:  Yes, that's why I have granted your motion.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA677**

63

```
1              MS. GINSBERG:  Thank you.
2              THE COURT:  You may step down, thank you.
3              Can you hear me?
4              PROSPECTIVE JUROR:  Thank you.
5              THE COURT:  I'm sorry, can you hear me?
6              PROSPECTIVE JUROR:  I can hear you.
7              THE COURT:  What is your name, please?
8              PROSPECTIVE JUROR:  My name is Elizabeth Pennisi.
9              THE COURT:  Yes, Ms. Mason [sic], which question do you
10      have an affirmative answer to?
11             PROSPECTIVE JUROR:  I'm not sure I can be dispassionate
12      about seeing pictures of sexually explicit activities by minors.
13             THE COURT:  All right.  And why is it that you can't be
14      sure that you can put your feelings about seeing pictures of
15      sexually explicit activities by minors to one side and judge
16      this case fairly and impartially based only on the evidence and
17      the Court's instructions on the law?
18             PROSPECTIVE JUROR:  Based on how I'm reacting just at
19      the thought of it, I might start crying.  And I think I can step
20      away from that to be impartial, but I could possibly make a
21      scene.
22             THE COURT:  All right.  Would you remove your
23      earphones, please.
24             Mr. Schlessinger, any objection to strike?
25             MR. SCHLESSINGER:  No objection.
```

64

```
 1              THE COURT:  Ms. Ginsberg?
 2              MS. GINSBERG:  Your Honor, we would ask she be stricken
 3     for cause.
 4              THE COURT:  So you don't have any objection?
 5              MS. GINSBERG:  No, sir.
 6              THE COURT:  She is stricken for cause.
 7              All right.  Thank you.  You may return to your seat.
 8              Yes, may I have your name, please, sir?
 9              PROSPECTIVE JUROR:  Jun Cho, C-H-O.
10              THE COURT:  Which questions do you have an affirmative
11     answer to?
12              PROSPECTIVE JUROR:  I think the last question, that
13     whether the nature of the crime would have an impact on my
14     ability to be impartial.
15              THE COURT:  All right.  We'll come to that.  Let me ask
16     you, are you a practicing attorney?
17              PROSPECTIVE JUROR:  Yes, I am.
18              THE COURT:  What is the nature of your practice?
19              PROSPECTIVE JUROR:  I'm general counsel for an
20     automotive company.
21              THE COURT:  And what automotive company is that?
22              PROSPECTIVE JUROR:  It's called FCA US LLC.  It's the
23     newly formed company resulting from the merger from Fiat,
24     Chrysler, and Peugeot.
25              THE COURT:  All right.  Tell me, why is it you think
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

65

```
 1    you would be affected by the nature of the crimes what are

 2    alleged in this case by the Government?

 3                PROSPECTIVE JUROR:  I raised -- I have three kids, and

 4    one of the kids is autistic, and that was always a big concern

 5    for our family, whether he would be taken advantage of.

 6                THE COURT:  Now, is your child who is autistic, he is

 7    on the autistic spectrum?

 8                PROSPECTIVE JUROR:  Yes.

 9                THE COURT:  And is he far down the spectrum?

10                PROSPECTIVE JUROR:  He's able to function.  He has a

11    job.

12                THE COURT:  All right.  And has he ever been abused?

13                PROSPECTIVE JUROR:  Not to my knowledge.

14                THE COURT:  All right.  You understand that your

15    concerns about your son have nothing to do with this case?

16                PROSPECTIVE JUROR:  I do.  But I just the question

17    whether I can be impartial, when you have the Department of

18    Justice bringing a case against an individual for this crime.

19                THE COURT:  Well, as I told you, the indictment brought

20    by the Department of Justice is merely an accusation.  It's not

21    proof or evidence of any kind whatsoever.  And the defendant has

22    pled not guilty, and must be presumed innocent --

23                PROSPECTIVE JUROR:  Yes.

24                THE COURT:  -- unless and until a jury find otherwise.

25    Do you think you can give effect to the presumption of
```

66

1    innocence?

2         PROSPECTIVE JUROR:  Yes.  I was asking myself that

3    question, and I just felt that I probably, in all fairness,

4    couldn't be that impartial.

5         THE COURT:  All right.  Remove your earphones, if you

6    would, please, sir.

7         All right.  Mr. Schlessinger, any objection to striking

8    this juror?

9         MR. SCHLESSINGER:  No objection to his removal for

10   cause.

11        THE COURT:  All right.  And Ms. Ginsberg?

12        MS. GINSBERG:  Also no objection, Your Honor.

13        THE COURT:  All right.  He is stricken.

14        Thank you, sir.  You may return to your seat.

15        (END JUROR CONFERENCE.)

16        THE COURT:  All right.  Ladies and gentlemen, I have

17   three final questions for you.  It may be that some of the

18   evidence in this case will involve sexually explicit

19   conversations between two people of the same sex or gender, and

20   I want to know whether that would prevent or hinder any of you

21   from rendering a fair and an impartial verdict in this case

22   based only on the evidence and the Court's instructions on the

23   law.

24        The next question is, the presentation of evidence in

25   this case will likely last about four days, and may extend until

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA681**

67

```
 1   Tuesday of next week.  I want to know whether that would prevent
 2   or hinder you in any way from rendering a fair and an impartial
 3   verdict in this case based only on the evidence or the Court's
 4   instructions on the law -- and the Court's instructions on the
 5   law.
 6        And finally, I want to ask you whether there is
 7   anything in any question that I have asked, or anything about
 8   the nature of this case that you think would prevent or hinder
 9   you in any way from rendering a fair and an impartial verdict in
10   this case based only on the evidence and the Court's
11   instructions.
12        Now, if you already brought that to my attention, you
13   need not come forward.  But if you haven't, I want you to come
14   forward.  And if you have anything to add to what you've already
15   told me, you may also come forward.
16        All right.  Raise your hands if you have answers to any
17   of those questions.  I can't see clearly.  I don't see any
18   hands.  All right.  One.  All right.
19        Mr. Giles, as I recall.  Come forward and sit in the
20   jury box, Mr. Giles.
21        (JUROR CONFERENCE ON THE RECORD.)
22        THE COURT:  Or in the witness stand, I should say.
23        Can you hear me, Mr. Giles?
24        PROSPECTIVE JUROR:  Yes, sir.  I can hear you.  The
25   matter being is, I have to appear at another court case on
```

68

 1    Friday, so if it extends to next week --

 2            THE COURT:  What is the court case on which you have to

 3    appear on Friday?

 4            PROSPECTIVE JUROR:  It's a moving violation in

 5    Clarksburg.

 6            THE COURT:  All right.  Well, if you're selected and

 7    this case carries over, I will ensure that you're excused from

 8    that appearance and it will be rescheduled.  Your jury service

 9    would take precedence if you're selected.  You may not be

10    selected, in which case you can attend it.

11            PROSPECTIVE JUROR:  Okay.  All right.  Thank you.

12            THE COURT:  Thank you, Mr. Giles, for calling that to

13    my attention.

14            PROSPECTIVE JUROR:  All right.

15            (END JUROR CONFERENCE.)

16            THE COURT:  All right.  Any other answers?  All right,

17    let's have the noise again, and counsel, put the earphones back

18    on.

19            (BENCH CONFERENCE ON THE RECORD.)

20            THE COURT:  Counsel, that completes the Court's

21    voir dire.  Let me begin, Mr. Schlessinger, with you.  Is there

22    any additional voir dire you think the Court should ask?

23            MR. SCHLESSINGER:  No, Your Honor.

24            THE COURT:  Ms. Ginsberg, is there any additional

25    voir dire you think the Court should ask?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA683**

69

```
1              MS. GINSBERG:  Yes, Your Honor.  It would be a question
2     in the nature of our proposed voir dire question number 9
3     regarding BDSM evidence that they'll hear.  We had requested the
4     Court ask -- or advise the jury that they would hear testimony
5     about bondage, discipline, domination, submission, sadism, and
6     masochism.
7              THE COURT:  So now you know the whole term.
8              MS. GINSBERG:  I think I knew the term last week.
9              THE COURT:  Let me hear it again.
10             MS. GINSBERG:  It's bondage, discipline, domination --
11    I'm sorry, domination comes first.  Bondage, discipline,
12    domination.
13             THE COURT:  Oh, so discipline does come first?
14             MS. GINSBERG:  Yes, sir.
15             THE COURT:  Bondage, discipline, domination.
16             MS. GINSBERG:  Submission, sadism, and masochism.  And
17    BDSM includes practices such as gagging, restraining, lipping,
18    and flogging, that, if consensual, you may find distasteful.
19    And we want to know if that would prevent jurors from being
20    fair.  There will be evidence about these types of activities -
21    not all of them, for sure - but there will be evidence, and I
22    think it may be either minimally distasteful to some of the
23    jurors.
24             THE COURT:  All right.  I do recall that somebody on
25    the defense team told me this was widespread, but let's get past
```

70

 1    that and move on.

 2              MS. GINSBERG:  Judge, I live in a vacuum so I'm not a

 3    good judge.

 4              THE COURT:  Tell me about those.  Let me list those

 5    things.  Gagging, tell me what that is.

 6              MS. GINSBERG:  In this case there will be flogging,

 7    restraint, possibly --

 8              THE COURT:  Was this in your question?

 9              MS. GINSBERG:  This was in our question number 9.

10              THE COURT:  Read those to me again.  Flogging,

11    restraining, what else?

12              MS. GINSBERG:  Gagging, restraint, self-imposed harm.

13    No, I'm sorry, that's not accurate.

14              THE COURT:  All right.  I've got flogging, restraining,

15    and gagging.  Anything else?

16              MS. GINSBERG:  Judge, I think if you would add power

17    exchange relationships, that would probably define the nature of

18    these relationships, as best as I can.

19              THE COURT:  That's an undefined term.  I'm not going to

20    add that.  But I will ask this question.  Anything else,

21    Ms. Ginsberg?

22              MS. GINSBERG:  No, thank you, Your Honor.

23              THE COURT:  Let's turn off the noise.

24              (END BENCH CONFERENCE ON THE RECORD.)

25              THE COURT:  Ladies and gentlemen, I have a further

71

```
 1    question for you.  This case may involve evidence of what is
 2    maybe known as BDSM.  That is evidence of bondage, discipline,
 3    domination, submission, sadism, and masochism.  And in that
 4    regard, practices of flogging, restraining, and gagging, you may
 5    hear evidence of that.  And I want to know whether that would
 6    prevent or hinder any of you from rendering a fair and an
 7    impartial verdict in this case based only on the evidence and
 8    the Court's instructions on the law.
 9              That doesn't mean you have to approve or disapprove of
10    those, I just want to know whether hearing evidence about BDSM,
11    with the possible practices of submissions, of flogging,
12    restraining, or gagging, would prevent or hinder you in any way
13    from rendering a fair and impartial verdict in this case based
14    only on the evidence and the Court's instructions on the law.
15              All right.  There are no hands raised.  Put the noise
16    back on.
17              (BENCH CONFERENCE ON THE RECORD.)
18              THE COURT:  All right.  Counsel, as that completes the
19    voir dire, I will now ask the Government, do you have any
20    motions to strike for cause?
21              MR. SCHLESSINGER:  Your Honor, we have no additional
22    motions to strike for cause.
23              THE COURT:  Ms. Ginsberg, do you have any motions to
24    strike for cause?  You didn't have your earphones on.  Let me
25    re-ask it.  Do you have any motions to strike for cause on
```

72

 1    behalf of the defendant?

 2         MS. GINSBERG:  Judge, if I could have just a minute to

 3    consult with co-counsel and Mr. Sanders.

 4         THE COURT:  Yes, you may do so.

 5         MS. GINSBERG:  Thank you.

 6         THE COURT:  Ms. Ginsberg, are you on?

 7         THE DEFENDANT:  She's not.  I will tell her.

 8         THE COURT:  The record will reflect that that was the

 9    defendant that said that.  I think your co-counsel need to

10    remember, this is motions to strike for cause, not peremptory

11    challenges.

12         MS. GINSBERG:  I understand, Your Honor.  We would move

13    to strike number 31 for cause.  He was the volunteer in the

14    program, the Speak Up and Be Safe childhood program.  He said he

15    had heard disclosures of sexual abuse by minors.

16         THE COURT:  Yes.  And, of course, he also said he could

17    be fair and impartial.

18         But Mr. Schlessinger, do you oppose this motion to

19    strike for cause of Mr. Mason?

20         MR. SCHLESSINGER:  We do oppose that.  As Your Honor

21    has already pointed out, he said quite clearly that he could be

22    fair.  I think he volunteered that he worked as a volunteer for

23    that child safety program simply to provide an accurate response

24    to the Court's question, but was nevertheless totally clear that

25    he could be fair in applying the law to the facts of the case.

73

1    There's no reason to categorically exclude all jurors who serve

2    as volunteers in child settings to rule out serving as a juror.

3           THE COURT:  I'll overrule the strike for cause, but of

4    course, Ms. Ginsberg, you may remove him peremptorily if you

5    wish.  Anyone else?

6           MS. GINSBERG:  Yes, Judge.  Number 30, that was the

7    juror who said he had doubts about his ability to be fair

8    because of cases his wife had told him about.

9           THE COURT:  All right.  Any objection to that,

10   Mr. Schlessinger?

11          MR. SCHLESSINGER:  No objection to striking 30 for

12   cause.

13          THE COURT:  All right.  30 is stricken for cause.

14   Next.

15          MS. GINSBERG:  32, Your Honor, is the individual who

16   has a daughter who works in law enforcement and is on the FBI

17   task force, currently the gang task force, but she previously

18   worked in either her state capacity or federal capacity on a

19   task force of crimes against children.  It's almost

20   inconceivable that she hasn't had some discussions with her

21   parents about the nature of that work.

22          THE COURT:  All right.  Mr. Schlessinger?

23          MR. SCHLESSINGER:  The Government opposes excusing this

24   juror for cause.  He responded about his daughter to the Court's

25   general question about whether anyone close to the juror worked

74

1    in law enforcement, and he identified her for that reason, not

2    because he felt that his relationship with her or her work would

3    be in any way a problem or an obstacle for him in applying the

4    law.  And indeed, he also said unequivocally that he would be

5    fair and impartial and would apply the law as the Court explains

6    it.  So there's no reason to excuse this juror for cause.

7                THE COURT:  What was his name again?

8                MR. SCHLESSINGER:  Michael McAllister?

9                THE COURT:  Anything further on this person?

10               MS. GINSBERG:  Yes, Your Honor.  It is possible that

11   she was on the task force of crimes against children at the time

12   the search occurred in this case.  But no question -- the juror

13   was not questioned about whether he had had discussions about

14   the nature of his daughter's work when she was on that task

15   force, and I think it's impossible to know that he would not be

16   influenced by conversations he may have had about this very

17   topic.

18               THE COURT:  Any other motions to strike for cause,

19   Ms. Ginsberg?

20               MS. GINSBERG:  No.

21               THE COURT:  All right.  I'll grant this motion to

22   strike.

23               MS. GINSBERG:  Thank you.

24               THE COURT:  I think, Ms. Ginsberg, it's probably not

25   persuasive, but we're going to move things along.  I will grant

75

```
 1    it.
 2              That completes the process.  I'm now going to instruct
 3    this jury that they're released for lunch.  They won't need to
 4    come become until 3 o'clock.  I'll tell them that I'm going to
 5    go through the same process with another 45 to 50 people to
 6    result in a panel from which the jury will be selected.
 7              Any objection to that, Mr. Schlessinger or
 8    Ms. Ginsberg?
 9              MR. SCHLESSINGER:  No, Your Honor.
10              MS. GINSBERG:  No, Your Honor.
11              THE COURT:  All right.  Let's proceed.  Turn off the
12    noise, please.
13              (END BENCH CONFERENCE.)
14              THE COURT:  Ladies and gentlemen, that completes the
15    part of the process that needed to be completed this morning for
16    you-all, so I'm going to release you now for lunch and ask that
17    you return at 3 o'clock.  Now, when you return at 3 o'clock,
18    you're to go to the ninth floor conference room.  There will be
19    a court security officer out here to direct you.
20              Now, during this luncheon recess, do not discuss this
21    case with anyone.  Do not allow anyone to discuss it with you.
22    Put it out of your mind until you return at 3 o'clock, when we
23    will continue and complete the jury selection process.
24              What I'm going to do now is, after lunch I'm going to
25    meet with another group just like you, about 40 to 50 people,
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA690**

1    and I will go through the same questions, get to the same point,

2    and then the jury -- the court security officer will call names

3    at random and seat you in the jury box, and then the lawyers

4    will have an opportunity to exercise their peremptory

5    challenges.  And once that's completed, the jury will be

6    selected and we'll proceed, and I'll be able to excuse the rest

7    of you.

8         The following need not come back at 3 o'clock:

9    Erin Harris, James Bowman, Elizabeth Pennisi, Jun Cho,

10   Nebojsa Malic, Michael McAllister.  You don't need to come back

11   at 3:00 o'clock, but I do want to thank you for your service

12   this morning.

13        All right.  You may follow the court security officer

14   and go to lunch.  Now, if you're selected as a juror, your

15   lunches will be provided for the duration of the trial.  But

16   don't look hard on the menu for Pheasant Under Glass or

17   Baked Alaska.  We can't even get a Chik Fil A around here.

18             (Prospective jurors leave the courtroom.)

19             THE COURT:  Court stands in recess until 1 o'clock.

20             (Recess taken at 11:47 a.m.)

21             THE COURT:  Good afternoon, ladies and gentlemen.  This

22   is United States against Sanders, it's 20-CR-143.  My name is

23   Tim Ellis, I'll be the judge presiding over this case, and I'll

24   tell you more about the case and your role in it in just a

25   moment.

77

```
 1              But first let me ask the attorneys here to put on your
 2     earphones.  This is the device we want use when we want to
 3     engage in conversations among the lawyers and the parties
 4     without everyone else hearing them.  It will just be two
 5     minutes.
 6              (BENCH CONFERENCE ON THE RECORD.)
 7              THE COURT:  You hear me, counsel?  Ms. Ginsberg has
 8     again asked for the reasons for the, I think, three or four
 9     people -- is it three people, Ms. Randall?
10              COURTROOM CLERK:  Three people, yes, Your Honor.
11              THE COURT:  Go ahead and the tell the counsel the
12     reasons they were excused.
13              COURTROOM CLERK:  Juror number 29, father is in the
14     hospital; juror number 46, full-time student out in California;
15     juror number 47, Marine Corps base Quantico, Virginia, law
16     enforcement police officer.
17              THE COURT:  I don't have any further information at
18     this time for that.
19              MS. GINSBERG:  Thank you, Your Honor.
20              THE COURT:  Let's proceed.  Take off the earphones.
21              (END BENCH CONFERENCE.)
22              THE COURT:  Ladies and gentlemen, as I said, this is
23     United States against Sanders, and it is a criminal proceeding
24     that I will tell you more about in a few minutes, and your role
25     in it.  We are in the jury selection process.  You may know that
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA692**

78

1      about an equal number of your fellow prospective jurors were

2      here this morning and went through what we call the voir dire

3      process.

4              Voir dire is a -- I can't quite put my finger on it.

5      It's either law French or French from a Latin origin that means

6      speak the truth, something close to that.  And that is the term

7      that lawyers use to describe the jury selection process in which

8      the court asks jurors a series of questions designed to enable

9      the court to ascertain whether any of you may be disabled by any

10     rule of law from serving as a juror.  And that's what we're

11     going to be about today.

12             But the first thing we are going to do is, I'm going to

13     have the deputy clerk call the roll.  But before we do it, I

14     forgot to add this.  I want to thank all of you for your service

15     as jurors.  Nothing you do as an American citizen is any more

16     important than jury service.  Together with voting, it's one of

17     the two cardinal duties we have as Americans, and it's very

18     important that you fulfill that responsibility and serve as a

19     juror and vote.

20             All right.  I will have the deputy clerk now call the

21     roll.  Now, when your name is called, please stand.  That

22     enables the attorneys to match a name with a face.  And when the

23     next name is called, you may be seated.  And after that, an oath

24     will be administered to you to answer truthfully the court's

25     questions during voir dire.  And after that, I will commence the

79

1    voir dire.

2          All right.  I'll ask the deputy clerk now to call the

3    roll.

4          COURTROOM CLERK:  Juror number 1, Kurt Abendschein.

5          PROSPECTIVE JUROR:  Here.

6          COURTROOM CLERK:  Juror number 2, Candice Alidoosti.

7          PROSPECTIVE JUROR:  (No verbal response.)

8          COURTROOM CLERK:  Juror number 3, Carol Bachmann.

9          PROSPECTIVE JUROR:  (No verbal response.)

10         COURTROOM CLERK:  Juror number 4, Justin Bradley.

11         THE COURT:  Excuse me.

12         (OFF THE RECORD.)

13         THE COURT:  I used to use a phrase, when I was looking

14   for something, I would say, when I found it, well, if it had

15   been a snake it would have bitten me.  Because it's always right

16   there.  I can't tell you how many times I would be a dead man

17   right now.

18         All right.  Proceed, please.  The first was -- did you

19   call the first one?

20         COURTROOM CLERK:  Yes, Judge.  Do you prefer me to

21   start over?

22         THE COURT:  No, that's fine.

23         COURTROOM CLERK:  Juror number 5, Gzne Brown.

24         PROSPECTIVE JUROR:  (No verbal response.)

25         COURTROOM CLERK:  Ladies and gentlemen, I prefer that

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA694**

80

```
 1    you answer "present" so I know exactly who the individual is.
 2    Thank you.
 3              Juror number 6, Patrick Campo.
 4              PROSPECTIVE JUROR:  Present.
 5              COURTROOM CLERK:  Juror number 7, Razzakul Chowdhury.
 6              PROSPECTIVE JUROR:  Present.
 7              COURTROOM CLERK:  Juror number 8, Sylvia Cook.
 8              PROSPECTIVE JUROR:  Present.
 9              COURTROOM CLERK:  Juror number 9, George Corso.
10              PROSPECTIVE JUROR:  Present.
11              COURTROOM CLERK:  Juror number 10, Tejal Desai.
12              PROSPECTIVE JUROR:  Present.
13              COURTROOM CLERK:  Juror number 11, William Ellis.
14              PROSPECTIVE JUROR:  Present.
15              THE COURT:  Mr. Ellis, I think you will confirm that
16    you have no relation to me or anybody in my family?
17              PROSPECTIVE JUROR:  Not that I know of.
18              THE COURT:  I'm sorry?
19              PROSPECTIVE JUROR:  Not that I know of.
20              THE COURT:  All right.  Next.
21              COURTROOM CLERK:  Juror number 12, Steven Ellis.
22              PROSPECTIVE JUROR:  Present.
23              THE COURT:  Would you confirm the same thing?
24              PROSPECTIVE JUROR:  I'm not related.
25              THE COURT:  And I would assume -- the middle name of
```

81

```
 1     the defendant here is Zackary Ellis Sanders.  If any of you is
 2     related in any way to this defendant, I'll be asking you a
 3     question.  But I assume you two are not.  Is that correct?
 4             PROSPECTIVE JUROR:  Correct.
 5             PROSPECTIVE JUROR:  Correct, sir.
 6             THE COURT:  All right.  Continue.
 7             COURTROOM CLERK:  Juror number 13, Donaciana Evans.
 8             PROSPECTIVE JUROR:  Present.
 9             COURTROOM CLERK:  Juror number 14, Beth Feldpush.
10             PROSPECTIVE JUROR:  Present.
11             COURTROOM CLERK:  Juror number 15, Sarah Finnern.
12             PROSPECTIVE JUROR:  Present.
13             COURTROOM CLERK:  Juror number 16, Hannah Fry.  Juror
14     number 16, Hannah Fry.
15             THE COURT:  Show cause.
16             COURTROOM CLERK:  Juror number 17, Regina Goffus.
17             PROSPECTIVE JUROR:  Present.
18             COURTROOM CLERK:  Juror number 18, Barbara Hill.
19             PROSPECTIVE JUROR:  Present.
20             COURTROOM CLERK:  Juror number 19, Joseph Hilton.
21             PROSPECTIVE JUROR:  Present.
22             COURTROOM CLERK:  Juror number 20, Adam Jacobs.
23             PROSPECTIVE JUROR:  Present.
24             COURTROOM CLERK:  Juror number 21, Wendy Jensen.
25             PROSPECTIVE JUROR:  Present.
```

82

```
 1              COURTROOM CLERK:  Juror number 22, Belle Johnson.

 2              PROSPECTIVE JUROR:  Present.

 3              COURTROOM CLERK:  Juror number 23, Carter Jones.

 4              PROSPECTIVE JUROR:  Present.

 5              COURTROOM CLERK:  Juror number 24, Irvin Kalugdan.

 6              PROSPECTIVE JUROR:  Present.

 7              COURTROOM CLERK:  Juror number 25, Patricia Kremer.

 8    Juror number 25, Patricia Kremer.

 9              THE COURT:  Show cause.

10              COURTROOM CLERK:  Juror number 26, Richard

11    Loveland, II.

12              PROSPECTIVE JUROR:  Present.

13              COURTROOM CLERK:  Juror number 27, Timothy Lynch.

14              PROSPECTIVE JUROR:  Present.

15              COURTROOM CLERK:  Juror number 28, Dale Manry.

16              PROSPECTIVE JUROR:  Present.

17              COURTROOM CLERK:  Juror number 30, Deanna McNeal.

18              PROSPECTIVE JUROR:  Present.

19              COURTROOM CLERK:  Juror number 31, Joshua Mecham.

20              PROSPECTIVE JUROR:  Present.

21              COURTROOM CLERK:  Juror number 32, Yesenia Mendez

22    Rodriguez.

23              PROSPECTIVE JUROR:  Present.

24              COURTROOM CLERK:  Juror number 33, Kohnwirak Om.

25              PROSPECTIVE JUROR:  Present.
```

83

```
 1              COURTROOM CLERK:  Juror number 34, David Park.

 2              PROSPECTIVE JUROR:  Present.

 3              COURTROOM CLERK:  Juror number 35, Urmi Patel.

 4              PROSPECTIVE JUROR:  Present.

 5              COURTROOM CLERK:  Juror number 36, Madison Payne.

 6       Juror number 36, Madison Payne.

 7              THE COURT:  Show cause.

 8              COURTROOM CLERK:  Juror number 37, Gerard Poliquin.

 9              PROSPECTIVE JUROR:  Present.

10              COURTROOM CLERK:  Juror number 38, Christy Rice.

11              PROSPECTIVE JUROR:  Present.

12              COURTROOM CLERK:  Juror number 39, Brittany Schindler.

13              PROSPECTIVE JUROR:  Present.

14              COURTROOM CLERK:  Juror number 40, Jonathan Smith.

15              PROSPECTIVE JUROR:  Present.

16              COURTROOM CLERK:  Juror number 41, Patricia Stoermer.

17              PROSPECTIVE JUROR:  Present.

18              COURTROOM CLERK:  Juror number 42, Mabel Twumasi.

19       Juror number 42, Mabel Twumasi.

20              THE COURT:  Show cause.

21              COURTROOM CLERK:  Juror number 43, Gordon Weynand.

22              PROSPECTIVE JUROR:  Present.

23              COURTROOM CLERK:  Juror number 44, Allen Williams.

24              PROSPECTIVE JUROR:  Present.

25              COURTROOM CLERK:  And juror number 45, Kyle,
```

84

1    Williamson.

2         PROSPECTIVE JUROR:  Present.

3         COURTROOM CLERK:  Is there any juror whose name I have

4    not called?

5         THE COURT:  All right.  You may administer the oath to

6    the panel, please.

7         COURTROOM CLERK:  Ladies and gentlemen of the jury,

8    will you please stand, raise your right hands, and respond after

9    the oath by stating "I shall."

10        Do you swear that you shall true and perfect answer

11   make to such questions as may be propounded to you by the Court

12   so help you God?

13        PROSPECTIVE JUROR PANEL:  (Collectively.)  I shall.

14        COURTROOM CLERK:  Thank you.  Please be seated.

15        THE COURT:  Ladies and gentlemen, I'm now going to ask

16   you a series of questions.  As I told you earlier, I'm going to

17   rely on your answers in order to ascertain whether any of you

18   may be disabled by any rule of law from serving as a juror in

19   this case.

20        Now, there will be two parts to my questions to you.

21   In the first part I will be asking you questions in a series

22   of -- well, singular questions, and if you have an affirmative

23   answer, raise your hands.  The court security officer will take

24   a microphone to you and hand you the microphone, and you can

25   answer with this microphone.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA699**

1          The second phase or the second group of questions will

2    be in a series of three.  And I ask it in a series of three so

3    that it won't be evident which question you have an affirmative

4    answer to.  Of course if your answer is no, you need not raise

5    your hand or indicate that you have a question.

6          And for those questions, if you have an affirmative

7    answer, the court security officer won't take the microphone to

8    you, but rather we'll have you come forward here and sit in the

9    witness box.  There is a screen around you, a Plexiglass screen,

10   and I will ask you questions using the earphones and a

11   microphone so that your answers will not be heard by everyone in

12   the courtroom.  They will be heard only by the lawyers, myself,

13   and the defendant.  And that is done to preserve your privacy as

14   to any information you may have to provide in response to my

15   questions, and also to avoid having any information that may

16   disable you from serving as a juror from also disabling others.

17         So I'll begin now by asking you the first series of

18   questions.  First I want to know whether any of you have seen or

19   read or heard or know anything about this case from any source

20   whatever.  Now, I ask that question not because it's likely or

21   probable that you have, but merely out of an abundance of

22   caution, to ensure that if any of you know anything at all about

23   this case, that that is brought promptly to the Court's

24   attention.

25         The second question in this first series of three is

86

```
 1   whether you or any member of your immediate family have ever
 2   been the victim of child sexual abuse.
 3        And the third question - and I'll repeat these three in
 4   a minute - have you or any member of your family, or immediate
 5   family, ever been a defendant in a criminal case or ever been
 6   accused of a crime by federal, state, or local prosecutors.
 7        I said I'll repeat those to you.  What I omitted doing
 8   is to tell you what the charges are in this case.  I'm going to
 9   read those charges against the defendant from the indictment.
10   But I hasten to instruct you that the indictment itself is not
11   proof or evidence of guilt whatsoever, it is merely the
12   government's means of accusing a defendant of a crime.  And this
13   defendant has pled not guilty to those crimes, and therefore
14   must be presumed by you to be innocent of those crimes unless
15   and until a jury finds otherwise.
16        So I will read to you now excerpts from the indictment.
17   There are 12 counts.  The first five counts are the following:
18   In separate instances, on or about five specific dates, within
19   the Eastern District of Virginia, Zackary Ellis Sanders
20   attempted to and did employ, use, persuade, induce, entice, and
21   coerce a minor to engage in sexually explicit conduct for the
22   purpose of producing a visual depiction of such conduct, knowing
23   and having reason to know that such visual depiction would be
24   transported or transmitted using any means and facility of
25   interstate and foreign commerce, and in and affecting interstate
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA701**

87

1    and foreign commerce and mail, and which visual depiction was

2    actually transported, transmitted using any means and facility

3    of interstate and foreign commerce, and in and affecting

4    interstate and foreign commerce and mail, and which visual

5    depiction was produced using materials that have been mailed,

6    shipped, and transported, affecting interstate and foreign

7    commerce, by any means, including by computer; to wit, digital

8    visual depictions of different minors engaged in sexually

9    explicit conduct.  And as I said, there are five separate

10   charges of that sort on five separate dates.

11           The next six charges are the following:  In separate

12   instances, on or about dates set below - that means the six

13   dates that are set forth in the indictment - within the

14   Eastern District of Virginia, the defendant, Zackary Ellis

15   Sanders, attempted to and did receive a visual depiction, using

16   any means and facility of interstate and foreign commerce, and

17   that had been mailed and had been shipped and transported in and

18   affecting interstate and foreign commerce, and which contained

19   materials which had been mailed and so shipped and transported

20   by any means, including by computer, and the production of such

21   visual depiction involved the use of a minor engaging in

22   sexually explicit conduct, and the visual depiction was of such

23   conduct; to wit, digital visual depictions of different minors

24   engaged in sexually explicit conduct on the following, and there

25   are six dates.  All in violation of Section 2252(a) and (a)(2)

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA702**

88

1    and (b)(1).

2         And then the 12th charge is the following:  That in or

3    about February 2013, within the Eastern District of Virginia,

4    the defendant, Zackary Ellis Sanders, knowingly possessed at

5    least one matter which contained a visual depiction that had

6    been mailed or had been shipped or transported using any means

7    or facility of interstate or foreign commerce, or in and

8    affecting interstate or foreign commerce, or which was produced

9    using materials which had been mailed or so shipped or

10   transported by any means, including by computer, and the

11   production of such visual depiction involved the use of a minor

12   engaging in sexually explicit conduct, and such visual depiction

13   was of such conduct; to wit, digital visual depictions of

14   minors, including prepubescent minors and minors who had not

15   attained the age of 12 years of age, engaged in sexually

16   explicit conduct stored on a Sandisk Cruzer Edge thumb drive, an

17   HP Elite Book 755 laptop, a Lexar thumb drive, an HP laptop, and

18   an HP -- second HP laptop, all in violation of Title 18

19   U.S. Code Section 2252(a)(4)(B) and (b)(2).

20        As I told you, ladies and gentlemen, I have just read

21   to you from the indictment.  The indictment itself is not proof

22   or evidence of guilt of any kind whatsoever.  The defendant has

23   pled not guilty to those crimes, and therefore must be presumed

24   by you to be innocent of those crimes unless and until the

25   Government [sic] find otherwise.

89

 1          Now, let me repeat these first three questions that I

 2   posed to you.  Let me begin first by having you,

 3   Mr. Schlessinger, stand, introduce yourself, your co-counsel,

 4   and your case agent to the panel.

 5          MR. SCHLESSINGER:  Thank you, Your Honor.  Ladies and

 6   gentlemen, good afternoon.  My name is Seth Schlessinger.  Up

 7   here at the table with me are Bill Clayman and Jay Prabhu.  We

 8   are prosecutors with the Department of Justice and we represent

 9   the United States in this case.  Also here with us, Special

10   Agent Christopher Ford with the FBI, and Loraine McNeill, a

11   paralegal in our office.  Once again, good afternoon.

12          THE COURT:  All right.  Ladies and gentlemen, do you or

13   any member of your family, so far as you know, know any of these

14   individuals, or have you had any business or social dealings of

15   any kind whatsoever with any of them?  If your answer is yes,

16   please raise your hand.  The record will show no hands.

17          Mr. Schlessinger and his colleagues are members of the

18   U.S. Attorney's Office of the Eastern District of Virginia.  I

19   want to know whether you or any member of your family, so far as

20   you know, has had any business or social dealings of any kind

21   whatsoever with any of the lawyers or employees of the

22   U.S. Attorney's Office for the Eastern District of Virginia.

23   Raise your hands if your answer is yes.  And the record will

24   reflect no raised hands.  We will continue.

