```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON


_____x
                               :
UNITED STATES OF AMERICA,       : Criminal Action
                               :
               Plaintiff,       : No. 2:21-cr-00127
                               :
v.                              :
                               :
RAYMOND DUGAN,                  :
                               :
               Defendant.       : APPEAL TRANSCRIPT
_____x
```

                         VOLUME I
              TRANSCRIPT OF JURY TRIAL
       BEFORE THE HONORABLE JOSEPH R. GOODWIN
           UNITED STATES DISTRICT COURT JUDGE
             IN CHARLESTON, WEST VIRGINIA
                   AUGUST 2, 2022


APPEARANCES:

For the Government:          Julie White, Esq.
                            Nowles Heinrich, Esq.
                            Assistant United States Attorney
                            United States Attorney's Office
                            P.O. Box 1713
                            Charleston, WV  25326-1713


For the Defendant:          David Schles, Esq.
                            David O. Schles
                            Suite 306
                            815 Quarrier Street
                            Charleston, WV 25301


Probation Officer:          Kiara Carper

                    _____
                      Kimberly Kaufman, RMR, CRR, CRC
                       Federal Official Court Reporter
                     300 Virginia Street East, Room 6610
                          Charleston, WV 25301

Proceedings recorded by mechanical stenography; transcript
produced by computer.

<u>INDEX</u>

                                                          <u>PAGE</u>

PRELIMINARY INSTRUCTIONS.........................13 - 24

OPENING STATEMENT BY MS. WHITE...................24 - 29

OPENING STATEMENT BY MR. SCHLES..................29 - 33


<u>GOVERNMENT WITNESSES</u>:                               <u>PAGE</u>

**Special Agent Michael Fleener**
   Direct Examination (by Ms. White)...................33
   Cross-Examination (by Mr. Schles)..................55
   Redirect Examination (by Ms. White)................70
   Recross-Examination (by Mr. Schles)................73

**Corporal Robert Boggs**
   Direct Examination (by Mr. Heinrich)...............74
   Cross-Examination (by Mr. Schles).................101
   Redirect Examination (by Mr. Heinrich)............111


                                                          <u>PAGE</u>

MOTIONS.........................................117 - 121

CHARGE CONFERENCE...............................121 - 127

CLOSING ARGUMENT BY MR. HEINRICH................128 - 138

CLOSING ARGUMENT BY MR. SCHLES..................138 - 143

REBUTTAL ARGUMENT BY MS. WHITE..................143 - 146

CHARGE TO JURY BY THE COURT.....................121 - 127

VERDICT.........................................159 - 160

INDEX CONTINUED

GOVERNMENT EXHIBITS                                    ADMITTED

Exhibit No. 1.......................................39
Exhibit No. 2A......................................43
Exhibit No. 2B......................................43
Exhibit No. 2C......................................43
Exhibit No. 2D......................................43
Exhibit No. 2E......................................43
Exhibit No. 9 (under seal).........................51
Exhibit No. 3 (under seal).........................53
Exhibit No. 4 (under seal).........................53
Exhibit No. 5 (under seal).........................53
Exhibit No. 6 (under seal).........................53
Exhibit No. 7.......................................91
Exhibit No. 8......................................115
Exhibit No. 10.....................................113

```
 1              PROCEEDINGS had before The Honorable Joseph R.

 2   Goodwin, Judge, United States District Court, Southern

 3   District of West Virginia, in Charleston, West Virginia, on

 4   August 2, 2022, at 8:50, as follows:

 5              THE COURT:  Good morning.

 6              THE COURTROOM DEPUTY CLERK:  The matter before the

 7   Court is The United States of America v. Raymond Dugan,

 8   Criminal Action No. 2:21-cr-127.

 9              THE COURT:  Is the United States ready?

10              MS. WHITE:  We are, Your Honor.

11              THE COURT:  Is the defendant ready?

12              MR. SCHLES:  Yes, Your Honor.

13              THE COURT:  Have you had an opportunity to review

14   the proposed preliminary instructions and the voir dire as I

15   plan to give it?

16              MS. WHITE:  Yes, sir.

17              MR. SCHLES:  We have, Your Honor.

18              THE COURT:  Any objections?

19              MS. WHITE:  No, sir.

20              MR. SCHLES:  Your Honor, we previously, in writing

21   on the forms, had a couple of minor corrections.  Assuming

22   those have been taken care of, no.

23              THE COURT:  Do you want to look and see?

24              MR. SCHLES:  I'm sorry?

25              THE COURT:  Would you look and see?
```

```
1              THE LAW CLERK:  I can print them out and give it
2    to them.
3              THE COURT:  Please.
4         We'll take care of it right now.
5         While we're waiting for her to print that out for you
6    to take a look at, the only motion pending is the motion in
7    limine with regard to the videotape; is that correct?
8              MR. SCHLES:  That is correct, Your Honor.
9              THE COURT:  I'm going to wait and rule on that at
10   the time that it's offered at trial.
11        In the meantime, I direct the parties not to mention it
12   in opening statement or discuss it prior to the time it's
13   offered.
14             MS. WHITE:  Yes, Your Honor.
15             MR. SCHLES:  Would you like me to go ahead, Your
16   Honor?
17             THE COURT:  You can say whatever you want, yeah.
18             MR. SCHLES:  On the motion in limine, it's fairly
19   basic application of the hearsay and relevance rules.  The
20   part that I specifically object to concerns Mr. Dugan's wife
21   asking the question whether that they're there to look for
22   child pornography; getting an answer in the affirmative from
23   one of the agents, which would be hearsay.  That's a
24   statement offered for the truth of the matter asserted.  And
25   then Ms. Dugan's reaction.  She becomes upset and hysterical
```

1    and leaves the room heaving and sobbing.

2        Your Honor, that has no relevance.  It has no tendency

3    to make any matter -- material matter at issue in the case

4    more or less likely.  And it is in my opinion highly

5    inflammatory, in two ways highly prejudicial and fairly

6    prejudicial because, first, the impression could be left

7    with the jurors that Ms. Dugan was previously suspecting the

8    use of child pornography by my client when I don't think

9    that is a fair statement at all.

10        And, also, just her reaction and how upset she was is

11    going to turn the jury against my client because he's

12    accused of doing something that caused his wife such severe

13    distress and I think it is not relevant.

14        The law enforcement's response is hearsay.  And even if

15    there is some slight probative value, Your Honor, it's

16    substantially outweighed by the danger of unfair prejudice

17    and confusing and misleading the jury.

18            MS. WHITE:  Thank you, Your Honor.

19        We provided a copy of the video excerpt to the Court --

20            THE COURT:  I've seen it.

21            MS. WHITE:  -- so I won't belabor the facts.

22        It's our position first that Mrs. Dugan asked a

23    question, which does not fall within the definition of

24    statement for the rule.

25        The answer, which is provided by law enforcement, the

```
1    affirmative yes, is offered not for the truth of the matter,
2    but offered to provide context for the ensuing conversation
3    on the video.
4         That's the only time during that video excerpt that the
5    words child pornography are used.  So for the jury to have
6    the proper context for what the conversation that follows is
7    discussing, they have to hear that exchange.
8              THE COURT:  How would you use her statement in
9    closing argument?
10             MS. WHITE:  We don't intend to reference her
11   statement at all in closing.
12             THE COURT:  Well, then, what important fact is it
13   offered to prove?
14             MS. WHITE:  It's offered to provide context in
15   that the defendant's comments made after that initial
16   exchange are all discussing child pornography and the only
17   time the words child pornography are mentioned to establish
18   that context is during her question.
19        We simply want the jury to hear the fact that everyone
20   in the room thought they were discussing child pornography
21   when the defendant made his inculpatory statements after
22   that exchange.
23             MR. SCHLES:  Your Honor, that can be simply
24   accomplished with Ms. White answering -- asking a
25   preliminary question to Agent Fleener:
```

```
1          Were you questioning Mr. Dugan about the investigation

2    into child pornography?

3          Yes.

4          And then play the clip from approximately 15:40 rather

5    than 14 minutes.  And it has everything that Mr. -- we're

6    not arguing that Mr. Dugan's statements are not either

7    statements of a party opponent or adoptive admissions, but

8    his words are admissible and the questions to him provide

9    the context, but it is certainly not necessary to show the

10   wife's question or the answer or her hysterical reaction.

11   It's done to inflame the jury.  I mean, it couldn't be much

12   more obvious that out of the whole 18-minute tape they pick

13   up right when that happens.

14              THE COURT:  Try again.

15              MS. WHITE:  Well, Your Honor, that happens because

16   that's when the conversation ensues about why the police are

17   there.  The issue is there's a portion at the beginning of

18   the excerpt and the whole rest of the excerpt.  And

19   Mr. Schles respectfully is telling the Court we could simply

20   start the tape later.  Well, no, because before this happens

21   the defendant is seen on the tape reading the search

22   warrant.  He throws the papers on the ground.  He throws his

23   glasses on the ground.  And at one point he says I'm sure

24   this is me on that tape.  And then the conversation happens.

25   A very brief exchange with the wife and the police officer
```

```
 1    to establish the context for all of the listeners and then
 2    the conversation ensues.
 3         Certainly it's the --
 4              THE COURT:  What if there was a Greek chorus in
 5    the living room, and we get to that point in the tape and
 6    the Greek chorus chimes in hang him, hang him, hang him, and
 7    he reacts badly to that suggestion?
 8         Would that come in?
 9              MS. WHITE:  Would the Greek chorus?
10              THE COURT:  Yeah, because he reacts so badly to
11    it.  Hang him for child pornography, hang him for child
12    pornography.
13              MS. WHITE:  Yeah, the government wouldn't offer
14    that into evidence.
15              THE COURT:  Why not?
16              MS. WHITE:  We know better than that.
17              THE COURT:  What's the difference?
18              MS. WHITE:  That's prejudicial asking for death
19    and arguing the penalty.
20         In this case the comment --
21              THE COURT:  Convict him for child pornography,
22    convict him for child pornography.
23              MS. WHITE:  Uh-huh.
24              THE COURT:  What about that from the chorus?
25              MS. WHITE:  Well, Your Honor, I don't think that
```

```
1    the government's allowed to elicit evidence during the trial

2    of an opinion of whether the defendant is guilty or not, so

3    that's different than establishing the context of what the

4    conversation is.

5              THE COURT:  Okay.  I'll still wait until the time

6    you offer it.  I'm dubious.

7              MS. WHITE:  Thank you, Your Honor.

8        If the Court does decide to remove that excerpt, would

9    it --

10             THE COURT:  Yeah, you ought to go ahead and

11   prepare the tape just to remove her question.

12             MS. WHITE:  Yes, Your Honor.

13       Would it be permissible to the Court that we simply

14   have the tape go silent during those 20 seconds, but

15   continue to play, so there's no issue of splicing it?

16             MR. SCHLES:  I don't think the visual depiction

17   fits within what my objection is.

18       I would be satisfied with the silence during that.

19             MS. WHITE:  Thank you, Your Honor.

20       So if -- just to make this trial as simple as possible,

21   the government will agree that we'll play the first portion

22   of the tape.  We'll make her question and answer silent.

23   And I will ask a question to the witness eliciting what the

24   topic was during that portion and then we'll play the

25   remaining portion of the tape.
```

```
 1              THE COURT:  That sounds like a good resolution to

 2    the problem for me.

 3        Is that satisfactory to the defendant?

 4              MR. SCHLES:  That is satisfactory, Your Honor.

 5              THE COURT:  That will be --

 6              MR. SCHLES:  Just to clarify that the sound should

 7    not come on until Mrs. Dugan has visually left the room.

 8    She can be heard during the rest of the time from a

 9    different room, but we can't flush that out and I just have

10    to accept that.

11              MS. WHITE:  Well, Your Honor --

12              THE COURT:  If there's any other -- I'm going to

13    take out her statement.

14              MS. WHITE:  Yes.

15              THE COURT:  I'm not going to try to edit it

16    further than that.  I'll silence that.

17              MS. WHITE:  Thank you, Your Honor.

18              THE COURT:  Her question was --

19              MR. SCHLES:  Thank you, Your Honor.

20              MS. WHITE:  We'll remove the question and answer

21    and we'll make that silent.

22        Thank you, sir.

23              THE COURT:  Very well.

24        Well, that's good.

25        How long do you need for opening?  I usually don't ask
```

```
 1    that, but I'm in a good mood.
 2                MS. WHITE:  No more than ten minutes, Your Honor.
 3                THE COURT:  Is that all right with you,
 4    Mr. Schles?
 5                MR. SCHLES:  That would be sufficient, Your Honor.
 6                THE COURT:  All right.  We're waiting for jurors.
 7    We've been fairly lucky during COVID to be able to get
 8    jurors, but we're -- this morning we're short or right on
 9    the cusp, so it may be a few minutes.
10        I'm going to recess court.  If you want to step
11    outside, just let Robin know exactly where you're going to
12    be and have a phone number and we'll call you.
13                MR. SCHLES:  We won't be any further than the
14    hallway, Your Honor.
15                MS. WHITE:  Thank you, Your Honor.
16        We'll just go downstairs to check that audio on the
17    video to make sure it plays appropriately for the jury.
18                THE COURT:  Sounds good.  The Court stands in
19    recess.
20        And the courtroom deputy has the papers for you -- I
21    mean, the law clerk.
22        (Recess taken from 9:00 a.m. until 9:37 a.m.)
23        (Whereupon, jury selection was conducted after which
24    the following occurred:)
25
```

1            THE COURT:  You may be seated.

2        Ladies and gentlemen of the jury, now that you've been

3    sworn I'll give you some preliminary instructions to guide

4    your participation in this trial.

5        You are now judges of the facts.  It is your job to

6    determine what those facts are.  I'll give you more lengthy

7    and full instructions at the end of the trial, but you must

8    decide the case based solely on the facts as you find them

9    and the law as I give it to you.

10        You must decide it based on the evidence.  Evidence is

11    the testimony of witnesses from the witness stand, which is

12    now in the middle of the courtroom for COVID reasons -- it

13    will be right there at the podium -- exhibits, stipulations

14    or agreements between the parties as to the existence of a

15    fact and those matters of which I take judicial notice.  Any

16    of those things happen, I'll explain it to you at the time

17    it occurs.

18        The following are not evidence.  The indictment, as I

19    previously told you, is not evidence.  It's a formal method

20    of accusing a defendant of a crime in order to bring that

21    defendant to trial.  My statements and rulings are not

22    evidence.  The attorneys' statements, arguments, questions

23    and objections and any evidence that I order stricken are

24    not evidence and may not be considered by you.  If there's

25    an objection made to a question, I'll rule on that

1    objection.  If I sustain the objection, ignore the question.

2    If I overrule the objection, treat the question and answer

3    just the same as you would any other question or answer in

4    the case.

5        In other words, try to ignore the judging and the

6    lawyer and listen to the witnesses and review the evidence

7    as it comes in.

8        You should consider the evidence in this case in the

9    same way you would consider evidence in making any very

10   important decision in your life.  Feel free to use your

11   common sense.  Feel free to draw reasonable conclusions

12   based on your common experience.

13       Some of you have heard the terms direct evidence and

14   circumstantial evidence.  Feel free to use either one.

15   Direct evidence might be if I were standing in a house, I

16   looked out the window and it was snowing outside.  It would

17   be direct evidence that it's snowing.  It would be

18   circumstantial evidence that it's somewhat cold out there.

19   You don't have to make those distinctions.  Just consider

20   both and give it just such weight as you believe it

21   deserves.

22       Consider any evidence which I admit for a limited

23   purpose, and I'll tell you if I do that, only for that

24   purpose.

25       You must presume this defendant not guilty.  The

```
1    presumption of innocence alone is enough to acquit the

2    defendant.

3         The government has the burden of proving the

4    defendant's guilt beyond a reasonable doubt.  Unless the

5    government proves beyond a reasonable doubt that the

6    defendant committed each and every element of the crime

7    charged, you must find the defendant not guilty of that

8    charge.  The burden never shifts to the defendant.  The

9    defendant does not have any duty or burden of calling

10   witnesses or presenting evidence.  If in your view the

11   evidence reasonably permits two conclusions, one consistent

12   with innocence and one consistent with guilt, you must adopt

13   the conclusion consistent with innocence.

14        The defendant in a criminal case has an absolute right

15   under the Constitution not to testify.  If a defendant

16   decides to exercise his constitutional right not to testify,

17   you must not discuss or consider that fact.

18        I'm going to give you detailed instructions at the end,

19   as I said, but I'm going to give you a brief summary of what

20   the government must prove to make its case.

21        The superseding indictment in this case charges the

22   defendant, Raymond Dugan, with accessing with intent to view

23   images and videos containing child pornography in violation

24   of 18 United States Code Section 2252A(a)(5)(B) and

25   2252A(b)(2).
```

1          2252A(a)(5)(B) states in pertinent part:  Any person

2     who knowingly possesses or knowingly accesses with intent to

3     view any material that contains an image of child

4     pornography that has been shipped or transported in or

5     affecting interstate or foreign commerce by any means,

6     including by computer, or that was produced using materials

7     that have been mailed or shipped or transported in or

8     affecting interstate commerce or foreign commerce by any

9     means, including by computer, shall be guilty of a crime

10    against the United States.

11         The superseding indictment in this case charges between

12    on or about January 30th, 2019, and on or about

13    November 4th, 2019, at or near Logan, Logan County, West

14    Virginia, and within the Southern District of West Virginia,

15    defendant Raymond Dugan did knowingly access with intent to

16    view material, that is computer graphic image files

17    containing images and videos of child pornography, as

18    defined in 18 United States Code Section 2256(8)(A), that

19    involved prepubescent minors and which had been shipped and

20    transported in and affecting interstate and foreign commerce

21    by any means, including by computer.

22         To sustain its burden of proof, the government must

23    prove the following three essential elements beyond a

24    reasonable doubt:

25         One, that this defendant possessed or accessed with

1    intent to view any material that contained an image of child

2    pornography involving a prepubescent minor.

3        Two, that the graphic image file images had been

4    transported in or affecting interstate or foreign commerce

5    by any means, including by computer, or was produced using

6    materials that had been transported in or affecting

7    interstate commerce by any means, including computer.

8        And, three, that the defendant acted knowingly.

9        To act knowingly means to do an act voluntarily and

10   intentionally and not because of a mistake or accident or

11   other innocent reason.  In other words, the government must

12   prove that the defendant knew the visual depiction was an

13   image of prepubescent child pornography.

14       Child pornography means any visual depiction where the

15   production of such visual depiction involves the use of a

16   minor engaged in sexually explicit conduct.  Such visual

17   depiction is a digital image, computer image or computer

18   generated image that is or is indistinguishable from that of

19   a minor engaging sexually -- engaging in sexually explicit

20   conduct or such visual depiction has been created, adopted

21   or modified to appear that an identifiable minor is engaging

22   in sexually explicit conduct.

23       Sexually explicit conduct means actual or simulated

24   sexual intercourse, including genital-genital, oral-genital,

25   anal-genital or oral-anal, whether between persons of the

1    same or opposite sex, bestiality, masturbation, sadistic or

2    masochistic abuse, or lascivious exhibition of the genitals

3    or pubic area of any person.

4        An identifiable minor is a person who was a minor at

5    the time the visual depiction was created, adapted or

6    modified -- adopted or modified and whose image as a minor

7    was used in creating, adopting or modifying the visual

8    depiction; and who is recognizable as an actual person by

9    the person's face, likeness and other distinguishing

10   characteristics, such as a unique birthmark or other

11   recognizable feature; and shall not be construed to require

12   proof of the actual identity of the identifiable minor.

13       The jury must determine, based on all the evidence,

14   whether a reasonable viewer would consider the depiction to

15   be of an actual minor.  The jury may look to the manner in

16   which the image was marketed to determine whether it is

17   prohibited material.

18       The government has alleged that the images at issue

19   here involve a prepubescent minor.  Under this law a

20   prepubescent minor is one under the age of 12.  The

21   government does not need to establish the exact age of the

22   child in the image, nor does it need to prove the identity

23   of the child in the image.  You may determine that a person

24   is under the age of 12 based on the relevant images.

25       Finally, I want to talk to you about your conduct as

1    jurors.

2         Do not discuss this case with anyone or permit anyone

3    to discuss the case with you or in your presence.  If anyone

4    tries to talk to you about the case, notify me.

5         Do not read any news stories, articles or listen to any

6    radio or television reports about the case or about anyone

7    who has anything to do with the case.  Don't do any research

8    or investigation on your own.

9         I used to worry that we'd try car wreck cases and the

10   jury would go out to the scene of the wreck and look around.

11        Everything you're allowed to consider will be presented

12   right here in the courtroom.  You may not go on your

13   computer and do searches or acquire information or get books

14   out and look them up or call somebody because you're not

15   allowed to do any of that.

16        I'm going to allow you to take notes.  We'll put

17   notepads out for you after you come back after a break.  I

18   want to tell you about the notes.  They're to help you.

19   They're not the court reporter's official record.  They are

20   simply notes to help you.  You can use them to aid your

21   discussion with your fellow jurors, but just because you've

22   got it in your notes doesn't mean that somebody else that

23   doesn't have it is right or wrong or that you're right or

24   wrong.

25        You get the drift?

```
1          Keep the doors to the jury room shut when possible.
2          (Sidebar discussion held with defendant present.)
3              THE COURT:  Can you hear me?
4          Any objections to the instructions as given?
5              MS. WHITE:  No, sir.
6              MR. SCHLES:  No, Your Honor.
7              THE COURT:  All right.  Are we ready to proceed?
8              MS. WHITE:  Yes, sir.
9              THE COURT:  All right.  Thank you.
10         (End of discussion at sidebar.)
11             THE COURT:  We're getting fancy.  It used to be we
12     would have to have the attorneys approach the bench and take
13     a break.  And then we developed this pink noise or whatever
14     it's called so you couldn't hear the things you weren't
15     supposed to hear.  And now we have these fancy headphones
16     and the pink noise.
17         When we're doing this, don't listen.  Talk among
18     yourselves or don't pay attention to us.
19         I'm going to tell you what happens next.  Actually,
20     what happens next is we're going to take a morning break,
21     but after that the government may make an opening statement.
22     That is simply a preview of what they believe the evidence
23     in the case will be.  It's not argument, but it is designed
24     to help you understand the evidence as it comes in.
25         The defendant has the opportunity to make an opening
```

1    statement, but, like I explained to you, the defendant has

2    no obligation to present anything.  It is solely the

3    government's burden in this case.  If they make an opening

4    statement, then, again, the same rules apply.  They're going

5    to preview what they think the evidence will be to help

6    guide your deliberations.

7         Next, after opening statements, we'll begin with the

8    government's witnesses.  They have the burden of proof, so

9    they get to go first and last.  They will call their

10   witnesses, examine them.  Then, after they finish with the

11   examination of a witness, if the defendant wants to, the

12   defendant may cross-examine that witness.  If they do, then

13   because the government gets to go first and last, the

14   government can take more questions on redirect.