25          Did you introduce Agent Cook, I think it is?

90

```
 1          MR. SCHLESSINGER:  Agent Ford.

 2          THE COURT:  Did you stand, Agent Ford?

 3          SPECIAL AGENT FORD:  Yes, sir.

 4          THE COURT:  Do you or any member of your family --

 5   Agent Ford is an FBI agent.  Do you or any member of your

 6   family, so far as you know, know any agents or employees of the

 7   FBI?  Raise your hands.  If there are none, you need not raise

 8   your hand.  All right.  No hands are raised.

 9          I didn't ask you this, but I think I will.  The

10   U.S. Attorney's Office, I asked you about that, but I think I

11   want to ask you whether you or any member of your family, so far

12   as you know, know any of the employees or attorneys with the

13   Department of Justice, and have you had any business or social

14   dealings of any kind whatsoever with any of them.  If you would

15   raise your hands.  One hand raised.  All right.  Hand that

16   person a microphone.

17          What is your name, please?

18          PROSPECTIVE JUROR:  Wendy Jensen.

19          THE COURT:  Who do you know in the Department of

20   Justice?

21          PROSPECTIVE JUROR:  I'm an attorney recruiter, so I've

22   placed numerous attorneys from the Department of Justice.

23          THE COURT:  All right.  And is the Department of

24   Justice a client of yours, or are these individuals clients?

25          PROSPECTIVE JUROR:  Individual clients, Your Honor.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA705**

91

```
 1              THE COURT:  All right.  And none of these individuals
 2     who were introduced today are your clients?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  Do you feel that having your position as a
 5     legal recruiter or as a recruiter of lawyers would prevent or
 6     hinder you in any way from rendering a fair and an impartial
 7     verdict in this case based only on the evidence and the Court's
 8     instructions on the law?
 9              PROSPECTIVE JUROR:  No, I don't.
10              THE COURT:  Now, I take it -- you're Ms. Jensen?
11              PROSPECTIVE JUROR:  Correct.
12              THE COURT:  I take it you have a lot of clients who
13     have nothing to do with the Department of Justice?
14              PROSPECTIVE JUROR:  Correct.
15              THE COURT:  So it's only some of your clients that are.
16     Is that correct?
17              PROSPECTIVE JUROR:  Yes.  I've also placed attorneys
18     from the U.S. Attorney's Office.
19              THE COURT:  And do you have any current clients at the
20     U.S. Attorney's Office?
21              PROSPECTIVE JUROR:  Me personally, no.  But my partners
22     may.
23              THE COURT:  But you don't know whether they do or
24     don't?
25              PROSPECTIVE JUROR:  I don't know.
```

```
 1              THE COURT:  Do you feel that that would prevent - that
 2      is, your employment and the fact that you have clients in the
 3      U.S. Attorney's Office -- or may have.  You don't know that you
 4      do.  Is that correct?
 5              PROSPECTIVE JUROR:  Correct.  Currently.
 6              THE COURT:  Do you feel that would prevent or hinder
 7      you in any way from rendering a fair and an impartial verdict in
 8      this case based only on the evidence and the Court's
 9      instructions on the law?
10              PROSPECTIVE JUROR:  No.
11              THE COURT:  Thank you, Ms. Jensen.  Anyone else?  One
12      more here.
13              Yes, sir, your name, please, sir?
14              PROSPECTIVE JUROR:  Gerard Poliquin.
15              THE COURT:  Tell me your name once again, please sir.
16              PROSPECTIVE JUROR:  Gerard Poliquin.
17              THE COURT:  Mr. Poliquin, whom do you know in the
18      Department of Justice?
19              PROSPECTIVE JUROR:  I do not know any of the lawyers in
20      this particular case, but I'm a government enforcement attorney
21      and we do a lot of business with the U.S. Attorney's Office,
22      Department of Justice, and the FBI.
23              THE COURT:  Now, your employer is who.
24              PROSPECTIVE JUROR:  National Credit Union
25      Administration.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

93

```
 1              THE COURT:  What do you do for that employer?

 2              PROSPECTIVE JUROR:  I'm a trial attorney, primarily

 3    involved in litigation and enforcement.

 4              THE COURT:  What kinds of cases?

 5              PROSPECTIVE JUROR:  Primarily bank fraud, credit union

 6    fraud.

 7              THE COURT:  Is your employer a government agency?

 8              PROSPECTIVE JUROR:  Yes, sir.

 9              THE COURT:  Do you feel that your employment would

10    prevent or hinder you in any way from rendering a fair and an

11    impartial verdict in this case based only on the evidence and

12    the Court's instructions?

13              PROSPECTIVE JUROR:  I do not.

14              THE COURT:  I take it you do know attorneys who are in

15    the Department of Justice?

16              PROSPECTIVE JUROR:  Yes, sir.

17              THE COURT:  And do you work with them in your work?

18              PROSPECTIVE JUROR:  I do.

19              THE COURT:  Do you feel that that would prevent or

20    hinder you in any way from rendering a fair and impartial

21    verdict in this case?

22              PROSPECTIVE JUROR:  I do not.

23              THE COURT:  And confirm for me again whether you know

24    any of the attorneys that were introduced to you here on --

25              PROSPECTIVE JUROR:  I do not, no.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA708**

94

```
 1            THE COURT:  I didn't hear you.

 2            PROSPECTIVE JUROR:  No, sir, I don't.

 3            THE COURT:  Thank you, Mr. Poliquin.  Anyone else?  No

 4    other hands were raised.

 5            Let's turn now to you, Ms. Ginsberg.  Would you stand,

 6    introduce yourself, your client, and your co-counsel to the

 7    panel, please.

 8            MS. GINSBERG:  Good afternoon.  My name is

 9    Nina Ginsberg.  I'm an attorney in private practice with

10    DiMuro Ginsberg in Alexandria, Virginia.  This is

11    Zackary Sanders.  He's my client and the defendant in this case.

12    He's represented by Mr. Sirkin of the firm of Santen & Hughes in

13    Cincinnati, Ohio, and by John Jeffress and Jade Chong-Smith with

14    the firm of KaiserDillon in the District of Columbia.  And we

15    have Leanna Feinleib, also from that same firm, who is helping

16    us as a paralegal for this trial.

17            THE COURT:  All right.  Ladies and gentlemen, do you or

18    any member of your family, so far as you know, know any of these

19    individuals, or have you had any business or social dealings of

20    any kind whatsoever with any of them?  The record will reflect

21    no hands have been raised.

22            Now, you heard that Ms. Ginsberg was a member of the

23    firm of DiMuro & Ginsberg.  Do I have that right?

24            MS. GINSBERG:  That's correct, Your Honor.

25            THE COURT:  And Mr. Sirkin is a member of what firm?
```

```
 1              MR. SIRKIN:  Santen & Hughes.

 2              THE COURT:  And that's in Cincinnati, Ohio.  And

 3    Mr. Jeffress, your firm is what, again?

 4              MR. JEFFRESS:  KaiserDillon.

 5              THE COURT:  Located?

 6              MR. JEFFRESS:  In Washington, D.C.

 7              THE COURT:  Ladies and gentlemen, do you or any member

 8    of your family, so far as you know, know any of the employees or

 9    lawyers in those firms, or have you had any business or social

10    dealings of any kind whatsoever with any of them? No hands were

11    raised.

12              All right.  Next, ladies and gentlemen, I want to know

13    whether any of you have served on any juries in the past, on any

14    grand juries or trial juries, in either state, federal, or local

15    courts.  If you would raise your hands.  I see a few veterans

16    here.

17              May I have your name, please.

18              PROSPECTIVE JUROR:  Beth Feldpush.

19              THE COURT:  Would you say your name again, please.

20              PROSPECTIVE JUROR:  Beth Feldpush.

21              THE COURT:  Yes, Ms. Feldpush, what juries have you

22    served on in the past?

23              PROSPECTIVE JUROR:  I served on a jury in the

24    District of Columbia about 10 years ago.  It was a civil case.

25              THE COURT:  And what was the nature of the case on
```

 1    which you served?

 2              PROSPECTIVE JUROR:  It was a car accident and some

 3    damage that resulted from it.

 4              THE COURT:  And was the jury on which you served able

 5    to reach a unanimous verdict, without telling me what the

 6    verdict was?

 7              PROSPECTIVE JUROR:  Yes, we did.

 8              THE COURT:  Have you had any other jury service,

 9    Ms. Feldpush?

10              PROSPECTIVE JUROR:  I have not.

11              THE COURT:  Thank you.  You may be seated.

12              Next.  Your name, please?

13              PROSPECTIVE JUROR:  Wendy Jensen.

14              THE COURT:  What juries have you served on in the past?

15              PROSPECTIVE JUROR:  I served on a jury in the

16    District of Columbia probably 25 years ago, and it was a

17    criminal trial.

18              THE COURT:  What was the nature of the crime involved?

19              PROSPECTIVE JUROR:  Murder.

20              THE COURT:  And was the jury on which you served able

21    to reach a unanimous verdict?

22              PROSPECTIVE JUROR:  Yes, we were.

23              THE COURT:  Thank you, Ms. Jensen.  Any other jury

24    service?  Ms. Jensen, any other jury service?

25              PROSPECTIVE JUROR:  No, Your Honor.

97

```
 1              THE COURT:  Thank you, Ms. Jensen.
 2              Next.  Your name, please.
 3              PROSPECTIVE JUROR:  Regina Goffus, G-O-F-F-U-S.
 4              THE COURT:  Yes, Ms. Goffus.  What juries have you
 5    served on in the past?
 6              PROSPECTIVE JUROR:  Prince William County in 1995.
 7              THE COURT:  And what was the nature of the case on
 8    which you served?
 9              PROSPECTIVE JUROR:  A criminal case.
10              THE COURT:  And the nature of the crime involved?
11              PROSPECTIVE JUROR:  A child died.  A child was killed.
12              THE COURT:  You say a child was killed.  Can you be a
13    little more specific?
14              PROSPECTIVE JUROR:  Shaken baby syndrome.
15              THE COURT:  I'm not sure I know what conveyance
16    syndrome is.
17              PROSPECTIVE JUROR:  Shaken baby syndrome.
18              THE COURT:  All right.  And was the jury on which you
19    served able to reach a unanimous verdict?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Any other jury service?
22              PROSPECTIVE JUROR:  No.
23              THE COURT:  Thank you.  You may be seated.
24              Anyone else?  May I have your name, please?
25              PROSPECTIVE JUROR:  Sylvia Cook.
```

98

```
 1            THE COURT:  Yes, Ms. Cook, what juries have you served

 2     on in the past?

 3            PROSPECTIVE JUROR:  Prince William County, about

 4     10 years ago.

 5            THE COURT:  What was the nature of the case?

 6            PROSPECTIVE JUROR:  It was brandishing a firearm.

 7            THE COURT:  Criminal case?

 8            PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  And without telling me what the jury

10     decided, was the jury on which you served able to reach a

11     unanimous verdict?

12            PROSPECTIVE JUROR:  Yes.

13            THE COURT:  Any other jury service, Ms. Cook?

14            PROSPECTIVE JUROR:  No.

15            THE COURT:  Next.  Has everyone had a chance to tell me

16     about your past jury service, trial jury or grand jury, at

17     either state local, or federal court?  All right.  We will go

18     on.

19            Are you or any member of your family employed by any

20     law enforcement agency.  If you would raise your hands, please.

21            All right.  One hand.

22            PROSPECTIVE JUROR:  Yes, sir.  It's the National Credit

23     Union Administration.  We have civil litigation authority, not

24     criminal authority.

25            THE COURT:  And your name again, sir?
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA713**

```
1              PROSPECTIVE JUROR:  Gerard Poliquin.

2              THE COURT:  Yes, Mr. Poliquin.  All right.  Do you feel

3     that your employment as such would prevent or hinder you in any

4     way from rendering a fair and an impartial verdict in this case

5     based only on the evidence and the Court's instructions on the

6     law?

7              PROSPECTIVE JUROR:  No, sir.

8              THE COURT:  Do you cooperate with Department of Justice

9     prosecutions in your cases?

10             PROSPECTIVE JUROR:  Yes, we do.

11             THE COURT:  Do you feel that that would prevent or

12     hinder you in any way from rendering a fair and an impartial

13     verdict in this case based only on the evidence and the Court's

14     instructions on the law?

15             PROSPECTIVE JUROR:  No, Judge.

16             THE COURT:  You may be seated.

17             Anyone else?  There's one over here to my left.

18             Your name, please, sir?

19             PROSPECTIVE JUROR:  Joshua Mecham, M-E-C-H-A-M.

20             THE COURT:  Mr. Mecham, what is your connection with

21     law enforcement?

22             PROSPECTIVE JUROR:  I'm a contractor for a federal law

23     enforcement agency.

24             THE COURT:  Which one?

25             PROSPECTIVE JUROR:  Customs & Border Protection.
```

100

1          THE COURT:  And what do you do for them?

2          PROSPECTIVE JUROR:  I assist with the development of

3     systems that the officers use.

4          THE COURT:  Can you be more explicit than "systems"?

5          PROSPECTIVE JUROR:  The primary and secondary

6     inspection systems that they enter their findings into.

7          THE COURT:  Do you have any law enforcement

8     responsibilities?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Do you feel that your employment would in

11    any way hinder or impair your ability to be a fair and an

12    impartial juror in this case, and reach a fair and an impartial

13    verdict based only on the evidence and the Court's instructions

14    on the law?

15         PROSPECTIVE JUROR:  No, Your Honor.

16         THE COURT:  All right.  Thank you, Mr. Mecham.  You may

17    be seated.

18         Anyone else?  All right.  The record will reflect no

19    other hands have been raised.

20         Now, ladies and gentlemen, I want to ask you whether

21    any of you, when you filled out your COVID questionnaire for the

22    court -- you'll recall that you had to respond to questions 2

23    through 5, and your answers at that time were "no."  And I want

24    to know whether your answers have changed in any way to

25    questions 2 through 5.  And if you need me to repeat those

1    questions, simply ask and I will do so.  I'll repeat them

2    anyway, just to be sure.

3           As you can see, we take special care to ensure the

4    health and safety of all jurors and prospective jurors.  We have

5    enforced social distancing, and we use masks except when you're

6    behind Plexiglass enclosures, as I am here, more than 40 to 50

7    feet away from everybody.

8           Here are the first questions, 2 through 5:  Have you

9    been diagnosed with COVID-19 or had contact with anyone who has

10   been diagnosed with COVID-19.

11          The second one is:  Have you been directed to

12   quarantine or isolate.

13          The third is:  Have you experienced a fever or chills,

14   persistent cough, shortness of breath, or difficulty breathing,

15   a new loss of taste or smell, or other flu-like symptoms.

16          And the fifth one is:  Have you resided with or been in

17   close contact with any person in the above-mentioned categories.

18          Previously you all answered "no" to those questions.  I

19   want to know whether your answers would change now in the

20   interim.  Anybody have new information they want to give me?

21   All right.  The record will reflect no hands, and so I will

22   proceed.

23          Now, ladies and gentlemen, I'm going to go to the

24   second phase of the voir dire in which I will ask you a series

25   of questions, and I do it in a series of three so it will not be

1    evident to everyone which question you have an affirmative

2    answer to.

3            Has any one of you, have you seen or read or heard or

4    know anything about this case from any source whatever.  And I

5    ask that not because it's likely that you have, but merely out

6    of an abundance of caution, to be sure that if any of you know

7    anything about this case from any source whatever, that it is

8    brought promptly to the Court's attention.

9            The second question is, have you or any member of your

10   family or any close friend ever been the victim of child sexual

11   abuse.

12           Third, have you or any member of your immediate family

13   ever been a defendant in a criminal case, or ever been accused

14   of a crime by any federal, state, or local prosecutor.

15           If your answer is "yes" to any of those, I want you to

16   come forward, and you'll be asked to sit in the witness box

17   here, and we'll use microphones and earphones to communicate so

18   that the answers you give will not be public.  It will preserve

19   your confidentiality as to any information you may be required

20   to give me in response to the questions, and it will also avoid

21   having any other juror in any way affected by your answers.

22           All right.  Come forward if your answer was "yes" to

23   any of those.

24           (JUROR CONFERENCE ON THE RECORD.)

25           THE COURT:  May I have your name, please, sir?

103

```
 1                    PROSPECTIVE JUROR:  Carol Bachmann.

 2                    THE COURT:  Yes, Ms. Bachmann, what is your occupation?

 3                    PROSPECTIVE JUROR:  I'm retired.

 4                    THE COURT:  Retired from what, Ms. Bachmann?

 5                    PROSPECTIVE JUROR:  The Navy.

 6                    THE COURT:  What did you do in the Navy?

 7                    PROSPECTIVE JUROR:  I was an officer.

 8                    THE COURT:  What was your rank on retirement?

 9                    PROSPECTIVE JUROR:  O4, Lieutenant Commander.

10                    THE COURT:  All right.  And what did you do in the

11      Navy?

12                    PROSPECTIVE JUROR:  I guess leadership and management.

13                    THE COURT:  All right.

14                    PROSPECTIVE JUROR:  My last command was I was

15      commanding officer of a ship repair facility.

16                    THE COURT:  And where was that located?

17                    PROSPECTIVE JUROR:  Long Beach, California.

18                    THE COURT:  All right.  Thank you for your service.

19      Now, which question do you have an answer to?

20                    PROSPECTIVE JUROR:  I was the victim of child abuse.

21                    THE COURT:  Now, Ms. Bachmann, how old were you when

22      you suffered this abuse?

23                    PROSPECTIVE JUROR:  11.

24                    THE COURT:  And was the person who committed the abuse

25      a family member?
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA718**

104

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Was the person who committed the abuse

 3    prosecuted and convicted?

 4              PROSPECTIVE JUROR:  No.

 5              THE COURT:  Was the person ever accused?

 6              PROSPECTIVE JUROR:  He died shortly thereafter.

 7              THE COURT:  Now, you understand, Ms. Bachmann, that

 8    what happened to you has nothing whatever to do with this case?

 9              PROSPECTIVE JUROR:  Of course.

10              THE COURT:  Do you feel you can put your feelings - and

11    I can tell they're strong feelings, as understandably they would

12    be - to one side and judge this case fairly and impartially

13    based only on the evidence and the Court's instructions on the

14    law?

15              PROSPECTIVE JUROR:  To be honest, I'm not sure,

16    Your Honor.

17              THE COURT:  All right.  Thank you, Ms. Bachmann.

18    Remove your earphones for just a minute but stay there.

19              Mr. Schlessinger, any objection to striking this person

20    for cause?

21              MR. SCHLESSINGER:  No objection to striking her.

22              THE COURT:  Ms. Ginsberg?

23              MS. GINSBERG:  No objection.

24              THE COURT:  All right.  She is stricken for cause.

25              MS. GINSBERG:  Judge, the last panel you read out the
```

105

```
1    names of the witnesses and asked if the jurors had any

2    connection or knowledge of the witnesses.  You haven't done

3    that.

4            THE COURT:  Yes, thank you for reminding me.  I haven't

5    done that, you're quite right.  I will do so.

6            MS. GINSBERG:  Thank you, sir.

7            THE COURT:  Thank you.  You may step down.

8            May I have your name, please?

9            PROSPECTIVE JUROR:  Kurt Abendschein.

10           THE COURT:  Yes, which questions do you have an answer

11   to?

12           PROSPECTIVE JUROR:  The sexual abuse question.

13           THE COURT:  Yes, sir.  Go ahead.

14           PROSPECTIVE JUROR:  In middle school I was coerced into

15   performing sex acts on older men, and I am currently seeking

16   therapy for sex addiction.

17           THE COURT:  All right.  Were these older men caught,

18   prosecuted, and convicted of sexual abuse?

19           PROSPECTIVE JUROR:  I have no idea.  I hope so.

20           THE COURT:  Now, you say you are currently in therapy?

21           PROSPECTIVE JUROR:  Yes.  I have been for several

22   years.

23           THE COURT:  Is that therapy growing out of that

24   experience?

25           PROSPECTIVE JUROR:  I'm sorry, repeat the question?
```

106

```
1              THE COURT:  Is the therapy you are undergoing, did it
2    grow out of this abuse that you suffered as a youngster?
3              PROSPECTIVE JUROR:  I think it was a big part of it,
4    absolutely.
5              THE COURT:  All right.  And what is it, other than
6    that, that you are receiving this counseling for?
7              PROSPECTIVE JUROR:  Just the sex addiction.
8              THE COURT:  That you have?
9              PROSPECTIVE JUROR:  Yes.
10             THE COURT:  All right.  Put your earphones down, if you
11   would, for a minute.  I want to...
12             PROSPECTIVE JUROR:  Of course.
13             THE COURT:  Mr. Schlessinger, any objection to striking
14   this person?
15             MR. SCHLESSINGER:  No objection.
16             THE COURT:  Ms. Ginsberg?
17             MS. GINSBERG:  No objection.
18             THE COURT:  All right.  He is stricken.
19             All right, sir.  Thank you.  You may step down.
20             PROSPECTIVE JUROR:  Thank you.  Do I go back to my
21   seat?
22             THE COURT:  Yes, you may return to your seat.
23             May I have your name, please?
24             PROSPECTIVE JUROR:  Candice Alidoosti.
25             THE COURT:  Yes, Ms. Alidoosti, which question do you
```

1    have an answer to?

2              PROSPECTIVE JUROR:  My brother was convicted of a

3    crime.

4              THE COURT:  And what's the crime your brother was

5    convicted of?

6              PROSPECTIVE JUROR:  Theft by taking and drug charges.

7              THE COURT:  And was he convicted?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  And did he serve a sentence?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Do you feel that the legal system operated

12   fairly in that context?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  You understand that what your brother did

15   and what he went through has nothing whatever to do with this

16   case?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Do you feel you can put your feelings about

19   your brother's experience to one side and judge this case fairly

20   and impartially based only on the evidence presented and the

21   Court's instructions on the law?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Do you have answers to any of the other

24   questions I put to you?

25             PROSPECTIVE JUROR:  No.

108

```
 1                THE COURT:  Thank you, Ms. Alidoosti.  You may return
 2      to your seat.
 3                PROSPECTIVE JUROR:  Thank you.
 4                THE COURT:  May I have your name, please, sir?
 5                PROSPECTIVE JUROR:  Steven Ellis.
 6                THE COURT:  Yes, Mr. Ellis, would you confirm for me
 7      that you and I are not related in any way?
 8                PROSPECTIVE JUROR:  Not that I'm aware of.
 9                THE COURT:  My mother's family came from a Jewish
10      shtetl in the Ukraine.  Do you have any Jewish relatives from
11      the Ukraine?
12                PROSPECTIVE JUROR:  None that I know of.
13                THE COURT:  They came in the early twentieth century.
14      And my father's family came from Surrey in England in the early
15      twentieth century.  Do you have any relatives there?
16                PROSPECTIVE JUROR:  Not that I know of.  My
17      grandparents were from Florida on the Ellis side.
18                THE COURT:  All right.  I have no family from Florida
19      ever, to my disappointment.  It's a nice place to live.
20                Mr. Ellis, can you tell me what affirmative answers you
21      have to the questions I asked?
22                PROSPECTIVE JUROR:  Your second question was about
23      whether anyone in my family had been party to sexual assault as
24      a minor.  My younger sister made accusations against my
25      stepfather in the late '80s.  As best I'm aware, no charges were
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA723**

109

1     ever filed.

2            THE COURT:  Do you feel that your sister, her

3     accusations, were valid?

4            PROSPECTIVE JUROR:  It's not clear.

5            THE COURT:  You understand that what your sister said

6     happened to her has nothing whatever to do with this case?

7            PROSPECTIVE JUROR:  Correct.

8            THE COURT:  Do you feel you can put your feelings about

9     that to one side and judge this case fairly and impartially

10    based only on the evidence presented and the Court's

11    instructions on the law?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Do you have answers to any of the other

14    questions that I asked, Mr. Ellis?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Thank you, sir.  You may return to your

17    seat.

18           Turn off the noise for a minute, please.

19           (END JUROR CONFERENCE.)

20           THE COURT:  Ladies and gentlemen, I understand that

21    some of you would like very much to have a very brief bathroom

22    break.  I'm going to permit that.  But everyone has to be in

23    here when I ask the questions in a series of three, and if you

24    have an answer, you can't leave until after you've given that

25    answer.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA724**

110

1          And I want the court security officers to take note of

2     who leaves and who comes back, so I need to know from you before

3     I start the next series of three questions that everyone is

4     back.  Is that clear?

5          COURT SECURITY OFFICER:  Yes, Your Honor.

6          THE COURT:  All right, thank you.  Noise again, please.

7          (JUROR CONFERENCE ON THE RECORD.)

8          THE COURT:  Yes, sir.  May I have your name, please,

9     sir?

10          PROSPECTIVE JUROR:  Jonathan Smith.

11          THE COURT:  All right.  Mr. Smith, which of the

12     questions that I asked do you have an answer to?

13          PROSPECTIVE JUROR:  May you repeat them again?

14          THE COURT:  Yes, sir, I can.  First is, have you seen

15     or read or heard or know anything about this case from any

16     source whatever.  And I said I asked that question not because

17     it's likely or probable that you have, but merely out of an

18     abundance of caution, to ensure that if you do know anything

19     about this case from any source, that it is brought promptly to

20     the Court's attention.

21          The second question was, have you or any member of your

22     family, or any close friend, ever been the victim of child

23     sexual abuse.

24          The third question is, have you or any member of your

25     immediate family ever been a defendant in a criminal case, or

111

1    ever been accused of a crime by any federal, state, or local

2    prosecutor.

3            Does that help you?

4            PROSPECTIVE JUROR:  That does help me, Your Honor.

5    Number two.

6            THE COURT:  All right, sir.  What's your answer?

7            PROSPECTIVE JUROR:  I have a friend of mine that was

8    molested in Jamaica when he was little, by three women, and his

9    daughter was molested as well when she was living with her

10   mother in Virginia as well.

11           THE COURT:  All right.  Now, were the people who

12   molested your brother, I think you said it was?

13           PROSPECTIVE JUROR:  No, a friend of mine.

14           THE COURT:  Were they caught, prosecuted, and convicted

15   by any authority?

16           PROSPECTIVE JUROR:  In Jamaica, no.  And here, no as

17   well.

18           THE COURT:  All right.  So you say that -- who was it

19   who was molested here?

20           PROSPECTIVE JUROR:  It was my really close friend and

21   his daughter.  She's now 27.

22           THE COURT:  And nobody was prosecuted or arrested for

23   any of those.  Is that correct?

24           PROSPECTIVE JUROR:  That's correct, Your Honor.

25           THE COURT:  And I take it you have feelings about that?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA726**

112

1          PROSPECTIVE JUROR:  Most definitely, I do.

2          THE COURT:  Do you think you can put those feelings

3     aside and judge this case fairly and impartially based only on

4     the evidence and the Court's instructions on the law?  Because

5     as you know, those instances have nothing whatever to do with

6     this case.

7          PROSPECTIVE JUROR:  That's correct, Your Honor.  It's

8     very difficult for me to do that when there is child sexual

9     abuse involved.  It's just something personal that I have a hard

10    time dealing with, when I hear somebody else does that to

11    minors.

12         THE COURT:  All right, sir.  You want to tell me

13    anything more, or does that encapsulate your feelings?

14         PROSPECTIVE JUROR:  That encapsulates my feelings,

15    Your Honor.

16         THE COURT:  Let me ask you again.  I think you did

17    answer.  Do you think you could put those feelings - and you

18    said they were strong feelings - to one side and judge this case

19    fairly and impartially based only on the evidence and the

20    Court's instructions on the law?

21         PROSPECTIVE JUROR:  I don't think I could.  If I did

22    say that, I would be lying, and I don't lie in the court.

23         THE COURT:  Thank you, sir.  You may remove your

24    earphones but stay up there for just a moment.

25         Mr. Schlessinger, any objection by the Government to

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA727**

113

1    striking this prospective juror?

2              MR. SCHLESSINGER:  No objection, Your Honor.

3              THE COURT:  Ms. Ginsberg?

4              MS. GINSBERG:  No, Your Honor.

5              THE COURT:  This juror, whose name is Smith, number 40,

6    is stricken for cause.

7              Mr. Smith, you may step down and return to your seat,

8    sir.

9              May I have your name, please, sir?

10             PROSPECTIVE JUROR:  My name is Allen Williams.

11             THE COURT:  Which question do you have an affirmative

12   answer to?

13             PROSPECTIVE JUROR:  This is for child pornography,

14   sexual molestation.

15             THE COURT:  Yes, sir.

16             PROSPECTIVE JUROR:  When I was a child I had some

17   childhood friends who were sexually abused by a man who was

18   later convicted of that crime.  This would have been in the

19   early '70s, '72 to '76.  And within the last 10 years, a person

20   from our church was convicted of possession of child

21   pornography.

22             THE COURT:  All right, sir.  With respect to the first

23   one, do you have strong feelings about what happened to your

24   friends?

25             PROSPECTIVE JUROR:  Relatively so.  I haven't seen

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA728**

114

1      those friends in years, you know, so...

2              THE COURT:  Do you feel you could put those feelings to

3      one side and judge this case?  Because what happened to -- who

4      was it, again, a friend?

5              PROSPECTIVE JUROR:  Yeah, a couple of friends.

6              THE COURT:  What happened to your friends has nothing

7      to do with this case.  Do you feel you could put your feelings

8      about what happened to them to one side and judge this case

9      fairly and impartially based only on the evidence presented and

10     the Court's instructions on the law?

11             PROSPECTIVE JUROR:  Yes, I think so.

12             THE COURT:  You think so, or can you be certain?

13             PROSPECTIVE JUROR:  Yes, I can be certain.

14             THE COURT:  Now, the second thing you mentioned, tell

15     me that again.

16             PROSPECTIVE JUROR:  So that was a person in our church

17     hierarchy charged with sexual pornography possession.  The

18     reason I bring that up is, I actually helped this gentleman move

19     apartments, so I had not seen any incriminating information, but

20     I had been involved with him to some degree.

21             THE COURT:  And was he prosecuted for child pornography

22     possession?

23             PROSPECTIVE JUROR:  Correct.  And he was convicted.

24             THE COURT:  In federal court?

25             PROSPECTIVE JUROR:  I think it was in Virginia state

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA729**

115

1    court.

2           THE COURT:  And do you think he was treated fairly in

3    that process?

4           PROSPECTIVE JUROR:  As far as I know.  I wasn't in the

5    trial.

6           THE COURT:  Do you feel you can put your feelings about

7    that matter to one side and judge this case fairly and

8    impartially based only on the evidence presented and the Court's

9    instructions on the law?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Do you have affirmative answers to any of

12    the other questions I asked, Mr. Williams?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Thank you, sir.  You may return to your

15    seat.

16          May I have your name, please?

17          PROSPECTIVE JUROR:  It's Yesenia Mendez Rodriguez.

18          THE COURT:  All right.  Do you go by Mendez or by

19    Mendez Rodriguez?

20          PROSPECTIVE JUROR:  Mendez.

21          THE COURT:  Ms. Mendez, what question do you have an

22    affirmative answer to?

23          PROSPECTIVE JUROR:  Yes, of course.  I guess my main

24    question was, I know somebody who was sex trafficked.  I didn't

25    know if that was part of the trial, domestic sex abuse.  I just

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA730**

116

1    wanted to make sure I had the information correct and wasn't

2    withholding anything.

3           THE COURT:  You say you have a friend who was sex

4    trafficked.  Is that right?

5           PROSPECTIVE JUROR:  A family friend, yes.

6           THE COURT:  Was she a minor when she was sex

7    trafficked?

8           PROSPECTIVE JUROR:  She was a minor.

9           THE COURT:  And was anyone caught, prosecuted, and

10   convicted for that?

11          PROSPECTIVE JUROR:  To my understanding, no.

12          THE COURT:  Now, do you have dealings about what

13   happened to your friend?

14          PROSPECTIVE JUROR:  Well, this was a friend of my

15   brother's.  It was a childhood friend.  So she wasn't directly

16   my friend, but I knew, obviously, of her.  But yes, of course

17   there was emotions towards it, but I don't think that would hold

18   any feelings or make any judgment.

19          THE COURT:  Do you understand that what happened to

20   that friend has nothing whatever to do with this case?

21          PROSPECTIVE JUROR:  That is correct.

22          THE COURT:  Do you feel you could put your feelings

23   about that case to one side and judge this case fairly and

24   impartially based only on the evidence presented here in court

25   and the Court's instructions on the law?

117

```
 1              PROSPECTIVE JUROR:  Yes, sir.

 2              THE COURT:  Ms. Mendez, do you have answers to any of

 3     the other questions the Court put to you?

 4              PROSPECTIVE JUROR:  No, I do not.

 5              THE COURT:  Thank you.  You may return to your seat.

 6              PROSPECTIVE JUROR:  Thank you.

 7              THE COURT:  May I have your name, please?

 8              PROSPECTIVE JUROR:  Wendy Jensen.

 9              THE COURT:  Which question do you have an affirmative

10     answer to?

11              PROSPECTIVE JUROR:  The sexual assault question.

12              THE COURT:  Yes, ma'am.  Go ahead.

13              PROSPECTIVE JUROR:  My sister was sexually assaulted by

14     a neighbor as a child.

15              THE COURT:  Was that neighbor caught and prosecuted?

16              PROSPECTIVE JUROR:  No, he was not.

17              THE COURT:  And do you have strong feelings about what

18     happened to your sister?

19              PROSPECTIVE JUROR:  Yes, I do.

20              THE COURT:  You understand that that incident with your

21     sister has nothing whatever to do with this case?

22              PROSPECTIVE JUROR:  Yes, I do.

23              THE COURT:  Do you feel you could put your feelings

24     about what happened to your sister to one side and judge this

25     case fairly and impartially based only on the evidence and the
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA732**

118

1    Court's instructions on the law?

2            PROSPECTIVE JUROR:  I'm not 100 percent certain.

3            THE COURT:  Why not?

4            PROSPECTIVE JUROR:  Because I have strong feelings

5    about child sexual abuse.

6            THE COURT:  Tell me about that.

7            PROSPECTIVE JUROR:  I'm a mother of two children, and

8    I've read a lot about it, and it's very disturbing.

9            THE COURT:  Now, you know that everything you've read

10   doesn't have anything to do with this case, this specific case.

11   Is that right?

12           PROSPECTIVE JUROR:  I know nothing about this specific

13   case, no.

14           THE COURT:  All right.  Let me ask you once again, do

15   you feel you can put any feelings you might have about child

16   sexual abuse to one side and judge this case fairly and

17   impartially based only on the evidence and the Court's

18   instructions on the law?

19           PROSPECTIVE JUROR:  I would try my best.

20           THE COURT:  All right.  You may remove your earphones

21   for a moment, Ms. Jensen.

22           Mr. Schlessinger, can you hear me?

23           MR. SCHLESSINGER:  Yes, I can, Your Honor.

24           THE COURT:  I watched, as I watch all jurors - fairly

25   carefully - and it seems to me that there is a basis for

119

1    striking this juror for cause.  Would you object to that?

2              MR. SCHLESSINGER:  I understand, Your Honor.  No

3    objection.

4              THE COURT:  Ms. Ginsberg?

5              MS. GINSBERG:  No objection, Your Honor.

6              THE COURT:  All right.  She is stricken.

7              Thank you.  You may return to your seat.

8              (END JUROR CONFERENCE.)