15        Now, we'll go like that until the government is

16   finished with their witnesses and exhibits and so forth.

17        At the end of that we'll take a short break and then

18   we'll be back.  And at that point the defendant will decide

19   whether they want to call any witnesses or present any

20   evidence.  Again, they have absolutely no obligation to do

21   that.  And if so, the same procedure will apply.

22        At the end of the evidence we'll take another break,

23   not terribly long, and then you'll come back.  You'll hear

24   the final arguments of the lawyers.

25        The government will make an opening.  This is where

1   they get to tell you what they think that the evidence

2   showed.  They get to argue their case to tell you what they

3   believe was proved and how it was proved.

4       Again, when the government finishes, the defendant may

5   have his lawyer stand up and make a closing argument to tell

6   you why he believes the government failed and what he

7   believes the government -- or that the evidence has or has

8   not shown.

9       After that, because the government gets to go first and

10  last, they get a brief period to rebut the defendant's

11  argument if the defendant has chosen to make one.

12      After that I then give you the instructions, much like

13  the ones I just gave you now.  After that you will retire to

14  the jury room to consider of your verdict.  I will explain

15  your duties in that regard at the end of the trial.  Suffice

16  it so say you're judges of the facts.  You will decide.  You

17  are the jury and you will decide this case.  Your verdict

18  must be unanimous.  You-all must agree.

19      Any objections, counsel?

20          MS. WHITE:  No, Your Honor.

21  Thank you.

22          MR. SCHLES:  No, Your Honor.

23          THE COURT:  At this time we'll take our morning

24  break.  Usually we'll take it earlier than this.

25      Our general schedule, if we go forward to another day,

1    is we'll take a 15-minute break midmorning, an hour and

2    15 minutes for lunch, 15 minutes in the afternoon for a

3    break.  And we'll go to 5:00 or as soon thereafter as it's

4    reasonable to interrupt the flow of the evidence.

5        Remember this, when you go home tonight, people are

6    going to be very curious as to what you've been up to.  Oh,

7    you're on a jury?  What's it about?  What kind of case are

8    you on?  Tell them that there's a very old and very mean

9    federal judge who's told you you cannot say what kind of

10   case you're on or tell them anything about it.  And that

11   goes for everybody, including your spouse and your children,

12   so forth.

13       You also might tell them you're not going to be able to

14   let them know if someday you're late getting home because

15   you're still in deliberations and have decided to stay past

16   5:00, so they'll be prepared for your disappearance into The

17   Twilight Zone.

18       After the trial is over and you've rendered your

19   verdict and you've been excused, you are permitted to

20   discuss the case.  My practical advice to you is don't.  It

21   doesn't do any good.  It can just stir up things, but it's

22   entirely up to you.

23       Now, having all that out of the way, everybody

24   understand where we're headed?

25       All right.  The court security officer will show you

```
 1    into your jury room.  It's not huge, but I think you'll feel
 2    reasonably safe.  We have another one of those air handlers
 3    like that one there that cleans the air as best we can and
 4    we have or should have some food and coffee.
 5         So we'll take about a 15-minute break and then we'll
 6    hear the opening statements of counsel.
 7         All rise for the jury.
 8         (Jury out at 10:53 a.m.)
 9              THE COURT:  Counsel, do you need anything?
10    Court's in recess.
11         (Recess taken from 10:53 a.m. until 11:14 a.m.)
12              THE COURT:  Good morning.
13         Government, you may open.
14              MS. WHITE:  Thank you, Your Honor.
15         May I use the podium this morning?
16              THE COURT:  You certainly may.
17              MS. WHITE:  Thank you.
18         Good morning, ladies and gentlemen.  Can everyone hear
19    me?
20         Okay.  We're here today because the defendant in this
21    case, Raymond Dugan, decided to go on the dark web and look
22    at child pornography.
23         Now, if you're looking for child pornography, these
24    days you have to put in some effort.  So if you or I went to
25    Google or Internet Explorer and we typed in child
```

```
 1   pornography, you'd find some articles about child

 2   pornography, you'd find some studies, maybe some press

 3   releases, stories, but what you wouldn't find are pictures

 4   and videos of actual children being abused, being sexually

 5   degraded.  You wouldn't find that on Google.  So if you're

 6   looking for it, you've gotta go a little further and one

 7   place folks go is the dark web.

 8        Now, in this case the defendant in this case admitted

 9   to going on the dark web.  Now, to get on the dark web, you

10   have to install an application or a portal to get to the

11   dark web.

12        In this case the defendant told police that he

13   installed the Tor browser.  The Tor browser stands for The

14   Onion Router.  So once you install that application, you

15   click on it and it gives you access to the dark web.

16        And the dark web is like a different version of the

17   internet.  It's a little -- a little more private, a little

18   more anonymous, and it has a lot of child pornography on it.

19        So if you're looking for child pornography, you might

20   do what the defendant in this case did, go on the Tor

21   browser to access the dark web and look at child

22   pornography.

23        Now, you'll hear testimony today from a forensic

24   analyst, Corporal Robert Boggs, and he will tell you that he

25   looked at some of the electronic devices in the Dugan home.
```

1    And specifically he analyzed the hard drive from a laptop

2    that was found in the defendant's home office.

3        He will tell you what he found, that that hard drive

4    had the Tor browser on it being used from January through

5    November of 2019 and that .onion or -- or Tor websites were

6    visited over 1,500 times.  And finally he will tell you that

7    he was able to recover from the unallocated space of the

8    defendant's hard drive over 1,200 images of child

9    pornography.

10       So you'll have that evidence to consider at the end of

11   this trial, but you'll also have the evidence of the

12   defendant's own words.

13       When the Department of Homeland Security executed a

14   search warrant at the Dugan home in June of 2020, they had

15   an opportunity to talk to Mr. Dugan, the defendant.  And as

16   soon as he found out why the police were there, he said I

17   probably did it.  My life is over.  She's gonna kill me,

18   talking about his wife.

19       So he then had an opportunity to sit down with

20   Agent Fleener.  He was given his rights and agreed to give a

21   statement.  And you'll hear the defendant, in his own words,

22   admit to installing the Tor browser, admit to using it to

23   access the dark web -- excuse me -- the dark web.  You'll

24   hear the defendant in his own words say, I went from website

25   to website clicking from one to another looking at child

1    pornography.

2         Now, he draws a clear distinction, the defendant.  He

3    didn't download any child pornography, but he admits that he

4    was looking.  And that, ladies and gentlemen, is what he's

5    charged with, accessing with intent to view child

6    pornography.

7         So in this case the government needs to prove a couple

8    of things.  By the end of this case, we need to show you

9    that the defendant in this case accessed with his intent to

10   view child pornography, that the children in some of those

11   images are under the age of 12, that the defendant knowingly

12   accessed the pictures and videos, and, finally, that some

13   part of his actions involved interstate or foreign commerce.

14        So we'll work backwards through the elements.

15        Number four:  Interstate or foreign commerce.

16        That one's pretty easy in this case because we all

17   agree.  During the trial I'll read you a stipulation that

18   the government and the defendant and his attorney have

19   entered into.  We all agree that the interstate and foreign

20   commerce element is met, so you can check that box pretty

21   quickly.

22        The next one is that the defendant knew what he was

23   doing.  And numbers one and two kind of go together, that he

24   looked at the child pornography and that he knew that's what

25   he was looking for.  And the evidence from that will come

1    directly out of his own mouth:

2        I was looking for it.  I went from website to website.

3    I spent several months on the dark web looking for child

4    pornography.

5        You'll hear those words on the tape in the defendant's

6    own voice.

7        Now, the last element is that the children in these

8    images are under the age of 12.  Prepubescent is the legal

9    term.  That means you're going to have to look at some

10    pictures.  You will not have to look at all 1,237 images.

11    I'm going to show you a handful in a way that's as painless

12    as I can possibly make it, but when you look at those images

13    that we have selected, you will have no question that these

14    children are little, under the age of 12, some by far, and

15    you'll check that final box.

16        When you finish all of the evidence, we'll get to come

17    back to you one more time and summarize it for you.

18        We're here today, and we'll come back to you later,

19    because the defendant in this case was curious.  Curiosity

20    got me is the last question he has on the tape for you.

21    Curiosity got me and it put me in a bad spot.

22        Yes, it did, ladies and gentlemen.  Curiosity to the

23    tune of 1,237 images carved out of the defendant's hard

24    drive, pulled out of the unallocated space, recovered, after

25    he spent nine months on the dark web looking for child

1  pornography.

2      When we come back to you, after you've heard the

3  defendant's words and you've heard the testimony of the

4  agent and the forensic analyst, you'll have no trouble doing

5  what we ask of you and that is checking the guilty box.

6      Thank you.

7          THE COURT:  Mr. Schles.

8          MR. SCHLES:  Thank you, Your Honor.

9      Good morning.  I am David Schles and I am Ray Dugan's

10  attorney.  And we are here today.  My client has denied the

11  allegations and he is here and we are putting the government

12  to its proof.

13      Ms. White just told you in her own words what she

14  thinks the government will prove.  I'm asking you and

15  Mr. Dugan is asking you to listen to the actual evidence,

16  don't start from their version.  They're trying to condition

17  you to accept the evidence the way they want you to view it.

18      She just claimed to have quoted Mr. Dugan.  You are

19  going to hear Mr. Dugan.  The interview was recorded.  When

20  you listen to it, ask yourself do you hear Mr. Dugan say I

21  was looking for it?  It, child porn, anything.  He didn't

22  say that.  You won't hear him say I was looking for it.

23  They want you to assume he was looking for it.

24      They also want you to assume that when you go on the

25  dark web that you have to have some sort of specialized

```
 1    knowledge and search for it.  They aren't going to prove

 2    that either.  The dark web is different than what I'm going

 3    to call the regular internet.  You do need specialized

 4    software to access it, but it acts just like the regular

 5    internet once you're inside it and using the software.

 6         We've all been on the internet.  You were asked before

 7    and everybody at least to some degree is familiar with

 8    surfing the internet.

 9         You do not need to type URLs or the names of websites

10    or links and sites.  They're going to make it sound like you

11    have to know the exact combinations of letters and numbers

12    to type in order to be directed to a particular website.

13         You will find out that's not true.  Just like on any

14    other internet, you Googled something, you do a search, you

15    go to one website.  On that website there's going to be

16    links to multiple other websites.  There are links to

17    advertisements.  There are pop ups.  There are embedded in

18    the text of articles, you know, hyperlinks where you just

19    click on a link and it will take you to another one.

20         Everybody, I would assume, at some point in their life

21    using the internet has ended up on a website that either

22    they didn't intend to ever visit or once they found out what

23    it was they didn't do anything.  I'm not interested in this

24    and they went away.

25         The government is claiming knowledge and intent and
```

31

1    they are not going to prove it.

2        We do not deny that there were images found in what

3    they're calling the unallocated space.  What that actually

4    is is your computer has system files or hidden files.  Some

5    of them are what are called thumbs databases where the

6    computer itself creates files and shortcuts and stores them

7    in what are hidden files.

8        When you open up what -- your file directory structure

9    on the internet, you see I have the file for -- like at my

10   office, I have my client files and then each individual file

11   individual client has a subfile and within the client's

12   subfiles there are different directories with different

13   categories and things and you sit there and you create them.

14       I create a file for John Smith.  I create a file for

15   John Smith evidence file, John Smith legal research file,

16   all these things.

17       And that's so -- why is it?  So I know where they are

18   and I can find them and I can go back to them and use them,

19   look at them.  That's the whole purpose of doing that.

20       You're going to find out that isn't the way Mr. Dugan's

21   hard drive was at all.  These were not visible.  They

22   weren't organized.  They hadn't been by any human hand, let

23   alone Mr. Dugan, placed into these files.  They are found in

24   hidden system files buried in the operating system of his

25   computer.

1          They are not going to prove that he looked at them.

2    They're not going to prove that he knew they were there.

3          They will be able to show that the computer that we're

4    talking about -- and it's an Acer laptop.  And it's got a

5    serial number, but I'm not going to bore you with that --

6    did have images in the drive that were recovered that

7    contained child pornography.  We're not disputing that

8    portion of it.

9          What we are disputing is that Mr. Dugan knowingly

10   accessed child pornography with the intent to view it.

11         The government has made some bold claims, very bold

12   claims, but you're going to see the actual evidence.  You're

13   going to hear his actual words.  You're going to hear from

14   the -- and you are going to hear that the government is

15   overselling this.  They are not going to be able to prove

16   knowledge or intent in terms of access or viewing.  And the

17   mere presence of these images in hidden system files is not

18   sufficient to convict a person.  It's simply not the crime

19   with which he has been charged.

20         When you listen to all the evidence and think about it

21   and discuss it among yourselves and ask yourselves did the

22   government prove what they claimed they proved?  Did they

23   prove intentional knowing access with the intent to view

24   child pornography?

25         You are going to come to the conclusion that not only

1    is there reasonable doubt, but they didn't prove it or even

2    come close.  And I will ask you at the appropriate time at

3    the end of the trial to acquit my client and I am confident

4    that you will.

5         Thank you very much.

6              THE COURT:  Call your first witness.

7              MS. WHITE:  Your Honor, the government would call

8    Special Agent Michael Fleener.

9              THE WITNESS:  Sir, am I allowed to bring this

10   over?

11             THE COURT:  You may.

12             THE WITNESS:  Thank you, sir.

13        **SPECIAL AGENT MICHAEL FLEENER, GOVERNMENT WITNESS, SWORN**

14                        **DIRECT EXAMINATION**

15             THE COURT:  Pull that microphone, close if you

16   would.

17             THE WITNESS:  Yes, sir.

18   BY MS. WHITE:

19   **Q.**   Agent Fleener, good morning.

20   **A.**   Good morning, ma'am.

21   **Q.**   Could you state your full name and your former employer

22   for the record, please?

23   **A.**   My full name is Michael Fleener.  I was formally

24   employed by Homeland Security Investigations with the

25   Department of Homeland Security.

Special Agent Michael Fleener - Direct (White)

1    **Q.**    And how long did you work for Homeland Security?

2    **A.**    Just over 21 years.

3    **Q.**    What made you leave?

4    **A.**    I retired, ma'am.

5    **Q.**    And when did you retire?

6    **A.**    May 31st of this year.

7    **Q.**    So during the course of this case?

8    **A.**    Absolutely, yes, ma'am.

9    **Q.**    What was your role with the Department of Homeland

10   Security when you were working there?

11   **A.**    I was a criminal investigator assigned all programatic

12   areas of the Department of Homeland Security and its legacy

13   agency the United States Custom Service.

14        Those duties included drug smuggling; money laundering;

15   what we call counterproliferation of American technology,

16   weaponry and data; human smuggling; human trafficking; and

17   cyber investigations, more specifically child pornography,

18   what some people call child sexual abuse material.

19        That actually encompassed about 95 percent of all my

20   caseloads.

21   **Q.**    Thank you.  So you focused a lot of attention --

22   **A.**    Yes, ma'am.

23   **Q.**    -- on child exploitation?

24   **A.**    Yes, ma'am, that is correct.

25   **Q.**    Could you tell the ladies and gentlemen of the jury

Special Agent Michael Fleener - Direct (White)

1    what training you had?

2    **A.**    Absolutely.  Beginning in 2001 at the United States

3    Customs Academy in Georgia I received approximately 32 hours

4    of basic child pornography investigative training.

5         Once I got out into the field and permanently assigned

6    in the Philadelphia office, I was assigned to a smuggling

7    group.  And at that time all child pornography

8    investigations came through the smuggling group because it

9    crossed the borders of the United States.  It's been that

10   way for decades.  So because I was in smuggling group, I

11   received specialized more advanced training in child

12   exploitation investigations to include online technical

13   skills, cyber investigations training, what's known as

14   peer-to-peer investigation.

15        Peer-to-peer is basically two computers working

16   together and communicating directly.  It would be, perfect

17   example, you text somebody an image of your grandkid.  That

18   is a peer-to-peer, you know, straight network of computers.

19        I received training as a forensic interviewer in child

20   exploitation cases.  I received training as a crisis

21   negotiator, what people would call hostage negotiations

22   specifically for my responding to child exploitation

23   investigations.  I've attended five week-long seminars in

24   Dallas put on by the Internet Crimes Against Child Task

25   Forces, which ranged anywhere from 32 to 40 hours each of

Special Agent Michael Fleener - Direct (White)

1    advanced training, and cell phone training -- forensic cell

2    phone training through West Virginia State Police, the

3    Marshall Laboratory down in Huntington.

4         And probably 95 percent of all my career, the 21

5    career, has been focused on child exploitation

6    investigations.  I think I -- without counting --

7    approximately 200 cases of my career of child exploitation.

8    **Q.**   Were you involved in the investigation into a man by

9    the name of Raymond Dugan?

10   **A.**   Yes, ma'am, I was.

11   **Q.**   Do you see him in the courtroom?

12   **A.**   Yes, ma'am.  He's sitting right there, ma'am.

13   **Q.**   Could you tell the ladies and gentlemen of the jury the

14   color of his tie?

15   **A.**   Yellow tie, blue shirt, gray suit coat.

16         MS. WHITE:  Your Honor, if we could let the record

17   reflect the witness has identified the defendant.

18         THE COURT:  The record may so reflect.

19         MS. WHITE:  Thank you.

20   BY MS. WHITE:

21   **Q.**   Now, were you involved in obtaining a search warrant

22   related to child pornography with respect to the Dugan

23   residence?

24   **A.**   Yes, ma'am, I was.

25   **Q.**   Okay.  And did you write the search warrant?

Special Agent Michael Fleener - Direct (White)

1    **A.**   I wrote the affidavit for the search warrant, yes,

2    ma'am.

3    **Q.**   And were you a part of the team that executed the

4    search warrant?

5    **A.**   Yes, ma'am, I was.

6    **Q.**   When did you execute that warrant?

7    **A.**   June 11th, 2020.

8    **Q.**   Okay.  And that was done on Lewis Lawson Branch Road in

9    Logan?

10   **A.**   Yes, ma'am, it was.

11   **Q.**   Now, when you executed that search warrant, did you go

12   in, knock the door down and take a team of SWAT officers

13   with you, or how did you go about that in this case?

14   **A.**   We did what we refer to as a very soft entry.  We

15   basically -- as tactically sound as we need to be for our

16   safety, basically just up to the front door with a warrant

17   in hand and knock on the door.

18   **Q.**   Okay.  Now, who did you expect to find in the home?

19   **A.**   I was aware living at the time was Mr. Dugan, his wife

20   Eleanor Dugan and they have an adult child by the name of

21   Tyler Dugan.

22   **Q.**   Okay.  When you got there on June 11th of 2020, who was

23   present that morning?

24   **A.**   I believe all three of them.

25   **Q.**   Okay.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Direct (White)

1    **A.**    If memory serves correct.

2    **Q.**    Now, during the course of your execution of the search

3    warrant, did you have authority to seize items?

4    **A.**    Yes, ma'am, I did.

5    **Q.**    What did you seize?

6    **A.**    What did I seize?

7    **Q.**    What was seized?

8    **A.**    A total of 17 items I believe encompassing hard drives,

9    thumb drives, cell phones, iPads.  I believe that's pretty

10   much it.

11   **Q.**    And what were you looking for?

12   **A.**    Evidence of the Tor network and child pornography.

13            MS. WHITE:  Your Honor, may I approach the

14   witness?

15            THE COURT:  You may.

16   BY MS. WHITE:

17   **Q.**    Agent Fleener, I'm going to show you what's been marked

18   as Government's Exhibit Number 1.

19       Do you recognize this item?

20   **A.**    I do, ma'am.

21   **Q.**    What is it?

22   **A.**    It is an audio/video recording of our entry during the

23   search warrant.

24   **Q.**    So you made a small video clip of when you got to the

25   home?

Special Agent Michael Fleener - Direct (White)

1  **A.**   Actually, it was recorded by Trooper Boggs, I believe.

2  **Q.**   Your team?

3  **A.**   Yes, ma'am.

4  **Q.**   Have you had an opportunity to review the clip that's

5  contained on Exhibit 1?

6  **A.**   I have.

7  **Q.**   Does that fairly and accurately depict what happened at

8  the residence that morning?

9  **A.**   Yes, ma'am, it does.

10 **Q.**   And it does contain a small silent portion?

11 **A.**   It does.

12        MS. WHITE:  We'd offer Government's Exhibit

13 Number 1 into evidence and ask to publish it to the jury.

14        THE COURT:  It may be done.

15        **GOVERNMENT EXHIBIT NUMBER 1 ADMITTED**

16        MR. SCHLES:  No objection, Your Honor.

17        MS. WHITE:  Thank you, Your Honor.

18     (Video played.)

19 BY MS. WHITE:

20 **Q.**   Now, Agent, you just saw a couple of people come across

21 the screen.

22     Who is the woman who is pictured on the screen right

23 now?

24 **A.**   That was Eleanor Dugan.

25 **Q.**   And there was a young man who preceded her on the

1    screen wearing a green T-shirt.

2        Who is that?

3    **A.**   That would be the adult son, Tyler Dugan.

4    **Q.**   And the third person on the screen that came by?

5    **A.**   It would be Mr. Dugan.

6    **Q.**   Okay.  Thank you.

7            MR. SCHLES:  Objection, Your Honor.

8            THE COURT:  Very well.  Can I have you on the

9    headphones.

10       All right.  This is the point you talk among

11   yourselves.

12       (Sidebar discussion held with defendant present.)

13           THE COURT:  All right, Mr. Schles.

14           MR. SCHLES:  Your Honor, my understanding is that

15   the portion with Ms. Dugan's words would be muted.  I could

16   hear that.

17           MS. WHITE:  Your Honor, we provided the tape and

18   allowed Mr. Schles to review it in the redacted form

19   pursuant to our agreement before court.  And this is exactly

20   what he viewed and just admitted into evidence without

21   objection.

22           MR. SCHLES:  Your Honor, what I viewed and

23   listened to, after our earlier hearing and the Court's

24   ruling, it did not include audio of Ms. Dugan speaking.

25           MS. WHITE:  She didn't speak on the tape, Your

Special Agent Michael Fleener - Direct (White)

1    Honor.  We redacted the portion in question.  It hasn't come

2    up on the screen yet because we haven't allowed it to play

3    that far.

4            THE COURT:  I think I just heard an "oh" or

5    something like that.

6        Is that all I heard?

7        It was only supposed to have muted her question.

8    That's what I understood the agreement was.

9            MS. WHITE:  That's correct, Your Honor.  We did

10   that from second 41 through minute 1:16 to cover her

11   question, the answer, and her ensuing response.

12       We've provided that to Mr. Schles and he watched it

13   during the recess.

14           THE COURT:  All right.  Overruled.  You may

15   proceed.

16           MS. WHITE:  Thank you, Your Honor.

17           MR. SCHLES:  Thank you.

18       (End of discussion at sidebar.)