9              THE COURT:  All right.  I have three additional

10   questions for you.  Well, I actually have six, but we'll start

11   with three.  Have you or any member of your family or anyone you

12   know well ever been involved in a crime involving

13   child pornography or child sex abuse, whether as a victim, as a

14   witness, as a complainant, or in any other capacity whatever.

15   That's the first question.

16             The second question is, would you tend to believe or

17   would you tend to disbelieve a law enforcement officer witness

18   merely because that person is a law enforcement officer.  If

19   your answer is no, you don't need to come forward.

20             And the last question I want to ask is, I'm going to

21   read to you a list of names, and at the end of that list I will

22   ask you whether you know or have had any business or social

23   dealings of any kind whatsoever with any of them:  FBI Special

24   Agent Eric Bailey; FBI Special Agent Laura Calvillo; FBI Special

25   Agent Ford, you've already met; former FBI forensic examiner

120

```
 1    Daniel Iannotti; FBI Special Agent Kochy.

 2           And what were the last names of those two?

 3           MR. SCHLESSINGER:  The last name of GM is ███████,

 4    and the last name of CM is ██████.

 5           THE COURT:  All right.  A GM -- or a G ██████ and a C?

 6           MR. SCHLESSINGER:  It's G ████████ and C ██████.

 7           THE COURT:  There's also an FBI Special Agent Obie and

 8    Special Agent Jeffrey Ross, Risa Sanders, Jay Sanders,

 9    Phillip DePue, Dr. Frederick S. Berlin, and Donna Fessler.

10           Do you or any member of your family, so far as you

11    know, know any of those people or have had any business or

12    social dealings with any of them?  If you have an affirmative

13    answer to any of those three questions, please raise your hands

14    at this time.

15           All right.  The record will reflect I don't see any

16    hands.  There are no hands that were raised.

17           So I will now ask you the final list of three

18    questions.  In the course of this case, it may be necessary to

19    disclose and reveal scenes of child sex abuse, child

20    pornography.  And I want to know whether that experience would

21    prevent or hinder you in any way from rendering a fair and an

22    impartial verdict in this case based only on the evidence and

23    the Court's instructions.

24           Next, the second question is, it may be that some of

25    the evidence in this case will involve sexually explicit
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA735**

121

1    conversations between two people of the same sex, and I want to

2    know whether that would prevent or hinder you in any way from

3    rendering a fair and an impartial verdict in this case based

4    only on the evidence and the Court's instructions on the law.

5          And finally for this round, this case may involve the

6    presentation of evidence relating to what may be known as BDSM;

7    that is, bondage, domination, submission...I've forgotten the

8    other term.

9          MS. GINSBERG:  Judge, it's bondage, discipline,

10   domination, submission, sadism, and masochism.

11         THE COURT:  Thank you, Ms. Ginsberg.  Otherwise known

12   as BDSM.

13         Would that prevent or hinder you in any way from

14   rendering a fair and an impartial verdict in this case based

15   only on the evidence and the Court's instructions.

16         If you have affirmative answers to any of that, come

17   forward.  I will have one final set of questions to ask you

18   after this.  I see one, two.  Come forward, please.

19         (JUROR CONFERENCE ON THE RECORD.)

20         THE COURT:  May I have your name, please, sir?

21         PROSPECTIVE JUROR:  Yes.  Kurt Abendschein.

22         THE COURT:  Let me see.  Your name once again, please.

23         PROSPECTIVE JUROR:  Kurt Abendschein.

24         THE COURT:  Abendschein, that's what I was looking for.

25   Hang on a moment.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA736**

122

```
 1              PROSPECTIVE JUROR:  Yes, sir.
 2              THE COURT:  All right, sir.  And this relates to
 3    matters you've already told me about?
 4              PROSPECTIVE JUROR:  Yes.
 5              THE COURT:  All right.  Thank you.  You may step down.
 6    I'm aware of that.
 7              May I have your name, please, sir?
 8              PROSPECTIVE JUROR:  Jonathan Smith.
 9              THE COURT:  Yes, Mr. Smith.  I think you've already
10    told me about your strong feelings about this.  Is that correct?
11              PROSPECTIVE JUROR:  That's correct, Your Honor.
12              THE COURT:  Thank you.  That was helpful.  You may step
13    down.  Thank you, sir.  I'm aware of it.
14              PROSPECTIVE JUROR:  Okay.
15              THE COURT:  Thank you.
16              May I have your name, sir?
17              PROSPECTIVE JUROR:  Timothy Lynch.
18              THE COURT:  Yes, Mr. Lynch, which question do you have
19    an affirmative answer to?
20              PROSPECTIVE JUROR:  I believe it was that first
21    question related to the imagery.  I've got two young kids.  My
22    daughter was born eight months ago.  I would do my best, but it
23    would be very hard to be impartial to imagery in that way.
24              THE COURT:  Can you explain that further?  What does
25    imagery that you have to look at in this case have to do with
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA737**

123

1    your feelings about your daughter?

2         PROSPECTIVE JUROR:  It would be challenging to separate

3    the two, knowing my daughter was born eight months ago, and it's

4    just hard to imagine if that happened to anybody.  And I would

5    have a tough time disassociating.

6         THE COURT:  All right.  Put your earphones down for

7    just a moment, please, sir.

8         Mr. Schlessinger, any objection to striking this

9    person?

10        MR. SCHLESSINGER:  Your Honor, actually, I would object

11   to striking this particular juror based on his answers so far.

12        THE COURT:  What else would you suggest I ask him?

13        MR. SCHLESSINGER:  I would suggest that the Court

14   ensure that this juror understands that the question is not

15   whether the child pornography is pleasant or unpleasant - that

16   many people would naturally find it unpleasant - but the task of

17   the jurors is going to be simply whether the defendant produced,

18   received, and possessed the child pornography, and that's a

19   separate undertaking apart from whether the child pornography is

20   difficult or easy to watch.

21        THE COURT:  Ms. Ginsberg, any objection to asking -- my

22   asking this person that question?

23        MS. GINSBERG:  No, I don't object.  But I think he's

24   made his views pretty clear.

25        THE COURT:  All right.

124

```
 1              Mr. Lynch, you understand that this is not a case about

 2    whether child pornography, images of child pornography, are

 3    pleasant or unpleasant, whether they're easy to watch or not

 4    easy to watch.  The question is whether the allegations in the

 5    indictment are proven beyond a reasonable doubt or not by the

 6    government.  And do you feel that you could pay careful and

 7    close attention to the evidence as it's presented and see these

 8    images of child pornography, and put aside your feelings and

 9    render a fair and an impartial based only on the evidence and

10    the Court's instructions on the law?

11              PROSPECTIVE JUROR:  I do.

12              THE COURT:  Do you have any doubt?

13              PROSPECTIVE JUROR:  No.

14              THE COURT:  All right.  Take your earphones off for a

15    minute.

16              Ms. Ginsberg, any further questions you would suggest I

17    ask?

18              MS. GINSBERG:  Yes.  If Your Honor would ask whether he

19    believes he can do that while he is watching these types of

20    images.

21              THE COURT:  While he is watching?

22              MS. GINSBERG:  Yes, if he believes he can be fair and

23    impartial in the face of -- while he is watching these images.

24    If seeing the images will overtake his belief that he can be

25    fair, given the strength of his earlier answers.
```

125

```
1              THE COURT:  Well, he's also just given strong answers
2     to the opposite.  But I'll ask a further question.  I'm not sure
3     it will capture exactly what you're seeking, but I'll ask
4     further questions.
5              MS. GINSBERG:  Thank you.
6              THE COURT:  Put your earphones back on, please.
7              Yes, Mr. Lynch, I want to ask you further, do you feel
8     you can be fair and impartial in this case -- after seeing these
9     images of child pornography, do you think you could be fair and
10    impartial in resolving the questions of guilt or innocence as a
11    juror?
12             PROSPECTIVE JUROR:  I believe that I could, but -- I
13    believe that I could.  That's as far as I can really say,
14    honestly.  It's recently difficult for me.
15             THE COURT:  Tell me what you find difficult.
16             PROSPECTIVE JUROR:  I think everybody relates those
17    things back to their own personal livelihoods and effects, and
18    it would be hard to disassociate that.  I would do my absolute
19    best.  I understand the importance of looking at the evidence
20    and evaluating the evidence, but it would be difficult.
21             THE COURT:  And when you say relate back to, what are
22    you referring to?
23             PROSPECTIVE JUROR:  My family.
24             THE COURT:  Take your earphones off please, sir.
25             Mr. Schlessinger?
```

126

```
 1              MR. SCHLESSINGER:  No objection at this point.

 2              THE COURT:  All right.  He is stricken.  I assume you

 3     want him stricken, Ms. Ginsberg?

 4              MS. GINSBERG:  Yes, sir, thank you.

 5              THE COURT:  All right.  You may step down, thank you,

 6     sir.

 7              May I have your name, please?

 8              PROSPECTIVE JUROR:  Beth Feldpush F-E-L-D-P-U-S-H.

 9              THE COURT:  Yes.  Which question do you have an answer

10     to?

11              PROSPECTIVE JUROR:  I think primarily the first one.  I

12     have an educational background in public health, and I work

13     currently for a hospital association, and part of my work

14     involves helping hospitals see and intercept victims of sexual

15     and human trafficking.  I have also previously worked for an

16     organization that assisted street sex workers in exiting that

17     trade and moving on to other opportunities.

18              So while neither of those focus specifically on the

19     pediatric or children's population, sexual trafficking is an

20     advocacy issue that I'm fairly passionate about for my work, and

21     I do worry that it would not -- that background and those

22     feelings would not make me as impartial as I would want to be.

23              THE COURT:  I understand what you're saying is that you

24     do a lot of work in sex trafficking.  Is that right?

25              PROSPECTIVE JUROR:  Correct.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA741**

127

1          THE COURT:  What is sex trafficking?

2          PROSPECTIVE JUROR:  Sex trafficking is one individual

3    coerces another, against their will, into sexual acts.

4          THE COURT:  All right.  And do you feel you can put

5    your feelings to one side -- because your general feelings about

6    sex trafficking don't have anything to do with this case.  Do

7    you feel your could put your feelings to one side and judge this

8    case fairly and impartially based only on the Court's

9    instructions and the evidence presented?

10          PROSPECTIVE JUROR:  Your Honor, I am concerned that I

11   would not be impartial because I have a very strong emotional

12   reaction.  And when you mentioned the evidence that we may be

13   viewing, I just feel that I would not be able to approach this

14   with impartiality like I would another topic.

15          THE COURT:  All right.  Remove your earphones for a

16   moment, please.

17          Mr. Schlessinger, any objection to striking this

18   prospective juror?

19          MR. SCHLESSINGER:  No objection, Your Honor.

20          THE COURT:  And Ms. Ginsberg, do you have any

21   objection?

22          MS. GINSBERG:  No objection.

23          THE COURT:  All right.  She is stricken.  What number

24   is she?

25          MS. GINSBERG:  14, Your Honor.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA742**

128

```
 1            THE COURT:  Yes.  Feldpush.  All right.
 2            Thank you, you may step down.
 3            (END JUROR CONFERENCE.)
 4            THE COURT:  All right.  Ladies and gentlemen, I just
 5    have a couple more questions for you.  I anticipate that this
 6    case may last three to six days, no longer than that.  In other
 7    words, until about Tuesday of next week is, I think, the most
 8    pessimistic view.  And I want to know whether there is anything
 9    that would prevent or hinder you from sitting and paying careful
10    and close attention to the evidence in this case as it is
11    presented, and rendering a fair and an impartial verdict based
12    only on that evidence and the Court's instructions.  So if you
13    have any physical impairment that would prevent that, or hearing
14    or anything else, I want to know about that.
15            The second question I would ask you is, I want to know
16    if there's anything about this case, anything about the nature
17    of the case or anything in any question that I have asked you,
18    that suggests itself that you would be unable to be a fair and
19    an impartial juror, I want you to come forward and tell me about
20    it.  But you need do so only if you haven't already told me
21    about something in particular.  Or if you feel you need to
22    expand on it, by all means come forward.
23            All right.  Let's see if there are any hands for either
24    of those questions.  I see one hand.  Come forward, please.
25            (JUROR CONFERENCE ON THE RECORD.)
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA743**

129

```
 1              THE COURT:  May I have your name, please, ma'am?

 2              PROSPECTIVE JUROR:  Gzne Brown.

 3              THE COURT:  Yes, Ms. Brown, which question do you have

 4       an answer to?

 5              PROSPECTIVE JUROR:  In regards to anything else we feel

 6       around the case that you don't feel like you could be fair and

 7       impartial regarding, I am a mother of three -- well, mother of

 8       five, but three small children.  So as you talked about the

 9       indictments, I felt concerned.  I immediately thought about my

10       own children.

11              THE COURT:  Well, that's certainly understandable.

12       Tell me why you think you might not be able to be fair and

13       impartial, though.

14              PROSPECTIVE JUROR:  I've not been a juror before, so

15       I'm not really sure how I would ensure that I frame my own

16       personal thoughts and opinions in regard to children in general

17       to ensure that I'm not being impartial.

18              THE COURT:  All right.  Would you put down your

19       earphones, please.

20              Mr. Schlessinger, we have an abundance of jurors now.

21       What's your view?

22              MR. SCHLESSINGER:  I understand, Your Honor.  There's

23       no objection to excusing this juror for cause.

24              THE COURT:  Ms. Ginsberg?

25              MS. GINSBERG:  No objection, Your Honor.
```

130

```
 1              THE COURT:  All right.  She is excused.

 2         Thank you.  You may step down.  What number was that?

 3              COURTROOM CLERK:  Juror number 5.

 4              THE COURT:  May I have your name, please?

 5              PROSPECTIVE JUROR:  Hi, my name is Barbara Hill.

 6              THE COURT:  Last name again, please.

 7              PROSPECTIVE JUROR:  Hill, H-I-L-L.

 8              THE COURT:  Yes, ma'am.  Which question do you have an

 9    answer to?

10              PROSPECTIVE JUROR:  Well, I just wanted to make you

11    aware of a conflict that I have for a trial that would last

12    three to six days.  I have a trip that I had planned where the

13    plane would leave Friday at 5:40 to Budapest, and I have an

14    appointment Thursday afternoon to do a PCR COVID test to make

15    sure I'm negative for the flight.  I have those conflicts for

16    the time of the trial.  I do want to serve, but this one is not

17    going to work with my schedule.  They told me to come and tell

18    you what my conflict was, so I'm doing that today.

19              THE COURT:  All right.  Well, you're certainly right to

20    do so.  Is this a business or pleasure trip?

21              PROSPECTIVE JUROR:  It's a pleasure trip.

22              THE COURT:  And you already have your tickets to

23    Budapest?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  And how long will you be away?
```

131

1              PROSPECTIVE JUROR:  A little over two weeks.

2              THE COURT:  All right.  Put your earphones down for a

3      moment, please.

4              Mr. Schlessinger, any objection to striking this juror?

5      I will do that, but I will have her placed on the next list.

6      She won't escape jury service, but I think it's reasonable, and

7      typically I allow the jury people to -- sometimes to excuse

8      people who have already planned overseas vacations.  But in this

9      case, out of an abundance of caution, I didn't give them that

10     freedom.

11             MR. SCHLESSINGER:  No objection, Your Honor.

12             THE COURT:  Ms. Ginsberg?

13             MS. GINSBERG:  Also no objection.

14             THE COURT:  All right.  You may return to your seat.

15     Thank you.

16             That concludes the Court's voir dire.  Does the

17     Government suggest any further voir dire?

18             MR. SCHLESSINGER:  No further voir dire requests from

19     the Government, Your Honor.

20             THE COURT:  All right, thank you.  Ms. Ginsberg?

21             MS. GINSBERG:  No, Your Honor.

22             THE COURT:  All right.  Now let me hear from the

23     Government, any motions to strike for cause?

24             MR. SCHLESSINGER:  No motions to strike for cause.

25             THE COURT:  Ms. Ginsberg?

132

```
 1              MS. GINSBERG:  Also none, Your Honor.

 2              THE COURT:  What I'm going to do is, I think we will --

 3    we can't put all the jurors in here, but we're going to have

 4    them -- where are we going to put these jurors and where are we

 5    going to put the other jurors?  Let me ask Ms. Randall.

 6              COURTROOM CLERK:  Judge, we will leave the 1 p.m. group

 7    in the courtroom and the 9 a.m. group is already on the other

 8    side, by the conference room.

 9              THE COURT:  All right.  Well, that will take care of

10    all the delays we had in the past.

11              COURTROOM CLERK:  Yes, Judge.

12              THE COURT:  If that doesn't remove any doubt in your

13    minds, you should have it removed; the real person in charge

14    here is Ms. Randall.  And for that, we are all fortunate.

15              All right.  I will tell the jury now, or this panel,

16    that the voir dire is completed; we'll now proceed with the jury

17    selection process.  Now, remember, counsel, you have seven

18    strikes for the Government; 11 strikes, Ms. Ginsberg, for the

19    defendant.  You may exercise as many or as few of those strikes

20    as you wish on any ground, but you may not back-strike, by which

21    I mean you may not return to strike a particular juror who has

22    made it through one round.  You only get one opportunity to

23    strike a particular juror.

24              And when you note your strikes on the jury board,

25    number them so we will know how many you have exercised.
```

133

 1              MS. GINSBERG:  Judge, may I ask a question?

 2              THE COURT:  Yes, of course.

 3              MS. GINSBERG:  Are you planning to bring the jurors

 4    from the first morning group back into the courtroom so we can

 5    see them?

 6              THE COURT:  No, not in the courtroom.

 7              MS. GINSBERG:  I think we need to see the individual

 8    people.

 9              THE COURT:  Oh, you will, you will.  When they're

10    called, they will come through the door.

11              MS. GINSBERG:  I see.  Okay.

12              THE COURT:  There's no conceivable way we can do it any

13    other way and maintain social distancing.

14              MS. GINSBERG:  I understand.  Thank you, Your Honor.

15              THE COURT:  Anything else, Ms. Ginsberg?

16              MS. GINSBERG:  No, nothing else.  Thank you.

17              MR. SCHLESSINGER:  I just wanted to make sure that the

18    Court was planning to announce the excusal of the jurors from

19    this panel so they will know before the jury selection starts.

20              THE COURT:  No.  But I will tell you who they are.  The

21    names of the persons excused -- is this for this afternoon's

22    group?

23              COURTROOM CLERK:  Yes, Judge.

24              THE COURT:  It's number 3, Carl Bachmann; number 1,

25    Kurt Abendschein; number 40, Jonathan Smith; number 21,

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA748**

134

1    Wendy Jensen; number 27, Timothy Lynch; number 14,

2    Beth Feldpush; number 5, Gzne Brown, or Zizney (ph) Brown or

3    something like that; and number 18, Barbara Hill.  Those all

4    have been stricken for cause.  Is there any difference between

5    the list I just gave you and what you know I've stricken,

6    Mr. Schlessinger?

7              MR. SCHLESSINGER:  No, Your Honor.

8              THE COURT:  Ms. Ginsberg?

9              MS. GINSBERG:  No, Your Honor.

10              THE COURT:  All right.  Then we will proceed.  Let's

11    turn off the noise and go back.

12              (END JUROR CONFERENCE.)

13              THE COURT:  Ladies and gentlemen, that completes the

14    Court's voir dire.  We are now going to start with the selection

15    process.  The deputy clerk will call 12 names at random.  You'll

16    come and sit here, and you'll see there are places here to

17    maintain social distancing.  Come and sit here, and then the

18    attorneys will have an opportunity to strike persons, exercise

19    their peremptory challenges.

20              Well, what I'm going to do, ladies and gentlemen, is

21    I'm going to take a 15-minute recess.  And the reason for that

22    is, I told your colleagues from the morning session to come back

23    here at 3:00, and they took me literally.  Many of them are not

24    here yet because it is not yet 3:00, and we can't proceed

25    without them.  They will be on this floor, however, and so there

135

1    will be no delay as we call people from the 9 o'clock session or

2    the 1 o'clock session.

3            So we will recess until 3 o'clock.  Be back here

4    promptly at 3 o'clock and we will proceed as I've indicated;

5    namely, the deputy clerk will calls names at random, you'll be

6    seated here, and then the attorneys will have an opportunity to

7    exercise their peremptory challenges.  When that whole process

8    is completed, we will have selected our jury, and I will then be

9    able to excuse the rest of you with our thanks for your service.

10   Because we could not have proceeded without you today.

11           Thank you.  Court stands in recess until 3 o'clock.

12           (Recess taken at 2:45 p.m.)

13           THE COURT:  All right.  We will proceed now to select

14   at random.  You may select 12 names at random, please.

15           COURTROOM CLERK:  Ladies and gentlemen of the jury, as

16   I call your name, please come forward and have a seat in the

17   jury box as directed by the security officer.  Juror number 19,

18   Joseph Hilton, p.m. group; juror number 44, Allen Williams, p.m.

19   group; juror number 31, Joshua Mecham, p.m. group; juror

20   number 5, Colette Brooks, a.m. group.

21           (OFF THE RECORD.)

22           COURTROOM CLERK:  Are you juror number 5,

23   Colette Brooks?

24           PROSPECTIVE JUROR:  Yes.

25           COURTROOM CLERK:  Please be seated.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA750**

136

1              Juror number 11, Diane Corina, a.m. group.  Juror

2    number 11, Diane Corina.  Juror number 13, Donaciana Evans,

3    p.m. group; juror number 8, Steven Cereghino, a.m. group.  Juror

4    number 8, Steven Cereghino.  Juror number 6, Jason Brost,

5    a.m. group.  Juror number 6, Jason Brost.  Juror number 32,

6    Yesenia Mendez Rodriguez, p.m. group; juror number 26,

7    Leonora Jordan, a.m. group.  Juror number 26, Leonora Jordan.

8    Juror number 35, Alexander Nykorchuk, a.m. group.  Juror

9    number 35, Alexander Nykorchuk.  Juror number 17,

10   Valerie Galbraith, a.m. group.  Juror number 17,

11   Valerie Galbraith.

12              THE COURT:  Put your earphones on for just a minute.

13              (BENCH CONFERENCE ON THE RECORD.)

14              THE COURT:  Let me remind counsel, Government has seven

15   strikes, the defendant has 11.  You are not required to save

16   strikes for your alternates.  You may exercise as many or as few

17   of your numbered strikes, either on this first 12 or on the

18   alternates when they are selected.  But you may not back-strike.

19   You may not strike any prospective juror who has already

20   survived a round.

21              Any questions, Mr. Schlessinger?

22              MR. SCHLESSINGER:  No, Your Honor.

23              THE COURT:  Ms. Ginsberg?

24              MS. GINSBERG:  No, Your Honor.

25              THE COURT:  All right.  Let's proceed.

137

1              (END BENCH CONFERENCE.)

2              COURTROOM CLERK:  Will the following jurors please

3       return to their seats in the courtroom.  Juror number 26,

4       Leonora Jordan, a.m. group; juror number 8, Steven Cereghino,

5       a.m. group; juror number 35, Alexander Nykorchuk, a.m. group;

6       juror number 13, Donaciana Evans, p.m. group; juror number 11,

7       Diane Corina, a.m. group; juror number 5, Colette Brooks,

8       a.m. group; juror number 44, Allen Williams, p.m. group; juror

9       number 32, Yesenia Mendez Rodriguez, p.m. group; juror

10      number 17, Valerie Galbraith, a.m. group.

11              Ladies and gentlemen of the jury, as I call your name,

12      please come forward and have a seat in the jury box as directed

13      by the security officer.  Juror number 2, Bruce Arthur,

14      a.m. group.  Juror number 2, Bruce Arthur, a.m. group.  Juror

15      number 2, Candice Alidoosti, p.m. group; juror number 21,

16      Samantha Hart, a.m. group.  Juror number 21, Samantha Hart.

17              PROSPECTIVE JUROR:  Here.

18              COURTROOM CLERK:  Juror number 33, Lucinda McLaughlin,

19      a.m. group.  Juror number 33, Lucinda McLaughlin.  Juror

20      number 39, Cynthia Riggs, a.m. group.  Juror number 39,

21      Cynthia Riggs.  Juror number 17, Regina Goffus, p.m. group;

22      juror number 41, Patricia Stoermer, p.m. group; juror number 29,

23      Brian Lieber man, a.m. group.  Juror number 29, Brian Lieberman,

24      a.m. group; juror number 7, Razzakul Chowdhury, p.m. group.

25              Will the following jurors please return to their seats

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA752**

138

1    in the courtroom.  Juror number 41, Patricia Stoermer,

2    p.m. group; juror number 29, Brian Lieberman, a.m. group; juror

3    number 39, Cynthia Riggs, a.m. group; juror number 21,

4    Samantha Hart, a.m. group; juror number 17, Regina Goffus,

5    p.m. group.

6            Ladies and gentlemen of the jury, as I call your name,

7    please come forward and have a seat in the jury box as directed

8    by the security officer.  Juror number 26, Richard Loveland, II,

9    p.m. group; juror number 27, Patrick Kerns, a.m. group.  Juror

10   number 27, Patrick Kerns.

11           PROSPECTIVE JUROR:  That's correct.

12           COURTROOM CLERK:  Juror number 38, Christy Rice,

13   p.m. group; juror number 28, Dale Manry, p.m. group; juror

14   number 16, Kamel Elhassani, a.m. group.  Juror number 16,

15   Kamel Elhassani.

16           Will the following juror please return to your seat in

17   the courtroom.  Juror number 28, Dale Manry, p.m. group.

18           Ladies and gentlemen of the jury, as I call your name,

19   please come forward and have a seat in the jury box as directed

20   by the security officer.  Juror number 44, Weiwei Stiltner,

21   a.m. group.  Juror number 44, Weiwei Stiltner.

22           Will the following juror please return to their seat in

23   the courtroom.  Juror number 44, Weiwei Stiltner, a.m. group.

24           Ladies and gentlemen of the jury, as I call your name,

25   please come forward and have a seat in the jury box as directed

139

1    by the security officer.  Juror number 31, Michael Mason,

2    a.m. group.  Juror number 31, Michael Mason.

3            Ladies and gentlemen of the jury, as I call your name,

4    please come forward and have a seat in the jury box as directed

5    by the security officer.  Juror number 42, Elizabeth Sheriff,

6    a.m. group; and juror number 6, Patrick Campo, p.m. group.

7    Juror number 42, Elizabeth Sheriff.

8            THE COURT:  You may now swear the jury.  Will the

9    defendant please stand and face the jury.

10           COURTROOM CLERK:  Ladies and gentlemen of the jury,

11   please stand and raise your right hand.  You shall well and

12   truly try, and true deliverance make, between the

13   United States of America and Zackary Ellis Sanders, the

14   defendant at the bar, whom you shall have in charge, and a true

15   verdict give according to the evidence, so help you God?

16           JURY PANEL:  (Collectively.)  I shall.

17           COURTROOM CLERK:  Thank you.  Please be seated.

18           THE COURT:  All right.  Ladies and gentlemen, now we're

19   prepared to proceed, but before we do so, I want to excuse the

20   remainder of you and thank you for your participation.  We could

21   not have proceeded in this matter without your participation.

22   So you may retire with the thanks of the Court for your help in

23   getting this matter under way.  You may file out of the

24   courtroom now.

25           All right.  Members of the jury, now that you've been

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA754**

140

 1    sworn, I'm going to give you some preliminary instructions to

 2    guide you in your participation in this trial.  First, it will

 3    be your duty to find from the evidence presented what the facts

 4    are in this case.  You and you alone will be the sole judges of

 5    the facts in this case.  You will then have to apply to the

 6    facts as you find them from the evidence in the case the law

 7    that the Court will give to you in the form of instructions at

 8    the end of the case and during the case, and you must follow

 9    that law whether you agree with it or not.

10          Nothing the Court may say or do during the course of

11    the trial is intended to indicate to you how -- what your

12    verdict should be or how I think you should find your verdict.

13    What your verdict is, is your sole and exclusive duty and

14    responsibility.

15          Now, the evidence from which you will find the facts of

16    the case will consist of the testimony of the witnesses who will

17    testify across from you on the witness stand, and any documents

18    or other materials received into the record in this case as

19    exhibits, and any facts that the lawyers may agree or stipulate

20    to or that the Court may instruct you that you may find.  But

21    there are certain matters that are not evidence and must not be

22    considered by you.  And let me list those for you now.

23          First, the lawyers' statements, the lawyers' arguments,

24    and the lawyers' questions are not evidence.  Only the answers

25    of the witnesses are evidence.  Objections to questions are not

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA755**

1     evidence.  Of course lawyers have an obligation to their client

2     to make an objection when they believe evidence is being offered

3     that is contrary to the rules of evidence.  The essence of a

4     fair trial is that it be conducted in such a way that only

5     legally admissible evidence is admitted, and your verdict is to

6     be based solely on legally admissible evidence.  You should not

7     be influenced by an objection or by the Court's ruling on it.

8     If the Court sustains an objection, then of course ignore the

9     question.  If the Court overrules the objection, then you may

10    treat the answer to the question as to which an objection was

11    overruled just as you treat the answer to any other question.

12          And if you're instructed that some item of evidence is

13    received for a limited purpose, you must follow that instruction

14    and consider that evidence solely for that limited purpose.  And

15    any testimony that the Court excludes or tells you to disregard

16    must be disregarded and must not be considered by you.  And

17    anything you may have seen or read or heard outside the

18    courtroom is not evidence and must not be considered by you in

19    arriving at your verdict.  You're to decide the case solely on

20    the evidence presented here in the courtroom.

21          Now, there are two kinds of evidence from which you may

22    find the facts of this case.  There is direct evidence and

23    circumstantial evidence.  Now, direct evidence is direct proof

24    of a fact, such as the testimony of an eyewitness, and

25    circumstantial evidence is proof of facts from which you may

142

1     infer or conclude that other facts exist.  And I will give you

2     further instructions on these as well as other matters at the

3     end of the case.  But have in mind that at this time, you may

4     consider both kinds of evidence, both direct and circumstantial.

5          Now, it will be up to you to decide which witness to

6     believe -- which witnesses to believe or not believe, and how

7     much of each witness' testimony to accept or reject.  You and

8     you alone are the sole judges of the credibility of the

9     witnesses in this case.  And I'll give you some guidelines for

10    determining the credibility of witnesses at the end of the case.

11         Now, as you know, this is a criminal case, and there

12    are certain basic rules that you must keep in mind in a criminal

13    case.  First, as I told you at the outset, this is a criminal

14    case, and the defendant is presumed innocent unless and until

15    the jury find otherwise.  And the indictment against the

16    defendant, as I told you earlier, is not proof or evidence of

17    guilt.  It's brought by the government, and that's only an

18    accusation, nothing more.  It is not proof or guilt or anything

19    else.  The defendant, therefore, starts out with a clean slate.

20         Second, the burden of proof is on the government until

21    the very end of the case.  The defendant has no burden to prove

22    his innocence or present any evidence, or to testify.  And since

23    the defendant has the right to remain silent, the law prohibits

24    you, in arriving at your verdict, from considering that the

25    defendant may not have testified.

143

1          Now, the third rule you must keep in mind is that the

2   government must prove the defendant's guilt beyond a reasonable

3   doubt.  And I'll give you further instructions on this point

4   later.  But bear in mind that in this respect, a criminal case

5   is different from a civil case.

6          Now let me give you a few words about your conduct as

7   jurors.  First, I instruct you that during the trial, you are

8   not to discuss the case among yourselves or with anyone.  You

9   are not to discuss it at all among yourselves.  Not until you

10  retire to the jury room at the end of the case are you to

11  deliberate on your verdict.  At that time, of course you are to

12  discuss it among yourselves.  But until then, you are not to

13  talk about this case to anyone.

14         Also, you are not to read or listen to anything

15  touching on this case in any way.  If anyone tries to talk to

16  you about this case, stop them and call that to the Court's

17  attention promptly.

18         Also, do not undertake to do any research on your own.

19  Now, many years ago when I first began hearing trials, this was

20  simple to tell people:  Don't look up anything in books.  Of

21  course for me to tell you that now would be silly.  Who looks up

22  things in books today, other than me?  Very few people.  But

23  don't do any investigation, electronically or otherwise.  Don't

24  use any computer or computer-related gadget to look up anything.

25  Don't look up anybody's name, including my own.  Don't look up

144

 1    anybody.  You are not to conduct any investigation on your own.

 2            Now the trial will begin.  First the Government has an

 3    opportunity to make its opening statement.  An opening statement

 4    is simply a forecast of the evidence that the Government intends

 5    to offer, and it's presented so you can follow that evidence as

 6    it is being presented.  Next, the defendant's attorney may, but

 7    does not have, make an opening statement.  And opening

 8    statements are neither evidence nor argument.

 9            Next, the Government will have an opportunity to

10    present its witnesses, and counsel for the defendant may

11    cross-examine them.  And after the Government's case is

12    completed, the defendant may, if he wishes - but he's not

13    required to - present witnesses, who the Government may

14    cross-examine.

15            And after all the evidence is in, the attorneys will

16    have an opportunity to present their closing arguments in which

17    they will summarize and interpret the evidence as they see it

18    for you.  And after that, I will instruct you on the law and you

19    will be permitted to retire and deliberate on your verdict.

20            Now we're going to have opening statements.  Tell me

21    again, Mr. Schlessinger, how long you think you need for your

22    opening statement.

23            MR. SCHLESSINGER:  Your Honor, about 10 to 15 minutes.

24            THE COURT:  All right.  And who is going to make the

25    opening statement for the defendant?

145

```
 1              MR. SIRKIN:  I will be, Your Honor.  It will be between

 2    10 and 15 minutes.

 3              THE COURT:  In past times, before the pandemic, we

 4    could move the podium.  We can't do that anymore.  You will

 5    stand at the podium and do your best to speak.  You'll be behind

 6    the enclosure.  You can, of course, if you wish, remove your

 7    mask.

 8              All right.  Mr. Schlessinger, are you ready to make

 9    your opening statement?

10              MR. SCHLESSINGER:  Yes, Your Honor, I am.

11              THE COURT:  You may proceed, sir.

12              MR. SCHLESSINGER:  Thank you, Your Honor.

13              THE COURT:  Let me ask first of all, have we given the

14    jurors their books yet?  They're in the cubbyholes.  Let's

15    collect them, if you would, and give them to the jurors.  I'm

16    going to permit you to take notes.  You may take as many or as

17    few notes as you wish.  It's entirely up to you.

18              Now, nobody will look at these books but you.  At the

19    end of the day, they will be placed back in this cubbyhole and

20    the court security officer will maintain their security, and

21    nobody will look at them.  I won't, nobody else.  Then, at the

22    end of the case, you'll have books to take home and discard or

23    do with as you wish.  But I'm going to have them provided to you

24    now so that you may take notes if you wish.  It's entirely up to

25    you.
```

146

1          While we're waiting, let me ask this.  After the

2    opening statements we're going to recess for the evening.  I

3    know many of you come from different distances and face

4    different obstacles in the morning, all the way from children to

5    traffic.  And I am willing to accommodate you to some extent on

6    what time we begin tomorrow morning.  I would ordinarily begin

7    at 9:00, but I'm prepared to begin a bit later if that suits

8    you, if that's something that you-all need in order to send your

9    kids off to school or feed them or whatever.

10          Would 9:30 be more suitable for you?  I think I see

11   some nods and some don't care.