19       (Video played.)

20   BY MS. WHITE:

21   **Q.**   Now, during this time where it's silent, Agent, was

22   there a question and answer that established the topic for

23   which you were there?

24   **A.**   Yes, ma'am, there was.

25   **Q.**   What was it?

Special Agent Michael Fleener - Direct (White)

1    **A.**   After Mr. Dugan's comment right there about I probably

2    used it, the Tor network, Mrs. Dugan asked --

3    **Q.**   Now, hold on just a second.  Let me stop you there.

4         It was established that you're there on child

5    pornography, correct?

6    **A.**   Yes, ma'am.

7    **Q.**   Okay.  And then what -- what did the defendant just

8    have in his -- on his leg that he brushed off?

9    **A.**   That was a copy of the search warrant that we gave him.

10        MS. WHITE:  Okay.  Could we just back that up and

11   play it just one more time, please?  Just about ten seconds.

12        (Video played.)

13   BY MS. WHITE:

14   **Q.**   Agent Fleener, on that clip the defendant points

15   backwards over his head.

16        What -- what was the room he pointed to?

17   **A.**   His home office.

18   **Q.**   Okay.  Now, you had an opportunity to interview

19   Mr. Dugan separately; is that correct?

20   **A.**   That is correct, ma'am.

21        MS. WHITE:  Your Honor, may I approach the

22   witness?

23        THE COURT:  You may.

24   BY MS. WHITE:

25   **Q.**   First I'm going to show you what's been marked

Special Agent Michael Fleener - Direct (White)

1    Government's Exhibit 2A through 2E.

2        Do you recognize that?

3    **A.**   Yes, ma'am, I do.

4    **Q.**   What is that?

5    **A.**   That is a recording of my interview with Mr. Dugan.

6    **Q.**   Is there clips from the recording?

7    **A.**   Yes, sir -- or yes, ma'am.

8        MS. WHITE:  Your Honor, we'd offer Government's

9    Exhibit 2A through E into evidence.

10       MR. SCHLES:  No objection, Your Honor.

11       THE COURT:  The exhibits may be admitted.

12       **GOVERNMENT EXHIBIT NOS. 2A - 2E ADMITTED**

13       MS. WHITE:  Thank you, Your Honor.

14   BY MS. WHITE:

15   **Q.**   And I'm also showing you a stack of paper that's

16   labeled 2F through 2I.

17       Could you tell the ladies and gentlemen of the grand

18   jury what these are?

19   **A.**   These are transcripts of sections of that interview.

20   **Q.**   Do you believe that those transcripts would aid the

21   jury in listening to the defendant's statement?

22   **A.**   I do, ma'am.

23       MS. WHITE:  Your Honor, we would ask permission to

24   publish the transcript along with the audio for the jury at

25   this time.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

44

Special Agent Michael Fleener - Direct (White)

1          THE COURT:  Mr. Schles?

2          MR. SCHLES:  No objection, Your Honor.

3          THE COURT:  Ladies and gentlemen, the transcripts

4   are simply an aid.  The exhibits themselves are the evidence

5   in the case.  You may use the transcripts, but use your own

6   faculties, hearings, to determine what is said on the tape.

7          MS. WHITE:  Thank you, Your Honor.

8          THE COURT:  You may proceed.

9      (Video played.)

10  BY MS. WHITE:

11  **Q.**   Agent Fleener, there's a second clip; is that correct?

12  **A.**   Yes, ma'am.

13  **Q.**   Okay.

14      (Video played.)

15          MS. WHITE:  There's a third clip.

16      (Video played.)

17          MS. WHITE:  And clip number four; is that correct?

18      (Video played.)

19          MS. WHITE:  Thank you.

20  BY MS. WHITE:

21  **Q.**   Agent Fleener, in the course of your career, have you

22  interviewed suspects on a regular basis?

23  **A.**   Yes, ma'am, I have.

24  **Q.**   Is it common in your experience for suspects to hedge?

25  **A.**   Yes, it is.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Direct (White)

1   **Q.**   What does that mean?

2   **A.**   I would say it means they're softening their guilt.

3   **Q.**   When you were meeting with the defendant in this case,

4   did you have that same feeling?

5   **A.**   Yes.

6         MR. SCHLES:  Objection, Your Honor.

7         THE COURT:  Sustained.

8   BY MS. WHITE:

9   **Q.**   Could you tell the ladies and gentlemen of the grand

10  jury what the Tor network is?

11  **A.**   Absolutely, I can.  I think it would be best, if you

12  don't mind, if I also explain kind of how the internet

13  works --

14  **Q.**   Okay.

15  **A.**   -- in general.

16        The internet -- obviously everyone knows what that

17  is -- is a global network of servers and computers all tied

18  together to share in the knowledge, hence the www worldwide

19  web.

20        When you connect to the internet on a device, all

21  devices that connect to an internet -- to the internet have

22  an IP address.  That's how a requesting computer that goes

23  online to go to a website identifies itself to the

24  responding website so the responding website knows where to

25  send that information back to, such as your banking website.

Special Agent Michael Fleener - Direct (White)

1          So your IP address identifies that device you're on as,

2    hey, I need information.  Please give it to me.  It's very

3    similar to a phone number in your cell phone.  It links to

4    you.

5          All activity on the internet starts out what I would

6    call the surface internet, the visible internet.  If you

7    want to think of an iceberg, okay, you got this tip sticking

8    out over the water.  That's the surface web or the surface

9    internet.  That's where when you plug in your computer and

10   you say open up Google Chrome or Internet Explorer, you get

11   a web page.  That's on the surface internet.  Websites such

12   that end in .com, .org are on the surface internet as well.

13   The surface internet accounts for probably only 5 percent

14   all internet activity.

15         Underneath the water surface, the rest of that massive

16   iceberg encompasses two different internets.  There's what's

17   called the deep internet and then the dark internet or dark

18   web.  Some people use that interchangeably, but that would

19   not be correct.  It's the deep internet and the dark web.

20         Now, the deep internet sounds scarey, but we've all

21   been on it.  Everybody uses it.  Those are sites such as

22   your banking institution, such as statistical and data sites

23   that -- say you want to find an old relative.  You go in and

24   put their name and date of birth.  Sites that require you to

25   log in with a password and your user name.  So your Macy's

Special Agent Michael Fleener - Direct (White)

1    account or Amazon account, all that is encompassed in the

2    deep web.

3        And at the very bottom of that iceberg is the dark web.

4    Now, the dark web is not accessible by regular internet

5    means.

6        Ms. White alluded in her opening statement you have to

7    have a specialized browser to get to the dark web.  One such

8    browser -- I believe it's one of the original -- is the Tor

9    network, which, as she said, stands for The Onion Router.

10        Now, when you download that, it allows you to go down

11    to the dark web.  And kind of similar to how the regular

12    internet works how it's all connected with computers and

13    servers, the dark web works that way, but they're all

14    running the Tor network.

15        So when you get on the dark web and you want to use the

16    Tor network and you say, okay, take me to this website,

17    you're going to go through a series of computers kind of

18    like links in a chain.  They're called circuits.  And you're

19    going to go to this computer and it's going to send you to

20    that computer and it's going to send you to the website

21    you're after.  And it will follow a similar path back to

22    your computer so you can view or get whatever information

23    you're trying to get.

24        Now, as I mentioned earlier, when you're on the

25    internet, you have an IP address, the internet protocol

Special Agent Michael Fleener - Direct (White)

1    address, and it kind of tells everybody where to send

2    information back to so everybody's talking to the right

3    people and you get what you want.

4        The Tor works a little differently because every time

5    you go through a different computer in that chain, your

6    internet IP doesn't change, but every link in that chain

7    only sees the previous IP address requesting the

8    information.  That's where the anonymity is supposed to

9    derive from because each computer in the chain hides the

10   previous computer's address and so forth.

11       Amongst the Tor network not only are the computers on

12   the network voluntary, anybody who is downloading Tor and

13   running it agrees to let their computer be an access point

14   through the Tor network and to the dark web, but the servers

15   that are specifically located on the dark web are also

16   running things like the Tor network and encryption that

17   hides their IP addresses as well.

18       So basically in short that's what the Tor network is.

19   **Q.**   Okay.  So when you went to the house that day and

20   executed this search warrant, you knew that someone there

21   had been using the Tor network?

22   **A.**   Yes, ma'am, I did.

23   **Q.**   And what, if anything, did you think they were using

24   the Tor network to do?

25   **A.**   To access illicit materials, specifically child

Special Agent Michael Fleener - Direct (White)

1   pornography.

2   **Q.**   Okay.  And you said that you did find a number of

3   electronics in the residence that day; is that right?

4   **A.**   That is correct, ma'am.

5   **Q.**   Did you seize every single piece of electronics?

6   **A.**   No, ma'am, we did not.

7   **Q.**   How did you decide what to take and what to leave

8   behind?

9   **A.**   Specifically when it came to, for example, Mrs. Dugan's

10  cell phone or Tyler Dugan's cell phone, as with all cases we

11  did a brief overview of what was contained -- with their

12  permission what was contained on their cell phones looking

13  for any evidence of illicit activity or the Tor network.  It

14  became immediately clear quickly that their cell phones had

15  nothing illicit on them so they were able to keep those.

16  **Q.**   Okay.  So did you seize any electronics belonging to

17  Mrs. Dugan?

18  **A.**   No, ma'am.

19  **Q.**   Did you seize any electronics belonging to Tyler Dugan,

20  the son?

21  **A.**   Not that I'm aware of, no, ma'am.

22  **Q.**   And why not?

23  **A.**   Because they had nothing illegal on them at the time.

24  **Q.**   When you previewed the electronics in the defendant's

25  home office, did you make the decision to seize anything out

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Direct (White)

1    of that room?

2    **A.**    Yes, ma'am, we did.

3    **Q.**    Why?

4    **A.**    They showed evidence of the Tor network and child

5    pornography at the time.

6    **Q.**    And when I say did you seize anything, what does that

7    mean?

8    **A.**    To take physical control of it and take it for further

9    forensic analysis at a lab.

10    **Q.**    And who did the full forensic analysis in this case?

11    **A.**    Corporal Robert Boggs.

12    **Q.**    Okay.  And did you have an opportunity to review the

13    images that Corporal Boggs found on the hard drive in the

14    defendant's office?

15    **A.**    I did, ma'am, yes.

16    **Q.**    And did you find any relevant material?

17    **A.**    Yes, I did, ma'am.

18    **Q.**    What did you find?

19    **A.**    It was over 1,200 images of child pornography.

20         MS. WHITE:  Okay.  Your Honor, may I approach?

21         THE COURT:  Yes.

22    Would this be a good time to break?

23         MS. WHITE:  Well, Your Honor, it's a good time to

24    break or I can show the images and then we'll be done with

25    this witness, whichever the Court prefers.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Direct (White)

1          THE COURT:  All right.  Let's go ahead then.

2          MS. WHITE:  Your Honor, if I may approach the

3    witness.

4          THE COURT:  You may.

5    BY MS. WHITE:

6    **Q.**  Agent Fleener, could you tell the ladies and gentlemen

7    of the grand jury what's been marked as Government's

8    Exhibit --

9          THE COURT:  They're not the grand jury, but I

10   know --

11         MS. WHITE:  I'm sorry.  I apologize.  The jurors.

12   **A.**  That's a CD containing child pornography images.

13   BY MS. WHITE:

14   **Q.**  Is that a full and accurate depiction of what was found

15   on the defendant's hard drive that day?

16   **A.**  Yes, ma'am, it is.

17         MS. WHITE:  We'd offer Exhibit Number 9 into

18   evidence under seal pursuant to the court order, Your Honor.

19         **GOVERNMENT EXHIBIT NUMBER 9 ADMITTED UNDER SEAL**

20         MR. SCHLES:  No objection.

21         THE COURT:  I'm sorry?

22         MR. SCHLES:  No objection, Your Honor.

23         THE COURT:  It may be received.  It will only be

24   sealed after it's viewed by the jury in open court.

25         MS. WHITE:  Thank you, Your Honor.

Special Agent Michael Fleener - Direct (White)

1    We do not intend to publish that full CD at this point.

2   We selected Exhibits 3 through 6, if I could publish them at

3   this time.

4           THE COURT:  You may, and the exhibit may be

5   received.

6       The jury may, of course, since it's in evidence, review

7   it at the time of their deliberations.

8           MS. WHITE:  Thank you, Your Honor.

9           THE COURT:  And then it will be sealed as part of

10  the record.

11          MS. WHITE:  Thank you, sir.

12  BY MS. WHITE:

13  **Q.**   Agent Fleener, I'm showing you four manilla envelopes.

14  They're marked Exhibits 3, 4, 5 and 6.

15      Do you recognize those documents?

16  **A.**   I do, ma'am.

17  **Q.**   Do you know what they are?

18  **A.**   Yes, ma'am, I do.

19  **Q.**   Could you tell the ladies and gentlemen just briefly

20  what materials are contained in them?

21  **A.**   Four specific examples or images of prepubescent

22  children and explicitly sexual conduct.

23  **Q.**   Where were those images recovered from?

24  **A.**   Mr. Dugan's hard drive from his laptop.

25          MS. WHITE:  With permission of the clerk, we would

53

1    publish these briefly to the jury when she's ready.

2              THE COURT:  It may be done.

3              MS. WHITE:  And, Your Honor, we'd move Exhibits 3

4    through 6 into evidence at this time.

5              THE COURT:  Without objection it may be received.

6         **GOVERNMENT EXHIBIT NUMBERS 3 - 6 ADMITTED UNDER SEAL**

7              MS. WHITE:  Thank you.

8              THE COURT:  I said without objection it may be

9    received.

10             MS. WHITE:  Yes, thank you.

11             THE COURTROOM DEPUTY CLERK:  We're ready, yes.

12   BY MS. WHITE:

13   **Q.**   Exhibit 3.  That's Exhibit 3, correct?

14   **A.**   Yes, ma'am.  I'm sorry.

15   **Q.**   Next I'll publish Exhibit 4.

16   **A.**   Yes, ma'am.

17   **Q.**   We'll publish Exhibit 5.

18   **A.**   Yes, ma'am.

19   **Q.**   And finally Exhibit 6.

20   **A.**   Yes, ma'am.

21             MS. WHITE:  Thank you, Your Honor.

22   BY MS. WHITE:

23   **Q.**   Agent Fleener, you said that those four images, along

24   with the 1,200 other images on Exhibit 9, where did they

25   come from?

Special Agent Michael Fleener - Direct (White)

1    **A.**    From the hard drive that was located within Mr. Dugan's

2    laptop.

3    **Q.**    In his home office?

4    **A.**    In his home office.

5              MS. WHITE:  Thank you.

6              THE COURT:  And that is the material contained on

7    Exhibit --

8              MS. WHITE:  Exhibit -- uh-huh.  I'm sorry.

9              THE COURT:  Are all of these individual pictures

10   contained on that disc that you introduced as Exhibit

11   whatever the number --

12             THE COURTROOM DEPUTY CLERK:  Nine.

13             MS. WHITE:  Exhibit 9.  Those four images as well

14   as the 1,200 images from the defendant's computer are on

15   Exhibit 9.

16             THE COURT:  Very well.

17             MS. WHITE:  We chose to only publish four to the

18   jury.

19             THE COURT:  Okay.  I want to explain to the jury

20   all the images on the disc are evidence in the case.

21             MS. WHITE:  Thank you, Your Honor.

22        I have no further questions of this witness.

23             THE COURT:  All right.

24        Let's -- Mr. Schles, should we take our lunch break

25   before we cross-examination or would you prefer to do it

Special Agent Michael Fleener - Cross (Schles)

1    now?

2            MR. SCHLES:  Lunch break would be fine, Your

3    Honor.

4            THE COURT:  All right.

5        Ladies and gentlemen, we'll take an hour and 15 minutes

6    for lunch.  And by my calculations that ought to make it

7    around 1:22 or 3.  Try to get back two or three minutes

8    early so we can start on time.  Have a nice lunch.

9        Very important, don't discuss the case or anything

10   about it among yourselves or permit anyone to discuss it

11   with you or in your presence.  Don't do any research, don't

12   use any social media at any time during your duties as

13   jurors.  Don't use Facebook, Twitter or any of the social

14   media platforms.  I'll see you back here at 1:22.

15       (Recess taken from 12:07 p.m. until 1:24 p.m.)

16           THE COURT:  Good afternoon.

17       Cross-examine.

18           MR. SCHLES:  Thank you, Your Honor.

19                        **CROSS-EXAMINATION**

20   BY MR. SCHLES:

21   **Q.**  Mr. Fleener, it's not illegal to download and install

22   the Tor browser, is it?

23   **A.**  That in itself, no.

24   **Q.**  I'm sorry?

25   **A.**  That in itself isn't unusual.  People do it.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Cross (Schles)

1    **Q.**   And it's also not illegal to access the dark web using

2    the Tor browser in and of itself, is it?

3    **A.**   No, sir.

4    **Q.**   And on I guess it was June 11th of 2020, you were the

5    lead agent when the search of Mr. Dugan's residence was

6    conducted?

7    **A.**   Yes, sir, that's correct.

8    **Q.**   So you are familiar with the items that were examined

9    and searched on that day?

10   **A.**   Yes, sir, I was.

11   **Q.**   Was there an HP Pavilion G series computer?

12   **A.**   If it's on that sheet, then that would be correct.

13   **Q.**   And there was no images of child pornography found on

14   that device, was there?

15   **A.**   Ultimately, no.

16   **Q.**   There was also an iPad model A1430.  I don't know

17   exactly what the model means.  You also examined that.

18   There was no child pornography found on that device?

19   **A.**   Correct, after forensics, yes.

20   **Q.**   There was an HTC cell phone, correct?

21   **A.**   Yes, sir.

22   **Q.**   No child pornography found on that, correct?

23   **A.**   I don't believe so, no, sir.

24   **Q.**   In the kitchen there was an iPhone 8 and an iPhone 7

25   Plus model.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

57

Special Agent Michael Fleener - Cross (Schles)

1    There was no child pornography found on either of those

2  devices, correct?

3  **A.**   That's correct, sir.

4  **Q.**   Then in Mr. Dugan's home office, which was visible on

5  the video -- that was the room through the double glass

6  doors?

7  **A.**   Yes, sir.

8  **Q.**   There was another iPad model A 1430 in that one,

9  correct?

10  **A.**   Yes, sir.

11  **Q.**   There was no child pornography on that?

12  **A.**   No, sir.

13  **Q.**   There was also in the home office an Amazon Kindle,

14  correct?

15  **A.**   I believe so, sir, yes.

16  **Q.**   Nothing illegal on that, correct?

17  **A.**   That's correct, sir.

18  **Q.**   Also in the home office there was a Toshiba hard drive

19  250 gigabyte?

20  **A.**   I'm assuming so if it's on that paper, sir, yes.

21  **Q.**   Would it help if I showed you this or --

22  **A.**   Well, you're welcome to.  I just can't remember by make

23  and model all the items --

24  **Q.**   I understand.

25  **A.**   -- that were at the house.

Special Agent Michael Fleener - Cross (Schles)

1    **Q.**    There was no child pornography found on that computer?

2    **A.**    No, sir.

3    **Q.**    There was another Toshiba HD hard drive found also in

4    the home office.  Also no child pornography on that device?

5    **A.**    No, sir.

6    **Q.**    There was also a Western Digital 120 gigabyte hard

7    drive found in the home office, correct?

8    **A.**    Correct, sir.

9    **Q.**    No -- no child pornography on that either?

10   **A.**    Correct, sir.

11   **Q.**    Also there was a Seagate hard drive 40 gigabyte also

12   found in the home office, correct?

13   **A.**    Yes, sir.

14   **Q.**    And as with the other ones we discussed there was no

15   child pornography on that?

16   **A.**    No, sir.

17   **Q.**    Also in the home office there were eight thumb drives

18   found.

19          There's not a more detailed description here, but am I

20   correct in stating that there was no child pornography found

21   on any of those thumb drives?

22   **A.**    That would be correct, sir.

23   **Q.**    There was also in the home office a micro SD card.  And

24   am I correct in saying there was no child pornography on

25   that device?

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Cross (Schles)

1    **A.**   Yes, sir.

2    **Q.**   There were ten SD cards, which I guess are a little

3    bigger than micro SD cards, and those were also clean of any

4    child pornography, correct?

5    **A.**   Correct, sir.

6    **Q.**   There was also an HD-120 RadioShack tape which could be

7    used as a storage device, correct?

8    **A.**   Yes, sir.

9    **Q.**   Also no child pornography, correct?

10   **A.**   No, sir.

11   **Q.**   Also there were three just DVDs.

12        There were no videos or images of child pornography on

13   any of those, correct?

14   **A.**   That's correct, sir.

15   **Q.**   And then in Room O, which I believe is an upstairs

16   bedroom, there was a Toshiba hard drive found and that also

17   had nothing on it?

18   **A.**   Correct, sir.

19   **Q.**   The one device that you say you did find images on

20   was -- and you described it by the hard drive PNY 240

21   gigabyte hard drive, but that hard drive was in an Acer

22   laptop?

23   **A.**   Yes, sir, I believe so.

24   **Q.**   And that's the only device out of the 20-some there

25   that contained any illicit images?

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Cross (Schles)

1   **A.**   Yes, sir.

2   **Q.**   And did you review the hard drive on that Acer laptop?

3   **A.**   That was reviewed by Robert Boggs, sir, not me.

4   **Q.**   I'm sorry?

5   **A.**   At the time of the search warrant Corporal Boggs was

6   viewing that and not me.

7   **Q.**   You did not check on that hard drive for anything?

8   **A.**   After the interview with him, sir, I stopped by the

9   room and asked how it was going.  And Robert Boggs says, you

10  know, this has child porn on it.

11  **Q.**   So you have no firsthand knowledge what might have been

12  found on that Acer laptop?

13  **A.**   Not during the search warrant, correct.

14  **Q.**   Not during the search warrant?

15  **A.**   Yes.

16  **Q.**   You did not turn on the computer or if it was already

17  on look at it and touch any of the buttons on the keyboard?

18  **A.**   No, all that was going on while I was interviewing

19  Mr. Dugan.

20  **Q.**   And that was conducted by Boggs from the State

21  Police -- West Virginia State Police?

22  **A.**   Yes, sir.

23  **Q.**   And to your knowledge the only evidence relevant to

24  this case was found on that one Acer laptop, correct?

25  **A.**   That is correct, sir.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Cross (Schles)

1    **Q.**   And can you tell me how you came to suspect somebody at

2    the Dugan residence of having accessed child pornography?

3    **A.**   Yes, sir, I can.  Our agent -- our office up in Boston,

4    Massachusetts, with the --

5    **Q.**   When you say your office, would you --

6    **A.**   Correct.  The HSI office -- the Special Agent in Charge

7    office of HSI in Boston, Massachusetts, was working jointly

8    with and assisting a foreign law enforcement agency

9    conducting an ongoing investigation.