12          JUROR:  It would help with traffic.

13          THE COURT:  Oh, believe me, that's why I don't live in

14   this area.  Yes, 9:30 tomorrow.

15          All right.  Mr. Schlessinger, are you ready to proceed?

16          MR. SCHLESSINGER:  Yes, Your Honor.

17          THE COURT:  You may do so.

18          MR. SCHLESSINGER:  May it please the Court, counsel for

19   the defendant, ladies and gentlemen, this case is about the

20   creation and the collection of sexually explicit images of

21   children.  It's specifically about this man, Zackary Sanders,

22   and his repeated and successful efforts to produce videos of

23   multiple minors, children, some of them as young as 13 years

24   old, engaged in sexually explicit conduct, specifically by

25   having those minors record themselves engaging in that type of

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA761**

147

1    conduct and then to send those videos to him.

2         And it's about the defendant's collection not only of

3    that child pornography, of those sexually explicit videos

4    depicting the minors with whom he was directly and personally

5    communicating, but also a large quantity of additional child

6    pornography that this defendant had obtained by other means,

7    much of which depicted extremely young children, including

8    toddlers.

9         What the evidence is going to show in this case is that

10   the defendant engaged in a pattern of behavior that you'll see

11   repeated over and over again with respect to five separate minor

12   victims.  What you'll see time and again is the defendant

13   meeting a minor online, engaging in conversations over any one

14   of a variety of different internet-based messaging platforms,

15   you'll see they included iMessaging, Kik, Telegram, and sooner

16   or later - in many cases it was very much sooner - directing

17   them to record a sexually explicit video of themselves and to

18   send that video to him.

19        So for that reason, much of the evidence in this case

20   consists of the defendant's own words, and you'll see that

21   evidence in the case.  You'll see the defendant 's own words in

22   the form of his own statements to those minor victims, his

23   directions to them, and you'll see that those statements

24   couldn't be clearer.

25        Now, here I'm going to beg your pardon for my language,

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA762**

148

1    but I'm going to quote the actual words of the defendant himself

2    as you'll see them presented in evidence.  You'll see that they

3    included, on November 24th, 2019, to a minor child who was

4    14 years old.  The defendant:  "You will send me a video of

5    this, you will apologize for disobeying, strip, and then slap

6    your balls as hard as you can 30 times.  Then send me the video.

7    If you don't do it hard enough, I'll make you start over."

8            You're going to see the defendant's own words to

9    another separate minor victim on November 14th, 2019, also

10   14 years old.  The defendant's words:  "Now for your punishment,

11   you're going to slap yourself on your balls as hard as you can

12   40 times.  You will record yourself doing this and then send me

13   the video."  To a 14-year-old child.

14           To a third child victim, this time September 18th,

15   2017, this child, 17 years old, the defendant's words:  "Slap

16   your balls as hard as you can 15 times, record it, send me a

17   video."

18           A fourth minor victim, September 30th, 2017, this child

19   also 17 years old.  The defendant's words:  "You're going to

20   slap yourself on the balls as hard as you can 30 times.  You

21   will record this and send me the video.  I strongly suggest you

22   actually do it hard, because if I feel you're being too gentle,

23   you'll have to start over."

24           To a fifth minor victim on November 29th, 2017, this

25   child, only 13 years old, immediately after this defendant

149

1    obtained that minor child's home address and the names of his

2    parents, and after learning that that 13-year-old minor was

3    then, at that time, nude and in the bathtub, these were the

4    defendant's words to that 13-year-old child:  "Now record a

5    video showing your entire face, your full body, and say, I am a

6    worthless," and a slur beginning with "F" that I will not repeat

7    here, and continuing, "and in the property of Master Zack for

8    the rest of my life."

9            Well, in February 2020, FBI agents obtained a search

10   warrant for the defendant's house.  You'll see where he was

11   living in McLean, Virginia with his parents.  And the search was

12   actually conducted on February 12th of that year.  And you're

13   going to see evidence in the form of the contents of the various

14   electronic devices that were recovered both from the defendant

15   himself, his phone, and also various other electronic devices

16   that were recovered from his bedroom.  And the evidence, the

17   contents of those devices, they include those conversations with

18   the minor victims and the sexually explicit videos that were

19   created and sent to the defendant as a result -- that I

20   described earlier.

21           But in addition, the evidence will also demonstrate, as

22   I mentioned, the defendant's extensive collection of additional

23   child pornography on various devices belonging to him and

24   recovered from his bedroom, laptop computers, USB thumb drives,

25   and you'll see that that additional child pornography depicted

150

1       numerous other minors, additional minors apart from those with

2       whom he was directly communicating.

3              And here I think that I must once again ask for your

4       indulgence.  This, as you've heard already, is a child

5       pornography case, and as you've already heard from the Court,

6       including in the preliminary instructions just now, the

7       Government, of course, bears the sole burden of proof in this

8       case.  And we proudly shoulder that burden.  But in order to

9       meet that burden, we're, of course, required to present

10      evidence.  And in a case like this, that evidence naturally

11      includes images and videos that are disturbing and difficult to

12      see.

13             I think that you'll see, during the course of this

14      trial, that we've taken all the steps possible to minimize, to

15      the greatest extent that we can, the need to display those in

16      court.  But to the extent that it is necessary to display those

17      in court, I simply ask that you bear in mind that we're doing so

18      only because we're required to in order to satisfy our burden of

19      proof.

20             Now, as I mentioned, in addition to that evidence, the

21      evidence also includes the defendant's own statements.  And we

22      already heard one type of evidence of the defendant's own

23      statements, including his messages to minor victims directing

24      them to create child pornography videos and send them to him;

25      but it also includes the defendant's words in another context,

151

1    in the form of his statements to two FBI agents who interviewed

2    him on the day of the search.

3         You'll hear the defendant.  You'll hear the defendant

4    in his own voice because the interview was audio recorded.  And

5    you'll hear him ultimately admit, admit downloading and

6    possessing the child pornography that was found on his

7    electronic devices.  You'll hear he eventually admitted that he

8    was, quote, "curious to see some of it," and that was why he had

9    obtained it.

10        You'll also hear the defendant in that interview

11   denying that he had caused or wanted minors to send him sexually

12   explicit images of themselves, a denial that is significant only

13   because of how utterly false it is, as will be demonstrated by

14   the evidence I just referred to.  That evidence will indeed show

15   that the defendant specifically directed multiple minor victims

16   to create and send to him sexually explicit videos involving the

17   minors, and that he possessed child pornography on the various

18   additional digital devices found in his bedroom.  That's what

19   this case is about.

20        Now, having said that, I would like to finish up by

21   pointing out a couple of things that this case is not about.

22   This case is not about anyone's attitude or feelings or thoughts

23   about any type or category of sexual interest or sexual

24   practices, including BDSM, including dominant and submissive

25   roles, or anything along those lines whatsoever.  This case is

152

1    in no way related to whether anything in that category is usual

2    or unusual, whether it's appealing or unappealing, good, bad,

3    indifferent.  This case is in no way about that.

4         It's not about whether, in producing child pornography,

5    the defendant was acting in some way consistent with these

6    practices; it's not about whether, if not, he thought that he

7    was.  That's not what this case is about.  It's about the

8    defendant's production, receipt, and possession of child

9    pornography, and that's all this case is about.

10        This case is also decidedly not about whether any of

11   the defendant's minor victims could in any way be characterized

12   as allegedly participating voluntarily or consenting to this

13   activity.  It is utterly irrelevant, because as you'll hear from

14   the Court's instructions, they are children; they're incapable

15   of legally consenting.  So when the defendant directed those

16   minor victims to produce sexually explicit videos of themselves

17   and send them to him, the fact that they indeed did so, just as

18   he intended them to do, of course in no way excuses, justifies

19   that conduct.

20        What does matter in this case is the evidence to be

21   admitted, the evidence that I've just briefly summarized for you

22   and that you're about to have presented to you in more detail

23   over the course of the rest of this trial.  That evidence will

24   prove the defendant overwhelming guilty of all of the offenses

25   charged in the indictment, well beyond a reasonable doubt.

153

1        For that reason, at the conclusion of the trial, we

2    will return to ask you to return the only verdict consistent

3    with that evidence, and that is guilty as charged in the

4    indictment.  Thank you very much.

5        THE COURT:  Mr. Sirkin, are you ready to make your

6    opening statement?

7        MR. SIRKIN:  If it please the Court, admitted counsel,

8    admitted counsel for Mr. Sanders.  I'm here representing

9    Mr. Sanders.  And what this case is really about is somebody who

10   chose a lifestyle, a lifestyle that demands obedience,

11   discipline, honesty, pure honesty and openness about one's

12   thoughts and desires, and thirdly, they need a trainer.  They

13   need a master in order to teach this.  This case started when

14   Mr. Sanders chose a lifestyle that included and is known as

15   BDSM, but is really expanded to bondage, discipline, domination,

16   submission, sadism, and masochism.

17       Now, the evidence will also show that this is a

18   lifestyle, again, that advocates honesty, openness.  And what

19   happened here, in order to find other people of similar

20   interests, he went on social media, and he was very specific on

21   his social media looking for other persons to participate or to

22   become, you know, under him.  There will be terms that you will

23   hear like a "sub" or a "slave" or a "pup" or a "puppy."  But

24   those are -- that's terminology used by people who practice

25   BDSM.  It's not derogatory.  It has meanings.  One who is

154

1    submissive wants to please a master.  A master is a trainer --

2              THE COURT:  You're slipping into argument now.

3              MR. SIRKIN:  Is a trainer.  He would train people, and

4    they would then -- you know, they would learn --

5              THE COURT:  You're still doing it.

6              MR. SIRKIN:  They would take these submissive --

7              THE COURT:  You're still doing it.

8              MR. SIRKIN:  I'm saying what the evidence will show.

9              THE COURT:  You can present evidence --

10             MR. SIRKIN:  We will attempt to present evidence that

11   shows that, Your Honor.

12             THE COURT:  Go ahead, sir.

13             MR. SIRKIN:  And you will find, in basically taking on

14   those roles, he would teach these young people who, on their

15   own, sought out from the internet, and then, because they were

16   supposed to be 18, indicated online that they were not when they

17   responded to his seeking individuals who wanted to participate

18   in this practice.  And what they did is, when he ultimately

19   learned, when they connected and communicated, he would indicate

20   to them that they're too young to engage in any conduct,

21   specifically sexual conduct or any other conduct with them that

22   dealt with the BDSM, but they could do whatever they wanted on

23   their own.  And they engaged in lawful activity for him.

24             And what he did, he did not, he did not ask them to go

25   ahead and perform any specific acts for the purposes of filming

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA769**

155

1    it.  He asked them -- because he would impose a discipline when

2    they lied, when they lied about their age or they lied about

3    what they were supposed to do as part of the obedient part of

4    the discipline of BDSM, and it was a penalty that was engaged.

5    And what would happen is he would say, I want you to do

6    something.  And it's our position that the activity that these

7    young people engaged in was lawful, it was not in a way

8    sexual --

9             THE COURT:  Now you're arguing.

10            MR. SIRKIN:  We will prove it was not a sexual

11   activity --

12            THE COURT:  Acknowledge when I speak to you, sir.

13            MR. SIRKIN:  I did, Your Honor.  I don't think that is

14   argument.  I'm saying what the evidence will show.

15            THE COURT:  All right.  That's how you respond, not

16   just continue on.  Is that clear?

17            MR. SIRKIN:  Yes, Your Honor.

18            THE COURT:  Proceed.

19            MR. SIRKIN:  All he wanted the recordings for, the

20   evidence will show, is he wanted to be certain that the activity

21   that he asked them to engage in, that they actually did perform

22   it.  That was the motivational factor of wanting it recorded.

23   That being the case -- you know, it wasn't -- he didn't direct

24   them, he didn't produce these.  They did it on their own.

25            And I think when I know you hear all this evidence and

156

1    you learn about all of this, I think at the end of the case you

2    will find that the Government did not sustain their burden

3    beyond a reasonable doubt that this individual, Mr. Sanders,

4    produced any of these videos.  This was activity that was sent

5    to him voluntarily.  And at the end of the case you will find

6    him not guilty.  Thank you.

7              THE COURT:  All right, ladies and gentlemen, we're

8    going to recess for the evening and we will commence tomorrow

9    morning at 9:30.  Now, put your books in the cubbyhole this

10   evening.  They'll be maintained there by the court security

11   officer.  No one will see them.  And then tomorrow morning we'll

12   begin at 9:30 and begin with the first witness of the day.

13             Who is that?

14             MR. SCHLESSINGER:  It will be CM.

15             THE COURT:  All right.  Ladies and gentlemen, again,

16   refrain from discussing the matter among yourselves or with

17   anyone, or undertaking any investigation on your own.  And do

18   not look up anything in books or any electronic source at all.

19   Don't look up anything about this case.  Put it out of your

20   mind.  Your spouses, your children, your friends will be

21   intensely curious about what you've been doing today.  They will

22   ask you questions and you will be tempted to answer those

23   questions.  Resist that temptation.  Do not answer the questions

24   because I've instructed you not to speak to anybody.

25             When the case is over, you'll have an opportunity to

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA771**

157

1    tell anyone whatever you wish about the case, but for now you

2    must not discuss it with anyone.  Thank you for your attention

3    today.  You may follow the court security officer out.  Remember

4    to put your books in the cubbyholes that are designated out

5    there, and tomorrow morning when you arrive there will be the

6    court security officer out here who will direct you into the

7    jury room where you can await our convening of the case.  One of

8    you is eager to leave.

9            JUROR:  No, I just have a bad hip.

10           THE COURT:  All right.  I'm glad you mentioned that.

11   If at any time during the case any of you truly need a recess

12   for some truly exigent reason, I give you the privilege of

13   raising your hand or giving the sports "time" signal, and I will

14   give you the recess.  And I will not ask you the reason for it.

15   So I ask that you don't avail yourself of that privilege unless

16   it's really truly necessary.

17           All right.  You may follow the court security officer

18   out.

19           (Jury out at 4:25 p.m.)

20           THE COURT:  Court stands in recess until 9:30 tomorrow

21   morning.

22           (Off the record at 4:26 p.m.)

23

24

25

158

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Rebecca Stonestreet, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8     ____//Rebecca Stonestreet_____              __12/9/21____

9     SIGNATURE OF COURT REPORTER                   DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                                              1

 1                   UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Alexandria Division

 3    UNITED STATES OF AMERICA,        :
                                       :     Criminal Case
 4                   Plaintiff         :     No. 20-CR-00143-TSE
                                       :
 5              v.                     :
                                       :
 6    ZACKARY ELLIS SANDERS,           :     October 15, 2021
                                       :     11:25 a.m.
 7                   Defendant         :
      ............................     :     ........................
 8
                      TRANSCRIPT OF PRETRIAL CONFERENCE
 9              BEFORE THE HONORABLE T.S. ELLIS, III
                      UNITED STATES DISTRICT JUDGE
10

11      APPEARANCES:

12      FOR THE PLAINTIFF:          SETH SCHLESSINGER
                                    JAY V. PRABHU
13                                  WILLIAM CLAYMAN
                                    U.S. ATTORNEY'S OFFICE
14                                  2100 Jamieson Avenue
                                    Alexandria, VA  22314
15                                  (703) 299-3700

16      FOR THE DEFENDANT:          NINA J. GINSBERG
                                    DiMURO GINSBERG, P.C.
17                                  1101 King Street
                                    Suite 610
18                                  Alexandria, VA  22314
                                    (703) 684-4333
19
                                    JONATHAN STUART JEFFRESS
20                                  JADE CHONG-SMITH
                                    KAISER DLLON, PLLC
21                                  1099 14th Street, NW
                                    8th Floor West
22                                  Washington, DC  20005
                                    (202) 640-2850
23
                                    (APPEARANCES CONTINUED ON NEXT
24                                  PAGE.)

25
```

2

```
 1    FOR THE DEFENDANT:          HENRY LOUIS SIRKIN
                                  SANTEN & HUGHES
 2                                600 Vine Street
                                  Suite 2700
 3                                Cincinnati, OH  45202
                                  513-721-4450
 4

 5    OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                  U.S. District Court, 9th Floor
 6                                401 Courthouse Square
                                  Alexandria, Virginia  22314
 7                                (240) 426-7767

 8
                          ( Pages 1 - 65)
 9

10
               COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                  P R O C E E D I N G S
2              COURTROOM CLERK:  Court calls criminal case United
3    States of America versus Zackary Ellis Sanders, Case Number
4    2020-CR-143.  May I have appearances, please, first for the
5    Government.
6              MR. SCHLESSINGER:  Good morning, Your Honor.
7    Seth Schlessinger, Bill Clayman, and Jay Prabhu for the
8    United States.
9              THE COURT:  Good morning to you all.  And who is here
10   for the defendant?
11             MS. GINSBERG:  Good morning, Your Honor.
12   Nina Ginsberg, Jonathan Jeffress, and Jade Chong-Smith for
13   Mr. Sanders.  And also present is Louis Sirkin, whose motion for
14   pro hac vice is still pending before this court.
15             THE COURT:  Yes.  I will of course sign that pro hac.
16   And there is no limit, in my view, on the number of lawyers who
17   can represent a defendant.  However, there are limits on who can
18   appear and where.
19             First, only one lawyer will be able to address the
20   Court on any particular argument, only one lawyer will examine a
21   witness or object to questions asked of that witness.  One
22   lawyer, not several.  But I don't care if you want to switch it
23   around.  But you're going to have to have social distancing at
24   the seats as well, so you can't all sit there during the trial.
25             MS. GINSBERG:  Judge, maybe I can be a little helpful.
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA776**

4

1    Mr. Mahoney, who has previously been admitted, will not be

2    present at trial.  He was admitted for the purpose of the autism

3    evidence.  The Court has excluded that evidence, so it's not

4    necessary for him to be here.

5         THE COURT:  But my point is, Ms. Ginsberg, it's fine

6    for you to have as many lawyers all over the country if you

7    want.  I don't care about that.  But you can't all participate.

8    In other words, I'm not going to have more than one lawyer for

9    each witness and more than one lawyer for each argument.

10        MS. GINSBERG:  I understand that.  We were hoping to

11   get some assistance from the Court.  The Government has

12   identified three agents or forensic experts to -- what appears

13   to be, to introduce evidence regarding the six victims.  They

14   have not indicated which agent is going to introduce evidence

15   with respect to -- it's got to be at least four of the victims.

16   Two are on the Government's witness list and will be present.

17        The volume of material is so large, we have divided

18   amongst the lawyers primary responsibility for each individual

19   victim.  We don't know - and the Government has not answered any

20   of my emails requesting this information - which agent is going

21   to testify about which victim.  So we are essentially unable to

22   prepare for one lawyer to examine or cross-examine one witness

23   because we don't know which --

24        THE COURT:  They're not bound to do that, though.

25        MS. GINSBERG:  Judge, what we're saying is, the volume

5

1    of material with regard to the victims is so voluminous that no

2    one lawyer representing Mr. Sanders is able to prepare to

3    cross-examine with respect to each victim.  It would be

4    different if the victims were coming to court.  We have divided

5    the two that are coming to court.  We've divided those up.  But

6    if the Government --

7            THE COURT:  And you've listed four.

8            MS. GINSBERG:  No, the Government has.

9            THE COURT:  Did you list any victims?

10           MS. GINSBERG:  We are not calling any victims,

11   Your Honor.

12           THE COURT:  All right.  They were listed.

13           MS. GINSBERG:  They were previously listed, but they've

14   been removed.

15           THE COURT:  All right.  So you're not calling any.  The

16   Government has listed two.

17           MS. GINSBERG:  They've listed two, but there are six

18   victims.  And they are going to introduce evidence -- as it

19   appears from their exhibit list and their witness list, they are

20   going to introduce evidence about the remaining four, who will

21   not be present in the courtroom, through three different agents.

22           THE COURT:  I understand your request.  I'm not

23   inclined to get into the business of requiring one party or

24   another to tell me exactly what their scope of their examination

25   is going to be.  But let me think about that.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA778**

6

```
 1              Let me go on.  I have an agenda that I want to get
 2    done.
 3              MS. GINSBERG:  I understand, Your Honor.
 4              THE COURT:  And at the end, Ms. Ginsberg, I will say,
 5    is there anything else you want to raise, and renew that request
 6    at that time and I'll think about it.
 7              MS. GINSBERG:  Thank you, Your Honor.
 8              THE COURT:  All right.  I have covered the fact that
 9    I've made clear that I have no problem or objection to however
10    many lawyers want to appear pro hac for the defendant.
11    However -- and that gives them access to the docket.  However,
12    if the clerk is directed by me to contact the defendant about
13    something, it's going to be you, Ms. Ginsberg.  And I do that
14    because you're the person with the most experience in this
15    courthouse, and you're the person who lives closest.  You're not
16    in Buffalo, Chicago, or wherever.  And if we need something, to
17    communicate something, then I don't want Ms. Randall to have to
18    go doing things.
19              MS. GINSBERG:  I'm very happy to do that, Your Honor.
20              THE COURT:  Yes, I'm glad.  Because I am going to do it
21    that way.
22              MS. GINSBERG:  I'm sure you are.
23              THE COURT:  All right.  Now, I'm going to review with
24    you the voir dire process.  I know Ms. Ginsberg may be familiar
25    with it from recent times.  Have you had a case in this
```

7

 1    courtroom recently?

 2             MS. GINSBERG:  I had a case in front of Judge Alston in

 3    the courtroom, but not in front of Your Honor.

 4             THE COURT:  Was what the MS-13 matter?

 5             MS. GINSBERG:  No, Your Honor, that was another

 6    child pornography case several weeks ago.

 7             THE COURT:  Oh, all right.  I do recall he asked to use

 8    this courtroom.

 9             All right.  So let me review the process with you.  For

10    the time being, although the pandemic is winding down, we still

11    adhere to the rules of social distancing and masking.  When

12    you're otherwise than behind these partitions, then it's not

13    required.  Otherwise, it is required.

14             Now, we will do the voir dire -- I'm going to go

15    through the whole process with you.  We will do the voir dire

16    beginning Tuesday at 9 o'clock.  Not beginning Tuesday at 9:30,

17    but at 9:00.  And at that time we're going to have the voir dire

18    proceed in two phases, a morning phase and an afternoon phase.

19    And we do that because we can't fit all of the prospective

20    jurors in this courtroom with social distancing.  It's the

21    largest courtroom, and I have been trying cases for 34 years

22    here.  Not in this courthouse.  This courthouse hasn't been here

23    34 years, or this courtroom.  For many years I've been in this

24    courtroom and we're able to accommodate large numbers of people

25    for voir dire in this courtroom.  But we can't do it during the

8

```
 1    pandemic because of social distancing requirements.
 2            So we'll proceed at 9 o'clock and again at 1 o'clock.
 3    I think I can complete the voir dire in that period of time.  At
 4    least cases I've had in the last two weeks demonstrate that I
 5    can do that.
 6            Now, next, I will conduct the voir dire.  I will ask
 7    all the questions.  And I think, Mr. Schlessinger, you were here
 8    for the last pornography case that I tried here to a jury.
 9            MR. SCHLESSINGER:  Yes, Your Honor, I was here as
10    recently as Tuesday.
11            THE COURT:  All right.  Now, I will conduct all the
12    voir dire.  I have reviewed your submissions and I will take
13    that into account.  However, I will do all the voir dire, and
14    I'm going to go into some detail now about how that will be done
15    mechanically.  But let me say that at the end of the voir dire,
16    I will ask you whether you have any further voir dire you want
17    me to conduct, and you can then look at what you've submitted
18    and tell me what you think you want to know.
19            I will tell you now that unlike other courts in other
20    jurisdictions -- and I have tried cases in North Carolina, the
21    Eastern District of New York, and other places, where they do
22    things very differently.  Indeed, I remember one matter in the
23    Eastern District of New York where the judge did not even want
24    to be present during voir dire, and another one where the judge,
25    who has now passed away - he's a famous person - he never did
```

9

1    come in in a robe.  Shirt sleeves and a jacket was the most.

2            Well, it's a big country and there's a wide variety of

3    people who inhabit this earth, and Ms. Ginsberg will tell you

4    what variety of people inhabit this courtroom.  I will do all

5    the voir dire.

6            Now, at the end of my voir dire I'll ask you if you

7    have any more, and at that point I will rule on anything that

8    you want to persist in asking for.

9            Now, there will be about 45 people in the courtroom

10   seated at social distances.  And, of course, you'll be here,

11   won't you, Ms. Ginsberg?

12           MS. GINSBERG:  Oh, absolutely.

13           THE COURT:  There was speculation whether you would be

14   here this morning.

15           MS. GINSBERG:  There was?

16           THE COURT:  There was.

17           MS. GINSBERG:  I maybe shouldn't ask why.

18           THE COURT:  No, you shouldn't.

19           MS. GINSBERG:  I won't.

20           THE COURT:  Anyway, the deputy clerk will call the

21   roll, so you'll have an opportunity to match a name with a face

22   when that person rises to indicate they're present.  They'll be

23   administered an oath and I will begin asking questions.

24           Now, for most of the questions, at the beginning they

25   will indicate they have an affirmative answer.  For example,

10

1    I'll ask them, have you previously served on a jury, a grand

2    jury or trial jury, on any state, federal, or local court, and

3    hands will go up.  The deputy clerk -- I'm sorry, not deputy

4    clerk.  The court security officer will take a microphone to

5    them, they will stand and they will answer the question with the

6    microphone.  And there will be a number of questions like that

7    that I'll ask.

8             For example, I'll point out -- who's going to be the

9    main person here?  You, Mr. Schlessinger?

10            MR. SCHLESSINGER:  Your Honor, I think it will be

11   either me or Mr. Clayman.

12            THE COURT:  All right.  I'll ask whether they or any

13   member of their family, so far as they know, know these people

14   or know this person, or any attorneys or employees of the

15   U.S. Attorney's Office.  And I'll do the same for each of the

16   firms involved.  And if hands are raised, the court security

17   officer will take the microphone to them, they'll answer, and

18   I'll do any follow-up.  That will cover a number of questions.

19            Then the second phase of the voir dire will be that

20   phase in which I ask questions that they will be permitted -- in

21   the usual case, before the pandemic, I would do it all at the

22   bench and they would give their answer in the relative privacy

23   of the bench and counsel to provide any personal information

24   they have to provide, and also to avoid having any knowledge or

25   information that might infect one juror from infecting them all.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA783**

— 11

1          And the way we'll do that is a little different.  The
2     questions -- I will ask the questions in a series of three, so
3     it won't be evident to anybody which question they have an
4     affirmative answer to.  If they do have an affirmative answer,
5     they'll be asked to come up, they'll take a seat in the witness
6     box - you can't see it clearly, there is a screen there - and
7     they will give their answers there wearing earphones and a
8     microphone.  And that will be heard only by counsel, the
9     defendant, and me, and the bench.  It won't be heard.  We also
10    have a noise machine here that we will activate so they won't
11    hear it.  And I'll also be reminding lawyers and the prospective
12    jurors to speak quietly into the microphone.
13          Now, then we will go through all of that voir dire.  At
14    the end of what voir dire, as I've told you, I will then ask you
15    if you have any further voir dire and I'll rule.  And I think
16    you can reasonably -- Ms. Ginsberg can reasonably anticipate
17    what those rulings will be.  I don't know whether you've read
18    some of the voir dire submitted by your colleagues,
19    Ms. Ginsberg, but you've had experience and know, I'm interested
20    in picking jurors who can render a fair and impartial verdict.
21    I'm not interested, as you would be -- and I understand your
22    interest.  You want to pick jurors who would be more favorable
23    to your clients.  That's your goal.  It isn't the Court's goal.
24    I want impartial jurors, that's all.
25          So you don't get to know who voted for Trump, who voted

12

1      for Clinton, anything like that, what magazines do you subscribe

2      to.  And I say this jokingly, because there are places where

3      that's done.  I even have a dear friend who is no longer in this

4      veil of tears who was a federal judge in Arizona, and he always

5      let jurors ask questions, and he tried to persuade me to do the

6      same thing.  He was a very persuasive man, he was a delightful

7      person.  I liked him very much, although we had views very, very

8      different.  So anyway, I did what he suggested, and I only did

9      it once.  The result was horrendous.

10             Anyway, that's how we will do the voir dire.  At the

11     end I'll ask you if you have any further voir dire; I'll rule on

12     it then.  Then I'll ask you if you have any motions to strike

13     for cause, and I'll rule on those.  That will be the morning.

14             Then these 45 people will go to lunch and be told to

15     come back at 2 o'clock or thereabouts, or 3 o'clock we told them

16     last time.  They'll come back at 3:00 because that will give me

17     a chance to do the second 45 and get them on down the road.  And

18     after that's done, we hope, in the first day, to have picked a

19     jury.

20             Now, I will seat -- how long do you think your

21     case-in-chief will take, Mr. Schlessinger?

22             MR. SCHLESSINGER:  Your Honor, I estimate probably the

23     balance of next week.  That is, until Friday, I would estimate.

24             THE COURT:  Really?  All right.  That surprises me.

25     But then I was surprised at how long this last case you were in

13

```
1    took.

2              MR. SCHLESSINGER:  Yes, Your Honor.  I think it's

3    similar, maybe a little shorter, maybe only two full days of

4    evidence, which would have us rest on Thursday.  But I would

5    estimate, best estimate, resting sometime on Friday.

6              THE COURT:  All right.  Usually I hear other matters on

7    Friday, but next week I will hear this case.

8              All right.  So I will seat, then, 14 jurors, two

9    alternates.  That means the Government will have seven strikes

10   and the defendant will have 11.  You get one extra strike for

11   every two jurors.  And, of course, unlike a civil case, the

12   alternates will be identified and the order in which they were

13   named or called will be identified.

14             Now, Ms. Ginsberg, in the event that you are not here

15   or not the person who is doing this, here's what happens after

16   the motions to strike are ruled on and we are left with a panel

17   of eligible jurors.  We have a board, and the deputy clerk,

18   Ms. Randall, will call names at random.  She'll call 12 names

19   and they'll come up.  And you can't see it, but there are social

20   distancing places here in the jury box where they may sit.  And

21   you'll know because we'll do it out loud, "Mr. Smith,

22   Ms. Jones," and they'll come up and sit and you'll know the

23   order.

24             Then they'll be listed here.  There will be a little

25   piece of paper that's attached to this.  This will be taken
```

14

1    first to the Government; the Government will exercise its

2    strikes.  Now, you may exercise as many strikes as you wish on a

3    round, but you may not back-strike.  In other words, a juror who

4    survives a round cannot be stricken later on.

5            So if the Government strikes two people and the

6    defendant strikes three people, then those people will be told

7    to return to their seat in the courtroom, and then the deputy

8    clerk will call out five new persons to come and sit in

9    the...and when you exercise strikes, be sure to number them as

10   you do.  This will ensure that you don't think you have more

11   strikes than you have, and it will also enable the deputy clerk

12   and me to keep track of that.

13           So after 12 people are chosen, then Ms. Randall will

14   call two more names and those will be alternates.  If you have

15   strikes left, you can exercise against those too.  And

16   ultimately the two people who are chosen in addition to the 14

17   are the alternates, and they will serve, if necessary, in the

18   order in which they are selected.  And we will know that because

19   of the way we do it.

20           So that is how the jury selection will go.  Following

21   the jury selection, I will have preliminary instructions to the

22   jury.  No substantive instructions, only procedural

23   instructions.  Following that, there will be opening statements.

24           Who will make the opening statement?

25           MR. SCHLESSINGER:  I will, Your Honor.

15

```
1          THE COURT:  How long do you think you need for opening

2    statement?

3          MR. SCHLESSINGER:  I request 10 or 15 minutes.

4          THE COURT:  Ms. Ginsberg, who will do your opening

5    statement?

6          MS. GINSBERG:  That has not yet been decided.

7          THE COURT:  How long do you think whoever it is is

8    going to need?

9          MS. GINSBERG:  Certainly not in excess of 15 minutes.

10         THE COURT:  Good.  Those are both reasonable.  Okay.

11   And then we'll go to the witnesses.  And as I said, it doesn't

12   matter to me how many lawyers want to divide up witnesses.

13   That's fine with me.  That includes the Government.  You don't

14   have to do all of them, Mr. Schlessinger and Mr. Clayman,

15   although -- is that Mr. Prabhu over there?

16         MR. PRABHU:  It is, Your Honor.

17         THE COURT:  Well, he's not going to take any witnesses,

18   I'm sure.

19         Then we will hear the evidence.  I want to tell you

20   that we use a questionnaire for COVID.  Every prospective juror

21   has filled out a questionnaire for COVID.  And, Ms. Ginsberg,

22   you know about that, don't you?

23         MS. GINSBERG:  Yes, sir.

24         THE COURT:  And you know that jurors who answer "yes"

25   to questions 2 through 5 can't even come into the courthouse.
```

16

1    Either because they have it or they've been quarantined, or for

2    whatever reason, they can't come into the courthouse.  I don't

3    think we preclude people from coming into the courthouse if they

4    haven't been vaccinated, but we do preclude people from coming

5    into the courthouse if they have been exposed to COVID or they

6    have the symptoms.

7            I've forgotten what the five questions are.  I don't

8    think I have them here in front of me.  Here they are.  "Have

9    you been diagnosed with COVID-19?"  If they answer "yes," they

10   can't come in the courthouse.  "Have you been directed to

11   quarantine or isolate?"  If they say "yes," they can't come in.

12   "Have you experienced a fever or chills, persistent cough,

13   shortness of breath or difficulty breathing, a new loss of taste

14   or smell, or other flu-like symptoms?"  If the answer is "yes,"

15   they can't come in the courthouse.  "Have you resided with or

16   been in close contact with any person in the above-mentioned

17   categories?"  If they say "yes," they can't come in the

18   courthouse.

19           Now, I can tell you that 12 people answered "yes" to

20   that.  So they can't in the courthouse, and I've excused them.

21   Any objection to that on behalf of the Government?

22           MR. SCHLESSINGER:  No, Your Honor.

23           THE COURT:  Any objection on behalf of the defendant?

24           MS. GINSBERG:  No.  Your Honor, I would reserve an

25   objection in the event that we end up having a jury that is not

—17

```
1    a fair cross section of the community.  But if that is not the
2    case --
3             THE COURT:  The ones we've excused for this are all
4    white.
5             MS. GINSBERG:  Oh, okay.  I didn't know that.
6             THE COURT:  Yes.  And there is a fair cross section.
7    That's reviewed.  A fair cross section of this area.
8             MS. GINSBERG:  Yes, sir.
9             THE COURT:  All right.  Now, for objections, in this
10   courtroom, the way in which you assert an objection to a
11   question is you stand, say "objection," but no speeches then.
12   If I need to hear from you on argument, we will go to the
13   earphones and the microphone and the noise machine.  In other
14   words, there will be no arguments by the Government or by the
15   defendant to the jury on objections.
16             In the years that I tried cases as a lawyer, I had
17   experiences where judges did not follow that, and the result was
18   what you might expect.  That's another reason why I don't allow
19   lawyers to conduct voir dire.  I too was subjected to that as a
20   lawyer, and -- at my age, I reminisce a lot.  I remember going
21   into a court in the western part of Virginia to try a case in
22   which my client was a large automobile manufacturer - I won't
23   identify it - but the problem was that they had been in a pickup
24   in the mountains in West Virginia, turned over, and a gear shift
25   lever went through the brain of the driver.  And I thought I had
```

18

1    a decent case.  I was wrong.  Because there had been five guys

2    in the front seat of this pickup truck; they had taken the gear

3    shift knob off the lever - wise - and they had had a lot of

4    beer.