10   **Q.**   So somebody who works -- you don't know who worked

11   for -- but at the time you were in the same agency obviously

12   in different divisions in different cities.

13        Somebody contacted you and told you that a foreign

14   agent from some other government had informed them that on

15   May 25th of 2019 a computer identified by an IP address

16   eventually traced to Mr. Dugan's residence had accessed a

17   certain website?

18             MS. WHITE:  Objection, Your Honor.

19             THE COURT:  Overruled.

20   **A.**   There was a lot more to it than that, but, yes, our

21   office in Boston, Massachusetts, forwarded me a package of

22   information that came both from DOJ's Child Exploitation and

23   Obscenities Section, as well as information from the foreign

24   law enforcement office, summarizing the ongoing

25   investigation and then providing me with the pertinent

Special Agent Michael Fleener - Cross (Schles)

1    information of what might have taken place in West Virginia.

2    BY MR. SCHLES:

3    **Q.**   Did you ever speak directly to this foreign agent who

4    was conducting this investigation?

5    **A.**   No, sir, I did not.

6    **Q.**   Do you even know who this foreign agent is, a name?

7    **A.**   A name?  No, I do not.

8    **Q.**   So you just know that some foreign agent contacted your

9    agency's office in Boston?

10   **A.**   I know who the foreign agency is, what law enforcement

11   agency.  I do not know the lead investigator for that

12   agency.

13   **Q.**   So you can't vouch for that person's credibility,

14   ability, virtue, honesty or anything, can you?

15          MS. WHITE:  Your Honor, I'm going to object.

16          THE COURT:  I'll allow that question.  We don't

17   need to get into the identity.

18          MR. SCHLES:  I understand, Your Honor.

19   **A.**   I can vouch that he is from a country with a rule of

20   law and he is from a very well known law enforcement agency

21   that has been worked with multiple times both by HSI, the

22   FBI, the Royal Canadian Mounted Police.

23   BY MR. SCHLES:

24   **Q.**   Would you consider the United States a country with a

25   rule of law?

Special Agent Michael Fleener - Cross (Schles)

 1   **A.**   Yes, sir.

 2   **Q.**   Would you then state that everything -- every law

 3   enforcement agency in the United States is therefore

 4   credible?

 5              MS. WHITE:  Objection, Your Honor --

 6              THE COURT:  Sustained.

 7              MS. WHITE:  -- we are far afield.

 8              THE COURT:  Sustained, sustained, sustained.

 9   BY MR. SCHLES:

10   **Q.**   So after you received a tip from somebody in your

11   agency in Boston, who's essentially just forwarding a tip

12   from someone you couldn't identify under any circumstances,

13   you then, using that information and some administrative

14   subpoenas, learned that the account -- the internet ISP --

15   internet service provider was Suddenlink and it was an

16   account at Mr. Dugan's residence, correct?

17   **A.**   Yes, sir.

18   **Q.**   And that essentially is the information that you used

19   to get permission to search, correct?

20   **A.**   That information was provided in a written affidavit to

21   a U.S. magistrate judge and sworn to by myself and found to

22   be -- contained probable cause for a search warrant, yes.

23   **Q.**   And you're saying that you -- you did not conduct any

24   examination of the hard drive on which the government is

25   alleging these images were found?

Special Agent Michael Fleener - Cross (Schles)

1   **A.**   I just read the report and looked at the evidence

2   collected by Trooper Boggs.

3   **Q.**   So you could not tell me or the jury that any specific

4   image was created on that hard drive on a certain date?

5   **A.**   No, sir.  Trooper Boggs would have to do that.

6   **Q.**   And so you can't say also when the Tor browser was

7   installed on that date?

8   **A.**   Not by date, no, sir.

9   **Q.**   You can't state when it was used, can you?

10   **A.**   I can give a date range when it was used, but not a

11   date specific.

12   **Q.**   Date range.

13       Your search warrant application specifically referenced

14   May 25th of 2019; is that correct?

15   **A.**   That's correct, sir.

16   **Q.**   Do you know what the Shimcashe is?

17   **A.**   The what, sir?

18   **Q.**   Shimcashe, S-h-i-m, cashe.

19   **A.**   The Shimcashe?

20   **Q.**   Uh-huh.

21   **A.**   I am familiar with it, but not in terms of

22   technologically advanced enough to explain.  I know what the

23   cache is, but the Shimcashe --

24   **Q.**   Well, what is your understanding of what information is

25   stored on a Shimcashe on a computer?

Special Agent Michael Fleener - Cross (Schles)

1    **A.**    A cache is typically where a computer stores various

2    types of information whether it's biodata, data, website

3    data, temporary data.

4    **Q.**    Would it store when a software program is executed on

5    the computer on a certain date?

6        Would there be evidence in the Shimcashe that a certain

7    software program was used on a certain date?

8    **A.**    Possibly, but I think a forensic analyst such as Boggs

9    would be more qualified to answer that.

10    **Q.**    Would it surprise you to learn that the forensic report

11    prepared in this case does not show the Tor browser being

12    executed on May 25th, 2019?

13    **A.**    I wouldn't say it surprises me.  I mean, no.

14    **Q.**    Wasn't it your belief that the Tor browser was used to

15    access this target website on May 25th, 2019?

16    **A.**    Yes, sir.

17    **Q.**    But it doesn't surprise you that there's no record of

18    the Tor browser being used on that date?

19    **A.**    I'm not sure what you're referring to because I haven't

20    looked at the file tree that specifically that Robert Boggs

21    printed out or that he conducted.

22    **Q.**    So you -- having gotten the search warrant, essentially

23    your job at the scene on June 11th of 2020 was to supervise

24    the collection of evidence and you also conducted the

25    interview with Mr. Dugan, correct?

66

Special Agent Michael Fleener - Cross (Schles)

1   **A.**   Partially correct.  My -- I was the lead agent on the

2   case.  My job during that search warrant process essentially

3   was to interview him.  Another agent by the name of Patrick

4   Kelly was assisting in the evidence collection, along with

5   four or five other agents.

6   **Q.**   But you -- you were supervising?

7   **A.**   I was interviewing him at the time.  Ultimately it was

8   my choice of what got taken and what didn't.

9        After everything was brought to me and said this is

10  what we have.  What would you like to take?

11       I would say take this, this, this, this, this, but --

12  **Q.**   But you --

13  **A.**   So ultimately that was my decision.

14  **Q.**   You were the agent in charge during the execution of

15  the search warrant, correct?

16  **A.**   Correct.

17  **Q.**   And you also interviewed Mr. Dugan, correct?

18  **A.**   That is correct.

19  **Q.**   We can agree on that?

20  **A.**   Yes, sir.

21  **Q.**   It's not particularly controversial.

22       Did you interview the other two people in the house?

23  **A.**   I did.  Well, Ms. Dugan I did not interview at that

24  time.  I believe a very brief interview was done by a female

25  state trooper.  I did interview Tyler Dugan.

Special Agent Michael Fleener - Cross (Schles)

1   **Q.**   And after the evidence was collected, you and your

2   coworkers, colleagues, left the residence with certain of

3   these items in your possession?

4   **A.**   That is correct, sir.

5   **Q.**   And you just, I assume, prepared a case submission

6   report for the state police forensic laboratory?

7   **A.**   Yes, sir, and turned over all the items.

8   **Q.**   And did you -- in doing so, did you -- and I'm going to

9   say parse the evidence that you had collected at the scene

10  and only ask for certain of it to be examined or was all of

11  it examined?

12  **A.**   All of it was examined or attempted to be examined.

13  From what I understand, there were a couple of things that

14  either crashed or were broken to where it couldn't get into

15  by Robert Boggs.  He couldn't access it.

16  **Q.**   Some of the older drives were no longer operable?

17  **A.**   Something like that, yes, sir.

18  **Q.**   And this target website, were you familiar with the

19  target website before you got the tip from this foreign

20  agent?

21  **A.**   No, sir, I was not.

22  **Q.**   Were you aware of what the home page of that target

23  website looked like?

24  **A.**   Not before the investigation, no, I was not.

25  **Q.**   At what point did you become aware of what the home

Special Agent Michael Fleener - Cross (Schles)

1    page of the target website looked like?

2    **A.**    During the course of the investigation, well into the

3    investigation, I requested copies of what the main page of

4    the websites looked like that were accessed by various

5    people, Mr. Dugan particularly in this case.

6    **Q.**    There are no images of child pornography on the home

7    page of that website, is there?

8    **A.**    No, sir, there's not.

9    **Q.**    And you do not have any evidence beyond that the

10   computer that I'm -- I'm going to call it the Acer laptop

11   just to be easy.  It's hard to say all those serial numbers

12   and stuff -- that any access beyond the home page of that

13   website occurred on May 25th, 2019, correct?

14   **A.**    My understanding from the case and the relevant

15   information that was passed on to download any images from

16   that website you had to get past the main page by logging in

17   and creating a user name and password.

18   **Q.**    That may be, but what I'm asking is whether you have

19   any evidence that this specific computer on May 25th, 2019,

20   did anything other than access the home page, which

21   contained no child pornography?

22   **A.**    I agree to that.  I have no exact proof that that

23   particular website was accessed beyond the main page.

24   **Q.**    And that's true for May 25th, 2019, and it's true for

25   any other date as well, isn't it?

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Cross (Schles)

1   **A.**   I'm only familiar with that home page of that website,

2   but I'll say yes.

3   **Q.**   So all you have and all you had is that -- that

4   computer, the Acer laptop, was used one time to access the

5   home page on one occasion, correct?

6   **A.**   The initial lead provided information as such, correct.

7   **Q.**   Do you claim to have other information that shows that

8   that computer was used to access beyond the home page of

9   that target website?

10  **A.**   Other than all the images found.

11  **Q.**   Well, images were found, but do you have any evidence

12  whatsoever that a single one of those images came from that

13  website at any time?

14  **A.**   No.

15  **Q.**   That was what -- and you knew that all along?

16  **A.**   That's not what you asked.

17  **Q.**   And you didn't want to provide that answer, did you?

18         MS. WHITE:  Objection, Your Honor.

19         THE COURT:  Sustained.

20         MR. SCHLES:  I have no further questions, Your

21  Honor.

22         THE COURT:  Redirect.

23         MS. WHITE:  Thank you, Your Honor.

24

25

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Redirect (White)

1              **REDIRECT EXAMINATION**

2    BY MS. WHITE:

3    **Q.**   Agent Fleener, you mentioned that you got a search

4    warrant to execute on the Dugan's home; is that correct?

5    **A.**   Yes, ma'am, it is.

6    **Q.**   What's the process for getting a search warrant?  What

7    do you do?

8    **A.**   The investigative technique into that is quite

9    extensive.

10   **Q.**   Well, let me see if I can narrow it down.

11          So there comes a point in your investigation when you

12   feel as if you have information to go search someone's

13   residence; is that right?

14   **A.**   That is correct.

15   **Q.**   What do you do in order to get permission to execute

16   the search?

17   **A.**   You put that --

18          MR. SCHLES:  I'm going to object, Your Honor.

19   This is irrelevant.  It doesn't tend to make any issue --

20   any matter at issue more or less likely.

21          MS. WHITE:  Well, it certainly does, Your Honor,

22   if I may.

23          Defense counsel has asked extensive questions about the

24   search warrant.  I think it's relevant for the jury to

25   understand --

71

Special Agent Michael Fleener - Redirect (White)

```
 1              THE COURT:  What questions are you thinking of
 2    about the search warrant?
 3              MS. WHITE:  I'd like to establish that he wrote an
 4    affidavit.  It was presented to the magistrate judge.
 5              MR. SCHLES:  She's testifying now.
 6              MS. WHITE:  I'm trying to answer the Court's
 7    question respectfully.
 8              THE COURT:  Finish your --
 9              MS. WHITE:  And I'd like to establish that that
10    search warrant probable cause is found by a magistrate judge
11    giving Mr. -- Agent Fleener lawful authority to enter the
12    Dugan home.
13              MR. SCHLES:  Your Honor, I --
14              MS. WHITE:  Mr. Schles has called into question
15    the agent's credibility with his question, simply
16    establishing that he was lawfully there.
17              MR. SCHLES:  Your Honor, I did not even imply that
18    they were not lawfully there.  That didn't come up in any
19    way.
20              THE COURT:  I didn't get that either, but what's
21    your question for this witness?
22    BY MS. WHITE:
23    Q.   Did you submit an affidavit to the magistrate judge
24    here in federal court to search --
25    A.   Yes.
```

72

Special Agent Michael Fleener - Redirect (White)

1    **Q.**   -- Mr. Dugan's home?

2    **A.**   Yes, ma'am, I did.

3    **Q.**   That was an extensive affidavit, correct?

4    **A.**   Yes, ma'am, it was.

5    **Q.**   Did the court find probable cause?

6            MR. SCHLES:  Objection, Your Honor.  Again,

7    irrelevant.

8            THE COURT:  I believe it's beyond the scope of the

9    cross-examination and I'll sustain the objection.

10           MS. WHITE:  Thank you, Your Honor.

11   BY MS. WHITE:

12   **Q.**   Mr. Schles asked you a series of questions about items

13   recovered from the home.

14       Do you recall that?

15   **A.**   Yes, ma'am, I do.

16   **Q.**   And the PNY hard drive that was recovered, could you

17   tell me again where that was found?

18   **A.**   It was in Mr. Dugan's home computer on his desk inside

19   of his work office -- a laptop computer.

20   **Q.**   The computer was on his desk, you said?

21   **A.**   I believe so, yes, ma'am.

22   **Q.**   And what, if anything, of value did you find on that

23   hard drive?

24   **A.**   Specifically that I can recall that the Tor -- Tor

25   URLs, which is basically a word for website, there was over

Special Agent Michael Fleener - Recross (Schles)

1    1,500 Tor URLs listed and captured and over 1,200 images of

2    child pornography.

3              MS. WHITE:  Thank you, Your Honor.

4         Nothing further.

5                      **RECROSS-EXAMINATION**

6    BY MR. SCHLES:

7    **Q.**   The laptop was found in the home office.  I think I had

8    asked you that on direct as well, correct?

9    **A.**   Yes, sir.

10   **Q.**   But also one, two, three, four, five, six, seven,

11   eight, nine, ten, eleven, twelve items were also found in

12   that home office and none of those other twelve contained

13   child pornography, correct?

14   **A.**   That's correct, sir.

15             MR. SCHLES:  No further questions.

16             THE COURT:  All right.  May the witness be

17   excused?

18             MS. WHITE:  Yes, Your Honor.  Thank you.

19             THE COURT:  Any objection?

20             MR. SCHLES:  No, Your Honor.

21             THE COURT:  You're excused from the trial.

22        Thank you very much.

23             THE WITNESS:  Thank you.

24             THE COURT:  Call your next witness.

25             MR. HEINRICH:  Your Honor, the United States calls

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

74

```
 1    Corporal Robert Boggs to the stand.

 2          CORPORAL ROBERT BOGGS, GOVERNMENT WITNESS, SWORN

 3                        DIRECT EXAMINATION

 4    BY MR. HEINRICH:

 5    Q.   Good afternoon, sir.  I'm glad we finally tracked you

 6    down.

 7          Do you mind just telling everybody your first name and

 8    your last name and then spell your last name for the record?

 9    A.   Yes.  My name's Robert Boggs.  Last name's B-o-g-g-s.

10    Q.   All right.  Thank you, sir.

11          And in case your uniform doesn't give it away, where do

12    you currently work?

13    A.   With the West Virginia State Police.

14    Q.   And what is your current rank?

15    A.   Current rank is Corporal.

16    Q.   And, Corporal, how long have you been a member of the

17    West Virginia State Police?

18    A.   It will be 24 years this November, so 23 years.

19    Q.   And what are some of the various roles you've had in

20    your almost 24 years with the West Virginia State Police?

21    A.   The first seven years I was a field trooper stationed

22    in Randolph County just doing normal trooper duties:  taking

23    calls, investigations, road patrol, things of that nature.

24          In --

25              THE COURT:  Would you pull the microphone a little
```

Corporal Robert Boggs - Direct (Heinrich)

1    closer, please.

2           THE WITNESS:  I'm sorry?

3           THE COURT:  Would you pull that microphone a

4    little closer.

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Thank you.

7    **A.**   In 2005 I was taking classes for digital crime and

8    computer forensics and was offered to develop a digital

9    forensics lab located at Marshall University's Forensic

10   Science Center and transferred down there and developed that

11   lab.

12   BY MR. HEINRICH:

13   **Q.**   Okay.  And tell us a little bit more about what the

14   West Virginia State Police Digital Forensic Lab is.

15   **A.**   Basically we are a forensic lab that we accept digital

16   evidence, anything that holds a binary code, ones and zeros.

17   We will try to take a look at it and pull out information if

18   needed for the investigation in a forensically sound manner.

19   **Q.**   And how many of these labs does the West Virginia State

20   Police have?

21   **A.**   We have two.

22   **Q.**   So you mentioned I think the one at Marshall.

23          Where is the other one?

24   **A.**   The other one is located at WVU.

25   **Q.**   And when did the Marshall location officially open?

Corporal Robert Boggs - Direct (Heinrich)

1    **A.**    Officially about 2005.  They were -- had already had

2    the room built and they were waiting on me to be transferred

3    down there; however, I had to spend some time at WVU.  So

4    we've been fully functional certainly since 2006.

5    **Q.**    And how long have you been in charge of the laboratory?

6    **A.**    The entire time.

7    **Q.**    And what are your duties at the lab specifically?

8    **A.**    Right now I have three civilian analysts that work with

9    me and do case work.  Primarily assist them and also go out

10   on search warrants assisting other agencies with device --

11   digital device previews and triage.

12   **Q.**    What does triage mean in your world?

13   **A.**    Triage basically is -- the contemporary home -- the

14   modern home now has so many digital devices.  You have

15   multiple cell phones, multiple computers, tablets, you name

16   it.  Everything's digital now and all of it can be

17   manipulated in one way or another, so we try to locate and

18   preview -- forensically preview these devices to try to

19   determine which device is the most likely one to have been

20   potentially used in a crime.

21   **Q.**    And you mentioned a little bit about analyzing

22   electronic devices.

23        This forensic analysis, does that include looking at

24   portions of an electronic device that normally can't be

25   seen?

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1  **A.**   Yes.

2  **Q.**   Are there hidden portions of some devices that are not

3  easily accessible by an average user?

4  **A.**   Yes.

5  **Q.**   And can you summarize for the jury some of the training

6  you've received regarding the examination of digital

7  evidence?

8  **A.**   Yes.  Starting in about 2005 I started taking classes

9  at National White Collar Crime Center in Fairmont and I

10  exhausted the vast majority of those classes; at the Federal

11  Law Enhancement Training Center, FLETC, in Glynco, Virginia;

12  the National Computer Forensics Institute sponsored by the

13  Secret Service in Hoover, Alabama; also many vendor specific

14  such as Axiom, which is the forensic program to sweep that

15  use -- that I used in this particular exam.  I've taken

16  certifications from them and many, many others.  I mean,

17  it --

18  **Q.**   Okay.  I think that's sufficient so we can make it home

19  tonight.

20       Do you instruct other people other people as well?

21  **A.**   Yes.  All basic and cadet officers who are in the

22  academy -- every police officer that is in West Virginia

23  that goes through the academy does get a class.

24       I developed a basic electronic evidence identification

25  search and seizure class, mobile phones -- mobile phone

Corporal Robert Boggs - Direct (Heinrich)

1    investigations.  And we consult with any investigator that

2    needs technical help.

3    **Q.**    So for the past ten to fifteen years, any trooper that

4    graduates the academy you've taught a class to?

5    **A.**    Yes, plus in-service occasional -- occasionally.

6    **Q.**    And, Corporal, what type of devices do you most

7    commonly examine?

8    **A.**    Well, right now in the last many -- quite a few years

9    it's all mobile devices now.  Cell phones seem to be the big

10   thing.

11        When I first started years ago, you would get maybe ten

12   hard drives submitted for every one cell phone.  Now it's

13   the other way around.  Cell phones seem to be the modern

14   method for people accessing the web, computer -- computer

15   work and whatnot so --

16   **Q.**    And over the years how many times do you think you've

17   analyzed a hard drive from a computer?

18   **A.**    How many hard drives?

19   **Q.**    Hard drives to the best of your estimate.

20   **A.**    At least 500.  Easily 500.  That's very conservative.

21   **Q.**    And in addition to cellular phones, is this something

22   you routinely do as well?

23   **A.**    Yes.

24   **Q.**    Have you ever previously been qualified as an expert in

25   a court of law regarding the forensic analysis of electronic

Corporal Robert Boggs - Direct (Heinrich)

1    devices?

2    **A.**    I have.

3    **Q.**    What courts?

4    **A.**    Federal court, Judge Johnston.  It was down in Beckley.

5    And I think Judge Chambers in Huntington.  All over the

6    state, multiple counties.

7                MR. HEINRICH:  Your Honor, at this time I would

8    ask that Corporal Boggs be qualified as an expert in the

9    area of forensic analysis of electronic devices.

10               THE COURT:  Any voir dire?

11               MR. SCHLES:  No objection, Your Honor.

12               THE COURT:  All right.  This witness may offer

13   opinion testimony in the area of forensic examination of

14   digital devices.

15        Generally lay people aren't allowed to give opinions,

16   but somebody with special training or experience may give

17   appropriate opinions.

18        You may inquire.

19               MR. HEINRICH:  Thank you, Your Honor.

20   BY MR. HEINRICH:

21   **Q.**    Corporal, when you're conducting a forensic analysis of

22   a phone or a computer, do you just flip through the phone or

23   scroll through the computer like one of us would do?

24   **A.**    No, sir, that would -- that's the ultimate sin in this

25   discipline I guess you could say.

80

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   So what is the right way you do it in your field of

2    forensic analysis?

3    **A.**   Well, in terms of a computer, when we're triaging, we

4    put the hard drive -- we will remove the hard drive from the

5    computer or laptop, whatever it is, and put it on a hardware

6    write blocker, which is just a bridge.  You just plug the

7    hard drive in.  It goes in the USB port.  And what it does

8    is it allows you read-only access.  So you can read the

9    data, but you cannot write anything to that hard drive.  The

10   whole idea is to keep that hard drive as pristine and

11   untouched as possible.

12        What we do, once we preview it, determine that it might

13   be relevant, it's secured, taken back to the lab and

14   forensically imaged.  And we work off that image.  We put

15   the original back in the lockers so we don't -- we try to

16   handle it as least as possible.

17   **Q.**   And do you ever forensically analyze a device if you

18   have not been granted lawful authority?

19   **A.**   No.

20   **Q.**   So what's the most common way that you would get lawful

21   authority?

22   **A.**   Search warrant or consent.

23   **Q.**   Corporal, have you ever heard of the term carved space?