5           So I thought, you know, this doesn't look that bad.

6    State case, state court.  And then we began the voir dire, which

7    was lawyer-conducted voir dire.  The plaintiff went first, and

8    the plaintiff, who was a very good plaintiff's lawyer from

9    Tennessee somewhere, he said, well, now, Ms. Ericson, you

10   wouldn't be prejudice against my client if he had had a few

11   beers before this, would you?  Whoa, wait a minute, I said.  The

12   judge said, never mind, son - I was young then - he says, you

13   can ask the question the other way around.  Well, I got home

14   cooked pretty badly that morning.

15          And later on, to finish this story quickly -

16   Ms. Ginsberg will tell you that's one of the disadvantages of

17   appearing before me, is sharing my reminisces - I was on a

18   judicial conference committee for the canopy committee, the big

19   committee for the rules of practice and procedure which

20   considers the various advisory committee rules, and I sat on

21   that committee for about six years toward the end of the 1980's.

22   And there was a fellow who was appointed to this committee who

23   had been Bill Clinton's lawyer, and he was a big advocate for

24   lawyer-conducted voir dire, as any trial lawyer would be.  You

25   want to do it because you want to persuade the jury in advance

19

1    that you are right.  And he and I squared off for about a year

2    and a half, and the result is what you see today in the rules of

3    civil procedure.  It's up to the judge, and I don't allow it.

4          MS. GINSBERG:  Judge, before you go on beyond

5    objections, I would like just some instruction.  If one of us

6    just stands up and objects and Your Honor makes a ruling, say,

7    denying my objection, how would you like us to be able to

8    preserve the basis for our objection for the record?  Because it

9    will be deemed waived if we --

10          THE COURT:  Remind me at the recess and I'll let you do

11   it in the absence of the jury.

12          MS. GINSBERG:  Thank you.

13          THE COURT:  But, you know...

14          MS. GINSBERG:  That's why I asked.  I understand the

15   Court's ruling, but I think we have to be able to preserve the

16   record.  And I have had objections waived because I didn't make

17   them clear on the record.

18          THE COURT:  Unless it's obvious.  If it's obvious,

19   don't take my time.

20          MS. GINSBERG:  Yes, Your Honor.

21          THE COURT:  For example, if you got up and objected in

22   this case and I ruled on it because I've already ruled on

23   autism, don't get up and tell me what this doctor or that doctor

24   would have said about the Autism Spectrum Disorder.

25          MS. GINSBERG:  That's not what I had in mind,

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

20

```
1    Your Honor.
2            THE COURT:  Well, I want to be clear that I don't want
3    frivolous objections.
4            All right.  And, of course, I'm not going to ask the
5    defendant at this time - that's not appropriate - whether they
6    intend to offer witnesses or evidence and what that will be.
7    I'll do that at the end of the Government's case.  You have the
8    right not to have to disclose that until then.
9            You have given me a list of witnesses, but I want that
10   updated.  Because I'm not requiring it, you're not required to
11   do it, but I want to safeguard against having a witness that you
12   call that all of a sudden Ms. Jones on the jury says, hey, I
13   know that person.  So that has happened.  Virtually everything
14   happens in 34 years.
15           So I ask that you give me a list of witnesses, but I
16   don't require it.  You don't have to do that if you don't want
17   to.  You have already submitted one, but I don't think it's
18   adequate anymore.  Is that right, Ms. Ginsberg?
19           MS. GINSBERG:  I think that's correct, Your Honor.
20           THE COURT:  All right.  So if you want to give me one -
21   and I hope you do, because I want to avoid the circumstance I
22   described to you - then I will get it from you on Tuesday
23   morning.
24           MS. GINSBERG:  Yes, sir.
25           THE COURT:  Now let me go to another matter.  And I
```

21

1    will issue the *pro hac* form for the -- I don't recall what

2    law firm it was, whether it was New York or Chicago.

3            MS. GINSBERG:  It's Cincinnati, Ohio.  That is

4    Mr. Sirkin, seated next to me.

5            THE COURT:  That's fine.  That's fine.  I will enter

6    that.  I'm not a computer person, as you know, Ms. Ginsberg, so

7    I don't know what that entitles that person to.  But they should

8    have it, and I will sign that.

9            MS. GINSBERG:  Thank you.

10           THE COURT:  Now, very recently the defendant has filed

11   a notice of a new expert, this one a BDSM so-called expert.  And

12   the Government has filed a motion to exclude that testimony, and

13   something was filed today.  I'll hear focused argument on that

14   now.

15           Who will argue that for your group?

16           MS. GINSBERG:  Mr. Jeffress, Your Honor.

17           THE COURT:  All right.  I'll hear first from him.  And

18   I understand what you've submitted, Mr. Jeffress, that you're

19   not going to elicit from him any questions relating to

20   mental health or autism or whatever.  But I do know that you

21   want to elicit questions from him about BDSM.

22           MR. JEFFRESS:  Yes, Your Honor.  That's correct.  In

23   response to Your Honor's ruling that we received the other day

24   on the autism evidence, we are not going to have Dr. Berlin

25   testify about Mr. Sanders' mental health condition with respect

—22

1    to the autism or with respect to any other aspect of

2    Mr. Sanders' mental health.  So I think many of the concerns

3    that the Government raised with respect to the 12.2 notice and

4    with respect to the law that, you know, limits our ability to

5    present a mental health defense are no longer relevant to

6    Dr. Berlin's testimony.

7          There were four opinions from Dr. Berlin's notice.  I

8    think the one that we seek to present, Your Honor, after

9    Your Honor's ruling, and that is consistent with it, is just the

10   subject matter expertise on the BDSM issue.  BDSM -- and it's

11   not really about opinion so much as it is providing the jury

12   with the context and with expert facts so that they will

13   understand --

14          THE COURT:  What makes him an expert on that?

15          MR. JEFFRESS:  Your Honor, Dr. Berlin, I don't think

16   the Government has seriously contested that he's one of the

17   foremost experts --

18          THE COURT:  Well, I don't think anything in what you've

19   submitted that suggests he knows anything about BDSM.

20          MR. JEFFRESS:  He runs the Johns Hopkins clinic on

21   sexual disorders.  He's one of the most foremost experts on

22   sexual disorders and basically --

23          THE COURT:  And BDSM is a sexual disorder?

24          MR. JEFFRESS:  No, it's actually not, Your Honor.

25          THE COURT:  Then what does that tell me?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA795**

23

```
 1              MR. JEFFRESS:  I think, Your Honor, we can certainly --

 2              THE COURT:  You tell me that Johns Hopkins has this

 3    great thing for sexual disorders, and now you tell me that BDSM

 4    is not even part of that.

 5              MR. JEFFRESS:  I would say that his knowledge on this

 6    range is beyond just the disorders.  He is one of the -- or he

 7    used to be, at least, one of the people, the professionals who

 8    decides what goes into the DSM.  So we're on that level of

 9    expertise.

10              But I don't think there's a serious objection to

11    Dr. Berlin not having a background and experience on many

12    different aspects of sexual behavior, including this one.

13              THE COURT:  I, as you know, under 702, am the

14    gatekeeper.

15              MR. JEFFRESS:  Yes, Your Honor.

16              THE COURT:  So you've got to persuade me that he knows

17    what he's talking about.  And what you've submitted doesn't.

18              MR. JEFFRESS:  Well, Your Honor, we are happy to -- and

19    again, this isn't going to come up until the defense case, but

20    we are --

21              THE COURT:  What opinion do you want to elicit from

22    him?

23              MR. JEFFRESS:  Again, Your Honor, on this subject, on

24    the first category of his expert notice, I don't think we're

25    providing an opinion.  I think it's more providing the jury with
```

24

```
 1    expert facts so that they understand the evidence and they

 2    understand the chat communications between Mr. Sanders and --

 3              THE COURT:  Well, that's expert testimony.

 4              MR. JEFFRESS:  It's expert testimony, but it's not

 5    really an opinion.  He's going to explain this area, explain how

 6    the terminology works, explain what the dynamic is.

 7              THE COURT:  Why is that relevant?

 8              MR. JEFFRESS:  Well, I don't think there's any

 9    question, and I think the Government would concede, that

10    Mr. Sanders met the alleged minor victims on BDSM websites, for

11    the most part.

12              THE COURT:  Tell me again what BDSM is.

13              MR. JEFFRESS:  Your Honor, I think the best way to

14    think about --

15              THE COURT:  No, tell me what the letters stand for.  I

16    know it's sadomasochism at the end, but what's the BD?

17              MR. JEFFRESS:  I'm just trying to make sure I say this

18    right.  I know the first one is bondage, discipline, and

19    sadomasochism are those letters.

20              THE COURT:  Bondage, discipline, sadomasochism.  All

21    right.

22              THE DEFENDANT:  That is not correct.  Bondage,

23    discipline, dominance, submission, sadomasochism.

24              MR. JEFFRESS:  This is why we need Dr. Berlin, Judge.

25    He would know the answer.
```

25

```
 1              THE COURT:  I don't know of any discussion between the
 2    defendant and the victims that use BDSM.
 3              MR. JEFFRESS:  Your Honor, the entire dynamic between
 4    Mr. Sanders -- and I think the Government is not going to
 5    seriously resist this --
 6              THE COURT:  Tell me what you want this person to
 7    testify to.
 8              MR. JEFFRESS:  I want him to explain what this is to
 9    the jury, explain what this dynamic is.  There is no question --
10              THE COURT:  And why is that relevant?
11              MR. JEFFRESS:  Well, it is what they're doing in these
12    chats.
13              THE COURT:  All right.  But why is that relevant to the
14    offense charged?
15              MR. JEFFRESS:  Well, Your Honor, in a couple of ways.
16    First of all, the best way to look at this is that when you come
17    into this --
18              THE COURT:  Look, let me get to the heart of this
19    matter.  You don't seem to see it -- the Government has to prove
20    that the defendant uses, persuades, induces, entices, or coerces
21    any minor to engage in, and so forth.  So is what you're
22    offering this person for relevant to uses, induces, entices, or
23    coerces any minor?
24              MR. JEFFRESS:  It's beyond that, Your Honor.  First --
25    I think there are a couple of different aspects.  First, he has
```

26

1    to explain what's going on here.  The jury is not going to be

2    familiar with this subject area.  This is classic expert

3    testimony in this respect.

4            THE COURT:  A moment ago you were saying it wasn't

5    expert.

6            MR. JEFFRESS:  No, he --

7            THE COURT:  But anyway, what is the relevance of what

8    they have to say?

9            MR. JEFFRESS:  The relevance of what Dr. Berlin has to

10   say?

11           THE COURT:  Yes.

12           MR. JEFFRESS:  Because he's explaining the dynamic that

13   these --

14           THE COURT:  Never mind dynamic.  What is it that he

15   wants to say?  In other words, let's say you have the defendant

16   saying, look, take your clothes off and slap yourself around.

17   What is he going to testify about as to that?

18           MR. JEFFRESS:  He's going to say that that is -- what

19   they are doing, they're engaged in a power-sharing relationship

20   where basically people like -- and this is a widespread sexual

21   practice and it's also a nonsexual practice.

22           THE COURT:  It's not widespread.

23           MR. JEFFRESS:  Well, Your Honor, it's much more

24   commonplace than people think, and that's why Doctor --

25           THE COURT:  That may be.  But it certainly isn't

27

```
 1    widespread.  I've lived nine centuries on this planet and I've
 2    never run across it.  Nine decades, not centuries.
 3              MR. JEFFRESS:  Well, Your Honor, among other people,
 4    this is something that goes on.  I don't even think the
 5    Government is opposing it on this basis.
 6              THE COURT:  I am still the gatekeeper, and I will have
 7    to decide this.
 8              MR. JEFFRESS:  So basically, Your Honor, he has to
 9    explain the whole context so the jury understands these chats.
10    We're entitled to do that.  That's classic expert testimony, for
11    him to explain the context --
12              THE COURT:  You're not entitled to do it until it's
13    relevant.  Look, I'm going to do this.  I'm going to take a
14    brief recess.  Ms. Ginsberg will give you a little prep on me.
15    But you better address what I'm asking.  I want to know the
16    relevance of it.  All right.
17              I'll take a brief recess, 15 minutes.
18              (Recess taken at 12:08 p.m.)
19              THE COURT:  Before we continue, Mr. Jeffress, let me
20    correct myself.  I misspoke.  I said there were no
21    African-Americans in, what was it, the 10 or 12 who had
22    responded "yes."  Two of the 12, one of them is Asian and the
23    other one is a person who identified herself as of mixed race.
24    So the extent I said they're all white, I was wrong.
25              MR. JEFFRESS:  Thank you, Your Honor.
```

28

 1          THE COURT:  All right.  Now, you-all submitted a

 2    Rule 12 -- or a 16(b)(1) notice, and you've already, I think

 3    appropriately, conceded that you're not going to ask this person

 4    for opinions about his mental health, autism, or anything else.

 5          MR. JEFFRESS:  Correct, Your Honor.

 6          THE COURT:  And I think I understand what you say is

 7    you want to -- well, let me hear what you say.  I need to focus

 8    sharply on what it is and why you think it's relevant.  Because,

 9    as you know, consent by these juveniles is not relevant and will

10    not be permitted.

11          MR. JEFFRESS:  Yes, Your Honor.  I think there are

12    really two things I would say, Your Honor.  The first is, is

13    that there's a lot of terminology and so forth that's used

14    during these chat communications that is particular to the BDSM

15    practice.  There are words that are used -- I mean, it would be

16    like when the Government calls a drug expert to come explain how

17    drug dealers talk to each other, which is usually admitted and

18    the Government often does.

19          Here, it's sort of the converse because it's the

20    defense that wants to put it on.  But basically there are words

21    that are being used that are used typically in BDSM practice

22    that the jury needs to have it explained what they mean.

23          THE COURT:  Like what?

24          MR. JEFFRESS:  Well, I mean, the big one for us is the

25    term "boy" used in this context - and I think it's very clear -

29

1    does not connote age.  It connotes the submissive part, a

2    submissive component of the dominant/submissive relationship,

3    but it's not being used for age.

4        So, for instance, the Government is going to put on an

5    ad that Mr. Sanders put out that this is how he met these

6    people, where the term "boy" is used, but boy is used in this

7    community not to say this is under age, in that sense of the

8    term "boy," but in the sense of, this is going to be the

9    submissive part of this.  So I think that kind of terminology

10   needs to be explained.

11       THE COURT:  All right.  And are you also telling me

12   that you contest -- because the Government has to prove to the

13   jury that these are juveniles, that these are under age people.

14   And I take it you-all contest that?

15       MR. JEFFRESS:  We don't contest.  We've seen the birth

16   certificates.  I think there are various issues that I'm still

17   unclear about, about how the Government is going to prove that.

18   But the point is, is the issue is Mr. Sanders' knowledge and

19   Mr. Sanders' intent, and when he is using the term "boy," he is

20   not asking for --

21       THE COURT:  Well, yes, but it doesn't matter

22   what Mr. Sanders -- he might have thought they were 25-year-old

23   people.  It doesn't matter.  If they're juveniles, the defendant

24   is charged with knowing.

25       MR. JEFFRESS:  Yeah.  Well, we've submitted our

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA802**

—30

1    argument that we believe age is an element of the -- knowledge

2    of age by Mr. Sanders is an element of the offense.

3            THE COURT:  Well, tell me a little bit more about that.

4            MR. JEFFRESS:  Yeah, Your Honor, we think the

5    Government has to prove that Mr. Sanders knew that the minors

6    were in fact minors, and that he intentionally sought to produce

7    a visual depiction or to have sexual activity for the purpose of

8    producing a visual depiction by a minor.  Now, if he thought he

9    was talking to another consenting adult, we do not believe that

10   that is illegal conduct, and that is not within the statute's

11   ambit.

12           THE COURT:  All right.  Go on.

13           MR. JEFFRESS:  So here, I think it's important for the

14   jury to understand, when Mr. Sanders is using the term "boy" in

15   his advertisements or in anything else, he is not seeking an

16   underage person, he is just seeking the submissive partner.  So

17   that's one explanation for how the terminology that Dr. Berlin

18   will explain from this area will be relevant and very helpful to

19   the defense for the jury to understand.

20           Now, the second thing -- and, Your Honor, there are

21   other examples.  That was --

22           THE COURT:  Do you expect he will say anything about

23   consent?

24           MR. JEFFRESS:  No.  Now, Your Honor, I think --

25   Dr. Berlin will not say that.  Now, what he will say, though, I

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA803**

31

1    think, is -- his testimony will be relevant in explaining the

2    sort of dynamic of basically:  I'm ordering you to do something,

3    you're doing it.  It looks from the outside like coercion, which

4    is one of the words that is included in the statute; but in

5    fact, in the context of this dynamic, there's already sort of

6    buy-in to these rules.  I mean, it's like they're playing a

7    game, right, and that they already know that they're not being

8    coerced to do anything, they're being -- you know, this is part

9    of the agreed-upon conduct that they're engaging in.

10          And the statute says that Mr. Sanders has to have

11   coerced, used, persuaded, enticed them to create this visual

12   depiction of sexual conduct.  We're going to oppose many aspects

13   of those elements, including that this is even sexually explicit

14   conduct.  That's something that we will say it's not, and it

15   will be up to the jury to decide.  But, more importantly, I

16   think, is that Mr. Sanders was not acting with the intent to

17   persuade, entice, coerce.  They're having a conversation over

18   this BDSM platform, if you will, where they're already agreed

19   upon about this is how we're going to talk to each other.  So

20   what maybe looks like coercion from the outside is not.

21          And I think we're entitled to show that it's less

22   likely that Mr. Sanders actually violated the statute once one

23   understands this BDSM dynamic.  The BDSM dynamic, Your Honor, is

24   going to be a subject of, I think, a lot of testimony during the

25   Government's case.

32

1          THE COURT:  Why?

2          MR. JEFFRESS:  Because there's no question, and even

3    they agree, that that is what's going on in these chats --

4          THE COURT:  Do you have to keep -- you know, you say,

5    "even they agree."  One of the reasons I took a recess is

6    because it didn't seem to me that you had read their brief.

7    They don't agree with a lot that you're saying.

8          MR. JEFFRESS:  I think they will agree that the

9    responses that he received to his ad were over a BDSM platform

10   and this was a BDSM practice.  Now they say it's still illegal

11   because these are minors we're talking about.

12         THE COURT:  And they can't consent.

13         MR. JEFFRESS:  Right.  That's what the Government's

14   position certainly will be.

15         THE COURT:  And that's the law.

16         MR. JEFFRESS:  Well, I mean, the statute still says

17   that Mr. Sanders has to have the intent to entice, coerce, use,

18   or persuade.  That's for the production statute.  Those are the

19   operative verbs.

20         THE COURT:  That's correct.

21         MR. JEFFRESS:  And they have to prove that about him.

22   And if he thinks in his mind, oh, this is already what we've

23   already agreed to, this is the rules of this game that we're

24   playing, that everyone plays for fun, then it makes it less

25   likely that he was acting with the intent to coerce, Your Honor.

33

1    And that's what the gist of our defense will be.

2              THE COURT:  You keep using the word "coerce," and that

3    isn't something that the Government has to prove.

4              MR. JEFFRESS:  Well, it is in the statute, Your Honor.

5              THE COURT:  No.

6              MR. JEFFRESS:  Yes.

7              THE COURT:  It's entice or coerce.  Or.  It's in the

8    disjunctive.  They don't have to prove coercion.

9              MR. JEFFRESS:  That's right.  There are four different

10   verbs, and they --

11             THE COURT:  I'm glad you agree.

12             MR. JEFFRESS:  I do agree with that, Your Honor.  But

13   coerce is one of the things -- they've charged Mr. Sanders under

14   coercion.

15             THE COURT:  Well, they charged him under the statute --

16             MR. JEFFRESS:  Correct.

17             THE COURT:  -- and it's typical to do it all.  But

18   they're not required to prove coercion.

19             MR. JEFFRESS:  They can prove one of the other ones.

20   They have to prove one of the verbs.

21             THE COURT:  They aren't required to prove coercion, are

22   they?

23             MR. JEFFRESS:  They could prove -- well, one of four --

24             THE COURT:  I'm sorry, are they required to prove

25   coercion?

34

1              MR. JEFFRESS:  No, not necessarily.

2              THE COURT:  All right.  What do you mean by "not

3    necessarily"?

4              MR. JEFFRESS:  They could prove one of the other verbs.

5              THE COURT:  All right.  So they're not required to

6    prove coercion.  They can prove one of the other ones.

7              MR. JEFFRESS:  Right.  They have to prove one of the

8    verbs.

9              THE COURT:  Yes.  All right.  I think I understand now

10   what you mean.  Do you want to tell me anything else about what

11   you want to use Dr. Berlin for, other than to define or explain

12   the significance of these terms in the chats?

13             MR. JEFFRESS:  I think, Your Honor, in light of

14   Your Honor's rulings and everything like that, that would be the

15   subject area, which is the first one that we noticed that we

16   would be presenting him on.

17             THE COURT:  Mr. Schlessinger, are you responding?

18             MR. SCHLESSINGER:  Yes, Your Honor.  Your Honor, I

19   think in the Court's colloquy with defense counsel, it's evident

20   the Court has already seized on the most significant fundamental

21   flaws with Dr. Berlin's proposed expert testimony.  And there

22   are numerous flaws, but I think most fundamental is the utter

23   irrelevance of the entirety of his proposed testimony.

24             The defense proposes that Dr. Berlin will testify about

25   BDSM practices, what that means, and whether Mr. Sanders'

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA807**

35

1    conduct, as will be shown to the jury through the evidence,

2    falls within this understanding of BDSM.  It does not matter

3    whether Mr. Sanders was acting consistently or inconsistently

4    with the precepts of BDSM, as Dr. Berlin proposes to explain

5    them.

6              Supposing that --

7              THE COURT:  Well, the statute says, "uses, persuades,

8    induces, entices, or coerces."  I take it you would say, if

9    these juveniles -- well, it says, "employs, uses, persuades,

10   induces."  So he could use or employ a minor to engage in lewd

11   and lascivious conduct, and that would be covered by the

12   statute.

13             MR. SCHLESSINGER:  That's absolutely right.  And

14   there's nothing that Dr. Berlin purports -- or that defense

15   purports to have Dr. Berlin testify about that has anything to

16   do with that one way or another.

17             When the defendant sent to a minor child, "You are to

18   record a video, you will show me your entire body, state your

19   full name," that is or is not production of child pornography -

20   it is, in fact - but there's no relevance whether this could be

21   considered, as defense suggests, part of BDSM or consistent with

22   BDSM.  It makes no difference whatsoever.

23             Supposing further that it's not consistent with BDSM,

24   but the purported testimony is that Mr. Sanders believed it was

25   consistent with BDSM, it's equally irrelevant.  It makes no

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA808**

36

1    difference when or whether, when Mr. Sanders was producing child

2    pornography, that he thought that it was consistent with BDSM or

3    some other sexual attitude or subculture.  It's totally --

4         THE COURT:  Does Mr. Sanders have to know that they

5    were juveniles, under age?

6         MR. SCHLESSINGER:  No, he does not.  And for that

7    reason, the specific proposed relevant purpose of Dr. Berlin, to

8    explain terminology, including the meaning of the term "boy," is

9    irrelevant.  It is not required.  And, in fact, this court has

10   already ruled in this case, in granting the Government's motion

11   in limine, to preclude any mistake of age defense, that it's not

12   relevant.  It doesn't matter, for purposes of the production

13   statute --

14        THE COURT:  I think the law is fairly clear on that.

15   But in the argument that I just heard, the defendant wants to

16   argue that the Government must prove beyond a reasonable doubt

17   that Mr. Sanders knew they were under age.  What's your view

18   again on that?

19        MR. SCHLESSINGER:  This court has already recognized

20   and rejected that argument in granting the Government's motion

21   in limine to preclude any mistake of age defense.  This court --

22        THE COURT:  But you would agree, wouldn't you, that the

23   Government has the burden to prove that they were in fact

24   juveniles?

25        MR. SCHLESSINGER:  Yes, Your Honor.  Yes, we do.

37

 1    Absolutely.  And we do have that burden.  We do not have any
 2    burden -- there's no requirement to show that Mr. Sanders knew
 3    they were juveniles.  And in this court's order of May 20th of
 4    this year, on docket entry 364 at page 6, the Court recognized
 5    as much, citing the Fourth Circuit's precedential decision in
 6    *United States vs. Malloy*, 568 F.3d 166, a 2009 decision.
 7         Equally irrelevant is the defense suggestion that
 8    Dr. Berlin will testify about the buy-in or the dynamic, to use
 9    two words that defense counsel chose.  It is irrelevant what the
10    dynamic was, or whether there was, quote, buy-in by the minors.
11    Because as this court has already aptly noted, minors cannot
12    consent to this conduct.  And indeed, the Court has already, in
13    the very same order, granted the Government's motion in limine
14    to preclude any defense evidence suggesting that the minors
15    could have possibly consented in some way, noting that there is
16    no consent defense.  For that reason, any purported testimony of
17    Dr. Berlin that the minors bought into it or there was a dynamic
18    where they were agreeable to it in some way is just totally
19    legally irrelevant, and can serve no function for the jury.
20         Finally, Your Honor, defense counsel suggested that --
21    near the end of his argument that Dr. Berlin is going to testify
22    that Mr. Sanders was not acting with any particular -- with the
23    requisite intent.  He was not acting with the intent to produce
24    a visual depiction when he communicated with the minors and said
25    things like "you're going to record a video and send it to me."

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA810**

38

1          The problem with that is that it runs directly afoul of

2    Rule 704(b).  Rule 704(b) expressly precludes an expert witness

3    from offering an opinion about whether a defendant did or did

4    not have a mental state that's an element of the crime.  And

5    when defense counsel proposes that Dr. Berlin will testify that

6    Mr. Sanders did not have the requisite purpose, that is exactly

7    what he's proposing to have Dr. Berlin testify to, and it's

8    flatly contrary to Rule 704(b).

9          Just as the Court ruled that Dr. Whitney's proposed

10   testimony was inadmissible and would have violated Rule 704(b),

11   to the extent that Dr. Whitney would have testified about a

12   mental state that's an element of the offense, so too

13   Dr. Berlin's testimony, to that extent, is inadmissible pursuant

14   to Rule 704(b).

15         For that reason, because Dr. Berlin's testimony is

16   entirely irrelevant, and it should be excluded.

17         THE COURT:  All right.  Mr. Jeffress -- by the way,

18   what does your mask say on it?

19         MR. JEFFRESS:  It says "D.C. Health Link, Get Covered,

20   Stay Covered."

21         THE COURT:  Well, that's fine.  But for the trial, see

22   if you can wear something that has nothing on it.

23         MR. JEFFRESS:  Absolutely, Your Honor.

24         THE COURT:  One never knows what something like that

25   might evoke from a juror.  Go ahead, Mr. Jeffress.

                                                                    39

 1              MR. JEFFRESS:  Your Honor, first of all, the last thing

 2       that Mr. Schlessinger said, we do not intend on having

 3       Dr. Berlin opine specifically on Mr. Sanders' intent.  We

 4       recognize that's not proper expert testimony, and that's not

 5       what he's going to do.  He's just going to give background facts

 6       on BDSM from which we can argue about to the jury, and will need

 7       in order to make our arguments to the jury that Mr. Sanders did

 8       not have the requisite intent, and that also he wasn't acting

 9       for the purpose of producing a visual depiction of sexual

10       conduct.

11              Now, I know the Court has already written about

12       *McCauley* and *Palomino Coronado*, but we think, Your Honor, that

13       one issue that we can argue here is, Mr. Sanders' purpose, if

14       you look at some of these chats, at least, he's not asking for

15       sexually explicit conduct.  He's asking for a naked photo or

16       he's asking for a photo that has them doing something that's in

17       the nature of BDSM, but he's really not asking for sexually

18       explicit conduct.  And he wasn't acting for the purpose of

19       producing a video.  There's no evidence that he ever distributed

20       the videos to anybody else, there's no evidence that he ever

21       watched the videos again.

22              THE COURT:  The evidence is that he demanded the

23       videos.

24              MR. JEFFRESS:  Demanded the video to confirm that they

25       were doing what they were supposed to be doing in the context of

```
 1    this BDSM game.  So we just need those rules explained.
 2    Dr. Berlin is not going to say that.  But that is part of our
 3    defense, is that the purpose of what he's asking this for is
 4    he's just trying to see that they did what he said, which is
 5    sort of the power dynamic here, like I order you to do
 6    something --
 7              THE COURT:  Are you also saying that what he asked them
 8    to do was not sexually explicit?
 9              MR. JEFFRESS:  Some of it is not.
10              THE COURT:  But some of it is.
11              MR. JEFFRESS:  I don't know, Your Honor.  I have my
12    witnesses.  What I have seen, when he asked for a full live body
13    pic, I don't regard that as sexually explicit conduct, and I
14    don't think it is under *Dost* --
15              THE COURT:  Do you have children?
16              MR. JEFFRESS:  I do, actually, yes.
17              THE COURT:  Never mind that.
18              MR. JEFFRESS:  But just a naked photo of a child, a lot
19    of parents have that, and I think Congress very specifically --
20              THE COURT:  Really?
21              MR. JEFFRESS:  Yeah, like in the bathtub or something
22    like that.  Yeah, I think a lot of parents have that.  I think
23    Congress very specifically and the courts very specifically have
24    endeavored not to criminalize that.  And that's why it has to be
25    lascivious.
```

41

 1          THE COURT:  All right.  Well, I think your point that

 2   it's a jury issue is somewhat well taken.  I'll think about

 3   that.

 4          MR. JEFFRESS:  Thank you, Your Honor.  I think after

 5   the Government's case, it will be even more clear why this needs

 6   to be part of the defense.

 7          THE COURT:  All right.  I think that last point that

 8   you've just made is the one that I find most moving at this

 9   time.  I'm going to do this.  I'm going to issue an order that

10   grants the Government's motion to exclude the testimony

11   because -- of his, on everything but what you've talked about.

12   I'll make it explicit in the order.  And I'll defer that until

13   the conclusion of the Government's case.  Maybe I will know more

14   at that time.

15          But it's very clear that there can be no evidence from

16   this purported expert about autism, about his mental health

17   condition, about his purpose under 704 as to why, in his

18   opinion, he did things.  This doctor says he's a nice person; I

19   don't have any doubt about his being a nice person.  But there

20   won't be any testimony about that.  And there won't be any

21   testimony about consent, that they did it all consensually.

22   Because that is legally irrelevant, and any evidence offered in

23   that regard would be unfairly prejudicial and confusing to the

24   jury.

25          The law says -- and I think, Mr. Jeffress, and I'll ask

1    you, but I think the law is fairly clear that he doesn't have to

2    know that they are juveniles.  Indeed, a mistake of age defense

3    does not apply.  So the Government doesn't have to prove that

4    Mr. Sanders knew they were under age.  They do -- the Government

5    does have to prove beyond a reasonable doubt that they were in

6    fact -- these so-called victims were in fact under age.  And

7    they can do that just by a picture.

8         Indeed, in this last case Mr. Schlessinger tried, they

9    relied very heavily on that, because there were literally

10   hundreds of them and there was no way to identify who they were,

11   nor any way to identify when the pictures were taken.  But it

12   was clear to anybody that these were small children; in some

13   cases babies and in some cases teenagers.  But they were all

14   under age, and the jury had no trouble concluding what.

15        As far as your issue about the standard, of course, as

16   you know, I have written some about the standard.  In the

17   *McCauley* case I used the wrong standard, and I was reversed for

18   that.  And I accept and understand that.  I was wrong, and I

19   should have anticipated that.  It wasn't that difficult.  I

20   don't remember now my exact feeling, but I should have seen that

21   one.

22        However, as you know, I have had a subsequent case in

23   which I have construed the statute in accordance with existing

24   Fourth Circuit precedent to be a motivating factor; that is, a

25   motivating, not the predominant, not the principal one, as you

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA815**

1    argue.  You'll have a chance to argue that anew.  Maybe there

2    will be some new law between now and then.  But at the moment

3    I'm not persuaded that it has to be more than a motivating

4    factor.

5              But anyway, I'll deal with that in this order.

6              MR. JEFFRESS:  Thank you, Your Honor.

7              THE COURT:  And again, of course, maybe I'm wrong

8    again.  But this is the wrong court to persuade me.

9              MR. JEFFRESS:  Your Honor, on mistake of age, I know

10   that's not exactly sort of what we were dealing with, but I

11   think it's very different now.  *Excitement Video* actually said

12   for possession and receipt counts, they do have to prove

13   defendant's knowledge of age.

14             THE COURT:  Oh, tell me that again.  I didn't follow

15   you.

16             MR. JEFFRESS:  The Supreme Court in *Excitement Video*

17   said that they do have to prove --

18             THE COURT:  In which case?

19             MR. JEFFRESS:  *Excitement Video*.

20             THE COURT:  What's the cite on that?  And was that a

21   2252 conviction?

22             MR. JEFFRESS:  I think that case is included in both

23   their jury instructions and in ours, Your Honor, referred to and

24   cited.  But I don't have the cite right in front of me.

25             THE COURT:  And what do you contend that case holds?

44

1          MR. JEFFRESS:  For possession or for receipt charges,
2    which Mr. Sanders is charged with, the Government -- the jury
3    does have to find that Mr. Sanders understood that material to
4    be -- yeah, here it is, Your Honor.  513 U.S. 64, and it's from
5    1994.  But the Government does have to prove that knowingly
6    meant knowingly that it was -- that the minors were under age.
7          THE COURT:  All right.
8          MR. JEFFRESS:  Okay.  Now, production, they argue
9    there's a different rule for production.  But there should not
10   be a different rule for production.  The reason why there's a
11   different --
12         THE COURT:  That you should address up the road here at
13   that building --
14         MR. JEFFRESS:  Yes, I just want to make sure our
15   objection is noted, Your Honor.  We've already litigated this
16   issue and already said that.
17         THE COURT:  All right.  But I'm glad to have your
18   reminding me of that, because we had that in your case as well,
19   Mr. Schlessinger.  They had to know, in the receipt and the
20   possession case, that they were minors.  It was a little easier
21   for you to show because of the obviousness of the pictures.  But
22   I think Mr. Jeffress is right, that for possession, it has to be
23   knowing.  Is that right, Mr. Schlessinger?
24         MR. SCHLESSINGER:  That is right, Your Honor.  And
25   perhaps it will be helpful to note for the Court that the

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA817**

45

1    possession count in this case pertains to child pornography that

2    is not the same child pornography that was produced with these

3    minor victims, but other child pornography, much of which

4    involves victims of similar age to those in the last case; that

5    is to say, very young victims.

6              THE COURT:  All right.

7              MR. JEFFRESS:  The receipt count, though, Your Honor,

8    does include material from older -- you know, the same victims

9    that are discussed in the production counts.