24   **A.**   Carved and allocated.  There's several terms.  We

25   prefer to use unallocated.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   Okay.  So do you mind telling the jury what unallocated

2    space is in the context of forensic analysis?

3    **A.**   Sure, it's based on the hard drive.  Whenever you

4    install the operating system or if it's preinstalled, you

5    take pictures and put on your hard drive, those are active

6    files.  Any file that is on a computer that is not deleted

7    is considered an active file.

8         Now, there's a portion for the hard drive that's for

9    active files and any of the space that's not being used,

10   even if it was once used, is called unallocated.  It's not

11   being currently allocated by the operating system for use

12   either by the user or by the system.  So the unallocated

13   space is where your deleted files would reside.

14   **Q.**   So even if an item has been deleted by the user, where

15   would you still find it possibly?

16   **A.**   Can you repeat?  I'm sorry.

17   **Q.**   Of course.  If an item has been deleted by the user,

18   could you still find it in unallocated space?

19   **A.**   In the vast majority of cases.  The only case that

20   makes it pretty much impossible is if -- if that space has

21   been written over.  If that space has been reused by the

22   operating system or the user.

23   **Q.**   And, Corporal, what is the Tor browser?

24   **A.**   The Tor is -- The Onion Router is what it stands for.

25   Essentially it's a -- it's a modified version of the popular

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1    Firefox browser.  And this is -- it was developed many,

2    many, many years ago by DARPA and became an open source

3    project, which basically means the code was open.  Anybody

4    could, you know, ensure or modify that code.

5        However, the Tor browser sets on top of -- or sets at

6    the bottom of Firefox.  And all the Tor does, it routes the

7    traffic to multiple IP addresses throughout the world.

8        So -- now, it's slower than the regular internet

9    because it has to make so many hops.  So when you do a

10   search or a query on -- using Tor, it may hop -- it will go

11   maybe to one server in Vietnam, one in Russia, one in China,

12   one in the U.S., and essentially what it does it makes it

13   almost impossible to track because so many of these

14   jurisdictions, if you send them a subpoena or a court order,

15   they don't care.  They're not going to honor it.

16       So -- and each of the connections and each of the hops

17   are encrypted, so there is a huge level of anonymity to

18   using that browser.

19       It's popular among, you know, political activists,

20   especially in other countries, things of that nature, but

21   it's certainly popular for many other illegal activities.

22   Q.  And I'd like to direct your attention now to June 11th

23   of 2020.

24       Were you working with Special Agent Fleener of HSI

25   regarding the execution of a search warrant down at a house

Corporal Robert Boggs - Direct (Heinrich)

1    in Logan?

2    **A.**    Yes.

3    **Q.**    And whose house was that?

4    **A.**    It was the Dugan residence.  I don't remember the

5    family's names individually.  It was the Dugan's residence.

6    I remember it quite well.

7    **Q.**    Do you remember encountering a gentleman named Raymond

8    Dugan?

9    **A.**    Yes.

10    **Q.**    And do you mind looking around the courtroom today and

11    telling us if you see Mr. Raymond Dugan anywhere in the

12    courtroom?

13    **A.**    Yeah, Mr. Dugan is the gentleman in the gray suit.

14    **Q.**    And do you mind just describing a little more what

15    color shirt or tie he's wearing?

16    **A.**    Yellow tie, blue shirt, gray -- yellow mask.

17            MR. HEINRICH:  Your Honor, if the record would

18    reflect the witness has pointed out the defendant and

19    described the clothing he's wearing?

20            THE COURT:  Yes.

21            MS. WHITE:  Thank you.

22    BY MR. HEINRICH:

23    **Q.**    Corporal, were any devices seized from the Dugan

24    residence on June 11th of 2020?

25    **A.**    Yes.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**    And you mentioned the triage method before.  Was the

2    triage method used on that date to limit how many items were

3    seized?

4    **A.**    Yes, there was many, many digital items, thumb drives,

5    computers, phones, things of that nature within that

6    residence that we had to look at.

7    **Q.**    And was one of the devices that was seized a laptop

8    that included a PNY hard drive?

9    **A.**    Yes.

10    **Q.**    And do you remember from which -- from where the --

11    from where the computer that contained that hard drive came

12    from?

13    **A.**    Yes, in the -- the gentleman's home office room there

14    was a bookshelf as if you were sitting at the desk, the

15    bookshelf was to the right, and it was located in the bottom

16    area of that bookshelf.

17    **Q.**    And what type of room was that from what you could

18    tell?

19    **A.**    It appeared to be Mr. Dugan's office.

20    **Q.**    What made you say that?

21    **A.**    Everything on the desk was like addressed to him and

22    bills and work material.  You know, it didn't appear to be

23    like a kid's gaming area or anything.  Just everything

24    suggested that it was Mr. Dugan's office.

25    **Q.**    And right now I'm going to play you a very brief

Corporal Robert Boggs - Direct (Heinrich)

1    portion of what's already been introduced as Government's

2    Exhibit No. 1.  It's the video from June 11th.

3          MR. HEINRICH:  And if we could start playing that

4    exhibit starting at 3:19 into the video, please.

5       (Video played.)

6          MR. HEINRICH:  Play it one more time starting at

7    3:15.

8       (Video played.)

9          MR. HEINRICH:  Stop there, please.

10   BY MR. HEINRICH:

11   **Q.**   So that portion from 3:14 to 3:21, is that the

12   defendant in that video there?

13   **A.**   Yes, sir.

14   **Q.**   And do you see where he points in the video?

15   **A.**   Yes, sir.

16   **Q.**   What room was that where he points at in this video?

17   **A.**   That was the office that we're speaking of.

18          MR. HEINRICH:  We can take that down if you don't

19   mind.

20   BY MR. HEINRICH:

21   **Q.**   And now I'd like to move on to June 24th of 2020.  Is

22   that when you conducted a forensic download of the PNY hard

23   drive that was found in the defendant's office?

24   **A.**   That was the date I believe I started the examination

25   of that drive, yes.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   Okay.  And when you conducted that forensic analysis of

2    the PNY hard drive, did you find any material relevant to

3    this case on that computer?

4    **A.**   I did find many files and artifacts that appeared

5    relevant, yes.

6    **Q.**   And specifically any evidence of child pornography?

7    **A.**   Yes.

8    **Q.**   Approximately how much?

9    **A.**   How much artifacts?

10   **Q.**   How many images, if any.

11   **A.**   1,200, 1,300.  I'm guessing.  There was a lot.

12   **Q.**   And what happens when you see -- in a case like this

13   where you're working with HSI, when you find an image that

14   could be child pornography, what happens in the process?

15   **A.**   Well, I personally don't sit there and determine for

16   sure whether it's child pornography or not.  That's not my

17   job.  What I do is any picture that looks suspicious, if it

18   looks edgy, I guess you could say, looks inappropriate, I

19   bookmark it within the forensic software and place that in

20   the digital report for the investigator to review and to

21   determine relevance.

22   **Q.**   So the approximately 1,200 number you mentioned, that's

23   something you flagged for Special Agent Fleener to make the

24   ultimate determination?

25   **A.**   Yes.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   And I'd like to ask you a few more general questions

2    about searching the internet versus searching on the Tor

3    browser.

4         When you're using a normal internet browser like Google

5    Chrome or Internet Explorer, can you find child porn just by

6    searching child porn into the search engine?

7    **A.**   Very doubtful.  Usually if you make a search like that

8    it's going to be -- immediately be flagged by the provider,

9    the search engine, and you're going to get some -- a lot of

10   times you'll get hits like for counseling and things of that

11   nature, but, no, just a simple Google search on the clear

12   net, which is what you're -- which is what you're referring

13   to, the open internet, no.  You really have to look for it

14   to find it.

15   **Q.**   And does a browser like Internet Explorer, Google

16   Chrome, does that work on the dark web?

17   **A.**   No.

18   **Q.**   Conversely, how quickly can a person find child

19   pornography when they're on the dark web using the Tor

20   browser?

21   **A.**   Within three clicks, four clicks, a couple of searches.

22   It's -- the dark net is inundated with child sexual

23   exploitation sexual material and illegal marketplaces for

24   drugs, guns.  You name it; you can find it on there.

25              MR. HEINRICH:  Your Honor, may I approach the

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

88

Corporal Robert Boggs - Direct (Heinrich)

1    witness?

2              THE COURT:  You may.

3              MR. HEINRICH:  After showing to defense counsel.

4         Thank you, sir.

5    BY MR. HEINRICH:

6    Q.   Corporal, if you don't mind looking at what has been

7    marked for identification purposes only as Government's

8    Exhibit No. 7.

9         Do you recognize that document?

10   A.   Yes.  Yeah, this is the printout of the Shimcashe.

11   Q.   And that's Shim, S-h-i-m?

12   A.   Yes, sir.

13   Q.   What is a Shimcashe?

14   A.   Well, since about -- it started about -- in the XP --

15   when XP come out.  Essentially what that is it's a program

16   capability test that the operating system does.  Any time

17   you install a program, the operating system will determine

18   whether that program is compatible with that particular

19   version of Windows and it logs that program that you're

20   installing into the Shimcashe.  And that's what we're

21   looking at here.  Those programs that were executed --

22   downloaded and/or executed.

23   Q.   So it's a way of telling when programs may have been

24   downloaded and installed onto a computer?

25   A.   Yes.

89

Corporal Robert Boggs - Direct (Heinrich)

1              THE COURT:  You said downloaded or executed.  Is

2       there a difference?

3              THE WITNESS:  Yes, sir.  You can download a

4       program, but not execute it, not start the installation

5       process.  You can do that.

6              THE COURT:  Explain that further, could you?

7          If -- let's say could I download a picture, but not

8       look at it?

9              THE WITNESS:  No, sir.  A picture would not be an

10      executable file.  You know, like an .exe file that contains

11      code for the operating system to do multiple processes,

12      whereas a picture would not be.  A picture would simply come

13      up in a program.  It's not doing anything.  It's just simply

14      displaying the data contained therein.

15             THE COURT:  One more question.

16         Would you have to do something in particular to

17      download a photograph or a picture?

18             THE WITNESS:  You can, for example, right click,

19      save picture as, and save it to your hard drive, yes, you

20      can.  But also, if you're surfing the internet, any page

21      that would come up, there's something called temporary

22      internet files, your internet cache.  All the files in

23      applets that are within that web page that you're viewing is

24      going to a temporary folder.  So should you ever -- the

25      whole purpose of --

Corporal Robert Boggs - Direct (Heinrich)

1              MR. SCHLES:  Your Honor, I hate to interrupt, but

2    when he turns his back away from the microphone, I have

3    trouble hearing him.

4              THE COURT:  I understand.

5         Could you speak into the microphone?  You were talking

6    to me.

7              THE WITNESS:  Yes, sir.  Okay.  We was talking

8    about temporary internet files.

9              THE COURT:  Talk to the jury and I'll hear you.

10             THE WITNESS:  Temporary internet files.

11        The whole idea and the creation of the temporary

12   internet files was really a result of dial-up days.  And the

13   computer will cache these files so should you ever return to

14   that website it don't have to download it.  You know, in the

15   old days it took forever.  Now it don't.  It serves less of

16   a purpose, but it is still within the operating systems.

17   BY MR. HEINRICH:

18   **Q.**  So the Shimcashe report, though, that deals with files

19   like exe files?

20   **A.**  Any executable file, yeah.

21   **Q.**  What's an executable file?

22   **A.**  It's a dataset.  It's a file with data that tells the

23   computer and operating system to run certain processes.  And

24   in doing so those processes will show you the program that

25   you're installing.

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   And so that includes a process of installing a program?

2    **A.**   Yes.

3    **Q.**   And what's been marked for ID purposes at Government 7,

4    is that a fair and accurate copy of a Shimcashe report that

5    you produced as part of your analysis of the PNY hard drive

6    recovered on June 11th?

7    **A.**   It is.

8    **Q.**   Is that based on data from the hard drive itself?

9    **A.**   Yes.

10           MR. HEINRICH:  Your Honor, at this point I would

11   ask that Government's Exhibit Number 7 be introduced into

12   evidence.

13           THE COURT:  Is there objection?

14           MR. SCHLES:  No objection, Your Honor.

15           THE COURT:  I'm sorry?

16           MR. SCHLES:  No objection, Your Honor.

17           THE COURT:  It may be admitted.

18           **GOVERNMENT EXHIBIT NUMBER 7 ADMITTED**

19           MR. HEINRICH:  Thank you, Your Honor.

20       If I could ask if we could publish Exhibit Number 7,

21   the Shimcashe reports.

22           THE COURT:  Exhibit 7 may be published.

23   BY MR. HEINRICH:

24   **Q.**   We see a one-page spreadsheet of sorts here.  If we

25   could zoom in on the middle column called key list -- excuse

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1   me -- key last updated.

2   **A.**   Uh-huh.

3   **Q.**   That entire column or that top row of that column

4   first, the title.

5        And, Corporal, do you mind just explaining to the jury

6   what this column -- this key last updated column is?

7   **A.**   Yes.  The Shimcashe is located in the Windows registry.

8   Windows registry consists of segments we call hives.  In

9   this particular hive is -- these hives are the -- there's

10  keys in these hives that are updated periodically.

11       Now, it's important to note that this date and time

12  that's displayed right here does not mean that that's the

13  exact time that that file was downloaded and/or executed.

14  That's when the key was updated -- the registry key.

15       Now, the registry does update fairly frequently, but

16  that would not be the exact date and time.

17  **Q.**   But a close approximation?

18  **A.**   Yeah, I mean, it updates fairly frequently.  There's

19  really no set time.  That's based on the operating system's

20  algorithms for efficiency and speed and things of that.

21  **Q.**   So this column would say when a program's registry was

22  updated?

23  **A.**   That's when that registry key would have been updated

24  that contains that data, yes.

25  **Q.**   And this Shimcashe report that's Government 7, is that

Corporal Robert Boggs - Direct (Heinrich)

1    a specific file program that it relates to?

2    **A.**   Yeah, these are all referenced to the Tor browser.  It

3    shows roughly the dates and times -- at least when the keys

4    were updated -- that it was, in fact, downloaded on -- it

5    looks like at least twice and it had been run the remaining

6    12 times, 11 times.  So it had been run and executed

7    multiple times.

8    **Q.**   And does this necessarily show every single time that

9    the Tor browser was used?

10   **A.**   No, no, these keys typically, if I remember correctly,

11   will hold like the last 25.  Some are less, some are more.

12   So this is not representative of everything that's ever been

13   run.  This is just some of the recent -- you know, recent

14   ones.

15   **Q.**   And is it just one when the program is run or is it

16   when the program is reinstalled?

17   **A.**   Ran.  That was when the program was ran and -- now, if

18   you notice there's two of them on here that you can see.  It

19   says browser, Tor download exe.  It's a little bit longer

20   name.  Those appear to possibly be the downloads of that

21   executable file.

22   **Q.**   Okay.

23   **A.**   But that is definitely when that file was executed.

24   **Q.**   Okay.  So if we could now -- first, I guess, just to

25   clear something up, there is a box right below that.  So I

94

Corporal Robert Boggs - Direct (Heinrich)

1    see it says 1/1/2000, 12:00 a.m.

2         Is that, based on your experience, an accurate date?

3    **A.**   No, no.

4    **Q.**   Why would a date like this be in the spreadsheet?

5    **A.**   It could be corrupt data, something that was being

6    prepared to be purged possibly.  Sometimes you do get

7    inaccurate date and timestamps.  You cannot rely on date and

8    timestamps just totally in and of themselves.

9    **Q.**   Go to the box right below this, please.

10        So what does this date represent?

11   **A.**   That -- January 30th, 2019, at that time, and that

12   would be -- let's see if has a time.  It should be UTC plus

13   or minus zero, yes.

14        THE COURT:  You need -- I'm sorry.  Speak clearly.

15   **A.**   Okay.  The time represents UTC, which is what the

16   Windows registry actually keeps time with.

17   BY MR. HEINRICH:

18   **Q.**   And based on your -- the spreadsheet that you have in

19   front of you, Government 7, does that appear to be the first

20   time that the Shimcashe report indicates the Tor browser was

21   executed?

22   **A.**   Yes, at least the first time that it was recorded that

23   we have a record of.  Now, it could have happened before.

24   We can't tell, but I can just tell -- I can tell you based

25   on this record, yes.

95

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   But you know at least as of January 30th, 2019, it had

2    been installed or executed?

3    **A.**   Yes.

4    **Q.**   If we could go to box one row below that, please.

5         And, Corporal, this date, November, 4, 2019, if you

6    don't mind just scanning this spreadsheet, is this the last

7    date that you see in the spreadsheet?

8    **A.**   Yes.

9    **Q.**   So this would represent the last known time based on

10   the Shim report that we know the Tor browser was executed?

11   **A.**   Yes, that's what it indicates.

12   **Q.**   You mentioned you could tell a little bit about the

13   file names.

14        Do any of these file names indicate that the event that

15   was recorded is a national installation of the Tor browser?

16   **A.**   That's what this is.

17   **Q.**   So these were all times it was installed?

18   **A.**   These were all times it was executed.

19   **Q.**   Okay.  Does that mean --

20   **A.**   That means once -- when you install it, it puts the

21   icon on your computer.  When you double click it, that's an

22   execution.  You're starting -- you're executing that

23   program.

24   **Q.**   And these executions, are these new installations of

25   the Tor browser or simple use?

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Direct (Heinrich)

1   **A.**   Use.

2   **Q.**   Are any of these related to installation?

3   **A.**   I believe that number six and number two would be

4   installations.

5   **Q.**   So at least a couple of times --

6   **A.**   Because you see the word install?  That's actually the

7   execution --

8   **Q.**   If I could just time-out.

9        What row are you talking about?

10  **A.**   Row two.  If you look, you'll see it says install in --

11  in --

12  **Q.**   Hang on one second, please.

13  **A.**   Yeah.

14  **Q.**   File paths there?

15  **A.**   Yes.  If you look in the file path, you will see --

16  also you'll see, in that file path, the folder downloads.

17       So the file would have been in the downloads folder.

18  That's where it's located.  And the Tor browser install for

19  Windows 64 exe.  That exe is the installation file that --

20  that puts that program on your computer.  So that's where

21  that executable resided and when it was executed and that's

22  the installation.

23  **Q.**   So based on this report we know that on or about

24  January 30th the Tor browser was installed?

25  **A.**   Yes.

Corporal Robert Boggs - Direct (Heinrich)

1    **Q.**   And if there's other dates where it appears it was

2    installed, would that indicate it must have been uninstalled

3    at some point?

4    **A.**   Yes, and that's -- that's not unusual, yeah.

5           MR. SCHLES:  Objection.  He's speculating, Your

6    Honor.

7           THE COURT:  Overruled.

8    BY MR. HEINRICH:

9    **Q.**   And do you mind -- rather than go through each one

10   one-by-one, you mentioned that the first apparent date on

11   there is January 30th and the last one that popped up, I

12   believe, was November 4th of 2019.

13          The rest of the dates that you see below that, are they

14   all -- are they all in between those two dates?

15   **A.**   Yes.  It appears so, yes.

16          Let's see.  Six, seven, eight, nine, ten -- ten, yes.

17   **Q.**   Okay.

18   **A.**   January to November, yeah.

19   **Q.**   Thank you, sir.  I think we can take down the

20   spreadsheet at this point.

21          Did you also, as part of your analysis, look at URLs?

22   **A.**   Yes.  The forensic software we use actually goes in and

23   carves and looks for active URLs, which is simply the

24   location -- logical location of a website address.

25   **Q.**   And during your analysis were you able to determine if

Corporal Robert Boggs - Direct (Heinrich)

1    this PNY hard drive accessed any Tor website?

2    **A.**   Yes, there are many, many Tor website URLs recovered.

3    **Q.**   Do you recall the approximate number that it was at or

4    exceeded?

5    **A.**   It was well over a thousand.  I mean, I didn't go

6    through each and every single one of them, but there was a

7    lot.

8    **Q.**   And based on your training and your experience as an

9    expert, does that mean at least over a thousand dark

10   websites were accessed using the Tor browser?

11   **A.**   Many of the URLs were the same, so that would indicate

12   revisiting whatever website it is.  And also there's some

13   suspect terms located within the URL that were, I think,

14   relevant to the case potentially.

15   **Q.**   What are some of these terms based on your training and

16   experience that are suspect?

17   **A.**   Well, some -- in the URLs some of the letters and words

18   that you see, they don't make any secret about what it is.

19   Like, I remember one was --

20             MR. SCHLES:  Your Honor, I'm going to object just

21   as general conversation.  If they have specific entries in

22   these logs, they can talk about that, but they're just

23   talking about things that they have not shown have any

24   foundation as related to this case.

25             THE COURT:  All right.  Let's go to specifics.

99

Corporal Robert Boggs - Direct (Heinrich)

1    BY MR. HEINRICH:

2    **Q.**   As to this specific case, Corporal, what are some

3    specific terms you remember seeing in your analysis of the

4    PNY hard drive?

5    **A.**   I distinctly remember one with the term boys pub in it.

6    And that is -- and -- and I've been on the dark web within

7    the lab and I know what this is.  It's a child porn site

8    that caters to specifically young boys.

9    **Q.**   And so you mentioned that even though there may be some

10   revisits, at least a thousand dark websites were visited by

11   this hard drive?

12   **A.**   Yes.

13   **Q.**   How long does it take to load a single URL?

14   **A.**   Well, the Tor browser is a little slower and it will

15   depend on the amount of media that is contained on the front

16   page, if you will, but typically you could probably load a

17   page within a few seconds, five seconds, ten seconds easily.

18        The downloading, if you was to choose to download

19   videos, now that takes a little longer because the file size

20   is obviously much, much larger so --

21   **Q.**   So you can't simultaneously download 1,000 URLs at

22   once?  It's a process?

23   **A.**   Yes.

24   **Q.**   And you mentioned a little bit --

25            THE COURT:  Let me interrupt for one second.

Corporal Robert Boggs - Direct (Heinrich)

1        Does it take a specific act by the operator of the

2   computer to download each URL?

3        THE WITNESS:  There are search engines on the dark

4   web, much like the clear net, and you will do searches in

5   these engines.  You know, for marketplace guns and you're

6   going to get inundated with a bunch of these different sites

7   and you'll click on one.  And when you click on it, that URL

8   will be displayed in the address bar and you would go to

9   that website.

10       THE COURT:  But in trying to understand that, are

11  you telling me the search engine would list some of these

12  URLs as it's searching?

13       THE WITNESS:  Yes, sir.

14       THE COURT:  Okay.

15       THE WITNESS:  Yeah, this is not the same search

16  engines that you might find with Google and on the clear

17  net.  These are hidden sites themselves.

18       THE COURT:  So the URLs might themselves just be

19  the product of the search engine's operation?

20       THE WITNESS:  No, no.  You -- no, these are --

21  yes, these would have been displayed -- well, actually it --

22  some are displayed when you do -- when you do a search.