10             THE COURT:  Does that also include others?

11             MR. JEFFRESS:  I believe it does.

12             THE COURT:  Well, I'll have to make all that clear in

13   instructions to the jury.

14             All right.  This is helpful.

15             MR. JEFFRESS:  Thank you, Your Honor.

16             THE COURT:  Now, Mr. Schlessinger, you have a lot of

17   evidence that you wish to admit from computers or telephones.

18   Right?

19             MR. SCHLESSINGER:  Yes, we do, Your Honor.

20             THE COURT:  All right.  Well, you need to be sure --

21   are there any stipulations about admissibility?

22             MR. SCHLESSINGER:  We've proposed a stipulation.  I

23   don't believe we've received a response from defense.

24             THE COURT:  They're not required to stipulate anything.

25   So you need to be prepared to dot every "I" and cross every "T,"

46

1    because I don't want to have to take time, in the course of the

2    trial, to hear objections that could have been obviated.  So I

3    think you can assume that every objection that can be made will

4    be made.

5            MR. SCHLESSINGER:  Yes, Your Honor.

6            THE COURT:  All right.  Anything else at this time?

7    Just a moment.

8            Mr. Schlessinger, I understand that you have requested

9    that these monitors be turned off.  Is that to preserve the

10   privacy of the minor victims?

11           MR. SCHLESSINGER:  Yes, Your Honor.  Because unlike in

12   the last case, we're not only going to have child pornography

13   exhibits in the case, but we're also going to have exhibits that

14   contain information identifying minor victims.  And for that

15   reason --

16           THE COURT:  Like birth certificates?

17           MR. SCHLESSINGER:  Yes.

18           THE COURT:  How do the birth certificates come in?

19           MR. SCHLESSINGER:  They're self-authenticating and

20   there's a special hearsay exception for records of births and

21   deaths, I believe.

22           THE COURT:  And have you made that information known to

23   Ms. Ginsberg?

24           MR. SCHLESSINGER:  Yes.

25           MS. GINSBERG:  Judge, I think that was a subject of a

47

```
1     prior motion.  And the Government has -- as I reread the
2     transcript, the Government, um, acknowledges that it is going to
3     have to produce a witness who can connect the name in the birth
4     certificate with the person who is the victim in this case.  A
5     birth certificate that's self-authenticating is not relevant for
6     any purpose unless it's connected -- unless it can be connected
7     to the victims.
8              THE COURT:  All right.
9              MS. GINSBERG:  So whether they do it through parents or
10    someone else who has seen and met with the victim, um, we don't
11    know how they're going to do that.  But we don't agree that --
12    we think that has to happen.  That's part of what would make it
13    admissible.
14             THE COURT:  All right.  Mr. Schlessinger, what's your
15    response to that?  Are you prepared to cover that?
16             MR. SCHLESSINGER:  Yes, Your Honor.  There will be --
17    that will be covered in the fashion envisioned by defense
18    counsel for four out of the five charged minor victims, and
19    there is a fifth charged minor victim as to which we anticipate
20    resting on the evidence that's going to be presented as to the
21    devices; that it is a real minor and it is a person under the
22    age of 18.  And we think it will be evident from that.
23             THE COURT:  So for the birth certificates, what are you
24    going to present?
25             MR. SCHLESSINGER:  For the birth certificates, we
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA820**

48

1    intend to introduce the birth certificates --

2         THE COURT:  Right.  But she says it's not relevant

3    unless it's tied to a particular victim.  The name won't be

4    enough, apparently.

5         MR. SCHLESSINGER:  Right.  And I think for four of the

6    five victims, the testimony of the type that Ms. Ginsberg

7    anticipated will be presented during the trial.

8         THE COURT:  All right.  Anything else on behalf of the

9    Government that I need to cover in this matter, Mr. Prabhu?

10        MR. PRABHU:  Yes, Your Honor.  An issue related to one

11   of our witnesses has been raised with us, and we felt that we

12   needed to present it to the Court.

13        The mother of one of the minor victims has been

14   receiving contact from the defense, which obviously they're

15   entitled to do, but she has informed the Government that she

16   told them that she did not want to expose her child to any

17   questioning by the defense, and that they should stop calling.

18   She has complained to us that the calls keep coming, that they

19   come from different numbers, different people.  She's had to

20   block numbers because of continued, what she views as

21   harassment.

22        We don't have any independent knowledge of that, but

23   this is what our minor victim's mother has told us.

24        THE COURT:  Is she going to be a witness?

25        MR. PRABHU:  She is not.  Her son is.  And the

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA821**

49

1    additional issue there is that she is feeling harassed, and

2    she's not the witness, she's the mother of the witness.

3          But she had two conversations, apparently, with a

4    member of the defense, and in one of them she was told that it

5    was in the child's interest to meet with the defense because

6    they were going to come very hard at him when he is testifying.

7    I just refer the Court to the previous discussion about consent

8    and circumstances and the age of the minor.  Those are the

9    things that they would likely be asking him about, and that's

10   inappropriate.

11         But the fundamental point is, she, independently of

12   us -- we certainly did not encourage her not to meet with the

13   defense, but she has made that decision, and would like it on

14   the record that she's refused that contact, and she believes

15   what she terms as harassment should stop.

16         MS. GINSBERG:  Judge, I would like to address that.

17   Because I was on both of those calls, among other people.  We

18   spoke with this witness' mother, we explained who we were, that

19   we were asking her permission to speak with her son.  We had a

20   conversation that was very short; she said that she didn't think

21   it was in his interest, she would think about it, and we asked

22   her if we could call her back and ask her again.  And she said

23   that we could, that she would speak with her son's therapist,

24   see if it was advisable.

25         We did call her back a second time; she told us at the

50

1    very beginning of that call that she has been told that she does

2    not and her son do not have to speak with us.

3            THE COURT:  That's true.

4            MS. GINSBERG:  Of course it's true.  I assume that she

5    meant - and I may be wrong - but that she was told by the

6    Government or someone on the Government's behalf that they did

7    not have to speak with us.  And we said that's right.

8            We asked her if she would reconsider; she said no.  The

9    call was very short.  She almost hung up on us.  But there was

10   never --

11           THE COURT:  I don't see anything for the Court to do,

12   Mr. Prabhu or Ms. Ginsberg.

13           MS. GINSBERG:  I don't either.  But if she felt

14   harassed, she may have because she is very protective of her

15   son.  But I want to assure the Court that we were extremely

16   careful, we had a witness who is not a lawyer --

17           THE COURT:  All right.  I don't doubt that,

18   Ms. Ginsberg.

19           MS. GINSBERG:  Thank you.

20           THE COURT:  But I also -- you can understand how she

21   might see things differently.

22           MS. GINSBERG:  Of course.

23           THE COURT:  But I'm glad to have your statement about

24   what happened.  I'm sure you would never harass a person like

25   that, so I don't feel that there's any need for the Court to do

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

51

 1    anything.

 2              Do you, Mr. Prabhu?

 3              MR. PRABHU:  No, Your Honor.  I brought it to the

 4    Court's attention at the request of the victim's mother.  And I

 5    felt we had a duty to do that.

 6              THE COURT:  All right.  Right.  And the most you ought

 7    to tell her is that it was brought to my attention.  That's the

 8    end of it.  I don't plan to do anything further.

 9              Anything else on behalf of the Government today?

10              MR. SCHLESSINGER:  No, Your Honor.

11              THE COURT:  Anything else on behalf of the defendant

12    today?

13              MS. GINSBERG:  One thing.  Your Honor asked me to

14    remind you about the problem that we have of anticipating who

15    can be prepared to cross-examine a given agent who is going to

16    offer testimony about these victims' chats.  The chats for some

17    of these victims are as long as a thousand pages.  The

18    Government is not intending to offer a thousand pages, but there

19    are portions of those chats that we believe are relevant and

20    admissible --

21              THE COURT:  In fact, the Government has already filed

22    their exhibits, have they not?

23              MS. GINSBERG:  They have.

24              THE COURT:  So you know.

25              MS. GINSBERG:  But, Your Honor, we are not bound by the

52

```
1      Government's exhibits.  And I think the cases -- um, the

2      defendant has the right to put context around these statements,

3      and Palomino is very clear that just the fact of taking a

4      picture of a minor, or in this case, because the minor took the

5      picture himself, basically asking them to do that is not enough

6      to convict.  That there is context that the defendant's intent,

7      in requesting the taking of the picture --

8              THE COURT:  What does that have to do with what you're

9      asking me -- are you asking the Court to tell the Government

10     that they have to tell you now which witness is going to do

11     which --

12             MS. GINSBERG:  Judge, I wish I was asking that, because

13     I'm going to ask something that's probably going to irritate the

14     Court more.  But I am asking the Court to allow -- if the

15     Government elects to have one witness testify about victims that

16     have been -- that different lawyers have prepared for, to allow

17     different lawyers to cross-examine on those particular victims.

18             THE COURT:  It doesn't irritate me, but I'm not going

19     to do it.

20             MS. GINSBERG:  Judge, I will say, and respectfully,

21     that I don't think under those circumstances I can be effective,

22     because I cannot personally prepare to cross-examine --

23             THE COURT:  Well, that's your problem.

24             MS. GINSBERG:  -- all of -- well, it will be

25     Mr. Sanders' problem.
```

53

```
 1              THE COURT:  Yes.  I'm not going to do it any other way.
 2    It's just not necessary.  Your client wants to talk to you.
 3              MS. GINSBERG:  Your Honor, what we're essentially
 4    asking is to allow one attorney per victim, to cross-examine per
 5    victim.
 6              THE COURT:  All right.  That might be a better way to
 7    do it.  You should listen to your client more often.
 8              MS. GINSBERG:  I should.  I think he thinks I should
 9    listen to him more often than I do.
10              THE COURT:  Well, he may be right.
11              MS. GINSBERG:  He may be.  But that is what I was
12    trying to say.  Because the Government may introduce its
13    evidence about more than one victim through the same witness, we
14    would like to be able to have a lawyer -- one lawyer
15    cross-examine per victim.  And if that means that the Government
16    is having an agent who is testifying about two victims, that it
17    could be that one lawyer, one victim --
18              THE COURT:  What is it that's cross-examining an FBI
19    agent about a victim?
20              MS. GINSBERG:  Maybe I...Your Honor, there are five
21    victims for the production charges.
22              THE COURT:  Yes.
23              MS. GINSBERG:  Only two of them are going to be in
24    court.
25              THE COURT:  All right.
```

54

 1          MS. GINSBERG:  It is our assumption --

 2          THE COURT:  But with respect to the others who are not

 3   going to be in court, what does an FBI agent know that isn't on

 4   the -- isn't in the exchanges and the chats?

 5          MS. GINSBERG:  Well, it's through the FBI agent that

 6   the Government will put on those chats.  And these agents have

 7   reviewed the entire body of the chats.  I mean, they've taken

 8   out certain portions, but these agents extracted these chats,

 9   they are familiar with the content of these chats, some of which

10   are longer than a thousand pages --

11          THE COURT:  They're not going to introduce a thousand

12   pages.  You keep arguing, well, we have the right to add other

13   material to show context.  And you do.  And I'll consider that.

14   I haven't heard anything that requires the Government to put on

15   a single -- I told you you should listen to him --

16          MS. GINSBERG:  I know.  But he's pointing to the entire

17   hard drive.

18          THE COURT:  I won't castigate you for interrupting me

19   and doing it.  Go ahead.  What do you want to say?

20          MS. GINSBERG:  What I want to say is that the

21   Government is introducing the entire chats.  They may elicit

22   testimony about a smaller volume of those chats.

23          Out of the greater volume, we are entitled to question

24   the agent who has knowledge of these chats about other portions

25   of the chats as they relate to Mister --

55

1      THE COURT:  All he knows or all she knows is what the

2  chat says.

3      MS. GINSBERG:  That's right.  But we need to be able to

4  pick from among those chats the relevant portions that we would

5  use to cross-examine them, to put the chats the Government has

6  selected into context and to --

7      THE COURT:  What can an FBI say about context?

8      MS. GINSBERG:  He can say yes -- judge, we have to have

9  a witness from whom we can elicit these other chats.  The other

10 chats put the Government's chats into context.

11     THE COURT:  All you have to do is designate those other

12 chats, and then you can argue that they're necessary for

13 context.  The Government will then be heard and I'll make a

14 ruling.  And if they come in, they come in.  But I don't see

15 what an agent has to do with it.

16     MS. GINSBERG:  Well, judge, wouldn't they come in

17 through the agent?  Otherwise, if we did what Your Honor is

18 suggesting, the Government could just give the jury a transcript

19 of the chats they want, we could give the jury transcripts.  I

20 mean, that's not how I envision the trial occurring.

21     I think the Government is going to ask the agents

22 whether they extracted these chats, whether they're familiar

23 with them, whether they're accurate, and then have them, through

24 the agent, put up on the monitors, and either have the agent

25 read them out loud or have the jury read them while the agent is

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA828**

56

1      on the stand.

2            And we ought to be able to do that with respect to

3      other portions of the chats so that the jury -- I did not

4      envision just designating portions of chats and giving it to the

5      jury in the jury room.  We have to have a witness --

6            THE COURT:  Mr. Schlessinger, what's your view on how

7      to deal with this?  She says she can't prepare for all of this.

8            MR. SCHLESSINGER:  Your Honor, the chats that defense

9      counsel has alluded to were provided to defense counsel in

10     discovery over one year ago.

11           If Your Honor recalls, the last case that Your Honor

12     tried last week, there were multiple chats in that case, and

13     there was a single defense counsel who was able to cross-examine

14     a testifying FBI agent --

15           THE COURT:  It wasn't even a law firm.  It was one

16     lawyer.

17           MR. SCHLESSINGER:  That's correct, Your Honor.

18           THE COURT:  He did a pretty good job.  In fact, he won

19     an acquittal on one of the three counts.

20           MR. SCHLESSINGER:  He did an outstanding job,

21     Your Honor.

22           THE COURT:  How long are these chats that you intend to

23     offer?

24           MR. SCHLESSINGER:  They vary widely.  Some of them are

25     quite short, in the tens of pages; some of them are hundreds of

57

 1    pages.

 2            THE COURT:  Why would you need a chat that's hundreds

 3    of pages long?

 4            MR. SCHLESSINGER:  We do not.  And we didn't intend to

 5    read to the jury, publish, or otherwise dwell on hundreds of

 6    pages.  It was our idea, our thought to at least admit the

 7    entire chats, quite honestly, simply to inoculate ourselves

 8    against any charge of hiding the ball or providing less than

 9    full context.

10            So it was our thought to admit them, certainly without

11    publishing all of them or even the majority of the very long

12    ones, but only the certain portions that are relevant to the

13    charges.  And I think defense counsel will be fully able to

14    cross-examine the witness about any chats that are --

15            THE COURT:  The defense counsel can't do anything other

16    than elicit from the agent what the other portions of the chats

17    say that are admitted for context or for completeness.  Right?

18    I mean, the agent can't do anything but read -- how is it that

19    you're going to put on what you want?  The agent would read it?

20            MR. SCHLESSINGER:  That's your intention, Your Honor,

21    yes.  Again, only small portions.

22            THE COURT:  I think I have a solution to this, but it

23    isn't going to be multiple lawyers, Ms. Ginsberg.  But let me

24    see if I can deal with this.

25            (OFF THE RECORD.)

58

```
 1              THE COURT:  I'll tell you in a moment how I intend to
 2     deal with this problem.
 3              Yes?
 4              MR. SIRKIN:  Your Honor, there is one thing I would
 5     like to point out to the Court.  The indication that merely the
 6     person may have been under the age of 18 and they could not have
 7     consented, there are other statutory provisions in the U.S. Code
 8     that say the age of consent is 16.  And there are very many
 9     variations throughout the country of the age of consent for
10     engaging in voluntary --
11              THE COURT:  I'm only interested in federal statutes.
12              MR. SIRKIN:  Well, the federal statutes, the
13     transporting across state lines for the purpose of sexual
14     activity and so forth, is 16.  And there are perhaps other
15     provisions in the federal code that provide that the age of
16     consent is 16.
17              THE COURT:  Now, I'm fine with your telling me the
18     this.  And you're Mr. Sirkin.  I'm glad that you have told me
19     this.  It's useful.  But it violates my rule that only one
20     lawyer can stand up.
21              MR. SIRKIN:  I understand that.  I understand that.
22              THE COURT:  I'm not going to chastise you for that
23     because we're beginning this.
24              Anything else you want to tell me, Mr. Sirkin?
25              MR. SIRKIN:  No, Your Honor.
```

59

```
 1          THE COURT:  Is there anything -- let me go back to you,

 2   Mr. Schlessinger.  You haven't addressed in any pleading that

 3   I've read, because I don't think you're on notice, that they

 4   intend to rely on statutes other than what might be -- well, let

 5   me ask you this.  What do you intend to rely on in order for me

 6   to instruct the jury that what does minor mean?

 7          MR. SCHLESSINGER:  Section 2256.  I don't recall the

 8   precise subsection, but it defines all the terms for Chapter 110

 9   of the U.S. Code, and defines minor as being a person under the

10   age of 18 years.  It does not matter that other statutes

11   prohibit conduct solely with respect to people under 16.

12          THE COURT:  All right.  I don't have before me,

13   Mr. Sirkin, right now any issue that makes me choose between

14   what you've said and what Mr. Schlessinger has said.  But at

15   least you both know what positions you may take.  I think it's

16   pretty significant that the specific chapter in the code has its

17   own decision about what's a minor.

18          Did you want to offer anything else, Mr. Sirkin?  I

19   take it you need to confer.  In this court, when you need to

20   confer, you ask for permission to do so.