23  That's a possibility.

24       THE COURT:  Sorry.  Go ahead.

25  BY MR. HEINRICH:

Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188

Corporal Robert Boggs - Cross (Schles)

1    **Q.**   And so that we're clear, it can be displayed when you

2    do a search, but you have to click on it for it to be saved

3    in the computer where you saw these?

4    **A.**   For that website to be loaded and to access the content

5    of that site, yeah, yes.  It's not just going to do the

6    search and then download everything from every website

7    that's seen.  You have to actually click on the website

8    to --

9    **Q.**   So there was --

10   **A.**   -- to obtain the data.

11   **Q.**   I apologize.

12        There was at least 1,000 times that a site was either

13   clicked on or manually entered?

14   **A.**   Yes, that was displayed on the computer.

15        MR. HEINRICH:  Thank you.  Your Honor, I do not

16   believe I have any additional questions for Corporal Boggs.

17        Sir, I appreciate it.

18        Thank you.

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Cross-examine.

21            MR. SCHLES:  Thank you, Your Honor.

22                     **CROSS-EXAMINATION**

23   BY MR. SCHLES:

24   **Q.**   Corporal Boggs, is it your understanding that simply

25   installing the Tor browser does not mean that the Tor

Corporal Robert Boggs - Cross (Schles)

1    browser was used to access child pornography?

2    **A.**   That's correct, sir.

3    **Q.**   And executing the Tor browser does not mean it was used

4    on a date that it was executed to view child pornography,

5    correct?

6    **A.**   That's correct.

7    **Q.**   You can use the Tor browser for all sorts of things

8    legal and illegal, correct?

9    **A.**   Yes, sir.

10   **Q.**   And you can't tell from this report on these dates when

11   the browser was executed what was done, can you?

12   **A.**   No, sir.

13   **Q.**   And when you say that there were a thousand Tor URLs,

14   how come the report that was prepared only lists 100?

15   **A.**   There should have been more.  I know there was more

16   recovered.

17   **Q.**   Well, are you familiar with the report there's actually

18   a tab for Tor URLs?

19   **A.**   Yes, that's the Tor URLs in the tab of the report.

20   That should be the number.

21   **Q.**   And they are numbered 1 through 100.

22         Would that not be accurate?

23   **A.**   It should be accurate.  It's possible that I misspoke,

24   but --

25   **Q.**   So could you have misspoke and it was a hundred and not

Corporal Robert Boggs - Cross (Schles)

1   a thousand or how do you explain that?

2   **A.**   No, I believe there was well over a thousand.  I'm not

3   sure what report you're looking at.

4   **Q.**   I am looking --

5   **A.**   -- because --

6   **Q.**   -- at the report that was --

7            THE COURT:  Stop.  Both of you stop interrupting

8   each other.  Take a pause.

9        Go ahead, Mr. Schles.

10  BY MR. SCHLES:

11  **Q.**   Corporal Boggs, you prepared a report for the U.S.

12  Attorney's Office, correct?

13  **A.**   Yes, sir.

14  **Q.**   And it was your forensic examination report of the PNY

15  240 gig hard drive, correct?

16  **A.**   Yes.

17  **Q.**   And it has multiple sections or tabs, whatever you want

18  to call it --

19  **A.**   Yes.

20  **Q.**   -- listed in a column on the left side, correct?

21  **A.**   That's correct.

22  **Q.**   And you click on those and it gives you the data that's

23  contained in each one of those.  And there are many, many of

24  them:  Google map queries, identifier social media URLs, Tor

25  URLs specifically.  There's a specific tab for The Onion

Corporal Robert Boggs - Cross (Schles)

1    Router, Tor, URLs and that shows when the Tor browser was

2    used to visit the identified URLs, correct?

3    **A.**   Yes.

4    **Q.**   There's only 100 in your report, correct?

5    **A.**   I have no idea.  I thought there were many, many more.

6    **Q.**   You haven't reviewed your report any time recently to

7    be able to explain this huge discrepancy?

8    **A.**   No.

9    **Q.**   Would it help you if I showed you?

10            THE COURT:  Showed him what?

11            MR. SCHLES:  I'm going to show him a printout from

12   the report and ask him if it refreshes his recollection,

13   Your Honor.

14            THE COURT:  All right.  Do you want to mark it?

15            MR. SCHLES:  Yes.  May I have it marked

16   Defendant's Exhibit Number 1 for identification?

17            THE COURT:  Sure.

18            MR. SCHLES:  May I approach, Your Honor?

19            THE COURT:  You may.

20            MS. WHITE:  Your Honor, may I take a quick peek at

21   that exhibit?

22            THE COURT:  Certainly.

23            MR. SCHLES:  Oh, I'm sorry.

24            MS. WHITE:  That's all right.  I understand.

25         Thank you, sir.

Corporal Robert Boggs - Cross (Schles)

```
 1           THE WITNESS:  This appears to be a list.
 2    BY MR. SCHLES:
 3    Q.   Stop.  Stop, please.
 4         Let me first ask you, do you recognize that document
 5    that's been marked as Defendant's Exhibit Number 1 for
 6    identification?
 7    A.   It looks familiar, yes.
 8    Q.   Does it refresh your recollection as to how many Tor
 9    URLs were identified on the PNY hard drive?
10    A.   No.
11    Q.   It does not?
12    A.   It does not reflect -- I -- I believe it was much more
13    than 100.  However, do you have the report?
14    Q.   You believe it was more.
15         Can you explain why your belief differs so dramatically
16    from the report?
17    A.   No.  The only explanation I would have I know there
18    were several custom reports made.  That was, I believe, one
19    of them when you and -- and the U.S. Attorney's Office came
20    to the lab and I created those custom reports.  The only
21    explanation I would have is we exported maybe the first 100.
22    That's it.  I don't know.
23    Q.   So somewhere along the line a mistake was made?
24    A.   Partial.
25    Q.   And going back to the Shimcashe, which you discussed on
```

Corporal Robert Boggs - Cross (Schles)

1    direct examination, I think we both agree that the 1/1/2000

2    must be some kind of placeholder because none of this stuff

3    existed on January 1st, 2000; is that correct?

4    **A.**    That's correct.

5    **Q.**    On 1/30/2019 we have what is an install exe, correct?

6    **A.**    Yes.

7    **Q.**    It's number two in the Shimcashe --

8    **A.**    Yes, sir.

9    **Q.**    -- list?

10   **A.**    Yes, sir.

11   **Q.**    The ones following that are not installations.  Those

12   are when the already installed software program was

13   executed, which is a fancy computer guy word for used,

14   correct?

15   **A.**    Yes, sir, that's correct.

16   **Q.**    Is it not correct that the Shimcashe does not show the

17   Tor browser being used on May 25th, 2019?

18   **A.**    Yes, you're correct.

19   **Q.**    But it shows it being used prior to May 25th, 2019?

20   **A.**    Yes.

21   **Q.**    And it shows it being used after May 25th, 2019,

22   correct?

23   **A.**    Yes.

24   **Q.**    So it's not a matter of us only having the most recent

25   uses.  There is clearly entries before May 25th and entries

Corporal Robert Boggs - Cross (Schles)

1    after May 25th?

2    **A.**   Yes, sir.

3    **Q.**   So your analysis would indicate that the Tor browser

4    was not used on May 25th, 2019, to access the dark web,

5    correct?

6    **A.**   No, sir.  That's --

7    **Q.**   How do you explain it?

8    **A.**   How do I explain it, it's from the operating system.

9    These are the records -- I can just testify to the recovery

10   of the data.  I cannot testify to the exact operation and

11   actions of that operating system.

12   **Q.**   So your testimony is not exact and 100 percent

13   accurate, correct?

14   **A.**   No, everything I said is absolutely the truth and

15   accurate.

16   **Q.**   Well, then, how do you explain the discrepancy between

17   Mr. Fleener testifying under oath that some unidentified

18   foreign agent told him that this --

19          MR. HEINRICH:  Objection, Your Honor.

20   BY MR. SCHLES:

21   **Q.**   -- computer was used on --

22          MR. HEINRICH:  Objection, Your Honor.

23   BY MR. SCHLES:

24   **Q.**   -- May 25th --

25          THE COURT:  Well, let him finish the question and

Corporal Robert Boggs - Cross (Schles)

1    hold your answer until I get to rule.

2        Ask your question again.

3    BY MR. SCHLES:

4    **Q.**   Can you explain why Agent Fleener testified that he was

5    told by an unidentified foreign agent that this computer

6    that you examined was used with the Tor browser on May 25th,

7    2019, but it doesn't show up in your report?

8    **A.**   I cannot --

9            THE COURT:  Hold, hold, hold.

10       Objection is what?

11           MR. HEINRICH:  Your Honor, my objection is to this

12   witness being cross-examined regarding what a different

13   witness may have said in the trial.  I would argue that's

14   improper.

15           THE COURT:  He's offered as an expert witness and

16   is testifying about his opinions about how this operates.

17   And I think this goes to his understanding of the

18   operability and the functioning of the computer and I will

19   allow it.

20       Overruled.

21   BY MR. SCHLES:

22   **Q.**   Do you remember the question?

23   **A.**   Repeat it, please.

24           THE COURT:  Do you want to read it back?

25           MR. SCHLES:  That would probably be better, Your

Corporal Robert Boggs - Cross (Schles)

1    Honor.

2        Thank you.

3        ("Can you explain why Agent Fleener testified that he

4    was told by an unidentified foreign agent that this computer

5    that you examined was used with the Tor browser on May 25th,

6    2019, but it doesn't show up in your report?")

7            THE WITNESS:  I cannot explain that, no.

8    BY MR. SCHLES:

9    **Q.**   Thank you.

10       And you also testified to finding images that are

11   classified as child pornography in, quote, the unallocated

12   space, correct?

13   **A.**   That's correct.

14   **Q.**   You can testify that you found them in the unallocated

15   space when you conducted the examination, correct?

16   **A.**   They were found in unallocated space and in the thumbs

17   DB cache, yes.

18   **Q.**   You cannot testify as to when those images were first

19   brought to that computer, can you?

20   **A.**   No, sir.  No, sir.

21   **Q.**   You can't testify as to how they were brought to that

22   computer, can you?

23   **A.**   No, sir.

24   **Q.**   You can't testify as to when they were moved, if they

25   were moved, correct?

Corporal Robert Boggs - Cross (Schles)

1    **A.**    Correct.

2    **Q.**    All you can testify to is that you found them in the

3    unallocated space on the computer on the day that you

4    examined the computer.

5          You can't testify to anything more than that, can you?

6    **A.**    That's correct.

7    **Q.**    And you've already testified that the unallocated space

8    is the type of thing that's not easily accessed to your

9    average computer user, correct?

10   **A.**    It -- well, you can access it with special software and

11   programs, sure.

12   **Q.**    That's what you do.  You use proprietary software.  You

13   don't go -- you don't -- I mean, I know a little bit about

14   this stuff.  No one here as much as you.

15         You can make the hidden files visible.  There's a

16   toggle in Windows, correct?

17   **A.**    It's not a hidden file, sir.  There's a difference

18   between a hidden file and a deleted file.

19   **Q.**    So it's even harder to do than that, isn't it?

20   **A.**    Yes.  You would have to carve -- basically the way the

21   carving process works with the forensic software is it takes

22   the unallocated space, it looks for the file header, the

23   file footer.  When I say the header and the footer, for

24   example, if it's a JPEG file, all JEPGs have the same

25   header:  FF D8, FF D9.

Corporal Robert Boggs - Redirect (Heinrich)

 1    **Q.**   As you testified, you're highly trained in this area,

 2    correct?

 3    **A.**   I would think so, yeah.

 4    **Q.**   We just literally decided you're an expert on this,

 5    correct?

 6    **A.**   Yes.  I know how it works, yes.

 7    **Q.**   And you're a very experienced expert.  You've been

 8    doing this for years and years?

 9    **A.**   Yes, sir.

10    **Q.**   And you use proprietary software that you purchased or

11    your agency purchased for a lot of money, correct?

12    **A.**   Yes.

13    **Q.**   And that's the only way you were able to locate these

14    images in the unallocated space and even with all that you

15    can't say how they got there, can you?

16    **A.**   No.  I cannot say how they got there, no.

17          MR. SCHLES:  I have no further questions, Your

18    Honor.

19          THE COURT:  Redirect.

20                       **REDIRECT EXAMINATION**

21    BY MR. HEINRICH:

22    **Q.**   Corporal, the report that you were shown by the defense

23    attorney, that's a screen that lists the top URLs that were

24    found, right?

25    **A.**   Yes.  That's I believe some of them, yes.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Redirect (Heinrich)

1    **Q.**   And, in fact, it's like some internet pages, the first

2    100 are shown and then you need to click to go onto the next

3    100, right?

4    **A.**   Yes.

5    **Q.**   So what you were shown that had 100 was page 1 of many,

6    correct?

7            MR. SCHLES:  Objection --

8    **A.**   I don't know.

9            MR. SCHLES:  -- Your Honor.

10   **A.**   I don't know.

11           MR. SCHLES:  He testified on cross that he

12   couldn't say --

13           THE WITNESS:  I can't --

14           THE COURT:  Whoa, whoa, whoa.  I heard you.

15       Sustained.  Leading.

16           MR. HEINRICH:  Your Honor, may I approach?

17           THE COURT:  Yes.

18           MR. HEINRICH:  May I approach, Your Honor?

19           THE COURT:  You may.

20   BY MR. HEINRICH:

21   **Q.**   Corporal, do you recognize that disc that I just handed

22   you?

23   **A.**   Yes.  It's a copy of the -- Mr. Dugan's report.

24   **Q.**   And your initials are on that?

25   **A.**   Yes.  I burnt this CD, yes.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Redirect (Heinrich)

1   **Q.**  And is that a fair and accurate copy of the report that
2   you were cross-examined on?
3   **A.**  Yes.
4           MR. HEINRICH:  Your Honor, at this point I would
5   ask that Government's Exhibit Number 10 be introduced.
6           MR. SCHLES:  No objection, Your Honor.
7           THE COURT:  It may be received.
8           **GOVERNMENT EXHIBIT NUMBER 10 ADMITTED**
9           MR. HEINRICH:  Thank you, Your Honor.
10      May I approach again?
11          THE COURT:  You may.
12          MR. HEINRICH:  Thank you.
13          THE COURT:  Don't forget to give it to the
14  courtroom deputy.
15          MR. HEINRICH:  Yes, Your Honor.
16      First we're going to attempt to display it for the
17  jury, so if we could display what's been admitted as
18  Government's Exhibit 10.
19          THE COURT:  It has been.
20      Yes, you may.
21  BY MR. HEINRICH:
22  **Q.**  So, Corporal, if you don't mind looking near the bottom
23  of the screen where it says page and one and then a down
24  arrow?
25  **A.**  Yes, sir.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Corporal Robert Boggs - Redirect (Heinrich)

1   **Q.**   And then after that it says 1 to 100?

2   **A.**   Yes, sir.

3   **Q.**   What do those buttons do?

4   **A.**   Those buttons navigate you from page to page.  What it

5   would seem to appear at this point that that was just page 1

6   that was printed.  However, if you look at the final number

7   1,543, that would be the number of items or URLs in this

8   case that are being listed.

9   **Q.**   And --

10  **A.**   So it was 1,543.

11  **Q.**   So 1,543 is the number of URLs that you found during

12  your analysis of the hard drive?

13  **A.**   Yes, of Onion URLs -- web -- dark web URLs.

14  **Q.**   Excuse me.  Thank you.

15          MR. HEINRICH:  Your Honor, I have no additional

16  questions.

17          Thank you, sir.

18              THE COURT:  All right.  Thank you very much.

19              May the witness be excused?

20              MR. SCHLES:  Yes, Your Honor.

21              THE COURT:  All right.  Thank you, Corporal.

22  You're excused.

23          Call your next witness.

24              MS. WHITE:  Your Honor, if I may provide the

25  stipulation that is Exhibit 8 to the jury and read it to

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

1    them at this time.

2              THE COURT:  You may.

3         Ladies and gentlemen, I take it that the Assistant

4    United States Attorney is going to read an agreement between

5    the parties as to the existence of a particular fact.  You

6    may consider that as evidence of that fact and give it just

7    such weight as you think it deserves.

8              MS. WHITE:  Thank you, Your Honor.

9         And to the extent that I didn't do this, I would move

10   Government's Exhibit 8 into evidence.

11             THE COURT:  It's admitted.

12             **GOVERNMENT EXHIBIT NUMBER 8 ADMITTED**

13             MS. WHITE:  And this joint stipulation says,

14        The United States and the defendant hereby stipulate

15   and agree to the following:

16        The individuals depicted in the images contained in

17   Government's Exhibit 3 through 6 are real people known to

18   law enforcement.

19        The individuals depicted in the images contained in

20   Government's Exhibit 3 through 6 were under the age of

21   18 years when the images and videos were produced and

22   manufactured.

23        The images and videos depicted in Government's

24   Exhibits 3 through 6 depict sexually explicit conduct.

25        The images and videos depicted in Government's 3

```
1    through 6 were produced and manufactured outside the state

2    of West Virginia and therefore have been shipped and

3    transported in interstate or foreign commerce, including by

4    computer.

5        Logan is located in Logan County, West Virginia, and

6    within the Southern District of West Virginia.

7        Signed by the Assistant United States Attorney defense

8    counsel and the defendant.

9        Your Honor, may I --

10       THE COURT:  Ladies and gentlemen, that is a

11   stipulation of fact entered into by agreement between the

12   defendant and the United States.

13       You may consider that as evidence.

14       MS. WHITE:  Your Honor, may I approach the clerk?

15       THE COURT:  You may.

16       MS. WHITE:  Thank you, Your Honor.

17       The government's records reflect that Exhibit 1, 2A

18   through E, and 3 through 10 have been received into

19   evidence.

20       Is that the Court's recollection as well?

21       THE COURT:  Madam Clerk.

22       THE COURTROOM DEPUTY CLERK:  I have Number 9 as

23   admitted.

24       MS. WHITE:  Yes, ma'am.  Thank you.

25       THE COURTROOM DEPUTY CLERK:  Yes.  All right.
```

1          MS. WHITE:  Given all that, Your Honor, the

2    government rests.

3          THE COURT:  All right.

4       Ladies and gentlemen, the government having rested

5    their case we'll take our afternoon recess now and then

6    we'll pick up from there.

7       During the recess don't discuss the case among

8    yourselves or permit anyone to discuss it with you.  It's

9    not time yet.  Don't use any social media, don't do any

10   research, just have a donut or something and I'll call you

11   back in a few minutes.

12      Would you show them to the jury room, sir.

13      (Jury out at 2:46 p.m.)

14          THE COURT:  Mr. Schles.

15          MR. SCHLES:  Yes, Your Honor.

16      At this time pursuant to Rule 29 of the Rules of

17   Criminal Procedure I would move for a judgment of acquittal.

18      I believe even viewed in the light most favorably to

19   the government and drawing all inferences in favor of the

20   government that the government has failed to establish the

21   intent of knowing access or intent to view material that is

22   child pornography.

23      And what we have is we have evidence that an

24   unallocated space, which by the government's own evidence is

25   difficult to access and find, that images containing child

1   pornography are found.  It's the only location on the

2   computer that it was found.

3        They cannot, Corporal Boggs testified, state how it got

4   there, when it got there, who caused it to get there.  They

5   haven't shown anyone's knowledge and intent, let alone my

6   client's, Your Honor.

7             THE COURT:  All right.

8        Ms. White.

9             MS. WHITE:  Thank you, Your Honor.

10       I believe the government has several elements to meet

11  and in the light most favorable to the government we've met

12  those elements.

13            THE COURT:  Let's take it to the defendant.

14       Light most favorable to the defendant.

15            MS. WHITE:  All right, Your Honor.

16       We have four elements.  We'll start with the image

17  traveled in interstate or foreign commerce, including a

18  computer.

19       We've stipulated to that in Exhibit 8.

20       The fact that the children in the images are

21  prepubescent, I think the Court can make that finding from

22  reviewing Exhibits 3 through 6 that were previously

23  published to the jury.

24       And that leaves us with the defendant accessing with

25  the intent to view images of child pornography and knowingly

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

119

1    doing that.  The evidence to support that comes from several

2    sources:  The 1,237 images of child pornography that were

3    recovered from the defendant's hard drive.  That comes from

4    Exhibit 9 and the testimony of both Corporal Boggs and

5    Agent Fleener.

6         In addition, the defendant's statement on the video, I

7    was trying to figure it out, coupled with these quotes from

8    his statements to Agent Fleener, quote, trying to figure it

9    out; quote, looking what's happening; quote, probably more

10   than a month or two; quote, I've looked around; quote, I

11   just kind of searched different things until I found

12   something; quote, curiosity got me.

13        Your Honor, that Shimcashe report shows that the dark

14   web -- the Tor browser was used 1,500 times to access --

15        I'm sorry.  The report shows that from January to

16   November of 2019 the Tor browser was executed multiple

17   times.  That, combined with Government's Exhibit Number 10,

18   shows that the dark web was accessed over 1,500 different

19   websites.  When you take that information, coupled with the

20   defendant's statements saying he used the dark web to search

21   for these images, that's more than sufficient evidence to

22   show that the defendant knew that he was looking for child

23   pornography and that he viewed it on the dark web using that

24   PNY hard drive and that computer.

25        So for those reasons we would ask that Rule 29 be

```
 1    denied.

 2              THE COURT:  I think it's in the light most

 3    favorable to the nonmoving party.  So to the extent I

 4    confused anybody, you can amend your arguments.  I perfectly

 5    understood what you had to say.

 6              MR. SCHLES:  Your Honor, I don't have anything to

 7    add at this time.

 8              THE COURT:  All right.

 9         Sorry about that.

10         It is the Court's assessment, viewing the evidence

11    properly, that the government has abundant evidence of

12    guilt.

13         The defendant's statements offered very persuasive

14    evidence of guilt.  The forensic evidence corroborates the

15    conclusions to be drawn from those statements.  I just don't

16    have any doubt about this motion.

17         The motion's overruled.

18         Do you want to take about ten minutes before we pick

19    up?

20         You want to preview for me what you're going to do,

21    Mr. Schles?

22              MR. SCHLES:  Yes, I would like to consult with my

23    client during the break, Your Honor.

24              THE COURT:  All right.  Well, I don't want to call

25    the jury back in until I know what you're going to do.  If
```

```
1    you don't mind, you can tell me.

2              MR. SCHLES:  That's fine, Your Honor.

3              THE COURT:  All right.  I'll be back at 3:00.

4         (Recess taken from 2:51 p.m. until 3:32 p.m.)

5         (Proceedings held before the jury entered the

6    courtroom.)

7              THE COURT:  Have the parties had an opportunity to

8    look at the proposed jury charge?

9              MS. WHITE:  Yes, Your Honor.

10             THE COURT:  Do you have any objections?

11             MS. WHITE:  No, sir.

12             MR. SCHLES:  Your Honor, I do have -- I -- on the

13   elements instruction, I think changes are necessary.  And

14   also I would like to -- and I assume the Court is going to

15   do this after closing arguments -- some of my proposed

16   instructions incorporated.

17             THE COURT:  All right.  Well, let's go over it

18   then.

19        Tell me on the elements what page or what's your

20   problem.

21             MR. SCHLES:  On the bottom of page 4, beginning

22   with the -- I guess it's the paragraph numbered 4.

23             THE COURT:  Uh-huh.

24             MR. SCHLES:  Your Honor, in this case the

25   indictment does not include the possession.  It simply
```

1    states that the defendant did knowingly access with intent

2    to view material that is computer graphic images containing

3    images of child pornography.