21          MR. SIRKIN:  I was just indicated, I think in

22   Ashcroft vs. Free Speech, the Court talked about the age of

23   consent in the New York statute was 16.  I know the Court had

24   indicated you're only interested in federal law, but I think

25   there's another case in which the U.S. Code, in a recent case
```

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA832**

60

1   of -- it appears at 137 Supreme Court 1562, where they mention

2   that the act of sexual abuse of a minor is 16.

3             THE COURT:  All right.  But you understand that this

4   statute of the code has its own definition of a minor.  What's

5   your response to that?

6             MR. SIRKIN:  It's what the statute says.  I can't

7   disagree with that.

8             THE COURT:  Am I not bound by what that statute says?

9             MR. SIRKIN:  Well, we think that there's some dispute

10  with that, but that's for another day.

11            THE COURT:  Well, I wouldn't be optimistic about that

12  other day, in view of the fact that this particular statute has

13  its own definition.

14            MR. SIRKIN:  Consistent -- as I say, I think it's

15  something that we will in the future argue.  Perhaps not in this

16  case, but on appeal or in other cases.

17            THE COURT:  All right.  Well, you can bring it to my

18  attention and the reasons for it; otherwise, an appellate court

19  will say you didn't raise it.

20            MR. SIRKIN:  Specifically, the age of consent is

21  different than the age of a minor.

22            THE COURT:  All right.  I understand that.

23            Mr. Schlessinger, do you want to respond to that?

24            MR. SCHLESSINGER:  The only definition we're concerned

25  with is the definition of minor as defined -- for purposes of

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA833**

61

1    Chapter 110 of the U.S. Code, all of the crimes with which

2    defendant is charged are violations of Chapter 110 of the

3    United States Code; and Section 2256, which is in Chapter 110,

4    specifically Subparagraph 1, says:  "For the purposes of this

5    chapter, the term 'minor' means any person under the age of

6    18 years."

7          THE COURT:  All right.  But then we go to the law on

8    when consent is relevant or irrelevant.  And he's saying that,

9    okay, so a minor is a person under the age of 18, and Mr. Sirkin

10   knows he doesn't have any traction to argue against that.  But

11   he says that the age of consent is different from the definition

12   of a minor.

13         MR. SCHLESSINGER:  The crimes with which Mr. Sanders

14   are charged do not reference any age of consent.  There's no --

15   it does not matter what the age of consent is in any federal --

16         THE COURT:  If they're minors, they can't consent.

17   That's your view?

18         MR. SCHLESSINGER:  Our view is that minor is

19   statutorily defined as a person under the age of 18 years for

20   all of the crimes with which Mr. Sanders is charged.

21         THE COURT:  Yes, but you didn't listened to what I

22   said.  I threw you a softball and you muddled it.

23         So consent, in your view, is defined by the statute --

24   or not defined by the statute.  But consent, in your view, does

25   not apply to a person under the age of 18?

62

1          MR. SCHLESSINGER:  Yes, that is right.

2          THE COURT:  All right.  I understand that.

3          Last, Mr. Sirkin?

4          MR. SIRKIN:  It is our position that if the child is of

5     the age of consent, then there's been no underlying crime

6     committed that was filmed because they were able to consent to

7     the sexual activity that was engaged in.  And therefore, to film

8     or record a lawful act, just a lawful act being transmitted,

9     cannot constitute a crime under the Fifth Amendment.

10         THE COURT:  All right.  Thank you, I understand that

11    argument.

12         All right.  Court will stand in recess.  We'll take up

13    the --

14         MS. GINSBERG:  Judge, were you going to give us

15    whatever decision you had about how we cross-examine that I

16    wasn't going to be happy with?

17         THE COURT:  Yes.  I'm not going to allow different

18    lawyers to do it.  I'm going to consider - I may put something

19    in an order - how you may resolve it, but I don't see it as a

20    problem, Ms. Ginsberg.  You've told me that you consider it a

21    very significant problem.  I don't.

22         MS. GINSBERG:  I understand.

23         THE COURT:  And I may not see it fully, but it seems to

24    me you've had these materials for years; you ought to be able to

25    tell me -- maybe I'll consider, Mr. Schlessinger, you don't

63

1    really intend to offer all of these chats or all portions of it,

2    just smaller portions of it.  Right?

3            MR. SCHLESSINGER:  We did intend to offer the entirety

4    of them, but simply to show the jury a small portion of them.

5            THE COURT:  So Ms. Ginsberg already knows what chats

6    you want to offer?

7            MR. SCHLESSINGER:  Yes.

8            THE COURT:  So she already knows or has the ability to

9    decide how much in addition to that she thinks should be

10   admitted for purposes of completeness.  Right?

11           MR. SCHLESSINGER:  Yes.

12           THE COURT:  Ms. Ginsberg, you already know that.

13           MS. GINSBERG:  I do know that.  Well, again, until we

14   hear which portions the Government is going to present to the

15   jury, it's very difficult to anticipate exactly which other

16   portions we want to use.

17           This would never be a problem if the individual victims

18   were all testifying, because we could divide up victim by

19   victim.  That's the situation we're in, Your Honor.

20           THE COURT:  Okay.  I'm not going to rule on that today.

21   I don't see any need to require the Government to parcel it out

22   or for you to have separate lawyers do it.  But I'll think about

23   it some more, and if I can conceive of how to do it.

24           But it seems clear that the Government has already told

25   you what statements it wants to argue -- or admit.  I take it,

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA836**

64

1     though, Mr. Schlessinger, you haven't told them precisely what

2     parts you want to elicit from the witness?

3             MR. SCHLESSINGER:  We have.  Because they're separated

4     out as separate exhibits, access to which defense has already

5     been granted.

6             THE COURT:  And does the defense know which agent is

7     going to testify to which victim?

8             MR. SCHLESSINGER:  That I do not -- no, I do not think

9     they do.

10            THE COURT:  All right.  Nor do I think it would make

11     any difference to the defendant.  Because all he's going to do

12     is be able to read it.  Right?

13            MR. SCHLESSINGER:  That's right.

14            THE COURT:  Last chance, Ms. Ginsberg.

15            MS. GINSBERG:  It would make a difference if we knew.

16     And --

17            THE COURT:  I'm not going to require that.

18            MS. GINSBERG:  Well, Your Honor, what we may have to do

19     is call these agents as our own witnesses.  And I was just

20     trying to avoid having to do that.

21            THE COURT:  That's something you have the ability to

22     do.

23            MS. GINSBERG:  Thank you.

24            THE COURT:  Anything further from the Government?

25            MR. SCHLESSINGER:  No, Your Honor.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA837**

65

1          THE COURT:  Anything further from you, Ms. Ginsberg?

2          MS. GINSBERG:  No.

3          THE COURT:  All right.  I'm going to take a 30-minute

4    recess.  I'll reconvene at 10 minutes to 2:00 and take up first

5    the Gant matter.

6          (Off the record at1:20 p.m.).

7

8

9

10

11

12

13

14

15

16

17              **CERTIFICATE OF OFFICIAL COURT REPORTER**

18

19          **I, Rebecca Stonestreet, certify that the foregoing is a**

20    **correct transcript from the record of proceedings in the**

21    **above-entitled matter.**

22

23

24    **_____//Rebecca Stonestreet_____          __12/14/21___**

25    **SIGNATURE OF COURT REPORTER                    DATE**

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**JA838**

# Exhibit 6

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 20-cr-10012-IT |
| | ) | |
| v. | ) | ***LEAVE TO FILE REDACTED MEMO &*** |
| | ) | ***EXHIBITS A-G, I-J UNDER SEAL*** |
| | ) | ***GRANTED ON 12/27/21*** |
| PAUL BATEMAN | ) | |

### MOTION TO SUPPRESS EVIDENCE

The defendant, Paul Bateman, pursuant to Fed. R. Crim. P. 12 and the Fourth Amendment,

respectfully moves this Court to suppress all evidence and illegal fruits obtained pursuant to the

invalid search warrant issued in this case because the warrant was not supported by probable cause.

Mr. Bateman also moves for a *Franks* hearing, as the affiant made material misstatements that

were necessary to a finding of probable cause and omissions that, if included in the affidavit, would

have vitiated probable cause.

### STATEMENT OF FACTS[1]

#### I.    The Search Warrant

On December 11, 2019, Homeland Security Investigations ("HSI") Special Agent Gregory

Squire submitted an application for a search warrant to the U.S. District Court of Massachusetts.

*See* Search Warrant Affidavit (attached as Exhibit A). Agent Squire sought authorization to search

Mr. Bateman's home located in Bridgewater, Massachusetts for evidence, fruits, and

instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(1) (Attempted Receipt of Child

Pornography) and 2252A(a)(5)(B) and (b)(2) (Access with Intent to View and Possession of Child

Pornography, and attempt). Ex. A at ¶ 4.

---

[1] The facts in this section are drawn from the discovery provided by the government. By repeating the
facts here, Mr. Bateman does not adopt them as true.

1

**JA840**

The affidavit submitted in support of the search warrant contains just one allegation of criminal activity. Specifically, Agent Squire stated:

> In the course of this investigation, a foreign law enforcement agency (hereinafter, "FLA") known to U.S. law enforcement and with a history of providing reliable, accurate information in the past, notified U.S. law enforcement that FLA had determined that on April 30, 2019 at 10:38:18 UTC, IP address 73.142.30.140 was used to access online child sexual abuse and exploitation material via a website.

*Id*. at ¶ 23. Agent Squire went on to state that "[a]ccording to the FLA, the website had an explicit focus on the facilitation of sharing child abuse materials (images, links and videos), emphasis on BDSM, hurtcore, gore and death-related material including that of children." *Id*. He noted that "[u]sers were required to create an account (username and password) in order to access the majority of the material." *Id*. Furthermore, he stated that the "FLA provided further documentation naming the site…as Website A".[2] *Id*. The affidavit did not include any allegations that the IP address was used to create an account on the website in question. Nor did it include any information about what material was allegedly "accessed" or what section of the website the internet user associated with that IP address had visited.

Agent Squire claimed that Website A was a "child pornography online bulletin board dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children" that operated from around September 2016 to June 2019. *Id*. at ¶ 14-15. Noticeably absent from the affidavit, but ultimately disclosed by the government and otherwise known from cases arising out of the same investigation, is that Website A's operation ceased in June 2019, when its server was seized by an as-yet-unidentified FLA.[3]

---

[2] Agent Squire noted in the affidavit that the FLA "referred to the site by its actual name, not the pseudonym [Website A] used for the purposes of this warrant." Ex. A at ¶ 23, fn. 7. The government has since disclosed that the website was called ████████.

[3] *See e.g. United States v. Kiejzo*, 4:20-cr-40036-TSH, D.E. 117-1 at pg. 3 (D. Mass. Oct. 19, 2021). The government in the instant case confirmed that both the instant case and *Kiejzo* arose out of the same

2

Agent Squire explained that Website A was a "hidden service" website that operated on the Tor network, a free and legal computer network "available to internet users that is designed specifically to facilitate anonymous communication over the internet." *Id*. at ¶ 6, 11. Agent Squire also included a description of how the Tor network operates and how information is anonymized on the network. *Id*. at ¶ 7-13. Specifically, Agent Squire noted that "the Tor network attempts to [facilitate anonymous communication over the internet] by routing Tor user communications through a globally distributed network of intermediary computers, or relays, along a randomly assigned path known as a 'circuit.'" *Id*. at ¶ 6. Agent Squire acknowledged that because of this process, "traditional IP address-based identification techniques are not effective." *Id*.

In the section of the affidavit discussing the tip, Agent Squire claimed that the FLA advised "that it had obtained that information through independent investigation that was lawfully authorized in FLA's country pursuant to its national laws." *Id*. at ¶ 25. In a footnote, Agent Squire averred that the FLA (since identified as the ███████████████████████████) was a "national law enforcement agency of a country with an established rule of law" and that there was a "long history of U.S. law enforcement sharing criminal information with FLA and FLA sharing criminal investigation information with U.S. law enforcement." *Id*. at ¶ 23, fn. 6. He further noted that the FLA had "advised U.S. law enforcement that FLA had not interfered with, accessed, search or seized any data from any computer in the United States in order to obtain that IP address information." *Id*. at ¶ 25. He averred that "U.S. law enforcement did not participate in the investigative work through which FLA identified the IP address." *Id*. Finally, Agent Squire alleged that prior tips provided by the FLA had "(1) led to the identification and arrest of a U.S.-

---

investigation, and also confirmed via email in December 2021 after specific inquiry that there was another, separate FLA local to the server host country that conducted the seizure of Website A's server – an FLA distinct from the tip-providing FLA referenced throughout Agent Squire's affidavit.

3

**JA842**

based child pornography producer and hands-on offender, and the identification and rescue of multiple U.S. children subject to that offender's ongoing abuse; (2) led to the seizure of evidence of child pornography trafficking and possession; and (3) been determined through further investigation to be related to targets that U.S. law enforcement investigation had independently determined were associated with child pornography trafficking and possession." *Id*. at ¶ 26. Again, these averments were only made with respect to the tip-providing FLA, as there was no such mention or averment made as to the as-yet-unidentified FLA that seized the server.

According to the affidavit, the only thing that U.S. law enforcement did in response to the tip from the FLA was to send a subpoena to Comcast Communications for subscriber information related to the IP address. *Id*. at ¶ 27. Comcast provided law enforcement with a physical address – ███████████████ – associated with the IP address. *Id*. Agent Squire, after reviewing commercial databases, property records, and RMV records, indicated that Mr. Bateman owned a condo at that address and that he resided there with an adult female. *Id*. at ¶ 28-29. Agent Squire also noted that on December 10, 2019, an HSI Task Force officer conducted surveillance on the condo and observed the cars at the residence that were registered to Mr. Bateman and the woman who allegedly lived with him. *Id*. at 29-30.

A search warrant to search Mr. Bateman's home was issued on December 11, 2019. *See* Search Warrant (attached as Exhibit C). The warrant was executed the next day. Based on the evidence discovered at Mr. Bateman's home, Mr. Bateman was arrested and a complaint was filed alleging violations of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(a)(5)(B) (receipt and possession of child pornography). On January 16, 2020, Mr. Bateman was charged via indictment with one count of receipt of child pornography and one count of possession of child pornography.

4

**JA843**

## II.    Information Recently Disclosed by the Government

On December 20, 2021, in response to a specific request by the defense, the government disclosed to defense counsel that the FLA that provided the tip to U.S. law enforcement (now known to be the ███████████) and the FLA that seized the server that hosted Website A were not just different FLAs, but from different countries altogether. The government further disclosed that the FLA that seized the server was local to the server host country (not ████ ████). The government has declined to identify the second FLA or the server host country. None of this information was included in Agent Squire's affidavit.

## ARGUMENT

### I.    The Warrant Was Not Supported By Probable Cause.

The Fourth Amendment of the United States Constitution guarantees the right to be secure against "unreasonable searches and seizures" and requires that no warrants issue "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. Am. IV. "With limited exceptions, it requires police officers to secure a search warrant supported by probable cause prior to effecting a search or seizure." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013).

Probable cause to issue a search warrant exists when "given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Id*. at 239. This Court is tasked with "ensur[ing] that the magistrate had a substantial basis for ... concluding that probable cause existed." *Id*. at 238-39.

5

**JA844**

When an affidavit relies on information provided by a confidential informant, "the affidavit must provide some information from which a magistrate can credit the informant's credibility." *Gifford*, 727 F.3d at 99. The First Circuit applies the following non-exhaustive factors in assessing probable cause:

> (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

*United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011).

Here, the affidavit submitted in support of the search warrant failed to establish a "fair probability" that evidence of a crime would be found in Mr. Bateman's home. *Gates*, 462 U.S. at 238-39. The affidavit relied entirely on one unsubstantiated and stale allegation of criminal activity by an unidentified foreign law enforcement agency. The affidavit failed to include any information as to how the FLA came across that information, how reliable the method the FLA used to obtain the information was, and whether the IP address was obtained through first-hand knowledge or through other sources. Without more information about the source of the FLA's tip and without additional corroboration, the months-old tip was not sufficient to establish probable cause, and Agent Squire could not possibly have assessed the probable significance of the tip.

**a. The Tip Was Insufficient To Establish Probable Cause.**

The factors outlined by the First Circuit in *Tiem Trinh*, 665 F.3d at 10, are instructive in this case because the tip that forms the entire basis of probable cause in the affidavit came from a confidential source akin to an informant. Those factors, although non-exhaustive, weigh in Mr. Bateman's favor. Agent Squire's affidavit is deficient because 1) it fails to establish the basis of

6

**JA845**

knowledge for the tip and whether it was obtained through first-hand knowledge or through hearsay (factors 1 and 2 in the *Tiem Trinh* analysis), and 2) it reflects no attempts from any U.S. law enforcement agency to corroborate the tip from the unidentified FLA (factor 3 of *Tiem Trinh*).

### i. The Affidavit Fails to Establish the Basis of Knowledge for the Tip.

The affidavit is deficient because it failed to establish the basis of knowledge for the tip in two respects. First, Agent Squire did not include any information about whether the tip was obtained through first-hand knowledge or through hearsay. Second, Agent Squire included no facts about the method used to obtain the IP address information and whether that method was reliable.

The only information provided in the affidavit that offered any clues about the source of the FLA's tip were Agent Squire's statements that the FLA "had obtained [the information in the tip] through independent investigation that was lawfully authorized in FLA's country pursuant to its national laws," and that "FLA had not interfered with, accessed, searched, or seized any data from any computer in the United States in order to obtain that IP address information." Ex. A, ¶ 25. However, neither statement by Agent Squire was sufficient to assure the Magistrate of the tip's reliability. Agent Squire did not state that the IP address information had reached the FLA through a reliable first-hand source rather than through multiple layers of hearsay. *Cf. Gates*, 462 U.S. at 234 (noting that the informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed *first-hand*, entitles his tip to greater weight than might otherwise be the case"); *United States v. Taylor*, 985 F.2d 3, 5-6 (1st Cir. 1993) (noting that an affidavit may support an informant's veracity "through the very specificity and detail with which it relates the informant's *first-hand* description of the place to be searched or the items to be seized"). Nor did Agent Squire aver that *no* FLA had "interfered with, accessed, searched, or seized any data from any computer in the United States." Ex. A, ¶ 25. Instead, Agent Squire left the

7

**JA846**

Magistrate to guess at how the FLA had obtained the information and to merely ratify Agent Squire's conclusion that the tip was a reliable one.

The First Circuit has found that a lack of explanation of the basis of knowledge for an informant's tip undermines a finding of probable cause. *Gifford*, 727 F.3d at 99-101. In *Gifford*, an informant told the affiant that the defendant was growing marijuana at his house. *Id*. at 95. However, the affidavit included no information about the informant's basis of knowledge for the tip. It was therefore unclear "whether the informant just happened to view the grow operation, heard about it as hearsay, or had direct, first-hand knowledge of the grow operation in the Gifford home." *Id*. at 100. Because the affidavit lacked any "statements as to the informant basis of knowledge," there was no means for the magistrate to determine "whether that information was obtained first-hand or through rumor." *Id*. The lack of any information about the source of the informant's knowledge weighed against a reliability finding in *Gifford*.

The facts of this case mirror those in *Gifford* and compel the same conclusion. As in *Gifford*, it is entirely unclear how, when, and through what method the FLA that provided the tip learned about the IP address. Without that information, there was no basis for the magistrate to determine whether the content of the tip from the FLA was reliable and trustworthy. By not divulging any information about the FLA's basis of knowledge, the magistrate was left with no reason to believe that the tip was obtained through a reliable and trustworthy source or method. Simply repeating the FLA's allegation without further explaining how the FLA uncovered the connection between the IP address and the accessing of child sexual abuse material was insufficient to adequately establish the basis of knowledge of the tip. The first and second factors of *Tiem Trinh* – "whether the affidavit establishes the probable veracity and basis of knowledge of persons

8

**JA847**

supplying hearsay information" and "whether an informant's statements reflect first-hand knowledge" – therefore weigh in Mr. Bateman's favor. *Tiem Trinh*, 665 F.3d at 10.

### ii. The Affidavit Reflects No Effort From Law Enforcement To Corroborate The Tip.

In addition to the lack of information about the basis of knowledge or reliability of the method used to obtain the IP address, the affidavit does not include any facts that actually or meaningfully corroborated the tip from the FLA that an internet user had "accessed online child sexual abuse and exploitation material via a website." Ex. A, ¶ 23. While Agent Squire did include a description of the steps U.S. law enforcement took to confirm who lived at ████████, that investigation only corroborated the fact that someone lived at the physical address associated with the IP address identified by the FLA. None of that investigation corroborated the tip that that particular IP address was used to access child pornography on April 30, 2019.

In the affidavit, Agent Squire briefly detailed the steps agents took to identify who, if anyone, lived at ████████. They deduced, according to the affidavit, that Mr. Bateman owned a condominium at that address, that he listed ████████ as his residential and mailing address at the RMV, and that he resided there with an adult woman. Ex. A, ¶ 27-30. One agent also saw cars that were registered to Mr. Bateman and the woman who resided there with him parked in front of the condo one day before the warrant was submitted to the Magistrate. *Id*. While this information certainly may have substantiated a claim that Mr. Bateman lived at that address in December 2019, none of it corroborated the allegation made by the FLA – that an internet user at ████████ had accessed child sexual abuse material in April 2019. *See Gifford*, 727 F.3d at 99-102 (DMV records that confirmed the defendant lived at his address did not corroborate an informant's tip that there was an ongoing grow operation at that address). The third factor identified in *Tiem Trinh* – "whether some or all of the informant's factual statements were

9

**JA848**

corroborated wherever reasonable or practicable" – therefore weighs in favor of Mr. Bateman. *Tiem Trinh*, 665 F.3d at 10.

In sum, Agent Squire failed to establish the basis of knowledge for the tip or the reliability of the method used to obtain the information in the tip. Agent Squire also failed to include any facts that corroborated the unreliable tip. The information provided in the affidavit therefore did not create a "substantial basis" for the magistrate to conclude that probable cause existed. *Gates*, 462 U.S. at 238-39.

### b. The Warrant Was Stale.

Stale information cannot establish probable cause that evidence of criminal activity will be found at the place searched. *United States v. Grubbs*, 547 U.S. 90, 96 n.2 (2006). Whether information is stale does not depend solely on the number of days between the events described in the affidavit and the issuance of the warrant. *Tiem Trinh*, 665 F.3d at 13–14. Courts look instead at a number of factors, including "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." *Id*. (citing *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008)). In cases involving child pornography, courts have often determined that the passage of a significant amount of time between the acquisition of the incriminating information and the obtaining of a warrant does not render the information stale where the magistrate was provided with information supporting a finding that such materials are likely to have been retained by their possessor. *See, e.g., Morales-Aldahondo*, 524 F.3d at 119.

Here, the FBI did not have probable cause to search Mr. Bateman's home in December 2019 when the alleged access to child sexual abuse material occurred in April 2019 – seven months earlier. The affidavit did not include any allegations specific to Mr. Bateman regarding any

10

propensity or habits of keeping a collection of child pornography. Moreover, the affidavit failed

to state what exactly was accessed on the website, whether it was downloaded or saved in any

manner, or whether there were multiple visits to the website – facts that could have bolstered

probable cause. *See United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) (no probable cause

where the affidavit alleged that "on a single afternoon more than nine months earlier, a user with

an IP address associated with Raymonda's home opened between one and three pages of a website

housing thumbnail links to images of child pornography, but did not click on any thumbnails to

view the full-sized files").

Without more information specific to Mr. Bateman, and without more information about

the material allegedly viewed and the number of visits to the website, there was not probable cause

to believe that Mr. Bateman's home contained evidence of a crime. The warrant was unlawfully

issued, and all evidence obtained as a result of the search conducted pursuant to the warrant must

be suppressed.

## II.    The Affiant Made Material Omissions and Misstatements and Mr. Bateman is Entitled to a *Franks* Hearing as a Result.

In *Franks v. Delaware*, the Supreme Court held that a defendant is entitled to a hearing to

challenge the truthfulness of statements in a search warrant affidavit if he makes "a substantial

preliminary showing" that the statements were "knowingly and intentionally [false], or [made]

with reckless disregard for the truth," and that the falsehood was "necessary to the finding of

probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). "An allegation is made with

reckless disregard for the truth if the affiant in fact entertained serious doubts as to the truth of the

allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations

in the application." *Gifford*, 727 F.3d at 98 (internal quotations omitted). "Suppression of the

evidence seized is justified if, at such a hearing, the defendant proves intentional or reckless

11

falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish probable cause." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015).

The right to a Franks hearing is triggered not only by false statements but also by material omissions. *Id.*; *United States v. Cartagena*, 593 F.3d 104, 112 (1st Cir. 2010). When a defendant alleges a material omission has been made, "[t]he required showing is two-fold: first, the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause." *Tanguay*, 787 F.3d at 49. The First Circuit has held that recklessness may be inferred where "the omitted information was critical to the probable cause determination." *Gifford*, 727 F.3d at 99-100.

Special Agent Squire made omissions and misstatements knowingly and intentionally, or with reckless disregard for the truth regarding three key issues. First, Agent Squire made material misstatements about the nature, origin, and reliability of the tip from the FLA. Second, Agent Squire made material omissions about the method(s) used by the FLA to identify the IP address. Third, Agent Squire misrepresented the relationship between U.S. law enforcement and the FLA in the affidavit. Each of these misstatements and misrepresentations went directly to the heart of the probable cause analysis. The magistrate would not have issued the warrant had these misrepresentations been corrected in the affidavit because the reformed affidavit would not establish probable cause. Mr. Bateman is therefore entitled to a *Franks* hearing.

### a. Agent Squire Misrepresented the Nature, Origin, and Reliability of the Tip.

The affidavit relies entirely on Agent Squire's assertion that an FLA notified U.S. law enforcement that a particular IP address "was used to access online child sexual abuse and exploitation material via a website that the FLA named and described as Website A." Ex. A, ¶ 23. There is no other allegation of criminal activity anywhere in the affidavit. However, this fact is

12

**JA851**

inherently misleading and factually incorrect. Agent Squire did not repeat the tip from the ████ verbatim. Rather, he added language that misled the magistrate into believing that U.S. law enforcement had more evidence of criminal activity that it did.

The exact words of the tip from the ████ tip document were: "████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████" *See* ████ Intelligence Report (attached as Exhibit D). Agent Squire did not copy or repeat this language into the affidavit. Instead, he stated the following: "FLA had determined that on April 30, 2019 at 10:38:18 UTC, IP address 73.142.30.140 was used to access online child sexual abuse and exploitation material *via a website*. According to the FLA, the website had an explicit focus on the facilitation of sharing child abuse material (images, links and videos), emphasis on BDSM, hurtcore, gore, and death-related material including that of children. Users were required to create an account (username and password) in order to access the majority of the material." Ex. A, ¶ 23.

While this change appears slight, its significance in the affidavit was great. By manipulating the language of the tip, Agent Squire created the impression that the ████, and therefore U.S. law enforcement, had information that the IP address was used to visit Website A *and then used to access child sexual abuse material*. The implication in the affidavit is that the internet user associated with that IP address viewed or downloaded the child sexual abuse material available on Website A and that, because the majority of the material was only available through an account, the internet user had accessed the child sexual abuse material through that account.

13

**JA852**

However, this implication misrepresents the substance of the tip from the ██ The ██ did not provide any such information, nor did U.S. law enforcement have any such evidence. Rather, the tip from the ██ conveyed only that the IP address in question was used to *access the website*.

The phrasing of the ██ Intelligence Report supports this interpretation of the tip. In the Intelligence Report, the ██ states that the IP address was used to "access online child sexual abuse and exploitation material, with an explicit focus on the facilitation of sharing child abuse material." Ex. D. The tip is inscrutable as it is written because it is unclear how "child sexual abuse and exploitation material" (i.e., videos and images) can have an "explicit focus" on the *facilitation of sharing the same material*. Its meaning only becomes clear if the phrase "online child sexual abuse and exploitation material" means Website A, rather than images or videos depicting child sexual abuse. In other words, the Intelligence Report should be read as "On 2019-04-30 10:38:18 UTC 73.142.30.140 was used to access [Website A], with an explicit focus on the facilitation of sharing child abuse material (images, links, and videos), emphasis on BDSM, hurtcore, gore and death-related material including that of children." This reading is consistent with, and tracks the exact language of, the ██ Intelligence Report identifying the website, which uses the identical language to describe the *website itself*, not the activity of the internet user. *See* Ex. F.[4]

Other parts of the affidavit reflect that this was, and has been, U.S. law enforcement's understanding of the ██ tip. *See* Ex. A at ¶ 24 ("I submit that the **website accessed by the IP address** 73.142.30.140 appears to be Website A."); ¶ 27 ("According to publicly available information, IP address 73.142.30.140 – the one used to **access Website A**… is owned/operated by Comcast."); ¶ 39 ("I am aware that this investigation revealed that an individual located at the

---

[4] The images and videos named in Ex. F appear to be those shared on the website, *not those accessed, viewed, or downloaded by any one user, let alone Mr. Bateman*.

address listed in Attachment A **accessed a website** that is dedicated to the sexual exploitation of children, and which is accessed through the Tor network.").

In rewording the tip from the ███, Agent Squire also omitted the crucial fact that the homepage of Website A did not contain any child sexual abuse material. Screenshots of the website provided by the government show that in order to "access" any child sexual abuse material, an individual would have to navigate past the homepage and, as Agent Squire acknowledges, log in with a username and password to access the material in question. Contrary to the impression created by Agent Squire in the affidavit, the ███ did not state in its tip that it had any information that the internet user associated with that IP address had an account on Website A, nor did it state that the user had logged into the website using a username and password.

The distinction between the substance of the tip and the retelling of that tip in the affidavit is important. There is a fundamental difference between: 1) evidence of a one-time visit to a website where no images, videos, or links to child pornography materials were either visible or available on the website's homepage, and no such items were viewed and/or downloaded and 2) evidence of an individual creating an account on that website and then using that account to view, download, or possess materials that would have only been accessible once a user navigated past the homepage. *See United States v. Falso*, 544 F.3d 110, 120-21 (2d Cir. 2008) (finding no probable cause for possession of child pornography when it was alleged that defendant "appear[ed]" to have "gained access or attempted to gain access" to the cpfreedom.com website— which did not require registering an account or logging in—and that even if one inferred that the defendant had accessed cpfreedom.com, there was no specific allegation that the defendant "accessed, viewed or downloaded child pornography"). The information the ███ relayed to U.S.

15

**JA854**

law enforcement fell squarely into the first category, which was insufficient to establish probable cause.

By manipulating the language in the tip from the ▇▇, Agent Squire misrepresented the information available to U.S. law enforcement and created a misleading impression that U.S. law enforcement had more evidence of criminal activity than it actually did regarding the sole allegation of criminal activity in the affidavit. Agent Squire's misrepresentation about the nature of the tip was recklessly made and was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. Had Agent Squire been truthful about the tip and stated that U.S. law enforcement had received information only that the IP address was used on a single occasion to visit a website where no child pornography was visible or available on the homepage, the magistrate could not have found sufficient probable cause to issue the warrant. Mr. Bateman is therefore entitled to a *Franks* hearing on these false statements.

In addition to this misrepresentation about the nature of the tip from the ▇▇, Agent Squire also omitted important information about the origin and reliability of the tip. In the affidavit, Agent Squire made a number of representations about the FLA that had provided the tip (now known to be the ▇▇) and its reliability. Specifically, Agent Squire stated that that FLA (again, ▇▇) had "a history of providing reliable, accurate information in the past" and that it was "a national law enforcement agency of a country with an established rule of law." Ex. A, ¶ 23. Agent Squire averred that the FLA (the ▇▇) had obtained the information in the tip through an investigation that was "lawfully authorized in FLA's country pursuant to its national laws," and that the FLA (the ▇▇) had not "interfered with, accessed, searched, or seized any data from any computer in the United States in order to obtain the IP address information." *Id*. at ¶ 25. Finally, Agent Squire

**JA855**

claimed that prior tips from the FLA (the ▮▮▮) had led to an arrest, the rescue of children subject to abuse, and the seizure of evidence. *Id.* at ¶ 26.

However, Agent Squire omitted from the affidavit the fact that there was not just one FLA involved in the investigation of Website A, but two, from two entirely different countries. The ▮▮▮, which provided the tip to U.S. law enforcement and which Agent Squire took pains to assure the court was subject to the rule of law, was seemingly not involved in the seizure of the website's server. Instead, the government recently disclosed that a second FLA – which it has refused to name – seized the server in a country distinct from ▮▮▮ – a country which it has also refused to name. Additional information – such as who participated in the seizure and/or investigation/investigation steps and what investigative steps were undertaken by the seizing FLA alone or in conjunction with other countries and/or law enforcement, including the United States – remains unknown. What little *is* known about the second FLA is that it was local to the server host country.

Agent Squire made no distinction between the two FLAs in the affidavit and failed to inform the court that there was even a second FLA involved in the investigation. Instead, Agent Squire created the misimpression that the tip and the source of that tip both originated from the same, allegedly reliable FLA. This impression was both misleading and inaccurate. While Agent Squire made a number of claims in the affidavit about the reliability of the FLA, those statements applied *only* to the FLA that provided the tip to U.S. law enforcement (again, ▮▮▮). There are no facts in the affidavit that address or establish the reliability or trustworthiness of the FLA that seized the server. Agent Squire did not, for example, make any assurances that the FLA that seized the server had a "history of providing reliable, accurate information." Nor did Agent Squire aver that the second FLA was from a country with an "established rule of law." Ex. A, ¶ 25. Likewise,

17

there are no facts in the affidavit that establish that the FLA that seized the server did not conduct

a search or seizure of any computer in the United States (e.g. performing a so-called "Network

Investigative Technique" (NIT)).

This misinformation went to the heart of the probable cause analysis. The tip from the ████

was the only allegation of criminal activity in the entire affidavit. It was also the only piece of

information that created a nexus between Mr. Bateman, his home, and the alleged criminal activity.

The omitted fact that there was a second FLA involved in obtaining the IP address information

"require[s] that [this Court] alter in significant ways the weight [it] give[s] to" the tip. *Gifford*, 727

F.3d at 101. Without assurances in the affidavit about the reliability and trustworthiness of the

second FLA and the legality of its action, no Magistrate could find there was probable cause.

Because Agent Squire's misrepresentations and omissions regarding the nature, origin, and

reliability of the tip were all "critical to the probable cause determination," this Court "may infer

recklessness" on the part of Agent Squire. *Gifford*, 727 F.3d at 101. The reckless

misrepresentations were "necessary to the finding of probable cause" and the omitted information,

adding back into the affidavit, "is sufficient to vitiate probable cause." *Franks*, 438 U.S. at 155-

56; *Tanguay*, 787 F.3d at 49. Mr. Bateman is therefore entitled to a *Franks* hearing.

### b. The Affiant Made Material Omissions Regarding The Method Used by the FLA to Identify the IP Address.

In the affidavit, Agent Squire stated that the FLA (████) assured U.S. law enforcement

that that FLA had not "interfered with, accessed, searched, or seized any data from any computer

in the United States." Ex. A, ¶ 25. This assurance, combined with the omitted fact that there was

more than one FLA involved in the investigation, created the impression that no law enforcement

agency, anywhere, had "interfered with, accessed, searched, or seized" data from a computer in

the United States. However, an expert declaration submitted in a case seemingly identical to Mr.

Bateman's, and arising out of the same tip, suggests that the specific IP address could not have been identified without running a NIT or, in the alternative, an error-prone and unreliable traffic analysis technique. *See* Declaration of Steven Murdoch at ¶ 22-32, *United States v. Sanders*, No. 20-cr-00143 (E.D. Va. Sept. 17, 2021), ECF No. 464-2 (attached as Exhibit H).

In Professor Murdoch's declaration, he explains that "there are only two techniques for identifying the IP address of a user using Tor Browser properly: traffic-analysis (which can generate errors) or a Network Investigative Technique (which interferes with a user computer)." Ex. H, ¶ 23. A NIT works "by forcing the user's computer to disclose its IP address by connecting directly to a law-enforcement server without using the Tor network." *Id*. at ¶ 27. A NIT "necessarily interferes with a user's computer wherever it is located." *Id*. at ¶ 32.

Traffic analysis, on the other hand, is a technique that attempts to "identify which user is communicating with which Onion Service by comparing patterns of when and how much data is sent (as opposed to looking at the content of the data, which is not visible to observers)." *Id*. at ¶ 17. Professor Murdoch states that before 2016, "traffic analysis on Tor was unreliable, but there were concerns that it might be possible in some cases." However, in 2016, Tor addressed this issue and introduced a new extension to its software that caused traffic analysis to "introduce more errors, both false positives (where a user is incorrectly identified as having visited the Onion Service) and false-negatives (where a user is incorrectly identified as not having visited the Onion Service)." *Id*. at ¶ 19. This measure, and others, have made it "even more difficult to use traffic-analysis to de-anonymize Tor users." *Id*. at ¶ 21.

The use of either technique by ▮▮▮▮▮▮ or another FLA would significantly undermine the veracity of the affidavit and its probable cause showing. If traffic analysis was used to uncover the IP address, the undisclosed fact that the technique is inherently error-prone would significantly

undermine the strength and reliability of the tip from ▉▉▉. *See id*. at ¶ 22-32. No magistrate, had he or she been aware that this fundamentally unreliable technique was used to obtain the IP address, would find there was probable cause, especially where the tip about the IP address was not corroborated by any other facts.

Alternatively, the use of a NIT would reveal a substantial misrepresentation in the affidavit, which relies on Agent Squire's assurance that no computer in the United States had been searched. The deployment of a NIT is an unlawful warrantless search. *See United States v. Tagg*, 886 F.3d 579, 584 (6th Cir. 2018); *United States v. Anzalone*, 208 F. Supp. 3d 358, 366 (D. Mass. 2016), *aff'd*, 923 F.3d 1 (1st Cir. 2019). Had any law enforcement agency deployed a NIT to obtain the IP address without a warrant, the Magistrate could not have considered the results of that search in the probable cause analysis. *See United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005) ("[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause.").

Agent Squire's omissions regarding the method used to obtain the IP address were material because if the omitted information – either that a NIT or an error-prone traffic analysis was used – was included in his affidavit, it would be "sufficient to vitiate probable cause." *Tanguay*, 787 F.3d at 49. This Court may infer that the information was omitted recklessly because the omitted information was "critical to the probable cause determination." *Gifford*, 727 F.3d at 99-100. Mr. Bateman is therefore entitled to a *Franks* hearing on this issue as well.

20

**JA859**

### c. The Affiant Misrepresented The Nature Of The Relationship Between U.S. Law Enforcement And The FLAs And Omitted Facts That Would Have Revealed that the FLAs' Actions Were Subject to the Exclusionary Rule.

Agent Squire's final misrepresentations involved omitting facts about the role of U.S. law enforcement in the investigation of Website A. Specifically, Agent Squire withheld information that would have shown that 1) U.S. law enforcement was engaged in a "joint venture" with the FLAs and 2) the FLAs engaged in conduct that would shock the judicial conscience such that the FLAs' actions would be subject to the exclusionary rule.

Generally, "the Fourth Amendment's exclusionary rule does not apply to foreign searches and seizures." *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012). There are, however, two exceptions to that rule: "(1) where the conduct of foreign police shocks the judicial conscience, or (2) where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts." *Id*. Here, both exceptions would apply to the conduct of the FLAs. Running a NIT to obtain an IP address of a computer in the U.S. – conduct that is unlawful in the U.S. without first obtaining a warrant – and then hiding that information from a magistrate judge would "shock the judicial conscience." *Id*. Likewise, the information available to the defense suggests that there was a "joint venture" afoot between the United States and the FLAs such that the exclusionary rule would apply to one (or both) of the FLAs running a NIT on a computer in the United States. *See id*. However, Agent Squire minimized the collaborative relationship between the agencies and withheld facts that would have established that "American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts." *Id*.

21

**JA860**



Although the Affidavit indicates that "U.S. law enforcement personnel did not participate in the investigative *work* through which [ ▮ ] identified the IP address information provided by



[▮▮▮],” Ex. A, ¶ 25, the ▮▮'s own representations about its collaborative work through its international liaison officers belie any conclusion that they solely engage in a simple information-sharing relationship with other countries. Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[10]

Cases filed in this district and others demonstrate that the tips provided by ▮▮▮▮ to U.S. law enforcement are more than just an informal, one-off relaying of information. *See, e.g., United States v. Kiejzo*, No. 1:20-cr-40036-TSH (D. Mass.); *United States v. Corwin*, No. 2:21-cr-00218-JS (E.D.N.Y.), D.E. 1 (unsealed at D.E. 4) (complaint affidavit indicates that in August 2019, the FBI received information from an FLA regarding an IP address which allegedly accessed ▮▮ ▮▮ on April 27, 2019); *United States v. Sanders*, No. 1:20-cr-00143-TSE (E.D. Va.).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮”[11] ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[11] *Id.*



The link between the U.S. and █████ in these kinds of operations is neither nebulous nor abstract – indeed, Agent Squire asserted that he was an "active member of a multinational, multi-agency working group that coordinates national and international operations to combat child exploitation on the dark web[.]" Ex. A, ¶ 1. The government, in a discovery response,

---

[12] *Id.*

[13] *Id.*

[14] See Twitter profile ████████████ and attached screenshots at Exhibit I.

[15] *See* "Justice News: Deputy Assistant Attorney General Richard W. Downing Delivers Remarks at the Academy of European Law Conference on "Prospects for Transatlantic Cooperation on the Transfer of Electronic Evidence to Promote Public Safety," April 5, 2019 (emphasis added), available at: https://www.justice.gov/opa/speech/deputy-assistant-attorney-general-richard-w-downing-delivers-remarks-academy-european-law (last accessed Dec. 10, 2021).

24

acknowledged that "there is at least one representative of the FLA in the working group." *See* Exhibit A to Defendant's Motion to Compel filed under seal at D.E. 76.

Based on the materials available to the defense, it appears there was, at the minimum, a significant collaboration between the United States and the ▆▆. By withholding this information from the affidavit, Agent Squire obscured the extent to which there was a "joint venture" between the two law enforcement agencies such that the actions taken by the ▆▆ would be subject to the exclusionary rule. This information was material as the tip from the ▆▆ formed the entire basis for probable cause in the affidavit. Mr. Bateman is therefore entitled to a *Franks* hearing on this misrepresentation.