4        The statute itself have -- there are two methods of

5    violating the statute.

6            THE COURT:  Any objection to removing possessed or

7    and just simply saying that the defendant accessed?

8            MS. WHITE:  No, Your Honor.

9            THE COURT:  I'll take that out.

10           MR. SCHLES:  And also, Your Honor, because the

11   indictment specifically -- excuse me -- contained the

12   language that the images involve prepubescent minors, I

13   believe that needs to be added in as part of the elements of

14   the offense the government's alleging and it needs to prove

15   it.

16           MS. WHITE:  Your Honor, we see where it is

17   included in instruction 4A of the elements.

18           THE COURT:  Yeah, it says it right there.

19           MS. WHITE:  And then on page 6 we see where the

20   Court has defined and explained what prepubescent minor

21   means.

22           THE COURT:  Yeah.  Right at the bottom of page 4,

23   Mr. Schles, the last two words on the page.

24           MR. SCHLES:  Yes, Your Honor.  I missed that.

25       Thank you.

```
1              THE COURT:  Okay.  Do you have anything else?

2              MR. SCHLES:  Other than incorporating some of my

3    proposed instructions --

4              THE COURT:  Tell me what -- I take it you want to

5    object to my refusal to give some particular instruction of

6    yours?

7              MR. SCHLES:  I'm sorry?

8              THE COURT:  You want me to -- you want to object

9    to my refusal to give --

10             MR. SCHLES:  Yes, Your Honor.  Yes, Your Honor.

11             THE COURT:  -- some particular instructions?

12             MR. SCHLES:  I do.

13             THE COURT:  Okay.  15 minutes each side good

14   enough?

15             MR. SCHLES:  It is for me, Your Honor.

16             THE COURT:  Okay.

17             MR. SCHLES:  Your Honor, I would object to the

18   refusal to give defendant's proposed instruction

19   number four.

20             THE COURT:  Let me do them one at a time.

21             MS. WHITE:  Your Honor, if I could just clarify,

22   is this from ECF filing 57 or 85?

23             THE COURT:  That's not it.  That's number one.

24   We're looking for number four here.

25         What page number was it, Mr. Schles?
```

```
 1              MR. SCHLES:  It would be number 17 in docket entry

 2    57, Your Honor.

 3              THE COURT:  Credibility, is that the one?

 4       Wait a minute.  These pages that I have I believe were

 5    numbered by you.  The whole set is numbered -- has numbered

 6    pages; is that right?

 7              MR. SCHLES:  Yes, Your Honor, but --

 8              THE COURT:  Point me to a page.

 9              THE LAW CLERK:  Page 17, Judge.

10              THE COURT:  Instruction number four on page 17; is

11    that right?

12              MR. SCHLES:  Correct, Your Honor.

13              THE COURT:  Hang on.  I think that's a totally

14    unnecessary instruction.  I will deny it.

15              MR. SCHLES:  Please note my objection, Your Honor.

16              THE COURT:  I will do so.

17       Defendant's proposed instruction number four is denied.

18    The proposed instructions will be made part of this charge

19    conference record.

20       Go ahead.

21              MR. SCHLES:  Also defendant's proposed instruction

22    number eight on page 21.  It's a mere presence instruction.

23              THE COURT:  On page what?

24              MR. SCHLES:  21, Your Honor.

25              THE COURT:  I'm going to deny the instruction.  I
```

1    feel like the Court's charge as written sufficiently covers

2    the law of this case and that there is nothing in the

3    evidence that would require a mere presence instruction.

4            MR. SCHLES:  Please note my objection, Your Honor.

5            THE COURT:  Yes.

6            MR. SCHLES:  Also, defendant's proposed

7    instruction number nine, inferences permissible from failure

8    to produce evidence, on page 22.

9            THE COURT:  Again, Mr. Schles, I don't think it

10   will aid the jury to give them this instruction, the proper

11   instruction of the law, but I don't know of any witnesses

12   that would -- can you tell me why you think this is

13   necessary?

14           MR. SCHLES:  Your Honor, as was testified, the

15   original identification of Mr. Dugan's ISP internet service

16   provider was relayed from a foreign law enforcement agency

17   to HSI Boston and then to Fleener.  The government did not

18   call anyone from this foreign law enforcement agency or the

19   person who received the tip from this foreign law

20   enforcement agency.

21           THE COURT:  Based on that objection as stated, I

22   overrule it.

23           MR. SCHLES:  Please note my objection, Your Honor.

24           THE COURT:  That's number nine that's overruled.

25       Anything else?

1          MR. SCHLES:  Just one moment, Your Honor.

2      Your Honor, I believe my other proposed instructions

3  are adequately included in the Court's charge.  That is it

4  for my objections.

5          THE COURT:  All right.  Thank you, Mr. Schles.

6      I am going to include your entire set of proposed

7  instructions with the record noting the ones that I've ruled

8  upon that you've raised as objections.

9          MR. SCHLES:  And one other thing, Your Honor, and

10  it's a minor matter and I'm not sure whether it was intended

11  or not, the jury verdict form is titled "Order."

12      Typically when I've seen them they're --

13          THE COURT:  That's a mistake.  We'll fix it.

14      Madam Clerk, would you file this as part of the record

15  in the case.

16      Let me look at that.

17      Anything else?

18          MR. SCHLES:  No, Your Honor.

19          THE COURT:  I think -- I assume you would renew --

20  after you announce you rest in front of the jury, you renew

21  your motion.

22      Do you have objection to going ahead and addressing

23  anything additional you want to say since we had your

24  initial motion?

25          MR. SCHLES:  I have already stated what I intend

1    to state for the Rule 29 purposes, Your Honor.

2        If it's simply understood that I am renewing the motion

3    and the record reflects that I'm renewing it on the same

4    grounds previously stated, I'm good with that.

5        THE COURT:  The record will so reflect.  We'll do

6    so after you've rested your case and the Court's ruling will

7    be the same; that is, your motion's overruled.

8        MR. SCHLES:  Thank you, Your Honor.

9        THE COURT:  Denied.

10   Okay.  Ready?

11       MS. WHITE:  Yes, sir.

12       THE COURT:  Would you bring in the jury.

13   (Jury in at 3:44 p.m.)

14       THE COURT:  You can be seated.

15   Ladies and gentlemen of the jury, thank you for that

16   long wait.  I think you'll find it's worthwhile.  The

17   government having rested, I turn to the defendant.  And I've

18   told you before the defendant has absolutely no burden at

19   all.

20   Mr. Schles.

21       MR. SCHLES:  Your Honor, at this time the defense

22   rests.

23       THE COURT:  The government and the defense having

24   rested, that is the close of the evidence in the case and we

25   will go from there to closing arguments by counsel.  After

128

1    that I'll instruct you on the law and you'll retire to

2    consider your verdict.  Each side will have 15 minutes.

3         Who will open for the government?

4              MR. HEINRICH:  I will, Your Honor.

5              THE COURT:  Very well, sir.  You may proceed.

6              MR. HEINRICH:  Thank you.

7         Good afternoon.

8         On June 11th of 2020, the police executed a search

9    warrant at the defendant's house.  This case is about what

10   they found.

11        You heard they found over 1,000 images of child

12   pornography and you've seen four of those images today.

13   They showed the sexual exploitation, the sexual abuse and

14   the humiliation of young children.  I'm not going to make

15   you look at those photos again, but I want you to keep those

16   images in your mind when you're deliberating, when you're

17   considering what this case is about.

18        And this was a quick trial, but I ask do not confuse

19   speed with a lack of evidence.  The evidence of the

20   defendant's guilt has been overwhelming.  The evidence has

21   shown and proven beyond a reasonable doubt that between

22   January 30th of 2019 and November 4th of 2019, in or near

23   Logan, the defendant knowingly accessed child pornography

24   with the intent to view the material.

25        And you've heard earlier, and I suspect you're going to

```
 1    hear later on, in any criminal trial the burden is on this
 2    side of the room.  The burden is always on us as a
 3    prosecution.  We have to prove this case beyond a reasonable
 4    doubt.  We welcome that burden.  We have met that burden in
 5    this case and this burden has been met, again, by powerful
 6    and overwhelming evidence.
 7        And this isn't the type of case where you need to rely
 8    upon the word of a stranger or an eyewitness.  In this case
 9    the evidence is right before you.  You can see for yourself
10    what these photos are, what these photos that were found on
11    the defendant's laptop are.  And you can hear for yourself
12    the defendant's own words both on the video as well as the
13    interview that he had with Special Agent Fleener.
14        And, again, as part of our burden we have a burden as
15    to every single element of the crime that the judge is going
16    to tell you about.  However, in every case some burdens may
17    be more obvious and some may take a little more explanation.
18    And oftentimes there's elements that the parties don't
19    really disagree about.
20        So here's some of the things I don't expect are going
21    to take a lot of thought during the deliberation process.
22    That's because of either the stipulations that we've agreed
23    upon or just because of common sense.
24        So first of all, the stipulations.  Again, you heard
25    that's an agreement between the parties.  So the stipulation
```

1    that was read into evidence, first of all, we agree that the

2    children in the four photos you saw are real people and they

3    were under the age of 18.

4             JUROR SHARON BLEVINS:  We never saw any photos.

5             THE COURT:  I couldn't -- I'm sorry.

6         Just a minute.

7         What did you say?

8             JUROR SHARON BLEVINS:  We never saw any photos.

9             THE COURT:  What did you say?

10            JUROR SHARON BLEVINS:  We never saw --

11            THE COURT REPORTER:  I'm sorry.  I don't know

12    who's talking.

13            THE COURTROOM DEPUTY CLERK:  Judge, she has to

14    take down who was speaking.

15            THE COURT:  Okay.  I'm sorry.

16        What is your name?

17            JUROR SHARON BLEVINS:  Sharon Blevins.

18            THE COURT:  All right.  The photos were -- that

19    were shown to the jury were six photos; is that correct?

20            MR. HEINRICH:  Four, Your Honor.

21            THE COURT:  Four photos that she took out of

22    envelopes and showed on the screen.

23        Did you see those?

24        (Jury members indicated no.)

25            THE COURT:  The screens didn't display them?

```
 1          (Jury members indicated no.)

 2              THE COURT:  All right.

 3              MR. SCHLES:  Your Honor, my screen they were --

 4              UNIDENTIFIED JUROR:  We didn't see them.

 5              THE COURT:  I'm very sorry about that.  The photos

 6   are in evidence and they are in envelopes and they are in

 7   evidence before you.  I admitted them.  You can take them to

 8   the jury room and see them.

 9          Moreover, you have the disc with what is represented to

10   be other photos should you want to review those as well.

11          All right.

12              MR. HEINRICH:  Thank you, Your Honor.

13              THE COURT:  Is there objection?

14              MR. SCHLES:  No, Your Honor.  They were admitted

15   and they can go back to the jury.

16          I don't object.

17              THE COURT:  All right.  I apologize for the

18   technical problem.

19          Go ahead.

20              MR. HEINRICH:  So ladies and gentlemen, I suspect

21   that my colleague Ms. White is going to show those photos to

22   you briefly before you begin your deliberations when she has

23   a chance to speak to you.

24          And in the stipulation the parties also agree that

25   these photos depict what the law calls sexually explicit
```

1    conduct.

2        Third, the four images were produced outside the state

3    of West Virginia and therefore transported in interstate or

4    foreign commerce.

5        And, lastly, we agree in the stipulation that Logan is

6    in Logan County within the Southern District of West

7    Virginia.

8        What else should not be complicated?

9        Now, we heard that the photos at some point were

10    deleted off the computer.  They were in this unallocated

11    space, but we heard that they can still be accessed during a

12    search of the computer using some software.

13        Now, who can access these deleted photos and how easy

14    that is, you don't need to worry about that technical issue

15    because this charge isn't based on whether he possessed them

16    on June 11th.  The charge is that the defendant knowingly

17    accessed the child pornography.

18        So you don't have to get sidetracked on exactly what it

19    means to possess photos in this unallocated space.  This

20    case is about accessing the photos.

21        What else should not be at issue?  When you see these

22    photos, there will be no doubt in your mind that these

23    children are under the age of 12.

24        So there's a lot of things I submit that are just

25    really simple either because you can see them or you will

133

1    see them with your own eyes or because you can hear them

2    yourself or because the parties have agreed to those facts

3    in the stipulation.

4        So I want to focus right now on how we know the

5    defendant knowingly accessed child pornography with the

6    intent to view it in 2019.

7        First of all, we know it was on his own laptop.  It was

8    found in the room right where the defendant told officers

9    they would find it.  You saw it in that video that was

10   played.  He pointed at that room and that is where it was

11   found.

12       We also heard the officers tell us that appeared to be

13   the defendant's home office and they described for you why

14   they believe that.

15       We also learned during this trial that this type of

16   child pornography is almost certainly accessed through the

17   dark web.  We also learned that you can't really find it on

18   the regular internet.  You need to use this dark web and to

19   use the dark web it's most often accessed through this Tor

20   browser.

21       And we heard through Corporal Boggs, in Government's

22   Exhibit Number 7, that spreadsheet, that this Tor browser

23   that is used for the dark web was installed repeatedly --

24   excuse me, installed and used repeatedly between January and

25   November of 2019.  Those are the dates in the superseding

1    indictment.

2        Now, this is strong evidence that the defendant was

3    accessing child pornography during the period alleged in the

4    indictment.

5        We also heard that over 15,000 dark web sites were

6    visited by the defendant's computer.

7        Now, all of this is powerful --

8        MR. SCHLES:  Objection, Your Honor.  That's

9    misstating the evidence.

10       THE COURT:  It is indeed.  I think he didn't mean

11   15,000.

12       MR. HEINRICH:  Excuse me.  My comma moved.

13       1,500 websites were accessed on the dark web.

14       Now, this is all powerful evidence proving the

15   defendant's guilt.

16       What removes any doubt is the defendant's own words,

17   statements that you heard him make both on the video and in

18   that recorded interview.

19       For example, in the video, when the topic of child

20   pornography was being discussed, he said, quote, it was

21   probably me that figured something out on Tor, some of the

22   statements he made in the audio clips of the interview.  In

23   Exhibit 2A he was asked if he's ever downloaded child

24   pornography.

25       No, not that I can ever recall specifically downloading

```
 1    other than going on, looking what's happening.

 2         Looking what's happening.  When you're considering that

 3    phrase, remember what he was looking at.  You're going to

 4    see these four photos.  This is what the defendant so

 5    casually says he was looking at.  Keep that in mind.  Keep

 6    that context in mind.

 7         Also in Exhibit 2A:

 8         Have you ever been on any other websites that offered

 9    child pornography?

10         There's some inaudible comments.  Special Agent Fleener

11    confirms he's talking about other websites outside of one

12    website in particular.

13         The defendant says:

14         I would say I have probably come across some, yeah.

15         Again, we heard this isn't -- this child pornography

16    isn't stuff you just come across like a broken umbrella on

17    the street.  This is stuff you have to get a special browser

18    for, you need to hunt down on the dark web for.  And these

19    photos that you're going to see they're going to stick in

20    your mind.

21         And, again, this isn't something you just casually come

22    across.

23         In clip 2B the defendant says:

24         Oh, no, a -- a search engine and just kind of searched

25    different things until I found something and then -- I don't
```

1    know -- moved -- clicked onto the next.

2         So he's looking at these and he's clicking on --

3    clicking and looking at more.

4         And, again, when you put this together with these

5    images you're going to see, that is powerful evidence that

6    the defendant knew exactly what he was doing and he was

7    going out and seeking these photos of child pornography.

8         In Exhibit 2D the defendant says:

9         I don't know.

10        Yes or no?

11        I can't be sure, but I would say I would -- I would

12   assume I probably made it to more than one.

13        And he's talking about a website.

14        Again, look at these photos.  Ask yourself after seeing

15   one what does it tell you that the defendant kept looking

16   for more on one or more websites?

17        That tells everything you need to know about his

18   knowledge and about his intent.

19        When Agent Fleener asked what -- what had you been

20   looking -- sorry -- what had you looking at child porn --

21   and this is in Exhibit 2E.

22        The defendant says:

23        Probably just wondering what -- what in the world is

24   all of it.

25        Again, when you look at these photos, ask yourself is

1    that what comes to your mind, curious what it's all about?

2        And the last exhibit I wanted to mention was

3    Exhibit 2E.  And, again, the defendant is trying to explain

4    why he's looking at child pornography.

5        No, I just -- you know, just curiosity.  You got me, I

6    guess.  I don't -- I don't -- I don't know.

7        Agent says:

8        All right.

9        The defendant:

10       Yeah.  I mean, I guess my curiosity pushed me into

11   something I should have steered clear of.

12           THE COURT:  That's about -- we had an

13   interruption, but you're about ten minutes even with the

14   interruption.

15           MR. HEINRICH:  Okay, Your Honor.

16       So, again, keep in mind what these photos that he's

17   talking about are.  These aren't photos you can find in a

18   normal web browser.  These are photos you have to hunt out.

19   It's not like checking a score on the internet, checking the

20   weather.  These are things you need to seek out -- things

21   you need to seek out.

22       The defendant had to be fully committed to this crime

23   to access these photos you're going to see.

24       And as much as he tried in these -- in this recorded

25   interview to make it sound like it wasn't a big deal, this

1    is a big deal.  And you're going to see that when you see

2    these four photos that Ms. White shows you later on this

3    afternoon.

4         Ladies and gentlemen, the defendant is guilty.  After

5    carefully reviewing all of the evidence during

6    deliberations, we ask that you come back with the only

7    verdict supported by your common sense and by the evidence

8    in this case, that's a finding of guilty on the sole count

9    of the indictment.

10        Thank you.

11             THE COURT:  Mr. Schles.

12             MR. SCHLES:  Thank you, Your Honor.

13        The judge has already told you and he will instruct you

14   again that the government has the burden to prove every

15   element of the offense beyond a reasonable doubt.  The

16   government has not done that.

17        The government presented two witnesses.  Mr. Fleener

18   testified, among other things, that he received essentially

19   a third-hand tip that originated with a, quote, foreign law

20   enforcement agency.

21        You notice that they didn't tell you what this foreign

22   law enforcement agency is.  Mr. Fleener admitted he doesn't

23   even know who -- not only doesn't know the individual, he

24   doesn't know who the individual is.  They want you to trust

25   a foreign government that they won't name and an individual

1    that they wouldn't put in -- on the witness stand to answer

2    questions in front of you and we're supposed to take on

3    faith that their tip is accurate.

4         What we do know is that some foreign agent is spying on

5    American citizens and is able to find out what they were

6    doing with their computers.  If they can do that, who knows

7    what else they are doing to the computers.

8              MS. WHITE:  Your Honor, I am going to object.  I

9    normally make it a practice not to, but at this point we are

10   far afield.

11             THE COURT:  The objection is sustained.  The

12   entire argument with regard to the foreign source is

13   improper.

14        You may proceed.

15             MR. SCHLES:  Your Honor, I'm going to object to

16   that ruling.

17             THE COURT:  You may.

18             MR. SCHLES:  Agent Fleener admitted that the

19   information came from a source that he could not

20   independently verify.

21        He then used normal methods to track -- whenever your

22   internet account -- you can be identified by what's called

23   an ISP number and it's a unique address.

24        We do not contest that the IP address was properly

25   traced back to Mr. Dugan's residence.  That's not the issue.

```
 1            The issue is whether the images that were found in --
 2     as Corporal Boggs testified in what he called the
 3     unallocated space, but as he also testified this is an area
 4     of the computer that the average user doesn't know how to
 5     access or necessarily even know that it's there.
 6            He also testified that he couldn't say when those
 7     images were placed there, by whom those images were placed
 8     or when they were placed.  All he could testify was on the
 9     day that he looked at the computer, which was not during the
10     period alleged in the indictment, that images were there.
11     He couldn't tell you that any human being accessed those
12     files.  Because they were in the unallocated space, they
13     couldn't have been accessed from there without specialized
14     software.  And they're just asking you to assume that at
15     some point my client downloaded those images and then
16     deleted them, but they just said, well, that's what we think
17     happened.
18            Did they offer any proof whatsoever that that is what
19     happened?  No, they did not.  And their whole case as far as
20     the examination is based on trust us.  They want you to
21     trust them and their opinions, but they don't want to
22     explain the full part of it.
23            Then they point you to Mr. Dugan's interview on
24     June 11th of 2020 I believe it was, the day the search
25     warrant was executed.  That was the audio interview you
```

1    heard.

2         Mr. Heinrich makes it sound like those statements were

3    ambiguus, unqualified and clear admissions.

4         You're going to have that recording back with you in

5    the jury room.  And I encourage you to listen to it again

6    without the government scripting it and ask yourself is

7    Mr. Dugan talking about child pornography when he's asked

8    about them or is he simply asking -- or answering about the

9    Tor browser, which is not illegal.

10        The Tor browser is not illegal.  Going on the dark web

11   is not illegal.

12        He goes like this (indicating).

13        Well, what was the question that was asked?  Which

14   computer has the Tor browser.  He wasn't answering about

15   child pornography.

16        And in terms of the questions concerning whether he

17   went on the dark website and went to child pornography

18   sites, remember it has to be knowledge and intent.

19        You go on and he says, well, I clicked one thing and I

20   clicked another and I clicked another and I clicked another.

21        You notice the question didn't start with I started on

22   one child pornography site and I went to another.  It

23   started with I was on the Tor browser and I just clicked.

24        We've all been on the internet.  You know you can

25   click, click, click and you can, in fact, as I told you in

1   my opening statement, end up someplace you didn't intend to

2   do.  They didn't show that he intentionally accessed these

3   sites that contained these images.

4       The government's own witnesses testified that they

5   didn't have evidence that they were downloaded.  There was

6   no evidence that the browser was even used on May 25th,

7   2019, yet some foreign agent in some country has evidence of

8   it.  They don't attempt to even explain these

9   inconsistencies and discrepancies.  Something is wrong.  The

10  agent who said it was accessed on May 25th, 2019, is wrong

11  or the forensic report is wrong.  They can't be reconciled

12  other than one of them is inaccurate.

13      Mr. -- I should say Corporal Boggs also testified that

14  the dates on those things, well, you can't rely on those and

15  they sometimes choke them up or he used words to that

16  effect.