Because the government has not disclosed the identity of the second FLA, the defense has been unable to investigate the possibility of a joint venture or cooperation between the United States and the second FLA. However, a recent case from the Northern District of Illinois, *United States v. Mitrovich*, 458 F. Supp. 3d 961 (N.D. Ill. 2020), sheds light on how U.S. law enforcement engages in these very kind of joint investigations of hidden services websites on Tor with FLAs and how that might have occurred in this case. In *Mitrovich*, the FBI began investigating a child pornography website in 2014. *Id*. at 963. Sometime that year, the FBI "obtained the ability to identify IP addresses associated" with the website, and learned that the website was hosted in the Netherlands, with the head administrator residing in Australia. *Id*. After the FBI shared that information with Australia, law enforcement agencies from Australia and New Zealand seized control of the website, operated it undercover, and shared backup copies of the website with the FBI. *Id*. As part of its investigation, the Australian and New Zealand authorities uploaded a hyperlink onto the website that, when clicked, allowed them to capture the clicker's IP address, which would have otherwise been concealed by Tor. *Id*. One particular user – known as

25

**JA864**

"cyberguy" – clicked on the hyperlink, thereby revealing his IP address, which was located in the United States, to the Australian and New Zealand authorities. *Id*. Australia and New Zealand sent the IP address to the FBI, which then obtained records from Comcast to identify the physical address associated with the IP address. *Id*. The FBI subsequently obtained a search warrant for that address – the defendant's home – and discovered child pornography materials therein. *Id*.

The facts in *Mitrovich* demonstrate how a U.S. law enforcement agency could *and did* participate in the seizure of a website server with an FLA. The facts also demonstrate that while U.S. agents may not necessarily direct an investigation into one particular IP address, a U.S. law enforcement agency could be engaged in a joint venture to uncover IP addresses within the United States. In *Mitrovich*, the court held that the defendant had made a *prima facie* showing that a Fourth Amendment search had taken place and that U.S. law enforcement was sufficiently involved to implicate the exclusionary rule such that the defendant was entitled to discovery on the issue. *Id*. at 967. Here, Mr. Bateman has made a substantial preliminary showing that Agent Squire omitted crucial information about the existence of a second FLA involved in the investigation of Website A. He has demonstrated that there was a joint venture between U.S. law enforcement and the ███, the only FLA so far identified by the government. The omissions and misrepresentations about the investigation into Website A by multiple FLAs and the relationship between those FLAs were material to probable cause and Mr. Bateman is entitled to a *Franks* hearing as a result.

## CONCLUSION

For the above reasons, this Court should suppress all evidence and illegal fruits obtained pursuant to the invalid search warrant and grant Mr. Bateman a *Franks* hearing.

26

**JA865**

Respectfully submitted,
PAUL BATEMAN
By His Attorney,

*/s/ Sandra Gant*
Sandra Gant, BBO # 680122
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

*/s/ Caitlin Jones*
Caitlin Jones, MN ID # 0397519
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Sandra Gant, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on December 27, 2021.

*/s/ Sandra Gant*
Sandra Gant

27

**JA866**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA          )
                                  )
v.                                )          Docket No. 20-cr-10012-IT
                                  )
                                  )
                                  )
PAUL BATEMAN                      )

**MOTION TO SUPPRESS**


**Exhibit H:**

Declaration of Professor Steven Murdoch

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

UNITED STATES OF AMERICA,

                    Plaintiff,

    v.

ZACKARY ELLIS SANDERS,

                    Defendant

Case No.: 1:20-cr-00143

## <u>DECLARATION OF PROFESSOR STEVEN MURDOCH</u>

I, Professor Steven Murdoch, Declare under penalty of perjury that:

1. I am currently Professor of Security Engineering at University College London. My research is focused on information security, particularly Internet privacy and payment systems security.

2. I have a Ph.D. from the Security Group of the University of Cambridge Department of Computer Science and Technology. My doctoral research, completed in 2007, focused on the traffic analysis of anonymous communications systems, in particular Tor. I have worked with the developers of Tor since 2004, and I created the first version of the Tor Browser software in 2008. I continue to work with the Tor Project, the 501(c)(3) non-profit organization responsible for the development of the Tor network and associated software. I helped the Tor Project assess and improve the security and usability of Tor.

June 21, 2021                                                                                    Page 1 of 14

3. I am a member of Christ's College Cambridge and a Royal Society University Research Fellow. I am a Fellow of the Institution of Engineering and Technology (IET) and the British Computer Society (BCS).

4. I have published a number of peer-reviewed research papers in the fields of anonymous communications and privacy-enhancing technologies, including Tor.

5. My C V is attached as Exhibit A.

## Scope of declaration

6. This declaration will discuss how the Tor network operated and how activity on the Tor network could be traced as of May 23, 2019 – the date of the alleged visit in this case. I have restricted this declaration to the use of websites running as Tor Onion Services (also known as Tor Hidden Services), where the website is accessible only through the Tor network. I also will only discuss version 2 Tor Onion Services, in which the Onion Service address is 16 characters followed by ".onion" as the website in question for this case is a version 2 Onion Service (because according to a screenshot disclosed in discovery, its address had 16 characters before the ".onion," not 56).

7. The vast majority of usage of the Tor network (about 98% as of June 2021) is to visit websites and other Internet services which are also accessible directly over the Internet. I will not discuss this use of Tor in my declaration because it is not the type of usage alleged in this case. Similarly, I will not discuss version 3 Tor Onion Services, in which the Onion Service address is 56 characters followed by ".onion."

## Operation of Tor Onion Services

8. When a user wishes to visit a Tor Onion Service, various computers (nodes) within the Tor network are involved. Some of these nodes are selected at random by the Tor software running on the user's computer. and the others are selected at random by the Tor software running on the Onion Service.

9. The Tor software on the user's computer will select at random a node to act as the rendezvous node and send the address of the rendezvous node to the Onion Service.

To protect the anonymity of the Onion Service (i.e., its IP address),[1] its connection is made through a three-node Tor circuit. Similarly, to protect the anonymity of the user, its connection to the rendezvous node is through a three-node Tor circuit.

10. Next, the Onion Service will connect to the rendezvous node through a three-node Tor circuit (excluding the rendezvous node). The rendezvous node is responsible for connecting together the two circuits: one created by the user's computer and one by the Onion Service. The Onion Service and user can then exchange information, i.e., the user's web browser can request to view a web page and other data, and the Onion Service can respond with the requested content, without disclosing each other's IP addresses.

11. When the Onion Service and user's computer are connected, there are six nodes between them: the guard node selected by the user's computer, one middle node, the rendezvous node, two middle nodes, and the guard node selected by the Onion Service. Only the Onion Service's guard node is aware of the Onion Service's IP address, and only the user's guard node is aware of the user's IP address.

**Improvements in the Tor network's design and operation prior to May 2019 have made traffic analysis less reliable and more difficult to execute**

12. Traffic analysis of Tor has always been unreliable because of security features which were present in Tor since its creation. For example, data sent between nodes has always been padded so that everyone's communications are the same size. As a result of this and other security measures, in 2012, NSA documents showed that "with manual analysis we can de-anonymize a very small fraction of Tor users."[2]

13. The Tor Project is continually improving the Tor network and associated software to enhance the level of privacy and usability offered to Tor users. This work is

---

[1]  The IP address could allow the physical location of the Onion Service to be found.

[2]  Tor Stinks, presentation by National Security Agency, dated June 2012. Published by The Guardian, October 4, 2013. Available at https://edwardsnowden.com/2013/10/04/tor-stinks-presentation/ (emphasis in original)

conducted in collaboration with academic researchers and other organizations. To help build trust in the development process, discussions of proposed and implemented changes to the Tor network are conducted publicly through academic literature, mailing lists, Internet chat, and websites maintained by the Tor Project. As such, the changes discussed here and the time frame in which they occurred are widely known.

14. Since September 2014, the Tor software will select one guard node and keep this selection for as long as possible to minimize the number of computers with knowledge of IP addresses. For this reason, if a Tor node collected IP addresses of users connecting to it, only a very small proportion of Tor users would be identified, no matter how long this node was run. It takes 68 days before a new node can run at full capacity, which is a measure put in place to prevent someone from quickly creating new nodes in an attempt to collect more IP addresses.

15. The likelihood that the Tor software will select any given node is proportional to that node's contribution to the capacity of the Tor network. Therefore, as the capacity of the Tor network has grown, the less likely it is that any one node will be selected, so it makes it less likely that a particular node can be used to observe users of the Tor network. For example, in 2012, NSA documents showed that "with manual analysis we can de-anonymize a <u>very small fraction</u> of Tor users."[3] Since then, the network capacity has grown from about 10 gigabits per second to 200 gigabits per second, which has further increased the difficulty of performing traffic analysis by a factor of 20.

16. Tor's encryption ensures that the content of data sent to and from a user's guard node is impossible to match to the corresponding content of data sent to or from the Onion Service's guard node. In other words, looking at the content of data the user sends to their guard node will be of no help in identifying with which Onion Service that user is communicating.

---

[3] Tor Stinks, presentation by National Security Agency, dated June 2012. Published by The Guardian, October 4, 2013. Available at https://edwardsnowden.com/2013/10/04/tor-stinks-presentation/ (emphasis in original)

June 21, 2021                                                                 Page 4 of 14

17. Traffic analysis is a technique to attempt nevertheless to identify which user is communicating with which Onion Service by comparing patterns of when and how much data is sent (as opposed to looking at the content of the data, which is not visible to observers).

18. Prior to 2016, traffic analysis on Tor was unreliable, but there were concerns that it might be possible in some cases because the rate at which data was sent between the user and their guard node was similar to the rate at which data was sent between the Onion Service and its guard node. Prior to 2016, if someone were able to observe those two links simultaneously, patterns in the two rates of data transfer may be sufficiently similar to identify the link with some degree of confidence. That was no longer the case beginning sometime in 2016.

19. In 2016 Tor introduced an extension to its padding feature, to obscure patterns in the rate of data transfer to and from guard nodes. The Tor software randomly sends additional padding data to and from guard nodes which does not continue on through the rest of the Tor circuit. In so doing, the Tor software hides patterns in data rates that might otherwise allow traffic analysis to link users to the Onion Services they are visiting. Padding will cause traffic analysis to introduce more errors, both false-positives (where a user is incorrectly identified as having visited the Onion Service) and false-negatives (where a user is incorrectly identified as not having visited the Onion Service). In an undated presentation published in 2014,[4] GCHQ noted a high level of errors in performing traffic-analysis on Tor, even before the extended padding feature was introduced in 2016.

20. The nodes that make up the Tor network are operated by thousands of volunteers around the world, many of whom do not disclose their identities. In some cases, operators of Tor nodes were found to tamper with or observe traffic on the nodes. To prevent operators from being able to tamper with or observe traffic passing through

---

[4] A potential technique to deanonymise users of the TOR network (undated). Published by Der Spiegel, December 28, 2014. Available at https://edwardsnowden.com/2015/01/07/a-potential-technique-to-deanonymise-users-of-the-tor-network/

June 21, 2021                                                                                      Page 5 of 14

their node, since 2014, the Tor Project has pro-actively identified Tor nodes that show suspicious behavior and then exclude them from the network. This has increased the difficulty of covertly performing traffic analysis on the Tor network since 2014.

21. Thus, prior to May 2019, numerous measures were implemented in the Tor software to make it even more difficult to use traffic-analysis to de-anonymize Tor users.

## Law-enforcement likely had control over the Onion Service when the visit was recorded

22. Law enforcement can attempt to identify the IP address of a Tor user visiting an Onion Service in four scenarios:

1) Law enforcement controls neither the user's guard nor the Onion Service

2) Law enforcement can observe the user and observe the Onion Service

3) Law enforcement controls the Onion Service and some guard nodes

4) Law enforcement controls the Onion Service

23. Although I describe four scenarios, there are only two techniques for identifying the IP address of a user using Tor Browser properly: traffic-analysis (which can generate errors) or a Network Investigative Technique (which interferes with a user's computer).

*Scenario 1: Law enforcement controls neither the user's guard nor the Onion Service*

24. In the first scenario, law-enforcement can only use traffic analysis if both the Onion Service and the user happen to randomly select a guard node controlled or observed by law-enforcement. Because guard nodes are selected at random, the chance of simultaneously controlling or observing both guard nodes is very small. It is for this reason, I believe the NSA concluded in 2012 that reliably de-anonymizing Tor users was not feasible, and since then, the difficulty has increased.

*Scenario 2: Law enforcement can observe the user and observe the Onion Service*

25. In the second scenario, law-enforcement could use traffic analysis to confirm if a particular user was visiting an Onion Service. For example, in the complaint dated October 29, 2014, alleging that Blake Benthall operated the Silk Road 2.0 Onion

June 21, 2021                                                                    Page 6 of 14

Service,[5] the FBI noted similarities between Tor traffic observed through pen-register data at the defendant's residence and activity on the Onion Service in question. There are still likely to be errors in traffic-analysis because of Tor's padding obscuring patterns in the rates of data, leading to both false-positives and false-negatives.

*Scenario 3: Law enforcement observes the Onion Service and some guard nodes*

26. In the third scenario, law-enforcement can use traffic analysis to try to identify random visitors to an Onion Service (as opposed to specific targets). Traffic analysis is more likely to succeed than in the first scenario, but the likelihood of doing so is still very small. Firstly, it would only be possible to trace users who happen to select a guard under observation by law-enforcement. Secondly, even in the small number of cases where this has occurred, Tor's padding will cause traffic analysis performed through observing traffic to have a significant number of errors. Even if there are similarities in traffic patterns at a given guard node under observation and at the Onion Service, it could be that a different guard node is the correct match but is not under observation. As the number of visitors to an Onion Service increases, so will the likelihood of traffic analysis errors. Increasing the traffic to an Onion Service to frustrate traffic analysis is known as adding "cover traffic." To reduce the chances of errors, law-enforcement should wait until traffic-analysis indicates that the same user has visited an Onion Service multiple times.

*Scenario 4: Law enforcement controls the Onion Service*

27. In the fourth scenario, law-enforcement could use a Network Investigative Technique (NIT) to identify the IP address of a user visiting an Onion Service by forcing the user's computer to disclose its IP address by connecting directly to a law-enforcement server without using the Tor network.

---

[5]  United States of America v. Blake Benthall, Southern District of New York. October 29, 2014. Available at https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/Benthall,%20Blake%20Complaint.pdf

28. In order to use an NIT, law-enforcement must control the Onion Service prior to deploying the NIT. If law-enforcement controls the Onion Service, applying an NIT would be feasible and avoid the error-prone nature of traffic analysis.

29. An NIT used in such a scenario could be based around malware that executes on the user's computer and forces it to directly connect to the Internet (as opposed to connecting through Tor). The FBI used this technique to identify visitors to the Freedom Hosting servers.[6] Such an NIT causes the user's computer to do something it would not otherwise do and therefore interferes with the user's computer.

30. Alternatively, the NIT may not involve malware code and instead force the user's Tor Browser to malfunction and connect directly through the Internet rather than sending network traffic through the Tor network. Such an NIT causes the Tor Browser on the user's computer to malfunction and reveal information that it was designed not to, and therefore interferes with the user's computer.

31. In summary, I do not believe the first scenario is plausible for this case. Traffic analysis is extremely unlikely to yield the hundreds of IP addresses submitted by the ████████████████████████, nor give the ██████ confidence that these IP addresses visited the Onion Service in question.

32. I, therefore, conclude that law-enforcement almost certainly controlled the Onion Service prior to May 23, 2019, and either used traffic analysis or an NIT to identify visitors to the Onion Service. As discussed above, a single identification using traffic analysis could very well be a false-positive error. An NIT necessarily interferes with a user's computer wherever it is located.

---

[6] Feds Are Suspects in New Malware That Attacks Tor Anonymity, Kevin Poulsen, Wired News, August 5, 2013. Available at https://www.wired.com/2013/08/freedom-hosting/

**Neither of the two papers that Special Agent Ford cites could explain what has happened in this case**

33. For reasons discussed below, neither of the two papers cited by Special Agent Ford, in paragraph 7 of the declaration dated August 10, 2020, could explain what has happened in this case.

**The existence of research on how to defend against a global passive adversary does not imply a global passive adversary is a realistic threat**

34. Neither paper shows that a global-passive adversary is possible.

35. Information security research commonly makes use of unrealistic and hypothetical scenarios to help ensure that systems are secure in all realistic scenarios. This approach is analogous to that taken for systems where a failure would be dangerous, such as elevators. These are designed to withstand a weight far exceeding what is realistic (or even possible) so as to create a safety margin when they are used in the real world.

36. The global-passive adversary is a similar type of theoretical assumption. A global-passive adversary is a hypothetical single organization that can observe every computer and every network connection in the world simultaneously and record all information. This is impossible, and even the most capable intelligence agencies such as NSA or GCHQ cannot achieve this goal.

37. The global-passive assumption is a helpful thought experiment for research because if a system is designed to be secure even in the face of a global-passive adversary, then it should be safe in any realistic situation. The use of the global-passive adversary assumption in research does not, however, imply that such an adversary could ever exist in the real world.

**The method of traffic-analysis that Special Agent Ford cites was not a feasible method in this case**

38. The 2008 paper cited by Special Agent Ford in paragraph 7 of his declaration, by Chakravarty et al., assumed that the IP address of the user visiting the Onion Service was already known to law-enforcement and that law-enforcement were able to

manipulate network equipment that is carrying that user's traffic only to confirm that identification. This confirmatory technique only worked when the law-enforcement agency was on the same continent as the user, and even then, it was unreliable. Since 2008, this type of confirmatory technique has become much more difficult for the reasons discussed above. The 2008 paper is not relevant to understanding what law-enforcement could have done in 2019.

### The Tor Project's advice has been taken out of context

39. The Special Agent's citation in paragraph 5, to the Tor Project's advice to its users has been taken out of context. It continued:

*"First, Tor protects the network communications. It separates where you are from where you are going on the Internet. What content and data you transmit over Tor is controlled by you. If you login to Google or Facebook via Tor, the local ISP or network provider doesn't know you are visiting Google or Facebook. Google and Facebook don't know where you are in the world. However, since you have logged into their sites, they know who you are. If you don't want to share information, you are in control.*

*Second, active content, such as Java, Javascript, Adobe Flash, Adobe Shockwave, QuickTime, RealAudio, ActiveX controls, and VBScript, are binary applications. These binary applications run as your user account with your permissions in your operating system. This means these applications can access anything that your user account can access. Some of these technologies, such as Java and Adobe Flash for instance, run in what is known as a virtual machine. This virtual machine may have the ability to ignore your configured proxy settings, and therefore bypass Tor and share information directly to other sites on the Internet. The virtual machine may be able to store data, such as cookies, completely separate from your browser or operating system data stores. Therefore, these technologies must be disabled in your browser to use Tor safely.*

*That's where Tor Browser comes in. We produce a web browser that is preconfigured to help you control the risks to your privacy and anonymity while browsing the Internet. Not only are the above technologies disabled to prevent identity leaks, Tor Browser also includes browser extensions like NoScript and*

> Torbutton, as well as patches to the Firefox source code. The full design of Tor
> Browser can be read here. In designing a safe, secure solution for browsing the
> web with Tor, we've discovered that configuring other browsers to use Tor is
> unsafe."

40. First, Tor does not protect users from disclosing identifying information about themselves (e.g., name, email address), but in this case, there is no allegation that the Internet user ever logged into any website or revealed their email address in a way that allowed law-enforcement to identify them.

41. Second, the Tor Project advises users to use Tor Browser when connecting to Tor because the Tor Browser disables technologies that could disclose identifying information.

42. The advice from the Tor Project that Special Agent Ford cites does not discuss traffic analysis or the global passive adversary at all.

43. This guidance from the Tor Project does not mean that the theoretical scenarios Special Agent Ford outlined in his declaration are likely or even possible. In fact, when highly capable intelligence agencies have tried to de-anonymize Tor users, they have rarely succeeded.

44. The discussion by Special Agent Ford on tracing exit nodes, in paragraph 6, is also not relevant to the case. Exit nodes are only used when Tor users visit a website outside of the Tor network. When visiting a Tor Onion Service, an exit node is not used because data never leaves the Tor network.

**Using a Tor search engine to visit an Onion Service website is easy**

45. Paragraph 27 of the search warrant affidavit implies that searching to discover the address of an Onion Service is difficult and requires the use of a directory site.

46. In fact, entering "tor search" into the Tor Browser address bar (as of June 2021) will offer 5 different search engines for Tor Onion Services, allowing the user to find Onion Services matching particular keywords easily. Of these, at least two were available in May 2019. There is no need to use an index to find a Tor Onion Service because search engines are easily available from Tor Browser with just a few clicks.

47. Compared to the open Internet, there are fewer Onion Services, and so it is easier for a user to visit all sites returned for a search. For example, a search on the Torch search

engine for "Department of Justice" finds 61 Onion Service websites, so it would be easy to visit them all. In contrast, Google finds 107 million websites, and so there is no feasible way to visit all of these.

## Visiting an Onion Service from a search engine does not imply the visitor was aware of the content of the website

48. Search engines, including for Onion Services, build an index of websites and associate these with keywords. This index is built by the search engine visiting publicly accessible parts of the website. Material on the website that is only visible after logging in will not be part of this index. Based on the screenshot of the target website's homepage, the site's homepage did not indicate the nature of the content available to logged-in users. Therefore the target site may appear in searches for innocuous keywords. Furthermore, when the site appears in search results, it will likely not be possible for a user to identify that there is illegal content without clicking on the search result to visit the website. For example, someone interested in BDSM could search for this term in a Tor search engine, but the results would not make clear what content is on the websites (see exhibit B attached, a search for "BDSM" as of June 2021 returning 10 results, any of which would be easy to click on).

49. Sites also have an incentive to encourage visitors from search engines, so the operator of the site may apply techniques to cause the site to appear more highly ranked for a wider range of keywords. This incentive results from the fact that some Onion Services are supported by advertising, just as with the open Internet. Furthermore, Onion Services who wish to protect the privacy of their operator and users visiting them may wish to increase the traffic to the website in order to obfuscate attempts to perform traffic analysis or other de-anonymization techniques (i.e., to add cover traffic). Search results may be intentionally misleading to attract more users who might not necessarily be interested in the content the website contains.

## Directories will not necessarily indicate the content of a website

50. Paragraph 27 of the search warrant affidavit also implies that directories of Onion Service addresses give accurate and clear indications of whether these services contain unlawful material.

June 21, 2021                                                    Page 12 of 14

51. This is not necessarily the case. Some directories are open to editing by anyone and are not moderated. A person who wishes to promote an Onion Service may list the address while not indicating that the content is unlawful. As with the discussion of search engines above, this could be because, for example, the person wants to attract more users who are not motivated by illegal content but may nevertheless visit.

## The difficulty of discovering the IP address of an Onion Service has nothing to do with how easy it is to visit an Onion Service

52. Paragraph 14 of the search warrant affidavit could be interpreted as saying that it is very difficult for users to view and visit Onion Services because they cannot find the IP address of the Onion Service using public lookups. However, this interpretation would not be correct.

53. Tor allows users to visit an Onion Service without knowing that service's IP address. Visiting an Onion Service from the Tor Browser is as simple as clicking on a link.

54. On the open Internet, law-enforcement can use a website's address (e.g., www.justice.gov) to identify its IP address. Tor does not allow law enforcement to do this for Onion Services. As a result, it is difficult, including for the reasons discussed above, for law enforcement to identify and locate who is running an Onion Service. That has nothing to do with how easy it is for a user to visit a Tor Onion Service because Tor allows users to visit an Onion Service without knowing its IP address.

## A recorded visit to an Onion Service does not imply there was intent to visit that Onion Service or view the content on it

55. Just because someone visits a website, it does not imply that they intended to visit that website or view the content on that website.

56. It is common that a single website will contain parts of other websites. For example, on visiting the CNN homepage, content is downloaded from 70 different domain names, mostly for the purposes of showing advertisements or collecting statistics about who is visiting the site. The CNN homepage includes code that causes the web browser to download and display an image from Google to form part of an advertisement.

June 21, 2021                                                                 Page 13 of 14

57. Onion Services can operate similarly. For example, an Onion Service (A) could include code that instructs Tor Browser to download images or other content from a different Onion Service (B), which then may or may not be displayed. If Onion Service B was under surveillance by law-enforcement, whether through an NIT or traffic analysis, a user visiting Onion Service A would also be seen to be visiting Onion Service B, even though the user only meant to visit Onion Service A. In the implementation of an NIT or traffic-analysis that I am aware of, it would not be possible for law-enforcement to distinguish someone directly visiting Onion Service B from someone who actually visits Onion Service A, which then triggers the indirect visit to Onion Service B.

58. Someone may include part of one Onion Service website within another to inflate the number of visitors to the website, to create cover traffic, to advertise content, or to collect statistics on who is visiting the site. The act of someone's browser visiting an Onion Service is not an indication of an intent to visit that website.

DONE this day, June 21, 2021.

----------------------------------------------
Professor Steven Murdoch
Cambridge, UK

June 21, 2021                                                            Page 14 of 14

# Exhibit A

# PROFESSOR STEVEN J. MURDOCH

| | | | |
|---|---|---|---|
| **Address:** | Computer Science Department<br>University College London<br>Gower Street, London, WC1E 6BT | **Email:**<br>**Homepage:** | s.murdoch@ucl.ac.uk<br>https://murdoch.is/ |

## Education

| | |
|---|---|
| 2002–2007 | University of Cambridge, Computer Laboratory (UK) – PhD in Computer Science<br>Thesis: *Covert Channel Vulnerabilities in Anonymity Systems* |
| 1998–2002 | University of Glasgow (UK) – BSc Honours in Software Engineering (1st Class) |

## Professional History

| | |
|---|---|
| Oct 20– | Professor (proleptic appointment), Computer Science, University College London |
| Oct 16–Oct 20 | Reader (proleptic appointment), Computer Science, University College London |
| Aug 14– | Principal Research Fellow, Computer Science, University College London |
| Nov 13– | Innovation Security Architect, OneSpan |
| Dec 12–Jul 14 | Research Fellow, Computer Laboratory, University of Cambridge |
| Jan 09–Nov 12 | Senior Research Associate, Computer Laboratory, University of Cambridge |
| Aug 07–Sep 13 | Chief Security Architect, Cronto |
| Aug 07–Dec 08 | Research Associate, Computer Laboratory, University of Cambridge |
| Aug 06–Jun 07 | Research Assistant, Computer Laboratory, University of Cambridge |

## Expert Witness

- Expert witness for Worcester Police Force, 2007
- R v Patel, Croydon Crown Court, 2008
- Job v Halifax PLC, case number 7BQ00307, Nottingham County Court, 2009
- Kaae v HSBC, London Mercantile Court, 2011
- R v Fisher, Camberwell Green Youth Court, 2014
- R v Vincent, Winchester Crown Court, 2014
- Expert witness relating to an application for third-party disclosure, 2014
- Ongoing case related to attribution of Internet traffic, 2019

## Other Appointments and Affiliations

Fellowships:
- Fellow of the Institution of Engineering and Technology – FIET (2016–)
- Fellow of the British Computer Society – FBCS (2016–)
- Bye-Fellow, Christ's College Cambridge (2014–)
- Research Fellow, Christ's College Cambridge (2008–2014)

Journal Editor:
- Proceedings on Privacy Enhancing Technologies (2015)
- IEEE Internet Computing (special edition in 2013)
- SpringerBriefs in Cybersecurity (2012–)

International Award Chair:
- Andreas Pfitzmann (Privacy Enhancing Technologies Symposium) Award (2019)

1

**JA883**

Case 1:20-cr-00143-TSE   Document 696   Filed 09/14/21   Page 443 of 578 PageID# 14756

International Conference Sponsorship Chair: Privacy Enhancing Technologies Symposium (2016–)

International Conference Program Chair: Privacy Enhancing Technologies Symposium (2014–2015)

International Conference General Chair: Financial Cryptography (2011)

International Conference Programme Committee Member:
- ACM CHI Conference on Human Factors in Computing Systems (2019)
- IEEE European Symposium on Security and Privacy (2019)
- Financial Cryptography (2010, 2016, 2018)
- IFIP Summer School (2008, 2016, 2017)
- Network and Distributed System Security Symposium (2017)
- ACM Conference on Computer and Communications Security (2007, 2008, 2010, 2011, 2016)
- Annual Privacy Forum (2014)
- USENIX Free and Open Communications on the Internet (2013)
- USENIX Security (2012)
- European Symposium on Research in Computer Security (2011)
- Privacy Enhancing Technologies Symposium (2007, 2008, 2009, 2011)
- Workshop on Foundations of Security and Privacy (2010)
- Workshop on Privacy in the Electronic Society (2006, 2007, 2009)
- ACM Symposium on Applied Computing (2007)

International Award Committee Member:
- SC Awards Europe (2018)
- PET Award (2013)

International Grant Proposal Reviewer:
- EPSRC Peer Review College
- Arts and Humanities Research Council
- Royal Society International Exchanges Panel
- Netherlands Organisation for Scientific Research (NWO)
- Austrian Science Fund (FWF)
- Isaac Newton Institute
- National Science Foundation
- Canada Foundation for Innovation
- Research Council of Norway (Panel Leader for Centre of Excellence Programme)
- European Commission
- United States Air Force Office of Scientific Research (AFOSR)

International Journal Reviewer:
- Proceedings on Privacy Enhancing Technologies (2017, 2018, 2019)
- ACM Transactions on Information & System Security
- IEEE Transactions on Software Engineering
- IEEE/ACM Transactions on Networking
- Identity in the Information Society

## Prizes, Awards and Other Honours

2019    Awarded Internet Research Task Force Applied Networking Research Prize
2019    Shortlisted for UCL Provost's Public Engagement Awards
2016    Awarded SIIA CODiE prize for Best Identity & Access Security Solution for DIGIPASS for Apps

2

**JA884**

| 2015 | Awarded Security Products New Product of the Year for DIGIPASS 760 authentication token |
| 2014 | Shortlisted for Cambridge Ring Company of the Year |
| 2011 | Shortlisted for the Lloyd's Science of Risk Prize – Chip and PIN is Broken |
| 2010 | Awarded the IEEE Award for Outstanding Paper in Security & Privacy – Chip and PIN is Broken |
| 2008 | Awarded the IEEE Award for Outstanding Paper in Security & Privacy – Thinking Inside the Box: System-Level Failures of Tamper Proofing |
| 2008 | Shortlisted for the Privacy Enhancing Technologies (PET) Award for Outstanding Research – Sampled Traffic Analysis by Internet-Exchange-Level Adversaries |
| 2008 | Awarded the European Research Consortium for Informatics and Mathematics (ERCIM) Security and Trust Management Working Group Prize for Best PhD Thesis – Covert Channel Vulnerabilities in Anonymity Systems |
| 2007 | Awarded the USENIX Security Prize for Best Student Paper – Keep Your Enemies Close: Distance Bounding Against Smartcard Relay Attacks |
| 2006 | Awarded the University of Cambridge Computer Laboratory Prize for the Most Notable Publication of 2006 – Low-Cost Traffic Analysis of Tor |
| 2006 | Shortlisted for the Privacy Enhancing Technologies (PET) Award for Outstanding Research – Low-Cost Traffic Analysis of Tor |

## Invited Talks

37 invited talks given since 2004, inc. 17 at international conferences and 12 keynotes

| Jul 18 | Royal Society – Privacy Enhancing Technologies |
| Feb 18 | Royal Society UK-Netherlands Bilateral International Meeting – *Transparency enhancing technologies for accountable data science* |
| Dec 17 | European Parliament – Sakharov Debate: is online privacy a human right? |
| Dec 17 | ACI Worldwide – Age of Customer Consent, who owns the Customer Data |
| Nov 17 | University of Edinburgh – Payment Security: Attacks & Defences |
| Aug 16 | IFIP Summer School – Anonymity & Censorship-Free Communication |
| Nov 15 | BT Insights, Adastral Park – *Anonymous Communications* |
| Sep 15 | Information Security Forum – *Privacy by Design* |
| Dec 14 | GCHQ Academic Centers of Excellence conference – *Cyber-security innovation* |
| Oct 14 | [Keynote] Payment Knowledge Forum 2014, London, UK – *Payment Security: Attacks & Defences* |
| Jun 14 | [Keynote] OWASP AppSec Europe 2014, Cambridge, UK – Anonymous Communications and Tor: History and Future Challenges |
| Nov 13 | [Keynote] UK Cyber & Fraud Solutions, British Embassy, Switzerland – *Banking Security* |
| Sep 13 | [Keynote] European Symposium on Research in Computer Security (ESORICS 2013), Royal Holloway, UK – *Security Protocols and the Law: The Case of Chip and PIN* |
| Sep 13 | [Keynote] Quantitative Aspects in Security Assurance, (QASA 2013), Royal Holloway, UK – *Quantifying and Measuring Anonymity* |
| Mar 13 | [Keynote] Open Web Application Security Project (OWASP), Leuven, Belgium – *Banking Security: Attacks and Defences* |
| Sep 12 | [Keynote] Cryptographic Hardware and Embedded Systems (CHES 2012), K.U. Leuven, Belgium – *Banking Security: Attacks and Defences* |
| Jun 11 | [Keynote] Centre for Telematics and Information Technology (CTIT) Symposium, University of Twente – *The Tor Anonymous Communication Network* |
| Feb 10 | [Keynote] Conference on Achieving Sustainable Improvements in the Security of Retail Payments, Federal Reserve Bank of Philadelphia, Philadelphia PA, US – *Chip & PIN: 5 Years On* |
| Sep 08 | [Keynote] Future of Identity in the Information Society (FIDIS)/International Federation for Information Processing (IFIP) Internet Security & Privacy Summer School, Brno, Czech Republic – *The Future of Anonymity and Censor-Free Publishing* |
| Jun 08 | [Keynote] International Workshop on Security and Trust Management, European Research Consortium for Informatics and Mathematics (ERCIM), Trondheim, Norway – *On the Origins of a Thesis* |
| Sep 07 | [Keynote] European Conference on the BSD Family of Operating Systems (EuroBSDCon), Copenhagen, Denmark – *Hot or Not: Fingerprinting Hosts through Clock Skew* |

3

**JA885**

## Teaching Career Summary

| | |
|---|---|
| 2015– | Lecturer for University College London |
| • | *COMP0057 Research in Information Security* (module co-ordinator, 30 contact hours over 10 lectures: lecturing and development of new lecture material) |
| • | *COMP0064 Dissertation* (module co-ordinator, allocation of projects to supervisors and managing assessment; supervising and assessing MSc Information Security projects) |
| • | *COMP0025 Introduction to Cryptography* (guest lecturer, on cryptography applied to banking security) |
| • | *COMP0058 Applied Cryptography* (guest lecturer, on anonymous communications systems) |
| 2014– | Visiting Lecturer for Computer Science & Engineering at the University of Cambridge |
| • | *Computer Security: Current Applications and Research* (lecturing, development of learning material, setting and marking of examinations for MPhil Advanced Computer Science) |
| • | *Security II* (Lecturing, development of learning material, setting and marking of examinations for BA Computer Science course in Year 3 of 3) |
| • | *Software Engineering* (Lecturer, Engineering Department for MEng Engineering in Year 3 of 4) |
| 2002– | Supervisor for Engineering and Computer Science at the University of Cambridge |
| | Tutorials and marking of coursework for: |
| • | *Digital Electronics* (BA/MEng Engineering course in Year 1 of 4) |
| • | *Linear Circuits* (BA/MEng Engineering course in Year 1 of 4) |
| • | Dimensional Analysis (BA/MEng Engineering course in Year 1 of 4) |
| • | *Introduction to Security/Security I* (BA Computer Science course in Years 2 of 3) |
| • | *Discrete Mathematics* (BA Computer Science course in Years 2 of 3) |
| • | *Object Oriented Programming* (BA Computer Science course in Years 1 of 3) |
| • | *Security II* (BA Computer Science course in Years 3 of 3) |
| • | Computer Science undergraduate and diploma/MPhil (postgraduate) projects |
| • | Engineering MEng projects |
| 2014 | Visiting Lecturer for Royal Holloway, University of London |
| • | *Smart Cards/Tokens Security and Applications* (lecturing and development of new lecture and corresponding formative assessment, on Trusted Execution Environments) |
| 2014 | Visiting Lecturer for University College London |
| • | *Web Economics* (lecturing and development of new lecture on Online Payments Methods) |
| 2011–2014 | Lecturer for Computer Science and Engineering at the University of Cambridge |
| • | *Computer Security: Principles and Foundations* (Development of new course, lecturing, development of learning material, setting and marking of examinations for MPhil Advanced Computer Science) |
| • | *Computer Security: Current Applications and Research* (Development of new course, lecturing, development of learning material, setting and marking of examinations for MPhil Advanced Computer Science) |
| • | *Security II* (Lecturing, development of learning material, setting and marking of examinations for BA Computer Science course in Year 3 of 3) |
| • | *Security I* (Lecturing, development of learning material, for BA Computer Science in Year 2 of 3) |
| • | *Software Engineering* (Lecturer, Engineering Department for MEng Engineering in Year 3 of 4) |

## Enterprise/External Engagement

Creator and maintainer of the EMV Lab (https://emvlab.org/) research platform in 2009 providing tools for researchers and practitioners in the field of card and payment system security, **currently attracting over 32,000 visits per month.**

4

**JA886**

Creator of the Tor Browser in 2008 based on my research on Internet privacy. This system is now the flagship product of the Tor Project and the **technology used by the vast majority of Tor's 2 million daily users**.

Creator of the Cronto payment authentication technology, spun out from my banking research in 2007. I served as Chief Security Architect for this company until its acquisition by OneSpan in 2013. The technology is used **banks including market leaders in Germany, Netherlands and Switzerland**.

Short Courses for Professional Development:
- UCL Faculty of Laws – development of a new lecture covering topics including data protection, privacy enhancing technologies, blockchain, and cryptography for legal professionals (2016–)
- SecAppDev Industrial Training course jointly run by K.U. Leuven, Solvay Business School and Trinity College Dublin. Development of new series of lectures: *security economics; anonymity systems requirements and architecture; banking security architecture; ATM and point of sale system security architecture; online banking security* (2010–2014)
- University of Cambridge – development of lectures and practical exercises for an advanced course for information security practitioners in industry: *mobile systems; traffic analysis and anonymity* (2008–2010)

Information Security consultant:
- A hedge fund developing new internal security controls (2018)
- A fund investing in Internet security technologies (2017)
- A start-up developing and commercializing privacy enhancing technologies (2015–)
- A leading academic publisher (2015)
- A company developing secure collaboration tools and services (2013)
- A small company developing secure voice conferencing services (2010)
- Documtion Research, developing secure PIN distribution technologies (2005)
- A leading developer of mobile phone operating systems (2004)

Public and Policy Engagement:
- Member of Advisory Council to the Foundation for Information Policy Research (2019–)
- Contributor to UK Authorised Push Payment Contingent Reimbursement Model consumer protection scheme, including through advising Which? and Age UK on how my research shows how to prevent fraud (2016–2019)
- Author of Home Office standard for secure handling of evidence in the UK justice system (2014–2017)
- Steering group member for Royal Society report on Cybersecurity (2014–2016)
- Technical adviser to House of Commons Science and Technology Committee investigation on the Investigatory Powers Bill (2016)
- Organiser of joint Royal Society & Royal Society of Canada Frontiers of Science meeting on Information and Communication Technologies (2016)
- Editor of Parliamentary Office on Science and Technology report on The Dark Web (2015)
- Witness to the Joint House of Lords and Commons Committee on the Communications Data Bill (2013)
- Editor of Parliamentary Office on Science and Technology report on Digital Identity (2012)
- Frequent meetings with policymakers, working as a Member of the Cambridge Centre for Science and Policy (CSaP) Network (2010–)
- Author of first UK standard on secure distribution of payment card PINs (2005)

Outreach to schools and school-age students:
- Presenter at Royal Institution Engineering Masterclass at University of Cambridge and University of Oxford (2016–)

5

**JA887**

- Presenter at Royal Institution Computing Masterclass at UCL (2015–)
- Presenter at Royal Institution Maths Masterclass, Cambridge (2011–)
- Supervisor for Nuffield Research Placement (2013)
- Talks to the general public and school students, including during UK National Science & Engineering Week

Work with the media

- Research featured on Computerphile YouTube channel (57,665 views as of October 2019)
- Ran security and source-protection training for Channel 4 investigative journalists
- Author for The New Statesman; article in August 2017
- Author for The Daily Mail; article in August 2016
- Author for The Observer; article in April 2015
- Author for The Conversation; 7 articles with 121,000 readers since February 2015
- Author for The European; article in August 2011
- Reviewer for BBC Tomorrows World online activity on history of science
- Regular interviews with print, online, radio, and TV journalists, including:

The UK – New Scientist, The Times, Guardian, Telegraph, Independent, Financial Times, Daily Mail, BBC News, BBC Watchdog, BBC Newsnight, BBC Fake Britain, ITV Manhunt, Naked Scientists, Rip Off Britain, BBC World Service, The Register, LBC
US – CNN, Wall Street Journal, Huffington Post, Pittsburgh Business Times, ABC News, WIRED
Canada – CBC News
France – Sciences et Avenir
Germany – ARD Plusminus, The European, Der Spiegel, Heise
Italy – L'Espresso
The Netherlands – VPRO Goudzoekers
Columbia – NTN24
Australia – ABC Background Briefing
China – Central China TV
Other international outlets – Channel News Asia, Al Jazeera, International Business Times

## Selected Publications

For the full list of publications, see https://murdoch.is/papers

- Do You See What I See? Differential Treatment of Anonymous Users. Sheharbano Khattak, David Fifield, Sadia Afroz, Mobin Javed, Srikanth Sundaresan, Vern Paxson, Steven J. Murdoch, Damon McCoy. 2016 Network and Distributed System Security Symposium, San Diego, CA, US, 21–24 February 2016.
- Optimising node selection probabilities in multi-hop M/D/1 queuing networks to reduce latency of Tor. Steven Herbert, Steven J. Murdoch, Elena Punskaya. IET Electronics Letters Volume 50, Issue 17, pages 1205–1207, 14 August 2014.
- Impact of Network Topology on Anonymity and Overhead in Low-Latency Anonymity Networks. Claudia Diaz, Steven J. Murdoch, Carmela Troncoso. 10th Privacy Enhancing Technologies Symposium (PETS 2010), Berlin, Germany, 21–23 July 2010.
- An Improved Clock-skew Measurement Technique for Revealing Hidden Services. Sebastian Zander, Steven J. Murdoch. 17th USENIX Security Symposium, San Jose, CA, USA, 28 July–01 August 2008.
- Metrics for Security and Performance in Low-Latency Anonymity Systems. Steven J. Murdoch, Robert N.M. Watson. 8th Privacy Enhancing Technologies Symposium (PETS 2008), Leuven, Belgium, 23–25 July 2008.
- Sampled Traffic Analysis by Internet-Exchange-Level Adversaries. Steven J. Murdoch, Piotr Zieliński. 7th Workshop on Privacy Enhancing Technologies, Ottawa, Canada, 20–22 June 2007.

6

# Exhibit B

USCA4 Appeal: 22-4242    Doc: 14-2    Filed: 06/16/2022    Pg: 447 of 448

Case 2:20-cr-00043-TES-DDC Document 586-1 Filed 03/14/22 Page 39 of 457 PageID #: 20762

**AHMIA**    [ bdsm ]    Search

About Ahmia   Statistics   Add Service   i2p search                    Contact   Blacklist

Any Time ▾

Did you mean *best*?

Omitted very similar entries. Displaying 10 matches in 0.26 seconds. Page 1 of 1.

## BDSM Bank
BDSM Bank
*hiddeiulowqgdh34ngrehlkkov3ijvsivjgvbj6e27w4pbr7qogghdyd.onion* — 6 months, 2 weeks ago —

## BDSM Bank
BDSM Bank
*hiddencrztrqz2h6bjito56pzdamwvhwssnhhghfvumfebuk5aejtlad.onion* — 5 months, 4 weeks ago —

## BDSM Bank
BDSM Bank
*hiddewjoaam33ayyoyc4rhtjcusy7amoxlkidqshr4yfjx4avib6cmqd.onion* — 6 months, 2 weeks ago —

## Porn Videos - XONIONS
XONIONS Porn Videos
*xonionshe7zqqhzowf6pjybykjt3j7a4ipszianf2rttnwsyiigli7qd.onion* — 0 minutes ago —

## Spanking — Jo van Buren
No description provided
*sh33jayxnq7af3i6.onion* — 2 weeks, 6 days ago —

## Recent questions in Sex and relationships - Hidden Answers
"That's not a really weird sex act; that's a really weird sex act" - Crocodile Dundee.
*ru.answerh4rfo4zgi4ao7lzoukjflpbur4ldabarachwwhabbu4vkpvxyd.onion* — 3 weeks ago —

## HIDDEN MARKETPLACE
HIDDEN MARKETPLACE
*hidden24qtvlgaxp.onion* — 5 months, 2 weeks ago —

## The page of links...
A link page to zoophile, furry and anthropomorphic content.
*tssa3yo5xfkcn4razcnmdfw5uxshx6zwzngwizpyf7phvea3gccrqbad.onion* — 2 weeks, 6 days ago —

## PZA Boy Stories

Case 1:20-cr-00143-TSE Document 566 Filed 09/14/21 Page 2 of 2 PageID# 21763

No description provided

*7h6xs7vpc2qlmm4r2oxfpme3xmj2zvorgu2gwxe6uvq47fk3463qzdad.onion — 6 days, 1 hour ago —*

## PZA: Quick Search

No description provided

*pzaboystoravp2rz.onion — 4 weeks ago —*

**JA891**