17      Well, if the dates are unreliable, why is any of the

18  rest of it reliable?

19      They want to take a man's liberty away and lock him up

20  and it's like, well, just trust us.  The mistakes are

21  immaterial.  Don't sweat it.

22      We need to sweat the mistakes that the government makes

23  because if we don't start sweating the government's

24  mistakes, holding them accountable and not just rubber

25  stamping their actions, then we will no longer be a country

```
1    of a rule of law.  And I think we all want to remain where
2    people have a fair day in court with a fair trial with fair
3    evidence with not trying to oversell what you have because
4    this is just the tip -- tip of the iceberg, so to speak,
5    down the road to a police state and it needs to stop.  And I
6    ask you to please stop it now.
7              THE COURT:  All right.  Ms. White.
8              MS. WHITE:  Thank you, Your Honor.
9         May I approach the clerk?
10             THE COURT:  You may.
11             MS. WHITE:  Ladies and gentlemen, in law school
12   they taught us about red herrings.  When I would try to
13   explain that to my children, I would say imagine you're
14   walking the dog down the street on Capital Street, which my
15   children do, and Lucky, our dog, sees a squirrel --
16   squirrel.  And you guys have all seen those memes on TV
17   where it's a distraction technique.
18        The squirrels in this case or the legalese, the red
19   herrings, are foreign law enforcement agencies and was there
20   any downloading.  The government made mistakes or maybe
21   we're turning into a police state.
22        Or maybe we're here because the defendant in this case
23   admitted that he was looking at child pornography, maybe.
24        Maybe it's about a police state.  Maybe it's about the
25   downfall of the United States of America or maybe, just
```

1    maybe, those are the squirrels in this case.

2         You're here today because for nine months during 2019

3    the defendant in this case installed the Tor browser and

4    used it to access the dark web to find child pornography.

5         Now, the defense makes a big deal that Corporal Boggs

6    couldn't tell you who put the images on the computer when,

7    but you know who did tell you who put the images on the

8    computer and when they did it?  That man right there with

9    the yellow tie.

10         The defendant told you in his statement he used his

11    computer to look at the child pornography and he did it for

12    months prior to the execution of the search warrant.

13         What better evidence than what the defendant says

14    himself about how and when he committed his crime?

15         Now, Mr. Schles told you that the government didn't

16    prove how the defendant accessed images in unallocated space

17    on the computer.  I tell you that's another red herring.

18    That's a squirrel.  That's not what this case is about.

19    It's not about how he got into the unallocated space because

20    no one says he got into the unallocated space.

21         What the testimony from Corporal Boggs was was that all

22    the images that you view on your computer on the screen are

23    saved in your temporary internet file.  That's what he said

24    in his testimony.

25         And then in Exhibit 2D you heard the defendant say he

1    cleaned everything up.

2        Well, ladies and gentlemen, cleaning up something on

3    your computer means deleting it.  And so when the defendant

4    cleaned up his computer and deleted his temporary internet

5    files, they went into the unallocated free space.  So that

6    is how they got there.

7        He's not charged with unallocated free space, is he?

8        He's charged with accessing those images and looking at

9    them.

10       Now, the defense attorney says we've all been on the

11   internet and we've gotten lost.  No, we haven't.  We haven't

12   all gotten on the internet, accessed the dark web and gotten

13   lost looking at 1,237 images of child pornography.  We just

14   haven't done that.  That hasn't happened to the average

15   American.

16       Now, if you were the defendant who was looking for

17   child pornography, well, then, yes, you would be on the dark

18   web and you would be accessing child pornography.

19       Now, I'm kind of old school and I'm going to show you

20   some photos just on paper really fast because you need to

21   see them to make the determination of the elements in this

22   case.

23       Exhibit 6 from the defendant's computer looks like

24   this.

25       Looking what's happening according to the defendant.

```
1          In Exhibit 5 is this little girl.  It's also found on
2     the defendant's computer.
3          When the defendant was just clicking and clicking one
4     to the next he found this.
5          This is another image from his computer.
6          Curiosity got him.
7          And this is what the defendant found when he was
8     curious and decided that he would keep clicking and keep
9     clicking, 1,543 dark websites, which resulted in 1,237
10    images of child pornography that we were able to recover
11    from the defendant's computer.
12         Curiosity got him and it's your turn to convict him.
13         Thank you.
14              THE COURT:  All right.
15         Ladies and gentlemen, now that you've heard the
16    evidence, it's my duty to instruct you on the law.  These
17    instructions, combined with the instructions I gave you at
18    the beginning of the trial, must guide your deliberations.
19         I'm going to divide these into three parts.  First,
20    general instructions on your duties as jurors; second, a
21    statement of the rules of law that you are to apply in this
22    case; and, third, guidelines for your deliberations and
23    return of a verdict.
24         I'll remind you you are judges of the facts.  You must
25    apply the facts as you find them to be to the law as I give
```

1    it to you in these instructions.  You must decide the case

2    based solely on the facts as you find them and the law as I

3    give it to you.

4        You must base your verdict solely upon the evidence

5    presented in this case.  The evidence consists of the sworn

6    testimony of witnesses, exhibits, stipulations, and those

7    matters of which I took judicial notice.  Well, I didn't

8    take any judicial notice.

9        The following are not evidence.  I'll remind you the

10   indictment is a formal method of accusing a defendant of a

11   crime.  My statements and rulings are not evidence.  The

12   attorneys' statements, arguments and questions and

13   objections and any evidence that I ordered stricken or

14   sustained an objection to are not evidence.

15       If I sustained an objection, you should disregard the

16   question.  If I overruled the objection, you are to treat

17   the answer and the question the same way you treat any other

18   question and answer in the trial.

19       You should consider the evidence in this case the same

20   way you consider evidence in making any important decision

21   in your own life.  Feel free to use your common sense.  Feel

22   free to draw reasonable conclusions based on your common

23   experience.

24       Consider each witness's testimony and whether it's

25   worthy of belief.  Feel free to consider each witness's

1    ability to observe the matters testified about, each

2    witness's demeanor, state of mind, motive and intelligence,

3    the effect of the verdict on each witness and whether the

4    testimony of the witness is consistent or inconsistent with

5    other evidence.

6         You may reject all or any part of a witness's testimony

7    if you believe he or she testified falsely on an important

8    matter, but remember two or more persons witnessing an event

9    may see or hear it differently.  A recollection or mistake

10   in remembering is not uncommon, especially when you get to

11   be my age.

12        Some of you have heard the terms as I mentioned

13   circumstantial and direct evidence.  Remember looking out

14   the window and seeing the snow is direct evidence.  It's

15   circumstantial evidence it's cold outside.

16        Consider with caution and weigh with great care any

17   statement, confession, admission, act, omission of the

18   defendant outside of the court and after the alleged

19   commission of the crime.  Disregard any such evidence unless

20   you conclude beyond a reasonable doubt that the defendant

21   acted knowingly and voluntarily.  Otherwise, give it just

22   such weight as you think it deserves.

23        Unlike other witnesses expert witnesses are, as I told

24   you, allowed to give their opinions regarding technical

25   matters.  You can give that testimony just such weight as

1    you believe it deserves.

2        You must presume the defendant innocent of the crime

3    charged.  The presumption of innocence alone is enough to

4    acquit the defendant.

5        The government has a burden of proving the defendant's

6    guilt beyond a reasonable doubt.  Unless the government

7    proves each and every element of the crime charged beyond a

8    reasonable doubt, you must find the defendant not guilty of

9    this crime.  This burden never shifts to the defendant

10   because the law never imposes upon the defendant any burden

11   of proving their innocence.  If you view the evidence, after

12   hearing all of it, as reasonably -- reasonably permitting of

13   two conclusions, then you must adopt the conclusion

14   consistent with innocence.

15       The charge alleges that a crime was committed on or

16   about a certain date or days.  The government need prove

17   beyond a reasonable doubt only that the offense was

18   committed on a date reasonably near the alleged date or

19   dates.

20       Throughout the remainder I'll use terms to describe

21   mental states required before a defendant can be found

22   guilty of a particular crime.  The government must prove

23   those mental states beyond a reasonable doubt.

24       To act knowingly means to act voluntarily and

25   intentionally and not because of a mistake, accident or

1    other innocent reason.  In determining whether a person acts

2    knowingly, you must focus on his or her actual knowledge.

3        To act intentionally means to act knowing that what

4    you're doing is against the law and purposefully intending

5    to violate the law.

6        Interstate commerce means train or travel from one

7    state to another.  The parties have offered a stipulation

8    which is evidence that these images traveled in interstate

9    commerce.

10        In the superseding indictment, the government has

11    charged two means of violating the statute, that the

12    government accessed computer graphic files containing photos

13    and videos of child pornography.  The government must prove

14    beyond a reasonable doubt only one of those means; that is,

15    Mr. Dugan intended to access files containing child

16    pornography or that Mr. Dugan intended to access files

17    containing images containing child pornography, but to

18    return a guilty verdict all 12 of you must agree that the

19    same means has been proved.

20        The superseding indictment charges the defendant as

21    follows:

22        2252A(a)(5)(B) is the law of the United States and it

23    provides any person who knowingly possesses or knowingly

24    accesses with intent to view any material that contains an

25    image of child pornography that has been shipped or

1    transported in interstate or foreign commerce by any means,

2    including by computer, or that was produced using materials

3    that have been mailed or shipped in interstate commerce or

4    affecting interstate or foreign commerce by any means,

5    including by computer, shall be guilty of a crime against

6    the United States.

7        The superseding indictment alleges factually that --

8    alleged facts that say between -- between on or about

9    January 30th, 2019, and on or about November 4th, 2019, at

10   or near Logan, Logan County, West Virginia, and within the

11   Southern District of West Virginia, defendant, Raymond

12   Dugan, did knowingly access with intent to view material,

13   that is computer graphic image files containing images and

14   videos of child pornography, as defined in 18 United States

15   Code Section 2256(8)(A) that involved prepubescent minors

16   and which had been shipped and transported in and affecting

17   interstate or foreign commerce by any means, including by

18   computer.

19       To sustain --

20            THE LAW CLERK:  Judge --

21            THE COURT:  The specific charge that I need to

22   read to you is the superseding indictment charges the

23   defendant, Raymond Dugan, with accessing with intent to view

24   materials containing child pornography in violation of the

25   statutes I read to you.

1          To sustain its burden of proof, the government must

2     prove the following three essential elements beyond a

3     reasonable doubt:

4          That the defendant accessed with intent to view any

5     material that contained an image of child pornography of a

6     prepubescent minor.

7          Two, that the graphic image file images had been

8     transported in or affecting interstate or foreign commerce

9     by any means, including by computer, or was produced using

10    materials that had been transported in or affecting

11    interstate or foreign commerce by any means, including

12    computer.

13         And that the defendant knew that the visual depiction

14    portrayed child pornography.

15         Child pornography means any visual depiction where the

16    production of such visual depiction involves the use of a

17    minor engaging in sexually explicit conduct.  Such visual

18    depiction is a digital image, computer image, or

19    computer-generated image that is or is indistinguishable

20    from that of a minor engaging in sexually explicit conduct

21    or such visual depiction has been created, adopted, adapted

22    or modified to appear that an identifiable minor is engaged

23    in sexually explicit conduct.

24         You'll remember the stipulations in that regard.

25         Sexually explicit conduct means actual or simulated

1   sexual intercourse involving genital-genital, oral-genital,

2   anal-genital or oral-anal whether between persons of the

3   same or opposite sex, bestiality, masturbation, sadistic or

4   masochistic abuse or lascivious exhibition of the genitals

5   or the pubic area of any person.

6       A lascivious exhibition is a depiction which displays

7   or brings to view to attract notice to the genitals or pubic

8   area of children in order to excite lustfulness or sexual

9   stimulation in the viewer.

10      Not every exposure of the genitals is a lascivious

11  exhibition.  In making your determination you may consider

12  whether the focal point of the image is on the child's

13  genitals or pubic area, the setting or pose is sexually

14  suggestive, the child is in an unnatural pose or

15  inappropriate outfit considering their age, the child is

16  partially clothed or nude.  The image suggests sexual

17  coyness or willingness to engage in sexual activity or the

18  image is designed to elicit a sexual response in the viewer.

19  None of these factors needs to be present for the image to

20  be lascivious.  You must determine whether the image is

21  lascivious based on your judgment of its overall content.

22          THE COURTROOM DEPUTY CLERK:  Judge.

23          THE COURT:  An identified -- what have we got now?

24          THE COURTROOM DEPUTY CLERK:  Not all.

25          THE COURT:  I said that.

1            THE COURTROOM DEPUTY CLERK:  You said none.

2            THE COURT:  Not all of these factors need to be

3    present for the image to be lascivious.  You must determine

4    whether the image is lascivious based on its overall

5    content.

6        I've got to keep somebody here to make sure I don't

7    skip important words.

8        An identifiable minor who was a minor at the time the

9    visual depiction was created, adapted or modified or whose

10   image as a minor was used in creating, adapting or modifying

11   the visual depiction and who is recognizable as an actual

12   person by the person's face, likeness and other

13   distinguishing characteristics such as unique birthmark or

14   other recognizable feature, and the government is not

15   required to prove the actual identity of the identifiable

16   minor.  With regard to those things, you must consider the

17   stipulation.

18       The jury must determine based on all the evidence

19   whether a reasonable viewer would consider the depiction to

20   be of an actual minor.  The jury may look at the manner in

21   which the image was marketed to determine whether it's

22   prohibited material.

23       The government has alleged that the images at issue

24   involve a prepubescent minor.  A prepubescent minor is one

25   under the age of 12.  The government does not need to

1    establish the exact age of the child in the image nor does

2    it need to prove the identity of the child in the image.

3    You may determine that a person is under the age of 12 based

4    on your view of the relevant images.

5        A computer is an electronic, magnetic, optical,

6    electrochemical or other high-speed data processing device

7    performing logical arithmetic or storage functions and it

8    includes any data storage facility or communications

9    facility directly related to or operating in conjunction

10    with such device.

11        Such a term does not include an automated typewriter or

12    typesetter, a portable handheld calculator or other similar

13    device.

14        I'm going to find some way to leave that out the next

15    time.

16        Interstate commerce means travel, trade, transportation

17    or communication from one state to another.

18        The government must show that the images at issue were

19    previously transported from one -- from another state or

20    from another country to the United States or that they were

21    produced using material that previously traveled in

22    interstate commerce.

23        When you retire to your jury room, the exhibits will be

24    sent back with you.  You will have them in your jury room.

25        The first thing you'll do is conduct an election.

1    You'll select one of your number to be your foreperson who

2    will preside over your deliberations in court and be your

3    spokesperson.

4        All jurors must agree on a verdict.  Your verdict must

5    be anonymous.  You must consult with one another and

6    deliberate with the intention of reaching agreement if you

7    can do so without violence to your individual judgment.

8        During your deliberations do not hesitate to reexamine

9    your own views or change your opinion, but do not surrender

10   your views or opinions just to reach a verdict.

11       I've prepared a verdict form for you.  When you've

12   reached the anonymous verdict, your foreperson shall fill

13   in, date and sign the verdict form.  Let the court security

14   officer know when you've reached a unanimous verdict.

15       If you need to communicate with me in any way, it

16   should be by means of the foreperson of the jury writing me

17   a note and on behalf of the jury and signed by that

18   foreperson.  I can tell you right now I'm not going to give

19   you transcripts of witness testimony.  If you need to

20   communicate with me, do it that way, but in so doing do not

21   tell me or suggest how the jury stands on the issue before

22   you.

23       At some point you may want to take a break or recess

24   for the day.  If you need to do that, just send a note

25   through the bailiff as I just told you.

```
 1        Anything else?

 2        Mr. Brohard, you're excused.  I think it's the hardest

 3   job on the jury.  You listen to all this, but you don't have

 4   to go back and deliberate, but you do get to go home and eat

 5   earlier.  You need to leave your notes right there and the

 6   courtroom deputy will get rid of them.

 7        Thank you very much and I appreciate your service.

 8            JUROR MATTHEW BROHARD:  Thank you.

 9            THE COURT:  You're now judges.  You have the most

10   serious task that a citizen has to do.  Go back and talk

11   among yourselves and deliberate based on the evidence and

12   the law and return a unanimous verdict.

13        Ladies and gentlemen, all rise for the jury.

14        (Jury out at 4:32 p.m.)

15            THE COURT:  Any objections to the instructions?

16            MS. WHITE:  No, Your Honor.

17            MR. SCHLES:  No, Your Honor.

18            THE COURT:  Good.  All right.

19   Court will be in recess to await the verdict of the

20   jury.  Leave word where you are with the courtroom deputy.

21   It's about 4:33.  We'll see.

22            MS. WHITE:  Thank you, Your Honor.

23            THE COURT:  Thank you for a well tried case.  I

24   appreciate it.

25            MR. SCHLES:  You're welcome, Your Honor.
```

```
 1            (Recess taken from 4:33 p.m. until 5:09 p.m.)

 2                 THE COURT:  Defendant ready?  Defendant ready?

 3                 MR. SCHLES:  Yes, Your Honor.

 4                 THE COURT:  Is the government ready?

 5                 MS. WHITE:  Yes, sir.

 6                 THE COURT:  Mr. Court Security Officer, I

 7       understand the jury has reached a anonymous verdict; is that

 8       correct?

 9                 THE COURT SECURITY OFFICER:  Yes, sir.

10                 THE COURT:  Would you bring them in, please.

11                 THE COURT SECURITY OFFICER:  Yes, sir.

12                 THE COURT:  What in the world is that?

13                 THE COURTROOM DEPUTY CLERK:  They're doing

14       construction on seven.

15                 THE COURT:  How about telling them to stop for a

16       minute.

17            One time I let that go in Parkersburg.  I said, oh,

18       they're trying to make a living, and they dropped a trash

19       compacter on top of my car.

20                 MR. SCHLES:  Do we have a motorcycle up there?

21                 THE COURT:  I don't know what they're constructing

22       on seven.  Judge Johnson may be installing a swimming pool.

23            (Jury in at 5:11 p.m.)

24                 THE COURT:  You may be seated.

25            Who speaks for this jury as its foreperson?
```

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

```
 1              (Indicating.)

 2              THE COURT:  Mr. Foreperson, the deputy marshal has

 3      informed me that you have reached a anonymous verdict in

 4      this case; is that correct?

 5              JURY FOREPERSON:  That is correct.

 6              THE COURT:  Would you hand your verdict to the

 7      court security officer for delivery to me for inspection

 8      before publication.

 9          Thank you, sir.

10          Before we go on, I would like to thank all of you for

11      your service as jurors in this case.  You've performed a

12      valuable service today.  I will stop back right after this

13      is over to say hello for any of you that aren't trying to

14      run and catch a bus.

15          Ladies and gentlemen, I will now publish your verdict

16      by asking the clerk to read it aloud in open court.  Please

17      listen carefully to the clerk to be sure this is your

18      verdict in all respects.

19          Madam Clerk.

20              THE COURTROOM DEPUTY CLERK:  The matter before the

21      Court is *The United States of America v. Raymond Dugan*,

22      Criminal Action No. 2:21-cr-127.

23          Verdict:  As to the charge of accessing with intent to

24      view material that is computer graphic image files

25      containing images and videos of child pornography that
```

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

1    involve prepubescent minors which had been shipped and

2    transported in and affecting interstate or foreign commerce

3    in violation of 18 United States Code Sections

4    2252A(a)(5)(B) and 2252A(b)(2) as contained in the

5    superseding indictment, we the jury find the defendant,

6    Raymond Dugan, guilty.

7        Date:  August 2nd, 2022.  Signed by the foreperson.

8        THE COURT:  Do either of the parties request the

9    jury be polled?

10        MS. WHITE:  No, sir.

11        MR. SCHLES:  No, Your Honor.

12        THE COURT:  Ladies and gentlemen, I accept your

13    verdict.

14        Madam Clerk, please file and record the jury's verdict.

15        Again, thanks for your service.  I now excuse you from

16    further service and you may return to your jury room.

17        The Court enters judgment on the -- you may go.

18        (Jurors excused from the courtroom.)

19        The Court enters judgment based on the jury's verdict

20    as to the charge in the superseding indictment.  Mr. Dugan

21    is adjudged guilty of violating 18 United States Code

22    Sections 2252A(a)(5)(B) and 2252A(b)(2).

23        I direct the defendant to make post-trial motions in

24    writing within seven days.

25        The probation office is to prepare a draft presentence

1   report, disclose it to the government and the defendant no

2   later than September 15.

3        Objections will be due September 29th.

4        The final report will be due October 13.

5        Sentencing memoranda due October 20th.

6        The Court schedules final disposition for this matter

7   on October 27th, 2022, at 10:00 a.m.

8        The defendant stands convicted of a violent crime.  As

9   such the Bail Reform Act of 1984 requires me to detain him

10  unless there's substantial likelihood he's not likely to

11  flee or pose a danger to any other person or the community

12  if released.

13       What's the government's position concerning release?

14       MS. WHITE:  Your Honor, our interpretation of the

15  statute is that he would have to not be a danger and we

16  would have to be recommending no jail time.  We are not

17  making any such recommendation at sentencing, so we believe

18  detention pending the next hearing would be appropriate.

19       MR. SCHLES:  Your Honor, I would ask my client be

20  released on the same bond with the same conditions pending

21  sentencing.  He has no prior criminal record.  He's been

22  100 percent compliant on an extended period on bond.  I

23  don't believe he poses any danger to the community.  He has

24  substantial community ties, his family, he's employed.  I

25  think he should be allowed to remain free on bond pending

1    sentencing, Your Honor.

2          THE COURT:  I agree with Ms. White's reading of

3    the law.  I find that the defendant should be detained

4    awaiting sentencing.  I don't believe there are any

5    exceptional circumstances existing why he should not be.  I

6    order you detained by the United States Marshal.

7      I direct that the person in charge of your confinement

8    make you reasonably available for consultation with your

9    lawyer and upon request of an attorney for the United States

10   or an order of a Court for the United States deliver you

11   here for the purpose of a court proceeding.

12     Anything further to come before the Court at this time?

13          MS. WHITE:  No, Your Honor.

14     Thank you.

15          MR. SCHLES:  No, Your Honor.

16          THE COURT:  Court's adjourned.

17

18

19   (Proceedings concluded at 5:16 p.m., August 2, 2022.)

20

21

22

23

24

25

```
1    CERTIFICATION:

2        I, Kimberly Kaufman, Official Court Reporter, certify

3    that the foregoing is a correct transcript from the record

4    of proceedings in the matter of United States of America,

5    Plaintiff v. Raymond Dugan, Defendant, Criminal Action No.

6    2:21-cr-00127, as reported on August 2, 2022.

7

8    s/Kimberly Kaufman, RMR, CRR, CRC          January 16, 2023

9    Kimberly Kaufman, RMR, CRR, CRC                     DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```